UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

UA LOCAL 13 & EMPLOYERS GROUP
INSURANCE FUND, Individually and on
Behalf of All Others Similarly Situated,

                          Plaintiff,

       vs.

SEALED AIR CORPORATION, JEROME A.
PERIBERE, EDWARD L. DOHENY II,
CAROL P. LOWE and WILLIAM G.
STIEHL,

                        Defendants.

———————————————————— x

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No. 1:19-cv-10161

CLASS ACTION

COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS

DEMAND FOR JURY TRIAL

Plaintiff UA Local 13 & Employers Group Insurance Fund ("plaintiff"), individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of Sealed Air Corporation ("Sealed Air" or the "Company") press releases, U.S. Securities and Exchange Commission ("SEC") filings, analyst reports, media reports, and other publicly disclosed reports and information about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all purchasers of Sealed Air common stock between November 5, 2014 and August 6, 2018, inclusive (the "Class Period"), against Sealed Air and certain of the Company's executive officers seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5. Jurisdiction is conferred by §27 of the Exchange Act, 15 U.S.C. §78aa.

3.      Venue is proper in this District pursuant to §27 of the Exchange Act. The acts and transactions giving rise to the violations of law complained of occurred in part in this District, including the dissemination of false and misleading statements into this District. In addition, the Company's common stock trades in this District on the New York Stock Exchange ("NYSE").

4.      In connection with the acts and conduct alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails and interstate wire and telephone communications.

**PARTIES**

5.      Plaintiff UA Local 13 & Employers Group Insurance Fund purchased Sealed Air common stock during the Class Period as described in the Certification attached hereto and incorporated herein by reference and suffered damages.

6.      Defendant Sealed Air is a manufacturer of packing materials based in Charlotte, North Carolina.  The Company's common stock trades in New York on the NYSE under the ticker symbol "SEE."

7.      Defendant Jerome A. Peribere ("Peribere") served as Sealed Air's President and Chief Executive Officer ("CEO") during the majority of the Class Period.  He left the Company in December 2017.

8.      Defendant Edward L. Doheny II ("Doheny") succeeded defendant Peribere as Sealed Air's CEO.

9.      Defendant Carol P. Lowe ("Lowe") served as Sealed Air's Chief Financial Officer ("CFO") for the majority of the Class Period.  Her abrupt resignation was announced in October 2017.

10.      Defendant William G. Stiehl ("Stiehl") served as Sealed Air's CFO following defendant Lowe's resignation until the Company announced he had been fired "for cause" in June 2019.  Prior to serving as the Company's CFO, Stiehl served as its Chief Accounting Officer and Controller under defendant Lowe.

11.      Defendants identified in ¶¶7-10 above are referred to herein as the "Individual Defendants."  During the Class Period, the Individual Defendants ran the Company as hands-on

managers overseeing Sealed Air's operations and finances and made the materially false and misleading statements described herein.  The Individual Defendants had intimate knowledge about core aspects of Sealed Air's financial condition and business operations.  They were also intimately involved in deciding which disclosures would be made by Sealed Air.

## BACKGROUND

12.     Defendant Sealed Air specializes in providing packing solutions in the food, e-Commerce, electronics, and industrial markets.  Two of the Company's most iconic brands include Bubble Wrap packaging and Cryovac shrink wrap products.

13.     In 1998, Sealed Air completed a transaction with chemical conglomerate W.R. Grace & Co. ("Grace") pursuant to which Sealed Air acquired the Cryovac packing business.  As part of that transaction, Grace and its subsidiaries retained all liabilities arising out of their operations before the Cryovac transaction (including asbestos-related liabilities), other than liabilities relating to Cryovac's operations, and agreed to indemnify the Company with respect to such retained liabilities.  Beginning in 2000, Sealed Air was named in a number of lawsuits alleging that the Cryovac transaction was a fraudulent transfer and/or gave rise to successor liability, and as a result the Company was responsible for the alleged asbestos liabilities of Grace and its subsidiaries.  Subsequently, Grace filed for bankruptcy protection and, after protracted litigation, the parties entered into a settlement agreement to resolve their asbestos-related liabilities, which was approved by the bankruptcy court in June 2005 (the "Settlement").

14.     In February 2014, Grace emerged from bankruptcy and, in accordance with the Settlement agreement and Grace's approved reorganization plan, Sealed Air paid $930 million and 18 million Sealed Air shares into two trusts established for the benefit of asbestos claimants.  At the time, Sealed Air's CEO, defendant Peribere, characterized the Settlement as a positive development for the Company, stating in pertinent part:

"This is very positive news for Sealed Air, as the completion of the settlement has been anticipated for some time and now brings finality to a matter after more than a decade of preparation.  It resolves asbestos-related claims against Sealed Air associated with W. R. Grace & Co. . . .  We will no longer incur interest on the settlement, which amounted to $48 million in 2013.  Additionally, we anticipate meaningful cash tax benefits over the next several years that will provide cash that we can use to continue to add value to our business."

