UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

UA LOCAL 13 & EMPLOYERS GROUP
INSURANCE FUND, Individually and on
Behalf of All Others Similarly Situated,

                     Plaintiff,

    vs.

SEALED AIR CORPORATION, and
WILLIAM G. STIEHL,

                  Defendants.

———————————————————— x

Civil Action No. 1:19-cv-10161-LLS-RWL

<u>CLASS ACTION</u>

**CORRECTED AMENDED COMPLAINT
FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS**

<u>JURY TRIAL DEMANDED</u>

Lead Plaintiffs UA Local 13 Pension Fund, UA Local 13 & Employers Group Insurance Fund, Plumbers & Steamfitters Local 267 Pension Fund and additional Plaintiff Plumbers and Steamfitters Local No. 7 Pension and Welfare Funds (collectively, "Plaintiffs"), jointly and on behalf of all others similarly situated, make the following allegations based upon the investigation of Plaintiffs' counsel, which included, among other things, a review of the U.S. Securities and Exchange Commission ("SEC") filings by Sealed Air Corporation ("Sealed Air" or the "Company"), interviews with former Sealed Air employees and persons knowledgeable about the Company's business, as well as reports by securities analysts, press releases, media reports and other public statements issued by or about the Company. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all purchasers of Sealed Air common stock between November 17, 2014 and June 20, 2019, inclusive (the "Class Period"), against Sealed Air and one of its most senior financial officers, seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Rule l0b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

2.      Defendant Sealed Air is a packaging company that is best known for its Bubble Wrap® and Cryovac® packaging products. The SEC and the U.S. Department of Justice (the "DOJ") have been investigating the Company's financial activities since at least June 2018 and June 2019, respectively.

3.      In March 1998, Sealed Air acquired W.R. Grace & Co.'s ("Grace") Cryovac packaging business. In connection therewith, Grace and its businesses agreed to retain and to

indemnify the Company for, from and against all liabilities arising out of Grace's operations, including those liabilities relating to asbestos-containing products previously manufactured or sold by Grace.

4.      Beginning in 2000, Sealed Air was named in a number of lawsuits alleging that its acquisition of Grace's Cryovac business was a fraudulent transfer and/or gave rise to successor liability, and that, as a result, the Company was financially responsible for the alleged asbestos liabilities of Grace and its subsidiaries.  Thereafter, Grace filed for bankruptcy protection and, after protracted litigation, Sealed Air and the Grace asbestos claimants entered into a definitive settlement agreement, which was approved by the bankruptcy court in June 2005.

5.      In 2014, Grace emerged from bankruptcy and Sealed Air made a cash payment of $930 million and issued 18 million Sealed Air common shares to settle the claims made by the Grace-related asbestos claimants.  In connection with this consideration, Sealed Air claimed a $1.49 billion income tax deduction on its 2014 consolidated U.S. income tax return, which the Internal Revenue Service ("IRS") later disallowed in full.

6.      After the market closed on November 14, 2014, Sealed Air announced that, effective upon the completion of KPMG LLP's ("KPMG") audit of Sealed Air's annual December 31, 2014 financial statements, the Company intended to terminate its relationship with KPMG, which had served as Sealed Air's auditor since 1998.  At the same time, Sealed Air announced that, after engaging in a "competitive search process," the Audit Committee of the Board of Directors (the "Audit Committee") of Sealed Air approved the selection of Ernst & Young LLP ("EY") to serve as the Company's outside auditor beginning with the fiscal year ending December 31, 2015.

7.      Because Sealed Air had previously disclosed that it intended to claim the income tax deduction on its 2014 U.S. income tax return and that it was expected to generate a tax refund of

approximately $200 million, investors were keenly focused on the process by which Sealed Air selected its new auditor.

8. As alleged herein, representations made during the Class Period by Sealed Air and its former Chief Financial Officer ("CFO"), William J. Stiehl ("Stiehl"), concerning the Company's selection of EY were materially false and misleading when made. Specifically, during the Class Period, Sealed Air and Stiehl engaged in collusion with EY whereby they rigged the process pursuant to which the Company selected its auditor. Thus, despite the Company's express representations to the contrary, EY was not selected pursuant to a comprehensive, competitive search process among audit firms. Rather, Stiehl and EY engaged in bid rigging to ensure that EY would be chosen as Sealed Air's audit firm.

9. Indeed, various representations made by Defendants during the Class Period were materially false and misleading and omitted to disclose material facts necessary to make such statements not false and misleading.

10. Because the unlawful conduct alleged herein was unknown to the marketplace, the price of Sealed Air common stock was artificially inflated throughout the Class Period.

11. On June 25, 2018, the Company received a subpoena from the SEC seeking documents concerning the Company's accounting for income taxes, its financial reporting and disclosures, and other matters. On the announcement of this news, the price of Sealed Air stock fell over 5% on very heavy trading volume.

12. On May 2, 2019, Sealed Air received an additional subpoena from the SEC seeking documents relating to the process by which the Company selected EY to serve as its audit firm and the independence of EY.

- 3 -

13.     Shortly thereafter, on June 20, 2019, the last day of the Class Period, Sealed Air announced that it fired its CFO, Stiehl, "for cause" following an internal review by the Audit Committee concerning the investigation by the SEC. On the announcement of this news, the price of Sealed Air stock fell approximately 5% on very heavy trading volume.

14.     Then, on August 2, 2019, Sealed Air announced that the DOJ had commenced an investigation into the process by which EY was selected to serve as Sealed Air's auditor and the Company's termination of Stiehl.

15.     Less than two weeks later, on August 12, 2019, Sealed Air disclosed it had fired EY.

## JURISDICTION AND VENUE

16.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

17.     This Court has jurisdiction over the subject matter of this action under Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331, because this is a civil action arising under the laws of the United States.

18.     Venue is proper in this District under Section 27(a) of the Exchange Act, 15 U.S.C. §78aa(a), and 28 U.S.C. §1391(b)-(d). The acts and transactions giving rise to the violations of law complained of occurred, in part, in this District, including the dissemination of false and misleading statements into this District. In addition, the Company's common stock trades on the New York Stock Exchange ("NYSE"), a national securities exchange located in this District.

## PARTIES

19.     Lead Plaintiff UA Local 13 & Employers Group Insurance Fund purchased Sealed Air common stock during the Class Period, as set forth in the attached certification (Exhibit A), and suffered damages thereby.

20.     Lead Plaintiff UA Local 13 Pension Fund purchased Sealed Air common stock during the Class Period, as set forth in the attached certification (Exhibit B), and suffered damages thereby.

21.     Lead Plaintiff Plumbers & Steamfitters Local 267 Pension Fund purchased Sealed Air common stock during the Class Period, as set forth in the attached certification (Exhibit C), and suffered damages thereby.

22.     Additional Plaintiff Plumbers and Steamfitters Local No. 7 Pension and Welfare Funds purchased Sealed Air common stock during the Class Period, as set forth in the attached certification (Exhibit D), and suffered damages thereby.

23.     Defendant Sealed Air manufactures and sells food and protective packaging products worldwide.  The Company is based in Charlotte, North Carolina and its common stock trades on the NYSE under the ticker symbol "SEE."

24.     Defendant Stiehl served as Chief Accounting Officer and Controller of Sealed Air and, effective as of the close of business on October 31, 2017, was appointed as Sealed Air's Acting CFO.  Stiehl relinquished these positions when the Company's Board of Directors appointed him to the positions of Senior Vice President and CFO effective June 7, 2018.  Stiehl served in such capacities until he was fired "for cause" on June 19, 2019 (Defendants Sealed Air and Stiehl are collectively referred to herein as "Defendants").

25.     Due to Stiehl's senior executive positions with the Company, he had access to the adverse undisclosed information about Sealed Air's operations, management, auditor selection process, systems of disclosure controls, and corporate governance via internal corporate documents and communications.  In addition, Stiehl was made aware of undisclosed adverse information about the Company from conversations and communications with other corporate officers, auditors,

directors and employees, as well as his attendance at management and/or Board and committee meetings.

26.     It is appropriate to presume the alleged false, misleading and incomplete information conveyed in the Company's public filings and other statements herein are attributable to Stiehl, particularly because he signed false and misleading filings made with the SEC, was directly involved in the management and/or oversight of the Company's operations at the highest level, and was privy to confidential proprietary information concerning the Company and its operations, management, auditor selection process, systems of disclosure controls, and corporate governance, as alleged herein.  In addition, Stiehl was involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein, and was aware, or recklessly disregarded, that the false and misleading statements were being issued to investors.  Stiehl approved or ratified these false and misleading statements in violation of the federal securities laws.