15.    In connection with the Settlement, the Company recognized a $1.49 billion income tax deduction.  As a result, the Company claimed a net operating loss for U.S. tax purposes in 2014 and carried back these losses for 10 years.  This allowed the Company to ultimately claim an estimated $250 million tax refund and $275 million deferred tax asset to be applied towards future liabilities.  Later, the Internal Revenue Service ("IRS") challenged the $1.49 billion deduction as improper, a claim that Sealed Air has strenuously denied.  The Company is still contesting an IRS disallowance of the deduction, representing to investors that it has "meritorious defenses for the deduction of the payments made pursuant to the Settlement agreement."

16.    In late 2014, as the Company was finalizing its accounting treatment for the improper $1.49 billion tax deduction, Sealed Air fired its auditor KPMG LLP ("KPMG") and hired Ernst & Young LLP ("E&Y").  In the announcement of the auditor switch, KPMG stated that it was "not in a position to agree or disagree with the Company's statement that EY were not engaged regarding the application of accounting principles to a specified transaction or the type of audit opinion that might be rendered on the Company's consolidated financial statements, or the effectiveness of internal control over financial reporting."  It would later be revealed that the process of hiring E&Y was conflicted, not disinterested, and done for an improper purpose.  Furthermore, as Sealed Air was in the process of switching auditors, it was also engaged in a fraudulent scheme to improperly account for income taxes and provide misleading financial reporting and disclosures to the Company's investors.  As would only be revealed after the Class Period, the fallout from defendants' misconduct

sparked an SEC investigation, a criminal inquiry, the firing of Sealed Air's CFO "for cause," and the termination of E&Y's engagement due to questions regarding the firm's lack of independence.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

17.      The Class Period starts on November 5, 2014.  On that date, Sealed Air filed its quarterly report on Form 10-Q for the quarter ended September 30, 2014, which was signed by defendant Stiehl and contained signed certifications by defendants Peribere and Lowe stating that the statements contained therein were accurate and not materially misleading.  The Form 10-Q stated that Sealed Air had achieved $59.3 million in net earnings for the quarter.  The Form 10-Q also stated in pertinent part:

> Our largest deferred tax asset relates to the funding of the Settlement agreement.  Our tax benefit with respect thereto depends upon our ability to efficiently utilize our deduction from funding the Settlement agreement, including our ability to generate future taxable income in the U.S.  In addition, changes in statutory tax rates or other new legislation or regulation may change our deferred tax assets or liability balances, with either favorable or unfavorable impacts on our ETR [effective tax rate].

> As discussed above, we funded the Settlement agreement on February 3, 2014 and we intend to deduct this payment in our 2014 consolidated U.S. income tax return.  As a result, we expect to incur a net operating loss for U.S. tax purposes in 2014 and intend to carry back a significant portion of this loss.  We have classified the resulting anticipated tax refund of approximately $200 million as a current income tax receivable, included in other receivables on the condensed consolidated balance sheet at September 30, 2014.

18.      On November 14, 2014, Sealed Air filed a current report on Form 8-K stating that it had switched auditors to E&Y.  The Form 8-K stated in pertinent part:

> On November 11, 2014, the Audit Committee of the Board of Directors (the "Audit Committee") of Sealed Air Corporation ("Sealed Air" or the "Company") approved the selection of Ernst & Young LLP ("EY") to serve as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2015 following a competitive search process.  The competitive search process involved several international registered public accounting firms.  The Company's current independent registered public accounting firm, KPMG LLP ("KPMG"), was notified on November 11, 2014, that it will not be retained as the Company's independent

registered public accounting firm for the fiscal year ending December 31, 2015. KPMG's engagement as the Company's independent registered public accounting firm to audit the Company's consolidated financial statements for the fiscal year ending December 31, 2014, and the effectiveness of internal control over financial reporting as of December 31, 2014, is unaffected by the selection of EY, as KPMG's dismissal will become effective upon the completion of KPMG's audit of the Company's consolidated financial statements as of and for the fiscal year ended December 31, 2014 and the filing of the related Annual Report on Form 10-K.