27.     As an officer and controlling person of a publicly-held company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, which is governed by the provisions of the federal securities laws, Stiehl had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, management, auditor selection process, systems of disclosure controls, and corporate governance, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of Sealed Air publicly-traded stock would be based upon truthful and accurate information. Stiehl's false and misleading misrepresentations and omissions violated these specific requirements and obligations, which caused Sealed Air common stock to trade at artificially inflated prices during the Class Period.

28.     Stiehl, because of his positions of control and authority as a senior executive officer of the Company, was able to, and did, control the disclosure in various SEC filings, as well as public statements pertaining to the Company during the Class Period.  Stiehl was provided with information alleged herein to be misleading before or shortly after its issuance and/or had the ability and/or opportunity to prevent its issuance or cause it to be corrected.  Accordingly, Stiehl is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the misrepresentations contained therein.

29.     Stiehl is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Sealed Air common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme: (a) deceived the investing public regarding Sealed Air's operations, management, auditor selection process, systems of disclosure controls, and corporate governance, as well as the intrinsic value of Sealed Air common stock; (b) enabled Company insiders to sell more than $4 million of Sealed Air common stock to the unsuspecting public at artificially inflated prices; and (c) caused Plaintiffs and Class Period purchasers of Sealed Air common stock to purchase Sealed Air publicly-traded common stock at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

### The Company and Its Operations

30.     Incorporated in Delaware in 1960, Sealed Air is a global manufacturer and seller of packaging and equipment systems used in food, industrial, medical, and consumer applications.  The Company currently operates its business through two business segments, the Food Care business segment and the Product Care business segment.

31.     Sealed Air's Food Care business segment is a provider of integrated packaging materials and equipment solutions that are designed to help customers reduce cost and enhance their

brands.  The Food Care business segment applications are primarily sold directly to perishable food processors, predominantly in fresh red meat, smoked and processed meats, poultry, and dairy markets worldwide.  These applications generally provide customers with food safety, shelf life extension, and packaging solutions.

32.     Sealed Air's Product Care business segment solutions are designed to protect valuable goods during shipment and enhance order fulfillment velocity while minimizing material usage, dimensional weight, and packaging labor requirements.  The Product Care business segment solutions are largely sold through supply distributors, although they are also sold directly to fabricators, original equipment manufacturers, contract manufacturers, third-party logistics partners, e-commerce/fulfillment operations, and various retail centers.  Product Care solutions are marketed via brands including Bubble Wrap® packaging, Cryovac® performance shrink films, Instapak® polyurethane foam packaging systems, and Korrvu® suspension and retention packaging.

### The Cryovac Transaction and the Settlement Agreement

33.     As a holding company, Sealed Air conducts substantially all of its business through two wholly-owned subsidiaries, Cryovac, LLC and Sealed Air Corporation (US).

34.     Sealed Air acquired Grace's Cryovac packaging business in March 1998 when it and Grace completed a multi-step transaction (the "Cryovac Transaction").  In connection with the Cryovac Transaction, Grace and its businesses agreed to retain all of the liabilities arising out of its operations (other than the liabilities relating to Cryovac's operations prior to the Cryovac Transaction) and agreed to indemnify the Company for, from, and against any such retained liabilities.  Among the liabilities retained by Grace were those liabilities relating to asbestos-containing products previously manufactured or sold by Grace's subsidiaries prior to the Cryovac Transaction, including those related to its primary U.S. operating subsidiary, W. R. Grace & Co. - Conn.

- 8 -

35.     Beginning in 2000, Sealed Air was named in a number of lawsuits alleging that the Cryovac Transaction was a fraudulent transfer and/or gave rise to successor liability, and, as a result, the Company was financially responsible for the alleged asbestos liabilities of Grace and its subsidiaries.  Thereafter, Grace filed for bankruptcy protection, and, after protracted litigation, the parties entered into a definitive settlement agreement to resolve all then current and future asbestos-related claims, fraudulent transfer claims, and successor liability claims made against the Company arising from the Cryovac Transaction (the "Settlement Agreement").  The bankruptcy court approved the Settlement Agreement in June 2005.

36.     Pursuant to the Settlement Agreement, Sealed Air agreed to: (i) issue nine million Sealed Air common shares, subject to customary anti-dilution provisions; and (ii) make a cash payment of $513 million, plus interest thereon at a 5.5% annual rate starting on December 21, 2002 and ending on the effective date of an appropriate plan of reorganization in the Grace bankruptcy, at which time the consideration was to be issued to the Grace-related asbestos claimants.

37.     In February 2014, Grace emerged from bankruptcy and, in accordance with the terms of the Settlement Agreement and the court approved reorganization plan, Sealed Air made a cash payment of $930 million (including $417 million in accrued interest) and issued 18 million Sealed Air common shares (as adjusted for a 2:1 stock split) to trusts established for the benefit of the Grace-related asbestos claimants.

**The Income Tax Implications Associated with the Settlement Agreement**

38.     In connection with its cash payment obligation under the Settlement Agreement, Sealed Air recorded a $513 million liability and a concomitant $262 million deferred tax asset ("DTA") in its financial statements for the year ended December 31, 2002.

39.     A DTA is a probable future tax benefit possessed by an entity arising from income tax relief that is expected by the entity.  Since the recognition and measurement criteria of income tax

expense under generally accepted accounting principles ("GAAP") and the income tax laws often differ, the amount of income tax expense an entity reports in its financial statements during a given period may be different than the amount of income tax due to the tax authorities.  In such cases, a DTA is created when an entity recognizes a tax benefit pursuant to GAAP, but must wait to recognize such benefit under the existing tax laws.

40.     Such tax benefit is recorded as a DTA for financial reporting purposes and it remains so until such time as the entity realizes the benefit for tax purposes or the entity determines the DTA is not likely to be realized.  GAAP requires that a valuation allowance be recorded to reduce the DTA to an amount that is more likely than not to be realized by the entity.

41.     In connection with the consideration it provided pursuant to the Settlement Agreement, Sealed Air reported a $1.49 billion income tax deduction on its 2014 consolidated U.S. income tax return.  The size of the income tax deduction resulted in a net operating loss for U.S. tax purposes in 2014.  The Company carried back more than $1 billion of this deduction and, as a result, Sealed Air's financial statements for the year ended December 31, 2014 reported a $247 million income tax receivable and total net deferred tax assets of $175 million from net operating losses available to offset taxable income in future tax years.

42.     After it filed its 2014 consolidated U.S. income tax return, Sealed Air received a $235 million tax refund during the first quarter of 2015 in connection with the income tax deduction. Thereafter, Sealed Air disclosed that the IRS intended to disallow the income tax deduction "in full."

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

### Sealed Air's Materially False and Misleading SEC Filings

43.     The Class Period begins on November 17, 2014.  After the close of trading on Friday, November 14, 2014, Sealed Air filed with the SEC a Form 8-K (the "November 2014 Form 8-K")

announcing that the Audit Committee had determined to dismiss KPMG as the Company's independent public accounting firm, effective with the completion of KPMG's audit of the Company's fiscal year ended December 31, 2014 financial statements and the filing of the related Annual Report on Form 10-K.

44.     The November 2014 Form 8-K represented that, following a "competitive search process" involving several international registered public accounting firms, the Audit Committee had approved the selection of EY to serve as the Company's auditor beginning with the fiscal year ending December 31, 2015.  Specifically, the November 2014 Form 8-K stated, in pertinent part, as follows:

> On November 11, 2014, the Audit Committee of the Board of Directors (the "Audit Committee") of Sealed Air Corporation ("Sealed Air" or the "Company") approved the selection of Ernst & Young LLP ("EY") to serve as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2015 **following a competitive search process**.  The **competitive search process involved several international registered public accounting firms**. . . .  [Emphasis added].

45.     The statements described in ¶44, above, misrepresented material facts and omitted to state material facts necessary in order to make the statements contained therein not misleading. Specifically, the statements in the November 2014 Form 8-K were materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were then known to, or recklessly disregarded by Defendants:

(a)     that Sealed Air's selection of EY to serve as the Company's independent registered public accounting firm did not follow a competitive search process involving several international registered public accounting firms but rather followed an illegally manipulated process through which bids were rigged by Stiehl and EY to ensure EY would be selected as the Company's registered public accounting firm;

(b)     that the unlawful bid rigging by Stiehl subjected Sealed Air to contingent liabilities, including fines, reputational damage, criminal penalties and/or other sanctions which, in violation of SEC rules and regulations, were not disclosed to investors; and

(c)     that as a result of the foregoing, the market was unaware of the Company's true exposure to financial, regulatory, and litigation risks arising from the unethical business practices of its senior executive management, which caused the price of Sealed Air common stock to trade at artificially inflated prices during the Class Period.