*     *     *

On November 11, 2014, the Audit Committee approved the selection of EY to serve as Sealed Air's independent registered public accounting firm for the fiscal year ending December 31, 2015.  During the fiscal years ended December 31, 2013 and 2012, and the subsequent interim period through November 11, 2014, neither Sealed Air nor anyone on its behalf has consulted with EY, regarding either (i) the application of accounting principles to a specified transaction, either completed or proposed, or the type of audit opinion that might be rendered on Sealed Air's consolidated financial statements, in any case where a written report or oral advice was provided to Sealed Air that EY concluded was an important factor considered by Sealed Air in reaching a decision as to the accounting, auditing or financial reporting issue; or (ii) any matter that was either the subject of a "disagreement," as that term is defined in Item 304(a)(1)(iv) of Regulation S-K and the related instructions to Item 304 of Regulation S-K, or a "reportable event," as that term is defined in Item 304(a)(1)(v) of Regulation S-K.

19.     On February 10, 2015, Sealed Air issued a press release announcing its financial results for the fourth quarter and year ended December 31, 2014.  The press release stated that Sealed Air had achieved $66.3 million in net earnings for the quarter.  The press release continued in pertinent part:

Cash flow used in operating activities in 2014 was $202 million, which includes the $930 million payment in February 2014 pursuant to the Settlement agreement and an excess tax benefit of $38 million related to the 18 million shares of Common Stock issued pursuant to the Settlement agreement.  Excluding the Settlement agreement payment and excess tax benefit, cash flow provided by operating activities was $766 million, which is net of $108 million of restructuring and $21 million of SARs payments.  This compares with cash provided by operating activities of $625 million in 2013, which is net of $107 million of restructuring and $46 million of SARs [stock appreciation rights] payments.  Capital expenditures were $154 million in the full year 2014 compared to $116 million in the full year 2013.

20.     On February 27, 2015, Sealed Air filed its annual report on Form 10-K for the quarter and year ended December 31, 2014, which was signed by defendants Peribere, Lowe, and Stiehl and contained signed certifications by defendants Peribere and Lowe stating that the statements contained therein were accurate and not materially misleading.  The Form 10-K contained the financial information provided in the February 2015 press release and further stated in pertinent part:

> We are deducting the payment mentioned above in our 2014 consolidated U.S. income tax return.  As a result, we have a net operating loss for U.S. tax purposes in 2014 and are carrying back, for 10 years, more than $1 billion of the loss. Tax benefits resulting from the Settlement agreement were recorded as a $247 million income tax receivable (including $38 million of additional paid in capital related to shares of Common Stock issued pursuant to the Settlement agreement) and net deferred tax assets of $144 million for U.S. federal net operating losses and $31 million for state net operating loss carry forwards.  The increase to additional paid-in capital on our consolidated balance sheet had no impact to our consolidated statements of operations.

*     *     *

> In the fourth quarter of 2013, we recorded an increase to the valuation allowance on our net deferred tax asset related to the Settlement agreement, which resulted in an increase of approximately $50 million to our income tax provision (approximately $0.23 per diluted share).

21.     On April 2, 2015, Sealed Air filed a definitive proxy statement on Form DEF 14A. The proxy statement stated in pertinent part:

> On November 11, 2014, following a competitive search process, the Audit Committee selected Ernst & Young LLP ("EY") to be engaged as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2015.  The competitive search process involved several international registered public accounting firms.  The Company's current independent registered public accounting firm, KPMG LLP ("KPMG"), was notified on November 11, 2014, that it would not be retained as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2015.  KPMG's engagement as the Company's independent registered public accounting firm to audit the Company's consolidated financial statements for the fiscal year ending December 31, 2014, and the effectiveness of internal control over financial reporting as of December 31, 2014, was unaffected by the selection of EY, as KPMG's dismissal became effective upon the completion of KPMG's audit of the Company's consolidated financial statements as of and for the fiscal year ended December 31, 2014 and the filing of the

related Annual Report on Form 10-K.  A representative of KPMG is not expected to be present at the Annual Meeting.

*     *     *

On February 16, 2015, the Audit Committee approved the engagement of EY as our independent registered public accounting firm to examine and report on the Company's consolidated financial statements and the effectiveness of the Company's internal control over financial reporting for the fiscal year ending December 31, 2015, subject to ratification of the retention by the stockholders at the Annual Meeting.  Following a comprehensive request for proposal process, the Audit Committee considered EY to be well qualified.  In the absence of contrary specification, the Proxy Committee will vote proxies received in response to this solicitation in favor of ratification of the appointment.  If the Company's stockholders fail to ratify the selection of EY as the independent registered accounting firm for 2015, the Audit Committee will reconsider whether to retain EY. Even if the proposal is approved, the Audit Committee may, in its discretion, appoint a different independent registered public accounting firm at any time during the year.