46.     On February 27, 2015, Sealed Air filed with the SEC its annual report on Form 10-K for the year ended December 31, 2014 (the "2014 Form 10-K"), signed by Stiehl and others.

47.     The 2014 Form 10-K contained the following representations concerning Sealed Air's Disclosure Controls and Procedures and an evaluation of those Disclosure Controls and Procedures:

**Disclosure Controls and Procedures**

**We maintain disclosure controls and procedures**, as defined in Rule 13a-15 under the Securities Exchange Act of 1934, as amended, **that are designed to ensure that information required to be disclosed in our reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported** within the time periods specified in the SEC's rules and forms **and that our employees accumulate this information and communicate it to our management**, including our Chief Executive Officer (our principal executive officer) and our Chief Financial Officer (our principal financial officer), as appropriate, to allow timely decisions regarding the required disclosure.  In designing and evaluating the disclosure controls and procedures, our management recognizes that any controls and procedures, no matter how well designed and operated, can provide only "reasonable assurance" of achieving the desired control objectives, and management necessarily must apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures.  [First emphasis in the original.]

**Evaluation of Disclosure Controls and Procedures**

As of the end of the period covered by this report, we carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures under Rule 13a-15.  Our management, including our Chief Executive Officer and Chief Financial Officer, supervised and participated in this evaluation.  Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer concluded

- 12 -

that **our disclosure controls and procedures were effective** at the "reasonable assurance" level.  [First emphasis in the original.]

48.     The 2014 Form 10-K also included representations concerning Sealed Air's corporate governance, stating in pertinent part:

> We have adopted a Code of Conduct applicable to all of our directors, officers and employees and a supplemental Code of Ethics for Senior Financial Executives applicable to our Chief Executive Officer, Chief Financial Officer, Controller, Treasurer, and all other employees performing similar functions for us.  The Code of Conduct and the Code of Ethics for Senior Financial Executives are posted on our website at *www.sealedair.com*.  We will post any amendments to the Code of Conduct and the Code of Ethics for Senior Financial Executives on our website.  We will also post any waivers applicable to any of our directors or officers, including the senior financial officers listed above, from provisions of the Code of Conduct or the Code of Ethics for Senior Financial Executives on our website.

49.     On information and belief, during the Class Period, Sealed Air's website made the following representations, in pertinent part, about its Code of Conduct, which were incorporated by reference into the Company's filings with the SEC on Form 10-K:

> **Sealed Air Corporation has a reputation for conducting its business on a highly ethical level**.  It is important that we continue this record of integrity in the future. Each and every employee of the Company and its subsidiaries throughout the world is responsible for the maintenance of our fine reputation.
>
> *        *        *
>
> **Each of our employees is expected to comply with the law, but our standard of business ethics goes beyond compliance with law.  No list of rules can substitute for the exercise by anyone who represents our Company of basic morality, common decency, high ethical standards and respect for the law**. . . .
>
> *        *        *
>
> In the course of performing their duties, employees may have access to confidential information concerning other employees such as information appearing on job applications, salary information or other confidential information concerning that employee.  **All employees must treat this information as confidential, use it only for proper purposes and divulge it only to those having a "need to know" it.**
>
> *        *        *

- 13 -

**No Sealed Air employee may put his or her personal interests ahead of the interests of the Company. Even the appearance of a conflict can damage the reputation of an employee or the Company**. . . .

\*          \*          \*

**Sealed Air requires its employees to comply fully with anti-corruption laws in the United States and similar laws in other countries**. . . .

50.     On information and belief, during the Class Period, Sealed Air's website also made the following representations, in pertinent part, about its Code of Ethics for Senior Financial Executives, which were incorporated by reference in the Company's filings with the SEC on Form 10-K:

This Code of Ethics sets forth the standards and procedures to be followed by Sealed Air's **Chief Executive Officer, Chief Financial Officer, Controller, Treasurer, and all other employees performing similar functions** for the Corporation (the "Senior Financial Executives") to **promote honest and ethical conduct, appropriate disclosure in Sealed Air's periodic reports and other documents filed with the Securities and Exchange Commission**, and compliance with applicable governmental rules and regulations.  This Code of Ethics supplements the Sealed Air Code of Conduct, which also applies to all Senior Financial Executives.

Conflicts of Interest

**All Senior Financial Executives should be scrupulous in avoiding a conflict of interest** with respect to the Company's interests.  **A "conflict of interest" exists whenever an individual's private or personal interests interfere or conflict in any way (or even appear to interfere or conflict) with the interests of the Company**. . . .

Conflicts of interest are prohibited as a matter of Company policy, unless approved under applicable guidelines established by the Board of Directors or a committee of the Board. . . .  Any such potential or actual conflict of interest must be disclosed to the Board, and the Senior Financial Executive must comply with any measure that may be required by the Audit Committee or the Board in order to avoid or eliminate such conflict.

**Any employee, officer or director of the Company who becomes aware of a conflict or potential conflict involving a Senior Financial Executive should bring it to the attention of the General Counsel of the Corporation or a member of the Audit Committee** of the Board of Directors at the principal executive offices of the Corporation. . . .

- 14 -

Accounting Complaints

The Company's policy is to comply with all applicable financial reporting and accounting regulations applicable to the Company. **If a Senior Financial Executive or any other employee of the Company has concerns or complaints regarding questionable accounting or auditing matters involving the Company, then he or she is encouraged to submit those concerns or complaints (anonymously, confidentially or otherwise) to the Audit Committee of the Board**. . . .

Disclosure Controls and Procedures

The federal securities laws and the regulations of the New York Stock Exchange impose disclosure requirements on the Company, including requiring the Company to file certain reports with the Securities and Exchange Commission and the New York Stock Exchange and make certain public disclosures. Such reports and disclosures must comply with all applicable legal and NYSE requirements.

The Company has adopted certain disclosure controls and procedures in connection with its reporting and other public disclosures. Each Senior Financial Executive must strictly adhere to such controls and procedures. **All Senior Financial Executives must ensure that such reports and disclosures are (i) full, fair, timely, factual, accurate and understandable and (ii) meet all legal and exchange requirements**. These requirements apply to all public disclosures of material information about the Company, including written disclosures, oral statements, visual presentations, analyst and press conferences, and media and investor calls. . . .

51.     The statements referred to in ¶¶47, 49 and 50, above, were each materially false and misleading in that they misrepresented material facts and omitted to state material facts necessary in order to make the statements contained therein not misleading. Specifically, the statements set forth and incorporated by reference in the 2014 Form 10-K were materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were then known to, or recklessly disregarded by Defendants:

(a)     that the Code of Conduct and the Code of Ethics for Senior Financial Executives purportedly adopted by the Company were circumvented by one of the Company's most senior financial officers, Stiehl, who engaged in illegal bid-rigging to ensure that EY would be retained as the Company's auditors;

- 15 -

(b)     that Sealed Air's Disclosure Controls and Procedures and Evaluation of Disclosure Controls and Procedures were not designed to ensure that employees accurately communicated required information but rather permitted the Company to file reports pursuant to the Exchange Act with the SEC that misstated and/or omitted material facts required to be disclosed by SEC rules and regulations;

(c)     that Sealed Air's Disclosure Controls and Procedures were not effective at the reasonable assurance level; and

(d)     that as a result of the foregoing, the market was unaware of the Company's true exposure to financial, regulatory, and litigation risks arising from the unethical business practices of its senior executive management, which caused the price of Sealed Air common stock to trade at artificially inflated prices during the Class Period.

52.     On April 2, 2015, Sealed Air filed with the SEC a definitive proxy statement on Schedule 14A (the "2015 Proxy Statement").  The 2015 Proxy Statement represented, in pertinent part:

> **Selection of Independent Auditor (Proposal 12)**
>
> On November 11, 2014, **following a competitive search process, the Audit Committee selected Ernst & Young LLP ("EY") to be engaged as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2015.  The competitive search process involved several international registered public accounting firms**. . . .
>
> On February 16, 2015, the Audit Committee approved the engagement of EY as our independent registered public accounting firm to examine and report on the Company's consolidated financial statements and the effectiveness of the Company's internal control over financial reporting for the fiscal year ending December 31, 2015, subject to ratification of the retention by the stockholders at the Annual Meeting.  **Following a comprehensive request for proposal process, the Audit Committee considered EY to be well qualified**. . . .
>
> On March 2, 2015, EY was engaged to serve as Sealed Air's independent registered public accounting firm for the fiscal year ending December 31, 2015. . . . [Emphasis added].

53.     In addition, the 2015 Proxy Statement included representations about Sealed Air's corporate governance stating, in pertinent part, "[t]he Board has adopted and operates under Corporate Governance Guidelines that reflect our current governance practices in accordance with applicable statutory and regulatory requirements, including those of the SEC and the NYSE."