On March 2, 2015, EY was engaged to serve as Sealed Air's independent registered public accounting firm for the fiscal year ending December 31, 2015. During the fiscal years ended December 31, 2014 and 2013, and the subsequent interim period through March 2, 2015, neither Sealed Air nor anyone on its behalf has consulted with EY, regarding either (i) the application of accounting principles to a specified transaction, either completed or proposed, or the type of audit opinion that might be rendered on Sealed Air's consolidated financial statements, in any case where a written report or oral advice was provided to Sealed Air that EY concluded was an important factor considered by Sealed Air in reaching a decision as to the accounting, auditing or financial reporting issue; or (ii) any matter that was either the subject of a "disagreement," as that term is defined in Item 304(a)(1)(iv) of Regulation S-K and the related instructions to Item 304 of Regulation S-K, or a "reportable event," as that term is defined in Item 304(a)(1)(v) of Regulation S-K.

22.     On April 30, 2015, Sealed Air issued a press release announcing its financial results for the quarter ended March 31, 2015.  The press release stated that Sealed Air had achieved $97.2 million in net earnings for the quarter.  The press release continued in pertinent part:

Cash flow provided by operating activities in the first three months ending 2015 was $319 million.  In March 2015, the Company received a tax refund of $235 million related to the Settlement agreement payment.  Excluding the tax refund, cash flow provided by operating activities in the first three months ending 2015 was $84 million, which is net of $22 million of restructuring and $4 million of SARs payments.  This compares with cash used by operating activities of $3 million in the first three months ending 2014, which is net of $27 million of restructuring and $14 million of SARs payments and $930 million related to the Settlement agreement.

Capital expenditures were $21 million in the first three months ending 2015 compared to $28 million in the first three months ending 2014.

23.     On May 5, 2015, Sealed Air filed its quarterly report on Form 10-Q for the quarter ended March 31, 2015, which was signed by defendant Stiehl and contained signed certifications by defendants Peribere and Lowe stating that the statements contained therein were accurate and not materially misleading.  The Form 10-Q contained the financial information provided in the April 2015 press release and further stated in pertinent part:

**Three Months Ended March 31, 2015**

Net cash provided by operating activities of $319 million in 2015 was primarily attributable to:

- $235 million tax refund related to the Settlement agreement payment;

- $100 million of non-cash adjustments to reconcile net earnings to net cash provided by operating activities, including adjustments for depreciation and amortization and share-based incentive compensation expenses; and

- $97 million of net earnings.

24.     On July 30, 2015, Sealed Air issued a press release announcing its financial results for the quarter ended June 30, 2015.  The press release stated that Sealed Air had achieved $28 million in net earnings for the quarter.  The press release continued in pertinent part:

Cash flow provided by operating activities in the six months ended June 30, 2015 was $463 million.  In March 2015, the Company received a tax refund of $235 million related to the Settlement agreement (as defined in the Company's Form 10-K for the year ended December 31, 2014) payment.  Excluding the tax refund, cash flow provided by operating activities in the six months ended June 30, 2015 was $228 million, which is net of $45 million of restructuring and $18 million of SARs payments.  This compares with cash used by operating activities of $756 million in the six months ended 2014, which is net of $50 million of restructuring, $17 million of SARs payments and $930 million related to the Settlement agreement.  Capital expenditures were $58 million in the six months ended June 30, 2015 compared to $55 million in the six months ended June 30, 2014.

25.     On August 4, 2015, Sealed Air filed its quarterly report on Form 10-Q for the quarter ended June 30, 2015, which was signed by defendant Stiehl and contained signed certifications by

defendants Peribere and Lowe stating that the statements contained therein were accurate and not materially misleading.  The Form 10-Q contained the financial information provided in the July 2015 press release and further stated in pertinent part:

### Six Months Ended June 30, 2015

Net cash provided by operating activities of $463 million in the first half of 2015 was primarily attributable to:

- $125 million of net earnings, which included $277 million of non-cash adjustments to reconcile net earnings to net cash provided by operating activities, including adjustments for depreciation and amortization and share-based incentive compensation expenses; and

- $235 million tax refund related to the Settlement agreement payment.

26.    On October 27, 2015, Sealed Air issued a press release announcing its financial results for the quarter ended September 30, 2015.  The press release stated that Sealed Air had achieved $87 million in net earnings for the quarter.  The press release continued in pertinent part:

Cash flow provided by operating activities in the nine months ended September 30, 2015 was $679 million.  In March 2015, the Company received a tax refund of $235 million related to the payment of funds in connection with the Settlement agreement (as defined in the Company's Annual Report on Form 10-K for the year ended December 31, 2014).  Excluding the tax refund, cash flow provided by operating activities in the nine months ended September 30, 2015 was $444 million, which is net of $72 million of restructuring and $20 million of SARs payments.  This compares with cash used by operating activities of $465 million in the nine months ended 2014, which is net of $76 million of restructuring, $18 million of SARs payments and $930 million related to the Settlement agreement.  Capital expenditures were $112 million in the nine months ended September 30, 2015 compared to $94 million in the nine months ended September 30, 2014.