54.     The statements referred to in ¶¶52-53, above, were each materially false and misleading in that they misrepresented material facts and omitted to state material facts necessary in order to make the statements contained therein not misleading.  Specifically, the statements in the 2015 Proxy Statement were materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were then known to, or recklessly disregarded by Defendants:

(a)     that the selection of EY as the Company's auditors did not follow "a comprehensive request for proposal process" or a "competitive search process" involving "several international registered public accounting firms" but rather was the result of illegal bid-rigging between EY and Stiehl, one of the Company's most senior financial executives;

(b)     that the Company was not operating under Corporate Governance Guidelines that were in accordance with applicable statutory and regulatory requirements, including those of the SEC and the NYSE, but rather operated under lax governance policies that permitted its most senior executives to rig the process of selecting the Company's auditor; and

(c)     that as a result of the foregoing, the market was unaware of the Company's true exposure to financial, regulatory, and litigation risks arising from the unethical business practices of its senior executive management, which caused the price of Sealed Air common stock to trade at artificially inflated prices during the Class Period.

- 17 -

55.     On May 5, 2015, Sealed Air filed with the SEC its Form 10-Q for the quarter ended March 31, 2015 (the "Q1 2015 Form 10-Q"), signed by Stiehl.  The Q1 2015 Form 10-Q repeated, in pertinent part, the representations concerning the Company's Disclosure Controls and Procedures and Evaluation of Disclosure Controls and Procedures set forth in ¶47, above.

56.     On August 4, 2015, Sealed Air filed with the SEC its Form 10-Q for the quarter ended June 30, 2015 (the "Q2 2015 Form 10-Q"), signed by Stiehl.  The Q2 2015 Form 10-Q repeated, in pertinent part, the representations concerning the Company's Disclosure Controls and Procedures and Evaluation of Disclosure Controls and Procedures set forth in ¶47, above.

57.     On November 3, 2015, Sealed Air filed with the SEC its Form 10-Q for the quarter ended September 30, 2015 (the "Q3 2015 Form 10-Q"), signed by Stiehl.  The Q3 2015 Form 10-Q repeated, in pertinent part, the representations concerning the Company's Disclosure Controls and Procedures and Evaluation of Disclosure Controls and Procedures set forth in ¶47, above.

58.     The statements referred to in ¶¶55-57, above, were each materially false and misleading in that they misrepresented material facts and omitted to state material facts necessary in order to make the statements contained therein not misleading.  Specifically, the Q1 2015 Form 10-Q, Q2 2015 Form 10-Q, and 2015 Q3 Form 10-Q were each materially false and misleading by misrepresenting and/or failing to disclose the following adverse facts, which were then known to, or recklessly disregarded by Defendants:

(a)     that Sealed Air's Disclosure Controls and Procedures and Evaluation of Disclosure Controls and Procedures were not designed to ensure that employees accurately communicated required information but rather permitted the Company to file reports pursuant to the Exchange Act with the SEC that misstated and/or omitted material facts required to be disclosed by SEC rules and regulations;

(b)     that Sealed Air's Disclosure Controls and Procedures were not effective at the reasonable assurance level; and

(c)     that as a result of the foregoing, the market was unaware of the Company's true exposure to financial, regulatory, and litigation risks arising from the unethical business practices of its senior executive management, which caused the price of Sealed Air common stock to trade at artificially inflated prices during the Class Period.

59.     On February 22, 2016, Sealed Air filed with the SEC its annual report on Form 10-K for the year ended December 31, 2015 (the "2015 Form 10-K"), signed by Stiehl and others.

60.     The 2015 Form 10-K repeated, in all material respects, the representations concerning the Company's Code of Conduct and Code of Ethics set forth in ¶¶49 and 50, above.

61.     In addition, the 2015 Form 10-K repeated, in all material respects, the representations concerning the Company's Disclosure Controls and Procedures and Evaluation of Disclosure Controls and Procedures set forth in ¶47, above.

62.     The statements referred to in ¶¶60 and 61, above, were each materially false and misleading in that they misrepresented material facts and omitted to state material facts necessary in order to make the statements contained therein not misleading.  Specifically, the statements set forth and incorporated by reference in the 2015 Form 10-K were materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were then known to, or recklessly disregarded by Defendants:

(a)     that the Code of Conduct and the Code of Ethics for Senior Financial Executives purportedly adopted by the Company were circumvented by one of the Company's most senior financial officers, Stiehl, who engaged in illegal bid-rigging to ensure that EY would be retained as the Company's auditors;

(b)      that Sealed Air's Disclosure Controls and Procedures and Evaluation of Disclosure Controls and Procedures were not designed to ensure that employees accurately communicated required information but rather permitted the Company to file reports pursuant to the Exchange Act with the SEC that misstated and/or omitted material facts required to be disclosed by SEC rules and regulations;

(c)      that Sealed Air's Disclosure Controls and Procedures were not effective at the reasonable assurance level; and

(d)      that as a result of the foregoing, the market was unaware of the Company's true exposure to financial, regulatory, and litigation risks arising from the unethical business practices of its senior executive management, which caused the price of Sealed Air common stock to trade at artificially inflated prices during the Class Period.

63.      On May 2, 2016, Sealed Air filed with the SEC its Form 10-Q for the quarter ended March 31, 2016 (the "Q1 2016 Form 10-Q"), signed by Stiehl.  The Q1 2016 Form 10-Q repeated, in pertinent part, the representations concerning the Company's Disclosure Controls and Procedures and Evaluation of Disclosure Controls and Procedures set forth in ¶47, above.

64.      On August 1, 2016, Sealed Air filed with the SEC its Form 10-Q for the quarter ended June 30, 2016 (the "Q2 2016 Form 10-Q"), signed by Stiehl.  The Q2 2016 Form 10-Q repeated, in pertinent part, the representations concerning the Company's Disclosure Controls and Procedures and Evaluation of Disclosure Controls and Procedures set forth in ¶47, above.

65.      On October 31, 2016, Sealed Air filed with the SEC its Form 10-Q for the quarter ended September 30, 2016 (the "Q3 2016 Form 10-Q"), signed by Stiehl.  The Q3 2016 Form 10-Q repeated, in pertinent part, the representations concerning the Company's Disclosure Controls and Procedures and Evaluation of Disclosure Controls and Procedures set forth in ¶47, above.

66.     The statements referred to in ¶¶63-65, above, were each materially false and misleading in that they misrepresented material facts and omitted to state material facts necessary in order to make the statements contained therein not misleading.  Specifically, the Q1 2016 Form 10-Q, Q2 2016 Form 10-Q, and 2016 Q3 Form 10-Q were materially false and misleading by misrepresenting and/or failing to disclose the following adverse facts, which were then known to, or recklessly disregarded by Defendants:

(a)     that Sealed Air's Disclosure Controls and Procedures and Evaluation of Disclosure Controls and Procedures were not designed to ensure that employees accurately communicated required information but rather permitted the Company to file reports pursuant to the Exchange Act with the SEC that misstated and/or omitted material facts required to be disclosed by SEC rules and regulations;

(b)     that Sealed Air's Disclosure Controls and Procedures were not effective at the reasonable assurance level; and

(c)     that as a result of the foregoing, the market was unaware of the Company's true exposure to financial, regulatory, and litigation risks arising from the unethical business practices of its senior executive management, which caused the price of Sealed Air common stock to trade at artificially inflated prices during the Class Period.

67.     On February 15, 2017, Sealed Air filed with the SEC its annual report on Form 10-K for the year ended December 31, 2016 (the "2016 Form 10-K"), signed by Stiehl, and others.

68.     The 2016 Form 10-K repeated, in all material respects, the Disclosure Controls and Procedures and Evaluation of Disclosure Controls and Procedures representations set forth in ¶47, above.

69.     The 2016 Form 10-K also repeated, in all material respects, the representations concerning the Company's Code of Conduct and Code of Ethics set forth in ¶¶49 and 50, above.

70.     The statements referred to in ¶¶68 and 69, above, were each materially false and misleading in that they misrepresented material facts and omitted to state material facts necessary in order to make the statements contained therein not misleading.  Specifically, the statements set forth and incorporated by reference in the 2016 Form 10-K were materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were then known to, or recklessly disregarded by Defendants:

(a)     that the Code of Conduct and the Code of Ethics for Senior Financial Executives purportedly adopted by the Company were circumvented by one of the Company's most senior financial officers, Stiehl, who engaged in illegal bid-rigging to ensure that EY would be retained as the Company's auditors;

(b)     that Sealed Air's Disclosure Controls and Procedures and Evaluation of Disclosure Controls and Procedures were not designed to ensure that employees accurately communicated required information but rather permitted the Company to file reports pursuant to the Exchange Act with the SEC that misstated and/or omitted material facts required to be disclosed by SEC rules and regulations;

(c)     that Sealed Air's Disclosure Controls and Procedures were not effective at the reasonable assurance level; and

(d)     that as a result of the foregoing, the market was unaware of the Company's true exposure to financial, regulatory, and litigation risks arising from the unethical business practices of its senior executive management, which caused the price of Sealed Air common stock to trade at artificially inflated prices during the Class Period.