27.    On November 3, 2015, Sealed Air filed its quarterly report on Form 10-Q for the quarter ended September 30, 2015, which was signed by defendant Stiehl and contained signed certifications by defendants Peribere and Lowe stating that the statements contained therein were accurate and not materially misleading. The Form 10-Q contained the financial information provided in the October 2015 press release and further stated in pertinent part:

**Nine Months Ended September 30, 2015**

Net cash provided by operating activities of $679 million in the nine months ended September 30, 2015 was primarily attributable to:

- $212 million of net earnings, which included $336 million of non-cash adjustments to reconcile net earnings to net cash provided by operating activities, including adjustments for depreciation and amortization and share-based incentive compensation expenses; and

- $235 million tax refund related to the Settlement agreement payment.

28.     On February 10, 2016, Sealed Air issued a press release announcing its financial results for the quarter and year ended December 31, 2015.  The press release stated that Sealed Air had achieved $124 million in net earnings for the quarter.  The press release continued in pertinent part:

Cash flow provided by operating activities in 2015 was $968 million.  In March 2015, the Company received a tax refund of $235 million related to the payment of funds in connection with the Settlement agreement.  Excluding the tax refund, cash flow provided by operating activities in 2015 was $733 million, which is net of $98 million of restructuring and $21 million of SARs payments.  This compares with cash used by operating activities of $215 million in 2014, which is net of $108 million of restructuring, $21 million of SARs payments and $930 million related to the Settlement agreement.  Capital expenditures were $184 million in the full year 2015 compared to $154 million in 2014.

29.     On February 22, 2016, Sealed Air filed its annual report on Form 10-K for the quarter and year ended December 31, 2015 (the "2015 Form 10-K"), which was signed by defendants Stiehl, Peribere, and Lowe and contained signed certifications by defendants Peribere and Lowe stating that the statements contained therein were accurate and not materially misleading.  The Form 10-K contained the financial information provided in the February 2016 press release and further stated in pertinent part:

We deducted the Settlement payment in our 2014 consolidated U.S. income tax return.  As a result, we had a net operating loss for U.S. tax purposes in 2014 and carried back, for 10 years, more than $1 billion of the loss.

We increased our unrecognized tax benefits by $104 million in 2015, for the recording of a reserve related to the Settlement payment.  While the Company believes it is more likely than not it will be successful, the ultimate outcome of negotiations may affect the utilization of certain tax attributes and require us to return all or a portion of the refund.

In the fourth quarter of 2013, we recorded an increase to the valuation allowance on our net deferred tax asset related to the Settlement agreement, which resulted in an increase of approximately $50 million to our income tax provision (approximately $0.23 per diluted share).

\*       \*       \*

Net cash provided by operating activities from continuing operations of $968 million in 2015 was primarily attributable to:

- $335 million of net earnings, which included $355 million of non-cash adjustments to reconcile net earnings to cash provided by operating activities, including adjustments for depreciation and amortization of $213 million, share-based incentive compensation expense of $61 million, profit sharing expense of $36 million, a loss on debt redemption of $110 million, partially offset by $46 million of excess tax benefit related to the 18 million shares of our common stock issued pursuant to the Settlement agreement and $13 million of excess tax benefit related to stock-based compensation.

- $235 million tax refund related to the Settlement agreement payment; and

- $43 million of changes in operating assets and liabilities, primarily reflecting an increase in accounts payable and trade receivables partially offset by a decrease in inventory and other assets and liabilities. This activity reflects the timing of inventory purchases and the related payments of cash along with the timing of certain annual incentive compensation payments and interest payments and the seasonality of sales and collections.

\*       \*       \*

Net cash used in operating activities from continuing operations in 2014 of $215 million was primarily attributable to

- $930 million used to fund the cash portion of the Settlement agreement;

- $38 million of excess tax benefit related to the 18 million share[s] of our common stock issued pursuant to the Settlement agreement; and

- $153 million of changes in operating assets and liabilities, primarily reflecting an increase in income tax receivables related to the Settlement agreement, as well as an increase in inventories, partially offset by an increase in accounts payable.  This activity reflects the timing of inventory

purchases and the related payments of cash along with the timing of certain annual incentive compensation payments and interest payments and the seasonality of sales and collections.