71.     On May 10, 2017, Sealed Air filed with the SEC its Form 10-Q for the quarter ended March 31, 2017 (the "Q1 2017 Form 10-Q"), signed by Stiehl.  The Q1 2017 Form 10-Q repeated, in pertinent part, the representations concerning the Company's Disclosure Controls and Procedures and Evaluation of Disclosure Controls and Procedures set forth in ¶47, above.

72.     On August 9, 2017, Sealed Air filed with the SEC its Form 10-Q for the quarter ended June 30, 2017 (the "Q2 2017 Form 10-Q"), signed by Stiehl.  The Q2 2017 Form 10-Q repeated, in pertinent part, the representations concerning the Company's Disclosure Controls and Procedures and Evaluation of Disclosure Controls and Procedures set forth in ¶47, above.

73.     The statements referred to in ¶¶71 and 72, above, were each materially false and misleading in that they misrepresented material facts and omitted to state material facts necessary in order to make the statements contained therein not misleading.  Specifically, the Q1 2017 Form 10-Q and Q2 2017 Form 10-Q were materially false and misleading by misrepresenting and/or failing to disclose the following adverse facts, which were then known to, or recklessly disregarded by Defendants:

(a)     that Sealed Air's Disclosure Controls and Procedures and Evaluation of Disclosure Controls and Procedures were not designed to ensure that employees accurately communicated required information but rather permitted the Company to file reports pursuant to the Exchange Act with the SEC that misstated and/or omitted material facts required to be disclosed by SEC rules and regulations;

(b)     that Sealed Air's Disclosure Controls and Procedures were not effective at the reasonable assurance level; and

(c)     that as a result of the foregoing, the market was unaware of the Company's true exposure to financial, regulatory, and litigation risks arising from the unethical business

practices of its senior executive management, which caused the price of Sealed Air common stock to trade at artificially inflated prices during the Class Period.

74.     On October 20, 2017, Sealed Air filed with the SEC a Form 8-K announcing the appointment of Stiehl, then the Company's Chief Accounting Officer and Controller, to the additional office of Acting CFO, effective as of the close of business on October 31, 2017.

75.     On November 9, 2017, Sealed Air filed with the SEC its Form 10-Q for the quarter ended September 30, 2017 (the "Q3 2017 Form 10-Q"), signed by Stiehl.  The Q3 2017 Form 10-Q repeated, in pertinent part, the representations concerning the Company's Disclosure Controls and Procedures and Evaluation of Disclosure Controls and Procedures set forth in ¶47, above.

76.     In addition, the Q3 2017 Form 10-Q included Stiehl's certification pursuant to the Sarbanes Oxley Act of 2002 ("SOX"), attesting that, *inter alia*:

    (a)     "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;"

    (b)     "[t]he registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have . . . [d]esigned such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;"

- 24 -

(c)     "[e]valuated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation;" and

(d)     "[t]he registrant's other certifying officer and I have disclosed . . . [a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting."

77.     The statements referred to in ¶¶75 and 76, above, were each materially false and misleading in that they misrepresented material facts and omitted to state material facts necessary in order to make the statements contained therein not misleading.  Specifically, the Q3 2017 Form 10-Q was materially false and misleading and failed to disclose the following adverse facts, which were then known to, or recklessly disregarded by Defendants:

(a)     that Sealed Air's Disclosure Controls and Procedures and Evaluation of Disclosure Controls and Procedures were not designed to ensure that employees accurately communicated required information but rather permitted the Company to file reports pursuant to the Exchange Act with the SEC that misstated and/or omitted material facts required to be disclosed by SEC rules and regulations;

(b)     that Stiehl had not disclosed any fraud, whether or not material, that involved management or other employees who had a significant role in the registrant's internal control over financial reporting but rather concealed his fraudulent bid rigging designed to ensure EY's selection as the Company's auditors;

(c)     that Sealed Air's Disclosure Controls and Procedures were not effective at the reasonable assurance level; and

(d)     that as a result of the foregoing, the market was unaware of the Company's true exposure to financial, regulatory, and litigation risks arising from the unethical business practices of its senior executive management, which caused the price of Sealed Air common stock to trade at artificially inflated prices during the Class Period.

78.     On February 21, 2018, Sealed Air filed with the SEC its annual report on Form 10-K for the year ended December 31, 2017 (the "2017 Form 10-K"), signed by Stiehl, and others.

79.     The 2017 Form 10-K repeated, in all material respects, the Disclosure Controls and Procedures and Evaluation of Disclosure Controls and Procedures representations set forth in ¶47, above.

80.     The 2017 Form 10-K also repeated, in all material respects, the representations concerning the Company's Code of Conduct and Code of Ethics set forth in ¶¶49 and 50, above.

81.     In addition, the 2017 Form 10-K included Stiehl's certification pursuant to SOX, identical in all material respects to the certification quoted in ¶76, above.

82.     The statements referred to in ¶¶79-81, above, were each materially false and misleading in that they misrepresented material facts and omitted to state material facts necessary in order to make the statements contained therein not misleading.  Specifically, the statements set forth and incorporated by reference in the 2017 Form 10-K were materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were then known to, or recklessly disregarded by Defendants:

(a)     that the Code of Conduct and the Code of Ethics for Senior Financial Executives purportedly adopted by the Company were circumvented by one of the Company's most senior financial officers, Stiehl, who engaged in illegal bid-rigging to ensure that EY would be retained as the Company's auditors;

(b)     that Stiehl had not disclosed any fraud, whether or not material, that involved management or other employees who had a significant role in the registrant's internal control over financial reporting but rather concealed his fraudulent bid rigging designed to ensure EY's selection as the Company's auditors;

(c)     that Sealed Air's Disclosure Controls and Procedures and Evaluation of Disclosure Controls and Procedures were not designed to ensure that employees accurately communicated required information but rather permitted the Company to file reports pursuant to the Exchange Act with the SEC that misstated and/or omitted material facts required to be disclosed by SEC rules and regulations;

(d)     that Sealed Air's Disclosure Controls and Procedures were not effective at the reasonable assurance level; and

(e)     that as a result of the foregoing, the market was unaware of the Company's true exposure to financial, regulatory, and litigation risks arising from the unethical business practices of its senior executive management, which caused the price of Sealed Air common stock to trade at artificially inflated prices during the Class Period.

83.     On May 7, 2018, Sealed Air filed with the SEC its Form 10-Q for the quarter ended March 31, 2018 (the "Q1 2018 Form 10-Q"), signed by Stiehl.  The Q1 2018 Form 10-Q repeated, in pertinent part, the representations concerning the Company's Disclosure Controls and Procedures and Evaluation of Disclosure Controls and Procedures set forth in ¶47, above.

84.     In addition, the Q1 2018 Form 10-Q included Stiehl's certification pursuant to SOX, identical in all material respects to the certification quoted in ¶76, above.

85.     The statements referred to in ¶¶83 and 84, above, were each materially false and misleading in that they misrepresented material facts and omitted to state material facts necessary in

order to make the statements contained therein not misleading.  Specifically, the Q1 2018 Form 10-Q was materially false and misleading and failed to disclose the following adverse facts, which were then known to, or recklessly disregarded by Defendants:

(a)     that Sealed Air's Disclosure Controls and Procedures and Evaluation of Disclosure Controls and Procedures were not designed to ensure that employees accurately communicated required information but rather permitted the Company to file reports pursuant to the Exchange Act with the SEC that misstated and/or omitted material facts required to be disclosed by SEC rules and regulations;

(b)     that Stiehl had not disclosed any fraud, whether or not material, that involved management or other employees who had a significant role in the registrant's internal control over financial reporting but rather concealed his fraudulent bid rigging designed to ensure EY's selection as the Company's auditors;

(c)     that Sealed Air's Disclosure Controls and Procedures were not effective at the reasonable assurance level; and

(d)     that as a result of the foregoing, the market was unaware of the Company's true exposure to financial, regulatory, and litigation risks arising from the unethical business practices of its senior executive management, which caused the price of Sealed Air common stock to trade at artificially inflated prices during the Class Period.