30. The 2015 Form 10-K also stated that the IRS had indicated that it would disallow the $1.49 billion deduction in connection with the Settlement, but that Sealed Air "strongly disagree[d]" and had "meritorious defenses for the deduction of the payments."

31. In subsequent quarterly earnings releases and Forms 10-Q and 10-K, Sealed Air continued to represent that its deductions and accounting treatment of the Settlement were proper and that the Company's financial results, which had been certified by the Individual Defendants, had been fairly and accurately represented in these financial filings in all material respects.[1]  In addition, in each Sealed Air Form 10-Q and Form 10-K filed during the Class Period, defendants claimed that the financial statements contained therein were prepared in conformance with  Generally Accepted Accounting Principles in the United States of America ("GAAP").  Sealed Air also continued to cite E&Y's purported "independence" in recommending that shareholders vote to approve the auditing firm, which shareholders did in every year from 2015 to 2019.

32. The statements referenced in ¶¶17-31 above were materially false and/or misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, operations and financial condition, which were known to or recklessly disregarded by defendants:

(a)     that Sealed Air had hired its auditor, E&Y, pursuant to a conflicted and improper process and in order to help facilitate defendants' efforts to engage in accounting fraud;

---

[1]   Defendant Doheny certified Sealed Air's quarterly financial filings after he became CEO, beginning with Sealed Air's fiscal year 2017 Form 10-K filed on February 21, 2018.  Similarly, defendant Stiehl certified Sealed Air's quarterly financial filings after he became CFO, beginning with Sealed Air's third quarter 2017 Form 10-Q filed on November 9, 2017.

      (b)     that Sealed Air's deduction of $1.49 billion in connection with the Settlement was indefensible and done for the improper purpose of artificially inflating the Company's financial results;

      (c)     that Sealed Air had artificially inflated its earnings, cash flows, and operating income during the Class Period;

      (d)     that, as a result of (a)-(c) above, Sealed Air's Class Period financial statements were materially false and misleading and not prepared in conformance with GAAP; and

      (e)     that, as a result of (a)-(d) above, Sealed Air's statements regarding its financial results, business, and prospects were materially misleading.

33.     In addition, Item 303 required the Class Period Forms 10-K and Form 10-Q to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Defendants' failure to disclose E&Y's lack of independence violated Item 303 because this lack of independence represented a known uncertainty that was likely to have a material unfavorable impact on the Company's revenues and income from continuing operations.

34.     Then, on August 6, 2018, Sealed Air filed its quarterly report on Form 10-Q for the second quarter of 2018, which revealed that the Company had received a subpoena from the SEC requesting documents and information concerning the Company's accounting for income taxes and financial reporting and disclosures. Analysts widely viewed the SEC investigation as relating to the Company's tax treatment of the Settlement. The SEC investigation severely undermined the Company's purported defense to the IRS disallowance proceedings.

35.     On this news, the price of Sealed Air stock immediately fell over 5% to close at $41 per share on August 7, 2018.  In the days that followed, the price of Sealed Air common stock continued its precipitous decline, falling to just over $30 per share by October 2018.

36.     On June 20, 2019, Sealed Air issued a press release announcing that it had terminated defendant Stiehl "for cause" following the receipt of a second SEC subpoena.  The Company stated that this subpoena related to the process by which Sealed Air had selected E&Y to serve as its so-called "independent" auditor and E&Y's independence.

37.     On August 2, 2019, Sealed Air filed its quarterly report on Form 10-Q for the third quarter of 2019, which revealed that the investigation into the Company by governmental authorities had expanded into a criminal inquiry and now included an investigation of the circumstances surrounding the termination of defendant Stiehl.  The Form 10-Q stated as follows:

> **We are involved in ongoing investigations by the U.S. Department of Justice and U.S. Securities and Exchange Commission, the results of which could adversely impact our business and results of operations and our ability to comply with certain obligations imposed by federal securities laws and other applicable rules**.
>
> The Company has received from the staff of the SEC subpoenas for documents and requests for information in connection with the SEC's previously disclosed investigation.  Those subpoenas and requests seek documents and information regarding the Company's accounting for income taxes, its financial reporting and disclosures, the process by which the Company selected its independent audit firm beginning with fiscal year 2015, the independence of that audit firm, and other matters.  The Company has also received a Grand Jury subpoena from the U.S. Attorney's Office seeking documents relating to the termination of our former CFO and relating to the process by which the Company selected its independent audit firm beginning with fiscal year 2015.
>
> The Company is fully cooperating with the SEC and the U.S. Attorney's Office.  However, we cannot predict the outcome or duration of either of those investigations and there can be no guarantee as to the amount of internal and external resources we may need to devote to responding to any further requests we may receive from the SEC and/or the U.S. Attorney's Office.  In addition, if the SEC and/or the U.S. Attorney's Office were to charge the Company with violations, we could potentially be subject to fines, penalties or other adverse consequences, and our business and financial condition could be adversely impacted.  Furthermore, any

- 15 -

determination that the Company's audit firm was not independent could require that certain of our historical financial statements be re-audited by a new independent registered public accounting firm which could affect our ability to comply with certain reporting obligations imposed by federal securities laws.