86.     On June 7, 2018, Sealed Air filed with the SEC a Form 8-K announcing in pertinent part, that, effective as of June 7, 2018, the Board of Directors of Sealed Air had appointed Stiehl as Senior Vice President and CFO of the Company.

**Facts Concerning Defendants' Unlawful Conduct Slowly Emerge**

87.     On August 6, 2018, after the market closed, Sealed Air filed with the SEC its Form 10-Q for the quarter ended June 30, 2018 (the "Q2 2018 Form 10-Q"), signed by Stiehl.  The Q2

2018 Form 10-Q repeated, in pertinent part, the representations concerning the Company's Disclosure Controls and Procedures and Evaluation of Disclosure Controls and Procedures set forth in ¶47, above.

88.     In addition, the Q2 2018 Form 10-Q included Stiehl's certification pursuant to SOX, identical, in all material respects, to the certification quoted in ¶76, above.

89.     The Q2 2018 Form 10-Q revealed, for the first time, that Sealed Air was under investigation by the SEC, stating, in pertinent part, that "[o]n June 25, 2018, **the Company received from the staff of the SEC a subpoena for documents** [(the "June 25, 2018 Subpoena")], **including requests concerning the Company's accounting for income taxes, its financial reporting and disclosures and other matters**." Emphasis added.

90.     On the announcement of this news, the price of Sealed Air stock fell over 5% to close at $40.02 per share on August 7, 2018 on very heavy trading volume.

91.     Defendants, however, continued to mislead the market by failing to disclose material facts then known to them.  Indeed, the statements referred to in ¶¶87 and 88, above, were each materially false and misleading in that they misrepresented material facts and omitted to state material facts necessary in order to make the statements contained therein not misleading. Specifically, the Q2 2018 Form 10-Q was materially false and misleading and failed to disclose the following adverse facts, which were then known to, or recklessly disregarded by Defendants:

(a)     that Sealed Air's Disclosure Controls and Procedures and Evaluation of Disclosure Controls and Procedures were not designed to ensure that employees accurately communicated required information but rather permitted the Company to file reports pursuant to the Exchange Act with the SEC that misstated and/or omitted material facts required to be disclosed by SEC rules and regulations;

(b)    that Stiehl had not disclosed any fraud, whether or not material, that involved management or other employees who had a significant role in the registrant's internal control over financial reporting but rather concealed his fraudulent bid rigging designed to ensure EY's selection as the Company's auditors;

(c)    that Sealed Air's Disclosure Controls and Procedures were not effective at the reasonable assurance level; and

(d)    that as a result of the foregoing, the market was unaware of the Company's true exposure to financial, regulatory, and litigation risks arising from the unethical business practices of its senior executive management, which caused the price of Sealed Air common stock to trade at artificially inflated prices during the Class Period.

92.    Thereafter, on June 20, 2019, Sealed Air issued a press release and filed a Form 8-K with the SEC announcing that on May 2, 2019, the SEC issued it an additional subpoena seeking documents and information relating to "the process by which the Company selected its independent audit firm [EY] for the period beginning with fiscal year 2015, and relating to the independence of that audit firm [EY]."

93.    In connection therewith, the Company's Audit Committee initiated an internal review into the process by which the Company selected EY.  As a result of such examination, on June 19, 2019, **the Board of Directors of Sealed Air terminated Stiehl's employment "for cause."**

94.    On the announcement of this news, the price of Sealed Air stock fell approximately 5% to close at $41.35 per share on June 21, 2019 on very heavy trading volume.

## POST CLASS PERIOD DISCLOSURES

95.    After the end of the Class Period, on August 2, 2019, Sealed Air disclosed in its Form 10-Q for the period ended June 30, 2019 that it had received a Grand Jury subpoena from the U.S.

Attorney's Office seeking documents relating to the process by which the Company selected EY,

stating, in pertinent part:

> Following the announcement on June 20, 2019 that the Company had terminated the employment of William G. Stiehl as Chief Financial Officer, **the Company received a Grand Jury subpoena from the United States Attorney's Office for the Western District of North Carolina (the "U.S. Attorney's Office") seeking documents relating to that termination and relating to the process by which the Company selected its independent audit firm beginning with fiscal year 2015**.
>
> *          *          *
>
> The Company has received from the staff of the SEC subpoenas for documents and requests for information in connection with the SEC's previously disclosed investigation. Those subpoenas and requests seek documents and information regarding the Company's accounting for income taxes, its financial reporting and disclosures, the process by which the Company selected its independent audit firm beginning with fiscal year 2015, the independence of that audit firm, and other matters. **The Company has also received a Grand Jury subpoena from the U.S. Attorney's Office seeking documents relating to the termination of our former CFO and relating to the process by which the Company selected its independent audit firm beginning with fiscal year 2015**. [Emphasis added].

96.    Less than two weeks later, on August 12, 2019, Sealed Air filed with the SEC a Form

8-K announcing that it had dismissed EY as its auditor, stating, in pertinent part:

> **On August 7, 2019, the Audit Committee of the Board of Directors (the "Committee") of Sealed Air Corporation (the "Company") dismissed Ernst & Young LLP ("EY") as the Company's independent registered public accounting firm effective as of that date. This change is being made in light of the Company's previously disclosed receipt of a subpoena from the U.S. Securities and Exchange Commission ("SEC") on May 2, 2019 for documents and information relating to the process by which the Company selected its independent audit firm for the period beginning with fiscal year 2015, and relating to the independence of that audit firm**. EY has reaffirmed to the Company that EY believes there has been no independence violation, and the Company has not reached a contrary conclusion. Nonetheless, the pendency of the SEC investigation, along with the Committee's dissatisfaction with information it learned about the process by which EY was selected as auditor, caused the Company to make this change now to allow for an orderly transition for the audit of the Company's fiscal 2019 consolidated financial statements and to minimize the risk of disruption that could arise in the event of an unplanned change in independent auditors at an undetermined time in the future. [Emphasis added].

## SEALED AIR'S FILINGS WITH THE SEC OMITTED
## MATERIAL INFORMATION REQUIRED TO BE DISCLOSED THEREIN

97.     Part II, Item 7 of Form 10-K and Part I, Item 2 of Form 10-Q required Sealed Air to

furnish the information called for under Item 303 of Regulation S-K [17 C.F.R. §229.303], MD&A,

during the Class Period.

98.     The instructions to Item 303(a) of Regulation S-K explain that MD&A disclosure is

to "focus specifically" on material events and uncertainties that would cause a company's reported

financial information not to be necessarily indicative of future operating results, including "matters

that would have an impact on future operations and [matters that] have not had an impact in the

past."

99.     In 1989, the SEC issued interpretative guidance associated with the requirements of

Item 303 of Regulation S-K, which states, in pertinent part, as follows:

**Events that have already occurred** or are anticipated **often give rise to known
uncertainties**.  For example, a registrant may know that a material government
contract is about to expire.  The registrant may be uncertain as to whether the
contract will be renewed, but nevertheless would be able to assess facts relating to
whether it will be renewed.  More particularly, the registrant may know that a
competitor has found a way to provide the same service or product at a price less
than that charged by the registrant, or may have been advised by the government that
the contract may not be renewed.  The registrant also would have factual information
relevant to the financial impact of non-renewal upon the registrant.  **In situations
such as these, a registrant would have identified a known uncertainty
reasonably likely to have material future effects on its financial condition or
results of operations, and disclosure would be required**. [Emphasis added].

100.     Based on these requirements, the MD&A in the Forms 10-K and 10-Q that Sealed Air

filed with the SEC during the Class Period was materially false and misleading when made because

Defendants Sealed Air and Stiehl, in violation of SEC rules and regulations, deceptively failed to

disclose the risks and uncertainties then known to management, including the unlawful acts that

subjected Sealed Air to contingent liabilities, including fines, reputational damage, criminal penalties

and/or other sanctions, that were reasonably likely to have a material adverse effect on Sealed Air's operating results.

101.     Part I, Item 1A. of Form 10-K and Part II, Item 1A. of Form 10-Q required Sealed Air to furnish the information called for under [17 C.F.R. §229.503], *Risk Factors*.  Item 503 of Regulation S-K required Sealed Air to disclose the most significant matters making an investment in it risky, including the unlawful acts that subjected Sealed Air to contingent liabilities, including fines, reputational damage, criminal penalties and/or other sanctions which, in violation of SEC rules and regulations, were not disclosed to investors.