38.     On August 12, 2019, Sealed Air announced that it had replaced E&Y as the Company's auditor, stating in an SEC filing that "the pendency of the SEC investigation, along with the Committee's dissatisfaction with information it learned about the process by which EY was selected as auditor, caused the Company to make this change now to allow for an orderly transition for the audit of the Company's fiscal 2019 consolidated financial statements and to minimize the risk of disruption that could arise in the event of an unplanned change in independent auditors at an undetermined time in the future."

39.     As a result of defendants' wrongful acts and omissions, plaintiff and the Class purchased Sealed Air common stock at artificially inflated prices and suffered significant losses and were damaged thereby.

## NO SAFE HARBOR

40.     Defendants' "Safe Harbor" warnings accompanying Sealed Air's reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.  Because most of the false and misleading statements related to existing facts or conditions, the Safe Harbor has no applicability.  To the extent that known trends should have been included in the Company's financial reports prepared in accordance with Generally Accepted Accounting Principles, they are excluded from the protection of the statutory Safe Harbor. 15 U.S.C. §78u-5(b)(2)(A).

41.     The defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer and/or director of Sealed Air who knew that the

FLS was false.  In addition, the FLS were contradicted by existing, undisclosed material facts that were required to be disclosed so that the FLS would not be misleading.  Finally, most of the purported "Safe Harbor" warnings were themselves misleading because they warned of "risks" that had already materialized or failed to provide any meaningful disclosures of the relevant risks.

### ADDITIONAL SCIENTER ALLEGATIONS

42.     As alleged herein, defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents and actions intended to manipulate the market price of Sealed Air common stock as primary violations of the federal securities laws.  Defendants, by virtue of their receipt of information reflecting the true facts regarding Sealed Air, their control over, and/or receipt or modification of Sealed Air's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Sealed Air, participated in the fraudulent scheme alleged herein.

43.     The adverse developments at issue also impacted the Company's most important revenue streams, including its Cryovac operating segment, and derived from the Company's efforts to resolve potentially billions of dollars in asbestos liability.  The magnitude of the Settlement and the improper tax deduction and the crucial importance of maintaining an independent auditing firm also indicate that the Individual Defendants were at least reckless in not knowing of the accounting improprieties that are the subject of the SEC investigation.  The Individual Defendants repeatedly held themselves out to investors as the employees most knowledgeable on these topics and stated that they had significant visibility into the Settlement's progress and timeline.  As such, the Individual Defendants knew or were reckless in not knowing of the undisclosed facts detailed herein.

Indeed, the Company has already determined that defendant Stiehl engaged in misconduct by firing him "for cause" for his role in improperly selecting E&Y to serve as Sealed Air's auditor.

## LOSS CAUSATION

44.     During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Sealed Air common stock and operated as a fraud or deceit on purchasers of Sealed Air common stock.  As detailed above, when the truth about Sealed Air's misconduct was revealed over time, the value of the Company's stock declined precipitously as the prior artificial inflation no longer propped up the stock's price.  The decline in the price of Sealed Air stock was the direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the share price decline negate any inference that the losses suffered by plaintiff and other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by plaintiff and other Class members was a direct result of defendants' fraudulent scheme to artificially inflate the price of the Company's stock and the subsequent significant decline in the value of the Company's stock when defendants' prior misrepresentations and other fraudulent conduct were revealed.

45.     At all relevant times, defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by the plaintiff and other Class members.  Those statements were materially false and misleading through their failure to disclose a true and accurate picture of Sealed Air's business, operations, and financial condition, as alleged herein.  Throughout the Class Period, defendants issued materially false and misleading statements and omitted material facts necessary to make defendants' statements not false or misleading, causing the price of Sealed Air common stock to be artificially inflated.  Plaintiff and

other Class members purchased Sealed Air common stock at those artificially inflated prices, causing them to suffer damages as complained of herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE

46.     At all relevant times, the market for Sealed Air common stock was an efficient market for the following reasons, among others:

(a)     Sealed Air stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     according to the Company's Form 10-Q, filed on August 2, 2019, the Company had over 154 million shares of common stock outstanding as of July 30, 2019, demonstrating a very active and broad market for Sealed Air common stock;

(c)     as a regulated issuer, Sealed Air filed periodic public reports with the SEC;

(d)     Sealed Air regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the Internet, and other wide-ranging public disclosures; and

(e)     unexpected material news about Sealed Air was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

47.     As a result of the foregoing, the market for Sealed Air common stock promptly digested current information regarding Sealed Air from publicly available sources and reflected such information in Sealed Air's stock price.  Under these circumstances, all purchasers of Sealed Air common stock during the Class Period suffered similar injury through their purchase of Sealed Air common stock at artificially inflated prices and a presumption of reliance applies.