102.     Part II, Item 9A of Form 10-K and Part I, Item 4 of Form 10-Q required Sealed Air to furnish the information called for under Item 307 of Regulation S-K [17 C.F.R. §229.307], *Disclosure Controls and Procedures*.  Item 307 of Regulation S-K required Sealed Air's Forms 10-K and 10-Q during the Class Period to disclose Stiehl's conclusions about the effectiveness of the Company's disclosure controls and procedures, defined by relevant regulation as the controls and procedures designed to ensure that information required to be disclosed in reports filed with the SEC is appropriately recorded, processed, summarized and reported.

103.     Specifically, in each of its Forms 10-K and 10-Q filed during the Class Period, Sealed Air violated Item 303(a), 503 and 307 of Regulation S-K, by failing to disclose:

(a)     that Sealed Air's selection of EY to serve as the Company's independent registered public accounting firm did not follow a competitive search process involving several international registered public accounting firms but rather followed an illegally manipulated process through which bids were rigged by Stiehl and EY to ensure EY would be selected as the Company's registered public accounting firm; and

(b)      that the unlawful bid rigging by Stiehl subjected Sealed Air to contingent liabilities, including fines, reputational damage, criminal penalties and/or other sanctions which, in violation of SEC rules and regulations, were not disclosed to investors and were reasonably likely to have a material effect on the Company's future operating results.

## DEFENDANTS' CLASS PERIOD MISSTATEMENTS AND VIOLATIONS OF SEC RULES AND REGULATIONS WERE MATERIAL

104.      As alleged herein, Defendants' statements misrepresented and failed to disclose facts that were *required* to be stated therein.  These material misrepresentations and omitted facts caused Sealed Air stock to trade at inflated prices during the Class Period.

105.      During the Class Period, Defendants Sealed Air and Stiehl engaged in collusion with EY and rigged the process by which EY was selected to serve as the Company's independent auditor.  As a result, the process by which EY was selected to serve as Sealed Air's auditor was unlawful and subjected Sealed Air to contingent liabilities, including fines, reputational damage, criminal penalties and/or other sanctions.

106.      The SEC, in its Staff Accounting Bulletin No. 99 ("SAB No. 99"), has provided stakeholders with its determination about materiality in the context of financial information, noting in particular, that materiality associated with financial disclosures requires an assessment of the factual context in which the user would view the financial information.

107.      Thus, SAB No. 99 provides that qualitative factors, such as a concealment of an unlawful transaction, may well render a quantitatively small misstatement material.  Here, Defendants were engaged in an unlawful manipulation that has subjected Sealed Air to fines, reputational damage, and/or criminal penalties.

108.      Indeed, the significance of these events is evidenced by the enactment of Section 10A(b) of the Exchange Act which requires auditors to take certain actions upon discovery of an

"illegal act" and it specifies that such obligations are triggered "whether or not [the illegal acts are] perceived to have a material effect on the financial statements of the issuer. . . ."

109.    In addition, SAB No. 99 provides that the "volatility of the price of a registrant's securities in response to certain types of disclosures may provide guidance as to whether investors regard quantitatively small misstatements as material." After Sealed Air announced that the SEC had commenced an investigation, the price of its common stock declined more than 5%, eviscerating approximately $400 million of its market capitalization. Then, after Sealed Air disclosed that Stiehl had been fired for cause, the price of Sealed Air common stock fell approximately 5%, causing another approximate $300 million market capitalization loss.

## ADDITIONAL SCIENTER ALLEGATIONS

110.    Stiehl acted with scienter in that he knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading. Stiehl knowingly or recklessly substantially participated or acquiesced in the issuance or dissemination of such statements or documents as a primary violator of the federal securities laws.

111.    By virtue of Stiehl's receipt of information reflecting the true facts regarding Sealed Air, as well as his control over and/or receipt of the Company's materially misleading misstatements and/or his associations with the Company that made him privy to confidential proprietary information concerning Sealed Air, Stiehl was an active and culpable participant in the fraudulent scheme alleged herein.

112.    Stiehl knew and/or recklessly disregarded the falsity and misleading nature of the information which he caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and

complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including Stiehl.

113.    Stiehl was a senior executive officer of Sealed Air and directed and participated in the retention of EY and was aware of key facts related to the Company's selection of and negotiations with EY.  As part of this process, Stiehl actively and willingly colluded with EY and as was party to the illegal process by which EY was selected to serve as the Company's auditor, as alleged herein.

114.    The Company's Board of Directors has now fired Stiehl "for cause."  Stiehl knew that the Company's false representations during the Class Period were materially false and misleading when made, including those claiming the Company had engaged in a "competitive search process" and a "comprehensive request for proposal process" in selecting EY to serve as its auditor. Nonetheless, Stiehl repeatedly signed and allowed Sealed Air to make filings with the SEC that contained false and misleading representations.

115.    Moreover, Stiehl repeatedly signed false and misleading Sarbanes-Oxley Act mandated certifications during the Class Period, which acknowledged his responsibility to investors for establishing and maintaining controls to ensure that material information about Sealed Air was appropriately disclosed to investors.

116.    Stiehl possessed knowledge of facts that directly contradicted Defendants' public statements.  Nonetheless, Stiehl substantially participated in the repeated issuance and dissemination of false and misleading statements by Sealed Air and repeatedly signed SOX certifications that he knew were materially false and misleading during the Class Period.

117.    These repeated unlawful acts over a multi-year period bolster a finding of scienter against Stiehl.

118.    The knowledge of Stiehl, who at the time of EY's retention by Sealed Air served as its Chief Accounting Officer and Controller and later served as the Company's CFO, can be imputed to Defendant Sealed Air itself.

119.    Moreover, the ongoing investigations by the SEC and DOJ support a finding of scienter against Defendants.

120.    Finally, Stiehl was motivated to engage in his fraudulent course of conduct in order to allow Company insiders, including himself, to sell shares of their personally-held Sealed Air common stock at inflated prices, which yielded them gross proceeds of more than $4 million during the Class Period, as follows:[1]

| Sealed Air (SEE) | | | | | |
| Insider Sales:    11/14/14 - 6/20/19 | | | | | |
| | | | | | |
| Filer Name | Transaction Date | Direct Indirect | Price | Shares Sold | Proceeds |
| Chammas (Emile Z) | 11/20/2017 | D | $45.24 | 6,000 | $271,440 |
| | 5/29/2018 | D | $45.03 | 10,000 | $450,300 |
| | | | | **16,000** | **$721,740** |
| | | | | | |
| Chrisman Kenneth P | 5/22/2018 | D | $45.01 | 7,000 | $315,070 |
| | | | | **7,000** | **$315,070** |
| | | | | | |
| Codey (Lawrence R) | 8/9/2016 | D | $46.50 | 200 | $9,300 |
| | 9/18/2017 | D | $42.91 | 3,500 | $150,185 |
| | | | | **3,700** | **$159,485** |
| | | | | | |
| Deily (Karl R) | 6/9/2015 | D | $49.57 | 19,850 | $983,965 |
| | | | | **19,850** | **$983,965** |
| | | | | | |
| Roper (Ruth) | 3/4/2015 | D | $46.00 | 14,622 | $672,612 |
| | 3/11/2015 | D | $45.18 | 4,916 | $222,105 |
| | 2/22/2016 | D | $44.08 | 18,000 | $793,440 |
| | | | | **37,538** | **$1,688,157** |
| | | | | | |
| Stiehl (William G) | 5/19/2017 | D | $43.43 | 3,000 | $130,290 |
| | 12/15/2017 | D | $48.98 | 3,000 | $146,940 |
| | 6/19/2018 | D | $44.01 | 3,000 | $132,030 |
| | | | | **9,000** | **$409,260** |
| | | | | | |
| **Grand Total** | | | | **93,088** | **$4,277,676** |

---

[1]    Lead Plaintiffs' counsel used publicly-available trading data that Company insiders filed with the SEC on Forms 4 to evaluate their selling activity.  Accordingly, the Forms 4 filed with the SEC by Company insiders during the Class Period are hereby incorporated by reference.

**LOSS CAUSATION**

121.     During the Class Period, Defendants perpetrated a scheme to deceive the market and engaged in a course of conduct that artificially inflated the price of Sealed Air common stock. This scheme operated as a fraud or deceit on Class Period purchasers of Sealed Air common stock (the "Class") by failing to disclose and misrepresenting the adverse facts detailed herein.

122.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, the Defendants made or caused to be made a series of materially false or misleading statements about Sealed Air's operations, management, systems of disclosure controls and corporate governance. These material misstatements and omissions had the cause and effect of artificially inflating the price of Sealed Air common stock and created a false impression about its senior executive management, thus causing the Company's shares to be overvalued and artificially inflated at all relevant times. The Defendants' materially false and misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's shares at artificially inflated prices, thus causing the damages complained of herein.