48.     A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because plaintiff's claims

are based, in significant part, on defendants' material omissions. Because this action involves defendants' failure to disclose material adverse information regarding Sealed Air's business and operations, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of defendants' material misstatements and omissions set forth above, that requirement is satisfied here.

## CLASS ACTION ALLEGATIONS

49.     This is a class action on behalf of all purchasers of Sealed Air common stock during the Class Period who were damaged thereby (the "Class"). Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

50.     Common questions of law and fact predominate and include: (a) whether defendants violated the Exchange Act; (b) whether defendants omitted and/or misrepresented material facts; (c) whether defendants knew or recklessly disregarded that their statements were false; (d) whether the price of Sealed Air common stock was artificially inflated during the Class Period; and (e) the extent of and appropriate measure of damages.

51.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Sealed Air common stock was actively traded on the NYSE. Upon information and belief, Sealed Air shares are held by hundreds or thousands of individuals located geographically throughout the country.

52.     Plaintiff's claims are typical of those of the Class. Prosecution of individual actions would create a risk of inconsistent adjudications. Plaintiff will adequately protect the interests of the

Class.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violation of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

53. Plaintiff incorporates ¶¶1-52 by reference.

54. During the Class Period, defendants disseminated or approved the false or misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

55. Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they, directly and indirectly, by use of the means or instrumentality of interstate commerce, or the mails or facility of a national securities exchange:

(a) Employed devices, schemes, and artifices to defraud;

(b) Made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Sealed Air common stock during the Class Period.

56. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Sealed Air common stock.  Plaintiff and the Class would not have purchased Sealed Air common stock at the prices they paid, or at all, had they been

aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

57.     By virtue of the foregoing, defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

58.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Sealed Air common stock during the Class Period.

**COUNT II**

**For Violation of §20(a) of the Exchange Act
Against the Individual Defendants**

59.     Plaintiff incorporates ¶¶1-58 by reference.

60.     During the Class Period, the Individual Defendants acted as controlling persons of Sealed Air within the meaning of §20(a) of the Exchange Act.  By virtue of their share ownership, executive and Board positions, and their culpable participation in the fraudulent scheme, as alleged above, the Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends were false and misleading as detailed herein.

61.     The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by plaintiff to be misleading prior to or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.  In particular, the Individual Defendants had direct involvement in and responsibility over the day-to-day operations of the Company and,

therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein.

62.     By reason of such wrongful conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

63.     As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays for judgment as follows:

A.     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff, and certifying plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Awarding such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  November 1, 2019

ROBBINS GELLER RUDMAN
 & DOWD LLP
SAMUEL H. RUDMAN


*/s/ Samuel H. Rudman*

SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com

ROBBINS GELLER RUDMAN
 & DOWD LLP
BRIAN E. COCHRAN
200 South Wacker Drive, 31st Floor
Chicago, IL  60606
Telephone:  312/674-4674
312/674-4676 (fax)
bcochran@rgrdlaw.com

SULLIVAN, WARD, ASHER & PATTON, P.C.
MICHAEL J. ASHER
JACQUELINE A. KELLY
1000 Maccabees Center
25800 Northwestern Highway
Southfield, MI  48075
Telephone:  248/746-0700
248/746-2760 (fax)
masher@swappc.com
jkelly@swappc.com

Attorneys for Plaintiff

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

UA LOCAL 13 & EMPLOYERS GROUP INSURANCE FUND ("Plaintiff") declares:

1.       Plaintiff has reviewed a complaint and authorized its filing.

2.       Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.       Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.       Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|---|---|---|---|

*See* attached Schedule A.

5.       Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

None.

6.       Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _31_ day of _October_, 2019.

UA LOCAL 13 & EMPLOYERS GROUP
INSURANCE FUND

By: _____

Steven Ostrander, Fund Manager

- 2 -

SEALED AIR

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Stock**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 06/20/2017 | 4,670 | $45.09 |
| 06/22/2018 | 895 | $43.44 |

Prices listed are rounded to two decimal places.