123.     As a result of their purchases of Sealed Air common stock during the Class Period, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. When Defendants' prior misrepresentations and fraudulent conduct were revealed and became apparent to the market, the price of Sealed Air common stock fell precipitously as the prior artificial inflation dissipated. Defendants' false and misleading statements had the intended effect and caused Sealed Air common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $55.84 per share on August 10, 2015.

124.    By issuing materially false and misleading statements and failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of Sealed Air's operations, management, systems of disclosure controls and corporate governance.  The declines in the price of Sealed Air common stock after the corrective disclosures came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price declines in Sealed Air common stock negate any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.

125.    The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Sealed Air common stock and the subsequent significant declines in the value of Sealed Air common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

126.    On August 6, 2018, after the market closed, Defendants disclosed that the Company's financial affairs were under investigation by the SEC.  When the marketplace was made aware of this adverse fact, Sealed Air stock declined by more than 5%, causing an approximate $400 million market capitalization loss, on high trading volume.

127.    On June 20, 2019, after the market closed, Defendants disclosed that Stiehl had been fired "for cause" in connection with the matters under investigation by the SEC.  When the marketplace was made aware of this adverse fact, Sealed Air stock declined by more than 5%, causing another approximate $300 million market capitalization loss, on high trading volume.

## APPLICABILITY OF THE PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

128.     Plaintiffs are entitled to a presumption of reliance for Defendants' material misrepresentations under the fraud-on-the-market doctrine because the market for Sealed Air publicly traded common stock was open, well-developed, and efficient at all times.  As a result of Defendants' materially false and misleading statements, Sealed Air publicly traded common stock traded at artificially inflated prices during the Class Period.  Plaintiffs and the other members of the Class purchased or otherwise acquired Sealed Air publicly traded common stock relying upon the integrity of the market price of those securities and the market information relating to Sealed Air and have been damaged thereby.

129.     The market for Sealed Air common stock was open, well developed and efficient at all relevant times.  As a result of the materially false and misleading statements and omissions alleged herein, Sealed Air common stock traded at artificially inflated prices during the Class Period.  Plaintiffs and other members of the Class purchased or otherwise acquired Sealed Air common stock relying upon the integrity of the market price of Sealed Air common stock and market information relating to Sealed Air, and have been damaged thereby.

130.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Sealed Air common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its operations, its management, its auditor selection process, its systems of disclosure controls and its corporate governance, as alleged herein.

131.    At all relevant times, the market for Sealed Air common stock was an efficient market for the following reasons, among others:

(a)    Sealed Air common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    As a public company, Sealed Air filed periodic public reports with the SEC and/or the NYSE;

(c)    Sealed Air regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Sealed Air was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

132.    As a result of the foregoing, the market for Sealed Air common stock promptly digested current information regarding Sealed Air from all publicly available sources and reflected such information in Sealed Air common stock price.  Under these circumstances, all purchasers of Sealed Air common stock during the Class Period suffered similar injury through their purchases of Sealed Air common stock at artificially inflated prices and a presumption of reliance applies.

133.    A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because Plaintiffs' claims are based, in significant part, on Defendants' material omissions.  Since this action involves Defendants' failure to disclose material adverse information regarding Sealed Air's operations,

positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of Defendants' material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

134.    The statutory safe harbor provided for forward-looking statements under the Private Securities Litigation Reform Act of 1995 does not apply to any of the false statements alleged herein.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.   In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not adequately identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Sealed Air who knew that the statement was false when made.

## CLASS ACTION ALLEGATIONS

135.    This is a class action on behalf of all purchasers of Sealed Air common stock during the Class Period who were damaged thereby.  Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased Sealed Air common stock between November 17, 2014 and June 20, 2019, inclusive, and were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of the

Company, at all relevant times, the members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

136.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Sealed Air common stock was actively traded on the NYSE.  While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class.  Millions of Sealed Air common shares were traded publicly during the Class Period on the NYSE.  As of April 29, 2019, there were approximately 157.7 million Sealed Air common shares outstanding.  Record owners and other members of the Class may be identified from records maintained by Sealed Air or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

137.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

138.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

139.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the operations, management, systems of disclosure controls, auditor selection process, and corporate governance of Sealed Air;

(c)     whether the price of Sealed Air common shares was artificially inflated during the Class Period; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

140.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

141.    Plaintiffs repeat and reallege each and every allegation contained above, as if fully set forth hereat.

142.    This Count is asserted against the Defendants for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

143.    During the Class Period, Defendants disseminated or approved the false or misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

144.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the operations, management and corporate governance of the Company, as specified herein.

145.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of Sealed Air common stock during the Class Period in an effort to maintain artificially high market price for Sealed Air common shares in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

146.    Each Defendant's liability arises from the following facts: (i) Stiehl was a high-level executive at the Company during the Class Period; (ii) Stiehl, by virtue of his responsibilities and activities as a senior executive officer of the Company was privy to and participated in the creation, development and reporting of the Company's affairs in accordance with relevant law and regulations; (iii) Stiehl had access to the Company's internal communications and other data and information at all relevant times; and (iv) Defendant Stiehl was aware that the Company's disseminated information to the investing public which he knew or recklessly disregarded was materially false and misleading.

147.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and

- 45 -

effect of concealing from the investing public the truth regarding the Company's operations, management, auditor selection process, systems of disclosure controls and corporate governance, thereby supporting the artificially inflated price of Sealed Air common shares.

148.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Sealed Air common stock was artificially inflated during the Class Period.  In ignorance of that fact, and relying directly or indirectly on the false and misleading statements made by the Defendants, or upon the integrity of the markets in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class purchased Sealed Air common stock during the Class Period at artificially high prices and were damaged as a result of the securities law violations alleged herein.

149.    At the time of said misrepresentations and omissions, Plaintiffs and the other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the significant problems alleged herein, which were not disclosed by Defendants, Plaintiffs and the other members of the Class would not have purchased or otherwise acquired Sealed Air common stock, or, if they had purchased such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

150.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.  As a direct and proximate result of the Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Sealed Air common stock during the Class Period.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against Stiehl

151.     Plaintiffs repeat and reallege each and every allegation above, as if fully set forth

hereat.

152.     This Count is asserted against the Stiehl for violations of Section 20(a) of the

Exchange Act.

153.     During the Class Period, Stiehl acted as a controlling persons of Sealed Air within the

meaning of Section 20(a) of the Exchange Act.

154.     By virtue of his executive position, share ownership, and culpable participation in the

fraudulent scheme, as alleged above, Stiehl had the power to influence and control and did, directly

or indirectly, influence and control the decision making of the Company, including the content and

dissemination of the various statements that Plaintiffs contend were false and misleading as detailed

herein.

155.     Stiehl was provided with or had unlimited access to the Company's internal

communications, public filings, and other statements alleged by Plaintiffs to be misleading prior to

or shortly after these statements were issued and had the ability to prevent the issuance of the

statements or cause them to be corrected.  In particular, Stiehl had direct involvement in and

responsibility over the selection of EY to serve as the Company's auditor, as well as the operation of

the Company and, therefore, is presumed to have had the power to control or influence the particular

conduct giving rise to the securities violations as alleged herein.

156.     By reason of such wrongful conduct, Stiehl is liable pursuant to Section 20(a) of the

Exchange Act.

157.   As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.   Determining that this action is a proper class action, and certifying Plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Lead Counsel;

B.   Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.   Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.   Awarding such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED:  July 13, 2020                          ROBBINS GELLER RUDMAN
                                                  & DOWD LLP
                                              SAMUEL H. RUDMAN
                                              ROBERT M. ROTHMAN
                                              DAVID A. ROSENFELD


                                           */s/ Robert M. Rothman*
                                       ROBERT M. ROTHMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
rrothman@rgrdlaw.com
drosenfeld@rgrdlaw.com

*Lead Counsel for Plaintiffs*

ASHER KELLY LAW
MICHAEL ASHER
JACQUELINE A. KELLY
25800 Northwestern Highway, Suite 1100
Southfield, MI  48075-812
Telephone: 248/746-2728
masher@asherkellylaw.com
jkelly@asherkellylaw.com


TREVETT CRISTO P.C.
MICHAEL T. HARREN
2 State Street, Suite 1000
Rochester, NY  14614
Telephone:  585/454-2181
mharren@trevettcristo.com

BLITMAN &KING LLP
Ginger B. LaChapelle
800 Troy-Schenectady Road, Second Floor
Latham, NY 12110-2424
Telephone:  518/785-4387
gblachapelle@bklawyers.com


*Additional Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on July 13, 2020, I authorized a true and correct copy of the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.

*/s/ Robert M. Rothman*
ROBERT M. ROTHMAN

ROBBINS GELLER RUDMAN
  & DOWD LLP
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
rrothman@rgrdlaw.com