UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————————— x

UA LOCAL 13 & EMPLOYERS GROUP : Civil Action No. 1:19-cv-10161-LLS-RWL
INSURANCE FUND, Individually and on :
Behalf of All Others Similarly Situated, : CLASS ACTION
:
               Plaintiff, :
:
      vs. :
:
SEALED AIR CORPORATION and :
WILLIAM G. STIEHL, :
:
               Defendants. :
:
——————————————————————————— x

**PLAINTIFFS' OMNIBUS MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ..................................................................................................1

II.     PRELIMINARY STATEMENT .........................................................................1

III.    STATEMENT OF FACTS ...................................................................................4

        A.      Sealed Air Claims a Massive Income Tax Deduction for 2014.............................4

        B.      Sealed Air Represents the EY Hiring Process Was "Competitive" and "Comprehensive"...................................................................................................6

        C.      The EY Hiring Process Was Not Remotely "Competitive" or "Comprehensive"...................................................................................................6

IV.     ARGUMENT........................................................................................................9

        A.      Applicable Legal Standards ..................................................................................9

        B.      The CAC Pleads Actionable Misrepresentations and Omissions..........................10

            1.      Defendants' Representations About the "*Competitive*" and "*Comprehensive*" Auditor Search Process Are Actionable .......................10

            2.      The EY Retention Statements Are Attributable to Both Stiehl and Sealed Air........................................................................................16

            3.      Defendants' Representations About Sealed Air's Corporate Policies and Procedures Are Actionable....................................................19

                a.      Defendants Code of Conduct and Code of Ethics Statements Are Actionable ..............................................................19

                b.      Defendants' Statements About Sealed Air's Disclosure Controls and Procedures Are Actionable.......................................21

                c.      The Statements in Stiehl's SOX Certifications Are Actionable.................................................................................22

        C.      The CAC Adequately Alleges Materiality.............................................................23

        D.      The CAC Adequately Alleges Violations of Items 303 and 503..........................26

**Page**

E.  The CAC Adequately Pleads Scienter ....................................................................28

    1.  Stiehl's "For Cause" Firing Supports a Compelling Inference of Scienter ...............................................................................................31

    2.  The SEC and DOJ Investigations Further Support an Inference of Scienter ...............................................................................................35

    3.  The Stock Sales at Issue Contribute to Scienter .......................................36

    4.  The CAC Adequately Alleges Sealed Air's Corporate Scienter ...............38

F.  The CAC Sufficiently Pleads a Control-Person Claim Against Stiehl..................40

    1.  Plaintiffs Plead a Primary Violation ..........................................................41

    2.  Stiehl Was a Control Person ......................................................................41

    3.  Stiehl Was a Culpable Participant in the Alleged Fraud............................42

V.  CONCLUSION.............................................................................................................43

# TABLE OF AUTHORITIES

**Page**

## CASES

*Acticon AG v. China N.E. Petroleum Holdings Ltd.*,
   615 F. App'x 44 (2d Cir. 2015) ....................................................................................40

*Aldridge v. A.T. Cross Corp.*,
   284 F.3d 72 (1st Cir. 2002)...........................................................................................25

*Alpha Capital Anstalt*,
   2014 WL 6466994,
   (S.D.N.Y. Nov. 18, 2014) .............................................................................................41

*Batwin v. Occam Networks, Inc.*,
   2008 WL 2676364
   (C.D. Cal. July 1, 2008) ................................................................................................36

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)...........................................................................................9, 12, 14

*Berman v. Sink*,
   2016 WL 8730672
   (E.D. Cal. May 27, 2016)...............................................................................................15

*Burkle v. OTK Assocs., LLC*,
   2 F. Supp. 3d 519 (S.D.N.Y. 2014) ...............................................................................23

*C.D.T.S. No. 1 v. UBS AG*,
   2013 WL 6576031
   (S.D.N.Y. Dec. 13, 2013)........................................................................................32, 34

*Caiola v. Citibank, N.A., N.Y.*,
   295 F.3d 312 (2d Cir. 2002)...........................................................................................10

*Christine Asia Co. Ltd. v. Yun Ma*,
   718 F. App'x 20 (2d Cir. 2017) .....................................................................................33

*CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*,
   735 F.3d 114 (2d Cir. 2013)...........................................................................................29

*City of Austin Police Retirement System v. ITT Educational Services, Inc.*,
   388 F. Supp. 2d 932 (S.D. Ind. 2005) ...........................................................................14

*City of Roseville Employees' Retirement System v. EnergySolutions, Inc.*,
   814 F. Supp. 2d 395 (S.D.N.Y. 2011) ..............................................................18, 19, 28

**Page**

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
    875 F. Supp. 2d 359 (S.D.N.Y. 2012)...................................................................18, 25, 29, 37

*Constr. Laborers Pension Tr. v. CBS Corp.*,
    433 F. Supp. 3d 515 (S.D.N.Y. 2020)..................................................................20, 33, 38, 42

*De Vito v. Liquid Holdings Grp., Inc.*,
    2018 WL 6891832
    (D.N.J. Dec. 31, 2018) ...........................................................................................................36

*Dobina v. Weatherford Int'l Ltd.*,
    909 F. Supp. 2d 228 (S.D.N.Y. 2012)....................................................................................41

*DoubleLine Capital LP v. Construtora Norberto Odebrecht, S.A.*,
    413 F. Supp. 3d 187 (S.D.N.Y. Sept. 22, 2019) ....................................................................40

*Duttle v. Bandler & Kass*,
    1990 WL 113187
    (S.D.N.Y. July 30, 1990) ........................................................................................................15

*ECA & Local 134 IBEW Joint Pension Tr. v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009) .............................................................................................30, 36

*Emps.' Ret. Sys. of Gov't of V.I. v. Blanford*,
    794 F.3d 297 (2d Cir. 2015)................................................................................13, 29, 32, 37

*FIH, LLC v. Found. Capital Partners LLC*,
    176 F. Supp. 3d 52 (D. Conn. 2016)................................................................................16, 28

*Floyd v. Liechtung*,
    2013 WL 1195114
    (S.D.N.Y. Mar. 25, 2013) .......................................................................................................42

*Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*,
    268 F. Supp. 3d 526 (S.D.N.Y. 2017)..............................................................................25, 37

*Freudenberg v. E*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010)....................................................................................38

*Galestan v. OneMain Holdings, Inc.*,
    348 F. Supp. 3d 282 (S.D.N.Y. 2018)....................................................................................12

**Page**

*Gamm v. Sanderson Farms, Inc.*,
  944 F.3d 455 (2d Cir. 2019)......................................................................13, 14

*Ganino v. Citizens Utils. Co.*,
  228 F.3d 154 (2d Cir. 2000).............................................................9, 26, 28, 36

*George v. China Auto. Sys., Inc.*,
  2012 WL 3205062
  (S.D.N.Y. Aug. 8, 2012) ...............................................................................30, 32

*Gruber v. Gilbertson*,
  2018 WL 1418188
  (S.D.N.Y. Mar. 20, 2018) ...................................................................................42

*Hall v. Children's Place Retail Stores, Inc.*,
  580 F. Supp. 2d 212 (S.D.N.Y. 2008)................................................................36

*Holwill v. AbbVie Inc.*,
  2020 WL 5235005
  (N.D. Ill. Sept. 1, 2020) ....................................................................................20

*Hutchins v. NBTY, Inc.*,
  2012 WL 1078823
  (E.D.N.Y. Mar. 30, 2012) ..................................................................................37

*In re Alstom SA Sec. Litig.*,
  406 F. Supp. 2d 433 (S.D.N.Y. 2005)................................................................32

*In re Axis Capital Holdings Ltd., Sec. Litig.*,
  456 F. Supp. 2d 576 (S.D.N.Y. 2006)................................................................14

*In re Barrick Gold Sec. Litig.*,
  2015 WL 3486045
  (S.D.N.Y. June 2, 2015)................................................................................16, 18

*In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*,
  763 F. Supp. 2d 423 (S.D.N.Y. 2011)................................................................34

*In re BHP Billiton Ltd. Sec. Litig.*,
  276 F. Supp. 3d 65 (S.D.N.Y. 2017)..................................................................14

*In re Bioscrip, Inc. Sec. Litig.*,
  95 F. Supp. 3d 711 (S.D.N.Y. 2015)..................................................................10

**Page**

*In re Bristol Myers Squibb Co. Sec. Litig.*,
586 F. Supp. 2d 148 (S.D.N.Y. 2008)...............................................................35, 43

*In re Cannavest Corp. Sec. Litig.*,
307 F. Supp. 3d 222 (S.D.N.Y. 2018)....................................................................17

*In re Daou Sys., Inc.*,
411 F.3d 1006 (9th Cir. 2005) ...............................................................................38

*In re Deutsche Telekom AG Securities Litigation*,
2002 WL 244597
(S.D.N.Y. Feb. 20, 2002) .......................................................................................42

*In re Electrobras Sec. Litig.*,
245 F. Supp. 3d 450 (S.D.N.Y. 2017)....................................................................20

*In re Fairway Grp. Holding Corp. Sec. Litig.*,
2015 WL 249508
(S.D.N.Y. Jan. 20, 2015)........................................................................................31

*In re FBR Inc. Sec. Litig.*,
544 F. Supp. 2d 346 (S.D.N.Y. 2008)....................................................................14

*In re Flag Telecom Holdings, Ltd. Securities Litigation*,
308 F. Supp. 2d 249 (S.D.N.Y. 2004)...............................................................41, 42

*In re Galena Biopharma, Inc. Sec. Litig.*,
117 F. Supp. 3d 1145 (D. Or. 2015) ......................................................................31

*In re Gen. Elec. Co. Sec. Litig.*,
857 F. Supp. 2d 367 (S.D.N.Y. 2012).....................................................................33

*In re Gentiva Sec. Litig.*,
932 F. Supp. 2d 353 (E.D.N.Y. 2013) ....................................................................35

*In re Glob. Brokerage, Inc.*,
2019 WL 1428395
(S.D.N.Y. Mar. 28, 2019) ................................................................................23, 38

*In re Goldman Sachs Grp., Inc. Sec. Litig.*,
2014 WL 2815571
(S.D.N.Y. June 23, 2014)........................................................................................22

**Page**

*In re Grupo Televisa Securities Litigation*,
  368 F. Supp. 3d 711 (S.D.N.Y. 2019)................................................................19, 20

*In re Insys Therapeutics, Inc. Sec. Litig.*,
  2018 WL 2943746
  (S.D.N.Y. June 12, 2018).........................................................................................26

*In re Interpool, Inc. Sec. Litig.*,
  2005 WL 2000237
  (D.N.J. Aug. 17, 2005) ............................................................................................32

*In re LDK Solar Sec. Litig.*,
  584 F. Supp. 2d 1230 (N.D. Cal. 2008) ..................................................................15

*In re McKesson HBOC, Inc. Sec. Litig.*,
  126 F. Supp. 2d 1248 (N.D. Cal. 2000) ..................................................................31

*In re Moody's Corp. Sec. Litig.*,
  599 F. Supp. 2d 493 (S.D.N.Y. 2009).....................................................................39

*In re Morgan Stanley Info. Fund Sec. Litig.*,
  592 F.3d 347 (2d Cir. 2010).....................................................................................10

*In re Mylan N.V. Sec. Litig.*,
  2018 WL 1595985
  (S.D.N.Y. Mar. 28, 2018) ........................................................................................34

*In re Nevsun Res. Ltd.*,
  2013 WL 6017402
  (S.D.N.Y. Sept. 27, 2013)........................................................................................18

*In re OSG Sec. Litig.*,
  12 F. Supp. 3d 622 (S.D.N.Y. 2014).......................................................................31

*In re Packaged Seafood Prods. Antitrust Litig.*,
  2017 WL 35571
  (S.D. Cal. Jan. 3, 2017)............................................................................................35

*In re Parmalat Sec. Litig.*,
  375 F. Supp. 2d 278 (S.D.N.Y. 2005)......................................................................24

*In re Refco, Inc. Sec. Litig.*,
  503 F. Supp. 2d 611 (S.D.N.Y. 2007).................................................................40, 42

**Page**

*In re Salix Pharms., Ltd.*,
 2016 WL 1629341
 (S.D.N.Y. Apr. 22, 2016)..................................................................................................9, 35

*In re Satyam Comput. Servs. Ltd. Sec. Litig.*,
 915 F. Supp. 2d 450 (S.D.N.Y. 2013)....................................................................................17

*In re Scholastic Corp. Sec. Litig.*,
 252 F.3d 63 (2d Cir. 2001)...........................................................................................11, 12, 37

*In re Scottish Re Grp. Sec. Litig.*,
 524 F. Supp. 2d. 370 (S.D.N.Y. 2007)..................................................................................41

*In re Signet Jewelers Ltd. Sec. Litig.*,
 2018 WL 6167889
 (S.D.N.Y. Nov. 26, 2018) .............................................................................................19, 20

*In re Signet Jewelers Ltd. Sec. Litig.*,
 389 F. Supp. 3d 221 (S.D.N.Y. 2019)....................................................................................20

*In re Smith Barney Transfer Agent Litigation*,
 884 F. Supp. 2d 152 (S.D.N.Y. 2012)...................................................................................42

*In re Tenaris S.A. Sec. Litig.*,
 2020 WL 6018919
 (E.D.N.Y. Oct. 9, 2020) ........................................................................................18, 20, 38

*In re Vale S.A. Sec. Litig.*,
 2020 WL 2610979
 (E.D.N.Y. May 20, 2020) ......................................................................................................12

*In re Virtus Inv. Partners, Inc. Sec. Litig.*,
 195 F. Supp. 3d 528 (S.D.N.Y. 2016)...................................................................................40

*In re Vivendi Universal, S.A. Sec. Litig.*,
 765 F. Supp. 2d 512 (S.D.N.Y. 2011)...................................................................................17

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
 818 F.3d 85 (2d Cir. 2016)....................................................................................................27

*J.W. v. City of Oxnard*,
 2008 WL 4810298
 (C.D. Cal. Oct. 27, 2008) ....................................................................................................16

**Page**

*Jackson v. Abernathy*
    960 F.3d 94 (2d Cir. 2020)........................................................................................39

*Janus Capital Group, Inc. v. First Derivative Traders*,
    564 U.S. 135 (2011)..................................................................................16, 17, 38

*Kaltman v. Key Energy Servs., Inc.*,
    447 F. Supp. 2d 648 (W.D. Tex. 2006)....................................................................32

*Litwin v. Blackstone Grp, L.P.*,
    634 F.3d 706 (2d Cir. 2011)............................................................................23, 27, 28

*Lopez v. Ctpartners Executive Search Inc.*,
    173 F. Supp. 3d 12 (S.D.N.Y. 2016).......................................................................27

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
    797 F.3d 160 (2d Cir. 2015)...........................................................................39, 43

*Luna v. Marvell Tech. Grp.*,
    2017 WL 2171273
    (N.D. Cal. May 17, 2017) ...............................................................................31, 34

*Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*,
    164 F. Supp. 3d 568 (S.D.N.Y. 2016).....................................................................14

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
    761 F.3d 245 (2d Cir. 2014)....................................................................................11

*Miss. Pub. Emps. Ret. Sys. v. Boston Sci. Corp.*,
    523 F.3d 75 (1st Cir. 2008)....................................................................................23

*Nagelberg v. Meli*,
    299 F. Supp. 3d 409 (S.D.N.Y. 2017)......................................................................9

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
    455 Fed. Appx. 10 (2d Cir. 2011)...........................................................................38

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000).........................................................................10, 12, 33

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
    2019 WL 1247583
    (S.D.N.Y. Mar. 19, 2019) ................................................................................21, 23

**Page**

*Okla. Police Pension Fund & Ret. Sys. v. Teligent, Inc.*,
   2020 WL 3268531
   (S.D.N.Y. June 17, 2020)......................................................................................................40

*Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*,
   595 F.3d 86 (2d Cir. 2010)....................................................................................................10

*Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*,
   874 F. Supp. 2d 341 (S.D.N.Y. 2012).............................................................................18, 38

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
   681 F.3d 114 (2d Cir. 2012)..................................................................................................26

*Patel v. L-3 Commc'ns Holdings Inc.*,
   2016 WL 1629325
   (S.D.N.Y. Apr. 21, 2016)......................................................................................................39

*PetEdge, Inc. v. Garg*,
   234 F. Supp. 3d 477 (S.D.N.Y. 2017)...................................................................................34

*Plumbers & Pipefitters Nat'l Pension Fund v. Davis*,
   2020 WL 1877821
   (S.D.N.Y. Apr. 14, 2020)......................................................................................................11

*Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*,
   89 F. Supp. 3d 602 (S.D.N.Y. 2015)..........................................................................22, 35, 38

*Pub. Pension Fund Grp. v. KV Pharm. Co.*,
   2013 WL 1831427
   (E.D. Mo. Apr. 30, 2013)......................................................................................................31

*Rex & Roberta Ling Living Tr. u/a Dec. 6, 1990 v. B. Commc'ns., Ltd.*,
   346 F. Supp. 3d 389 (S.D.N.Y. 2018)...................................................................................40

*Roth v. Jennings*,
   489 F.3d 499 (2d Cir. 2007)..................................................................................................12

*Schiro v. Cemex, S.A.B. de C.V.*,
   438 F. Supp. 3d 194 (S.D.N.Y. 2020)...................................................................................13

*SEC v. First Jersey Sec., Inc.*,
   101 F.3d 1450 (2d Cir. 1996)................................................................................................41

**Page**

*Sedima, S.P.R.L. v. Imrex Co., Inc.*,
    741 F.2d 482 (2d Cir. 1984)
    *rev'd on other grounds, Sedima, S.P.R.L. v. Imrex Co., Inc.*,
    473 U.S. 479 (1985).....................................................................................................15

*Setzer v. Omega Healthcare Inv'rs, Inc.*,
    968 F. 3d 204 (2d Cir. 2020)......................................................................................32

*Silverstrand Invs. v. AMAG Pharms., Inc.*,
    707 F.3d 95 (1st Cir. 2013).........................................................................................28

*Singh v. Cigna Corp.*,
    918 F.3d 57 (2d Cir. 2019).........................................................................................21

*Stevelman v. Alias Research Inc.*,
    174 F.3d 79 (2d Cir. 1999).........................................................................................37

*Stratte-McClure v. Morgan Stanley*,
    776 F.3d 94 (2d Cir. 2015)..............................................................................26, 27, 28

*Suez Equity Invs., L.P. v. Toronto-Dominion Bank*,
    250 F.3d 87 (2d Cir. 2001).........................................................................................43

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
    531 F.3d 190 (2d Cir. 2008).......................................................................................39

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)............................................................................................ *passim*

*U.S. v. Mahaffy*,
    693 F.3d 113 (2d Cir. 2012).......................................................................................16

*Van Dongen v. CNinsure Inc.*,
    951 F. Supp. 2d 457 (S.D.N.Y. 2013)...................................................................31, 37

*Washington State Investment Board v. Odebrecht*,
    2020 WL 2555431
    (S.D.N.Y. May 20, 2020)...........................................................................................18

*Yi Xiang, et al., v. Inovalon Holdings, Inc., et al.*,
    268 F. Supp. 3d 515 (S.D.N.Y. 2019).......................................................................26

**Page**

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
    §78j(b)................................................................................................9, 16, 17, 34
    §78u-4(b)(1)..............................................................................................10
    §78u-4(b)(2)..............................................................................................28
    §78z..........................................................................................................15

Federal Rules of Civil Procedure
    Rule 9(b) ............................................................................................ *passim*
    Rule 12(b)(6).............................................................................................9
    Rule 15(a)(2).............................................................................................43

17 C.F.R.
    §229.303...................................................................................................26
    §229.307...................................................................................................21
    §229.503...................................................................................................28
    §240.10b-5 .................................................................................................9

## I.    INTRODUCTION

Lead Plaintiffs UA Local 13 Pension Fund, UA Local 13 & Employers Group Insurance Fund, Plumbers & Steamfitters Local 267 Pension Fund and additional Plaintiff Plumbers and Steamfitters Local No. 7 Pension and Welfare Funds (collectively, "Plaintiffs"), respectfully submit this omnibus memorandum of law in opposition to the motions to dismiss the Corrected Amended Complaint (the "CAC") filed by defendants Sealed Air Corporation ("Sealed Air" or the "Company") and defendant William Stiehl ("Stiehl") (collectively, "Defendants").[1]

## II.    PRELIMINARY STATEMENT

Plaintiffs have alleged a straightforward case of securities fraud.  Defendants made material misrepresentations concerning the process by which Sealed Air selected its independent auditor.  Specifically, on November 14, 2014, Sealed Air announced that following the completion of its 2014 audited financial statements, the Company intended to terminate its relationship with its then auditor, KPMG, and hire Ernst & Young LLP ("EY") to serve as its outside auditor beginning with fiscal year 2015.  Recognizing the importance to investors of hiring a new independent auditor, Sealed Air solicited shareholder ratification of its retention of EY.

Purportedly to aid shareholders in making their decision, Defendants chose to provide insight behind its decision to recommend that shareholders vote in favor of EY.  For example, Defendants repeatedly represented that they engaged in a "competitive search process" that "involved several international registered public accounting firms."  Bolstering their contention that the search process was competitive, Defendants further represented that the Company's employees conducted their

---

[1]    Paragraphs of the CAC (ECF No. 32) are cited as "¶__."  Sealed Air's memorandum of law (ECF No. 34) is cited as "SA Br."  Stiehl's memorandum of law (ECF No. 37) is cited as "Stiehl Br."  The Declaration of Robert M. Rothman in support of this opposition is referred to herein as "Rothman Decl."  References to the exhibits attached thereto appear herein as "Rothman Decl. Ex. __."  Unless otherwise noted, emphasis has been added and internal citations and quotations have been omitted.  Capitalized terms not defined herein are as defined in the CAC.

business on a highly ethical level, avoiding even the appearance of a conflict of interest, and disclosed any impropriety. Each of these representations was false.

As alleged in the CAC – the allegations of which must be accepted as true – the Company did not engage in a competitive search process involving several international registered public accounting firms. And the Company's employees neither conducted their business on a highly ethical level nor disclosed improprieties. Rather, one of the highest ranking members of Sealed Air management, Stiehl, who served at various times as the Company's Chief Financial Officer, Chief Accounting Officer, and Controller, and who signed each of the Company's annual and quarterly reports filed with the SEC during the Class Period, rigged the process for selecting the auditor.

On August 6, 2018, Sealed Air disclosed that it was advised more than a month earlier that it had been under investigation by the SEC concerning its accounting for income taxes, its financial reporting disclosures and other matters. Then, in June 2019, the Company revealed that it had received an additional subpoena from the SEC seeking documents and information relating to the "process by which the Company selected its independent audit firm [EY] for the period beginning with fiscal year 2015, and relating to the independence of that audit firm [EY]."

In connection therewith, the audit committee of the Company's Board of Directors (the "Audit Committee") began its own internal review into the process by which Sealed Air selected EY. Based on the results of that internal review, the Audit Committee Sealed Air terminated Stiehl's employment "for cause." The Company then admitted that it also fired EY as a result of "the pendency of the SEC investigation, along with the [Audit] Committee's dissatisfaction with information it learned about the process by which EY was selected as auditor."

Despite these clear misrepresentations about the process by which the Company selected its auditor, as well as those concerning its codes of conduct and ethics, Defendants raise a hodgepodge

- 2 -

of arguments seeking to dismiss the case. None of these arguments, however, have merit and the motions should be denied. For example, the Company claims that Plaintiffs did not plead fraud with the requisite particularity. But Defendants conflate Rule 9(b)'s particularity requirement of pleading the "who, what, where, when and why" concerning the allegedly fraudulent statements, with a requirement to allege precise details about the underlying wrongdoing. There is no dispute that Plaintiffs have alleged each of the particulars regarding the statements at issue in this action. And there is no requirement at this stage of the proceedings that Plaintiffs present evidence regarding falsity. Rather, falsity is determined based on a plausibility standard. And it is certainly plausible, based on the investigations by the SEC, Audit Committee, and later the U.S. Department of Justice into the process by which the Company selected its auditor, which resulted in the Company admitting that it terminated defendant Stiehl, Sealed Air's CFO, "**for cause**" and the termination of EY that the process was rigged.

The Company also resorts to the general rule that Defendants do not need to accuse themselves of wrongdoing. However, Defendants ignore the critical and universally accepted exception to that rule that mandates once Defendants chose to speak on a subject, they must disclose all facts necessary so that their statements are not misleading, even if those disclosures require admissions of wrongdoing. Here, even if Defendants did not need to disclose how they selected their auditor, once they chose to speak on that subject, they were required to disclose the bid rigging.

Defendants also claim that Plaintiffs have failed to allege scienter. But Plaintiffs have alleged the personal involvement of Defendant Stiehl – the Company's then-Chief Accounting Officer and Controller – in the rigged EY hiring process. The Company fired Stiehl "for cause" precisely because of his conduct. Not only are these allegations sufficient to establish Stiehl's own conscious misbehavior or recklessness, but also that of Sealed Air because under controlling Second

- 3 -

Circuit authority, his scienter is imputed to the Company. Further, despite being a senior executive officer of the Company, and the person whose misconduct is at the heart of this litigation, Stiehl launches a fruitless attack arguing that Plaintiffs fail to plead a control person claim against him. This, too, is without merit, as Stiehl clearly knew of his bid rigging activities, yet falsely proclaimed that the process was competitive.

In a last ditch effort, Defendants claim that their statements were not material. This argument also fails. Acknowledging the significance to investors of retaining a new independent auditor, Sealed Air put the final say on its hiring of EY up for a shareholder vote. In addition, Code of Conduct and Ethics statements are highly material, as this Court and others have held.

Plaintiffs have satisfied their obligation of adequately alleging a violation of the federal securities laws. Accordingly, the Court should deny Defendants' motions.

## III.      STATEMENT OF FACTS

### A.      Sealed Air Claims a Massive Income Tax Deduction for 2014

Sealed Air is a global manufacturer and seller of packaging and equipment systems used in food, industrial, medical, and consumer applications. ¶30. The Company operates through two business segments – Food Care and Product Care. *Id.* Sealed Air's Food Care business segment is a provider of integrated packaging materials and equipment solutions. ¶31. The Product Care business segment's solutions are designed to protect valuable goods during shipment and enhance order fulfillment velocity. ¶32. The Company's Product Care solutions are marketed through brands including Bubble Wrap® packaging, Cryovac® performance shrink films, Instapak® polyurethane foam packaging systems, and Korrvu® suspension and retention packaging. *Id.*

The selection of Sealed Air's independent auditor was highly material to investors due to an ongoing $1.5 billion dispute between Sealed Air and the IRS. Specifically, in 1998, the Company acquired W.R. Grace & Co.'s ("Grace") Cryovac packaging business. ¶3. In connection therewith,

- 4 -

Grace and its businesses agreed to retain and to indemnify Sealed Air for, from and against all liabilities, including liabilities relating to asbestos-containing products previously manufactured or sold by Grace. *Id.* Shortly thereafter, Sealed Air was sued in a multitude of lawsuits alleging that Cryovac transaction amounted to a fraudulent transfer and/or gave rise to successor liability, and that, as a result, the Company was financially responsible for the alleged asbestos liabilities of Grace and its subsidiaries. ¶35.

Grace would later file for bankruptcy protection. *Id.* After protracted litigation, the parties to those underlying actions entered into a definitive settlement agreement to resolve all then-current and future asbestos-related claims, fraudulent transfer claims, and successor liability claims made against Sealed Air arising from the Cryovac Transaction (the "Settlement Agreement"). *Id.* Grace emerged from bankruptcy and, in accordance with the terms of the Settlement Agreement and reorganization plan, Sealed Air, *inter alia*, made a cash payment of $930 million to trusts established for the benefit of the Grace-related asbestos claimants. ¶37.

In connection with consideration Sealed Air issued pursuant to the Settlement Agreement, it reported a **$1.49 billion** income tax deduction on its 2014 consolidated U.S. income tax return. Sealed Air received a $235 million tax refund during the first quarter of 2015 in connection with the income tax deduction, as well as total net deferred tax assets of $175 million from net operating losses available to offset taxable income in future tax years. ¶¶41-42. Shortly thereafter, Sealed Air disclosed that the IRS intended to disallow the $1.49 billion deduction in connection with the payments it made pursuant to the Settlement Agreement "in full." *Id.*

On the heels of this disclosure, while facing major tax-related implications in connection with its $1.49 billion income tax deduction, Sealed Air announced that the Audit Committee had dismissed KPMG as the Company's independent public accounting firm, after having served in such

- 5 -

capacity since 1998.  ¶43.  In a press release filed with the SEC on Form 8-K (the "November 2014 Form 8-K"), the Company stated that KPMG's dismissal was to be effective with the completion of KPMG's audit of Sealed Air's fiscal year ended December 31, 2014 financial statements and the filing of the related Annual Report on Form 10-K.  ¶43.

Sealed Air also announced that the Audit Committee had approved the selection of EY to serve as the Company's auditor beginning with the fiscal year ending December 31, 2015.  ¶44.

### B.    Sealed Air Represents the EY Hiring Process Was "Competitive" and "Comprehensive"

In the November 2014 Form 8-K, Sealed Air highlighted the process by which EY was supposedly chosen to be its auditor, stating, in pertinent part, as follows:

> On November 11, 2014, the Audit Committee of the Board of Directors (the "Audit Committee") of Sealed Air Corporation ("Sealed Air" or the "Company") approved the selection of Ernst & Young LLP ("EY") to serve as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2015 **following a competitive search process.  The competitive search process involved several international registered public accounting firms**. . . .

*Id*.  To obtain shareholder approval of EY's retention, Sealed Air reiterated to its shareholders in a definitive proxy statement on Schedule 14A (the "2015 Proxy Statement") that it hired EY following a "**competitive search process**" and a "**comprehensive request for proposal process**."  ¶52.

### C.    The EY Hiring Process Was Not Remotely "Competitive" or "Comprehensive"

Despite Defendants' express representations to the contrary, EY was not selected as Sealed Air's auditor pursuant to anything closely resembling a "comprehensive" or "competitive" search process among audit firms.  ¶¶8, 45, 52, 54.  Rather, defendant Stiehl, the Company's then-Chief Accounting Officer and Controller, rigged the process to ensure that EY was selected as Sealed Air's independent auditor.  ¶¶45, 54.  After doing so, Defendants, throughout the Class Period, made positive statements about the Company's ethics and compliance policies.  ¶¶47-50.  This included,

*inter alia*, statements pertaining to Sealed Air's disclosure controls and procedures, corporate governance and codes of conduct and ethics – none of which even hinted to investors that these processes and controls were being circumvented by one of the Company's executive financial officers, Stiehl, who had manipulated the process of hiring EY to ensure that it would be retained as the Company's auditor.  ¶¶47-50, 55-57, 59, 63-65, 67, 71-72, 75, 78, 83, 87.

Thereafter, on August 6, 2018, the Company announced that it had received a subpoena from the SEC seeking documents concerning the Company's accounting for income taxes, its financial reporting and disclosures, and "other matters."  ¶89.  On the announcement of this news, the price of Sealed Air stock fell more than 5% on very heavy trading volume.  ¶90.  As the SEC continued to dig into Sealed Air's financial reporting, details of the tainted process by which EY was hired began to emerge.

On May 2, 2019, Sealed Air received another subpoena from the SEC seeking documents and information relating to the process by which the Company selected EY as its independent audit firm for the period beginning with the fiscal year 2015, as well as EY's independence.  ¶92.  After receiving the May 2019 subpoena, Sealed Air's Audit Committee initiated an internal review to specifically examine the process by which EY was selected as the Company's auditor.  ¶93.

A mere six weeks after commencing the review, on June 20, 2019, Sealed Air filed a press release with the SEC on Form 8-K announcing that as a direct result of the internal investigation into this process by which EY was selected as Sealed Air's auditor, the Company had fired Stiehl "**for cause**."  ¶93.  The press release was explicit that Stiehl was fired because of his role in the selection of EY as the Company's auditor, stating, in pertinent part, as follows:

> On June 19, 2019, the Board of Directors (the "Board") of Sealed Air Corporation (the "Company") **terminated the employment of William G. Stiehl as Chief Financial Officer for cause**.  **Mr. Stiehl's termination is related to an internal review** by the Audit Committee of the Board in connection with the previously

- 7 -

disclosed investigation by the U.S. Securities and Exchange Commission ("SEC"). This review followed the Company's receipt of an additional subpoena for documents and information on May 2, 2019, **relating to the process by which the Company selected its independent audit firm for the period beginning with fiscal year 2015, and relating to the independence of that audit firm**. The Company is continuing to cooperate with the SEC's investigation.

¶¶92-93.

In reaction to this news, the price of Sealed Air stock fell on very heavy trading volume, causing a $300 million diminution in the Company's market value. ¶94.

The federal government's inquiry into Sealed Air's tainted retention of EY as its auditor did not end there. On August 2, 2019, Sealed Air disclosed the existence of yet another federal investigation, announcing that it had received a Grand Jury subpoena from the U.S. Attorney's Office "seeking documents relating to the termination of our former CFO and relating to the process by which the Company selected its independent audit firm beginning with fiscal year 2015." ¶95.

Just five days later, on August 7, 2019, Sealed Air fired EY effective immediately. ¶¶44, 52, 96. In an August 12, 2019 press release, Sealed Air made clear that EY's firing was directly related to the process by which it was originally retained by the Company, stating as follows:

> On August 7, 2019, the Audit Committee of the Board of Directors (the "Committee") of Sealed Air Corporation (the "Company") dismissed Ernst & Young LLP ("EY") as the Company's independent registered public accounting firm effective as of that date. **This change is being made in light of the Company's previously disclosed receipt of a subpoena** from the U.S. Securities and Exchange Commission ("SEC") on May 2, 2019 for documents and information **relating to the process by which the Company selected its independent audit firm for the period beginning with fiscal year 2015, and relating to the independence of that audit firm**. EY has reaffirmed to the Company that EY believes there has been no independence violation, and the Company has not reached a contrary conclusion. **Nonetheless, the pendency of the SEC investigation, along with the Committee's dissatisfaction with information it learned about the process by which EY was selected as auditor, caused the Company to make this change** now to allow for an orderly transition for the audit of the Company's fiscal 2019 consolidated financial statements and to minimize the risk of disruption that could arise in the event of an unplanned change in independent auditors at an undetermined time in the future.

¶96.

Although the Company failed to provide additional details regarding the investigations, on February 6, 2020, *The Wall Street Journal* reported in an article entitled "Ernst & Young Won a Multimillion-Dollar Audit Spot. Investigators Want to Know Why," that the SEC and federal prosecutors in North Carolina were "**investigating allegations that Mr. Stiehl rigged the competition** to win Sealed Air's multimillion-dollar audit contract in favor of Ernst & Young **by tipping the Big Four firm details of rival KPMG's bid**[.]" Rothman Decl. Ex. 1 at 2. In addition, the article stated that "SEC officials widened their inquiry to look at Ernst & Young's independence **after coming across emails that allegedly showed Mr. Stiehl interfered in the competition held in 2014 to select an audit firm**, according to a person familiar with the matter." *Id*. at 4.

## IV.    ARGUMENT

### A.    Applicable Legal Standards

"In general, to survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead facts sufficient 'to state a claim to relief that is plausible on its face.'" *In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *4 (S.D.N.Y. Apr. 22, 2016) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim is plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Nagelberg v. Meli*, 299 F. Supp. 3d 409, 413 (S.D.N.Y. 2017) (Stanton, J.). Even in securities fraud cases, when evaluating a motion to dismiss, a court must construe the complaint liberally, "accept[ing] all factual allegations in the complaint as true" and construing them in the light most favorable to the plaintiff. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

Under Section 10(b) and Rule 10b-5, "a plaintiff must plead that the defendant . . . made a materially false statement or omitted a material fact, with scienter, and that . . . defendant's action caused injury to the plaintiff." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000).

### B.    The CAC Pleads Actionable Misrepresentations and Omissions

To allege an actionable misstatement or omission, a plaintiff is required to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. §78u-4(b)(1). To do so, a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000). The "'veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead'" investors; thus, even literally true statements can, through context and presentation, mislead investors. *In re Bioscrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 727 (S.D.N.Y. 2015) (quoting *Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010)). Once a party chooses to speak, it has a "duty to be both accurate and complete." *Caiola v. Citibank, N.A., N.Y.*, 295 F.3d 312, 331 (2d Cir. 2002). "The literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of defendants' representations, taken together and in context." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010).

### 1.    Defendants' Representations About the "*Competitive*" and "*Comprehensive*" Auditor Search Process Are Actionable

Defendants made actionable misrepresentations by repeatedly assuring investors that Sealed Air hired EY as its auditor following both "**a competitive search process**" and a "**comprehensive request for proposal process**." ¶¶44, 52 (sometimes referred to herein as, the "EY Retention Statements"). These statements were false. Just weeks after receiving a subpoena explicitly relating to the process by which the Company selected EY as its auditor and launching its own internal investigation on the issue, Sealed Air took the extraordinary step of firing Stiehl, its Chief Financial Officer, "for cause." ¶93. Five days after receiving a criminal subpoena which Sealed Air described

as "relating to the termination of our former CFO and relating to the process by which the Company selected its independent audit firm" the Company fired EY.  ¶95.  It placed the reason for terminating EY squarely on the Audit Committee's "**dissatisfaction with information it learned about the process by which EY was selected as auditor**."  ¶96.  Furthermore, *The Wall Street Journal* later revealed that "**after coming across emails that allegedly showed Mr. Stiehl interfered in the competition**," the SEC and federal prosecutors are "**investigating allegations that Mr. Stiehl rigged the competition**" to be Sealed Air's auditor in EY's favor "**by tipping the Big Four firm details of rival KPMG's bid**."  Rothman Decl. Ex. 1 at 2, 4.  The CAC's allegations make clear that the EY hiring process was nothing close to being "competitive" or "comprehensive." Accordingly, these material misrepresentations are actionable because they "'affirmatively created an impression of a state of affairs that differ[ed] in a material way from the one that actually existed.'"  *Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, 2020 WL 1877821, at *7 (S.D.N.Y. Apr. 14, 2020); *see also Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250-51 (2d Cir. 2014) ("[e]ven when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth").

To plead with particularity requires no more than to "identify the statements plaintiff asserts were fraudulent and why, in plaintiff's view, they were fraudulent, specifying who made them, and where and when they were made."  *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 69-70 (2d Cir. 2001).  The CAC alleges that on November 4, 2014 and April 2, 2015, Defendants declared to investors that Sealed Air hired EY as the Company's auditor "following a competitive search process."  ¶44.  Plaintiffs allege who made each statement, what in particular was said, where the statement was made, when the statement was made, and why the statements were materially false and misleading, *i.e.*, because Defendants knew, or recklessly disregarded, that Mr. Stiehl

manipulated the bidding process to ensure that EY won.  ¶¶44, 52, 92-93.  These allegations are sufficiently particular.  *See In re Vale S.A. Sec. Litig.*, 2020 WL 2610979, at \*19 (E.D.N.Y. May 20, 2020) (finding claim stated with requisite particularity where, like here, the complaint "introduces each statement by identifying the context and speaker and provides the relevant language, emphasizing the allegedly problematic portions in bold, italics, and underline.  The Complaint then follows each statement with an explanation of what Defendants allegedly knew or recklessly disregarded, what information should have been disclosed, and why.").

Despite these well-pleaded allegations, Sealed Air argues that Plaintiffs must provide granular detail about the EY hiring process at the pleading stage.  *See, e.g.*, SA Br. at 7-8.  Sealed Air is mistaken.  The Second Circuit "do[es] not require the pleading of detailed evidentiary matter[,]" (*Scholastic*, 252 F.3d at 72), but simply sufficient facts "to support a reasonable belief" that defendants' statements were materially false or misleading.  *Novak*, 216 F.3d at 314 n.1.  The facts alleged in the CAC support a reasonable belief that Defendants' statements to investors that the EY Retention Statements were false and misleading.  ¶¶44, 52.[2]  Moreover, Plaintiffs are entitled to all reasonable inferences from these facts at the pleading stage.  *See Twombly*, 550 U.S. at 572; *Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir. 2007).  The particulars that Defendants demand at this pre-discovery stage about the steps Stiehl took to rig the EY hiring process (SA Br. at 7-11) are exclusively within Defendants' control and unnecessary to plead a viable claim.  *See Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 302 (S.D.N.Y. 2018) (rejecting, as premature, the

---

[2]    Sealed Air's gripe that the November 14, 2014 statements (¶44) cannot be actionable because they were made prior to the start of the Class Period (SA Br. at 7 n.7), is much ado about nothing. As the CAC makes clear, those statements were issued in a Form 8-K filed with the SEC "[a]fter the close of trading on Friday, November 14, 2014."  ¶¶43, 44.  In other words, investors could not have purchased Sealed Air common stock at a price that incorporated the statements until the market opened on Monday, November 17, 2014 – *i.e.*, the first day of the Class Period.  Accordingly, the Class only includes investors who purchased Sealed Air common stock during the Class Period.

defendants' argument on a motion to dismiss that "Plaintiff fails to quantify the scope, magnitude, or duration of the integration problems."); *see also Emps.' Ret. Sys. of Gov't of V.I. v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015) (holding the PSLRA's "pleading standard does not involve applying the more probing test used at the summary judgment or judgment as a matter of law stage of litigation, as the court is 'unaided by discovery' at the motion to dismiss stage").

Brushing aside the CAC's allegations, Sealed Air relies on inapposite cases concerning the illegality of the alleged misconduct to argue that the EY Retention Statements are not actionable. SA Br. at 7-11.  But Sealed Air entirely ignores that – unlike the cases on which it relies – the falsity of Defendants' statements about the hiring of EY is not dependent on whether or not the conduct alleged herein was in fact illegal.  Here, regardless of whether the conduct rose to the level of a technical violation of the criminal law, the rigged process was certainly neither competitive nor comprehensive and resulted in the firing of both Defendant Stiehl and EY.  Thus, cases such as *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 464 (2d Cir. 2019) (SA Br. at 8, 9, 11), where the Second Circuit made clear that "Sanderson Farms' statements were materially false or misleading **only** to the extent that anticompetitive conduct actually occurred" provide Defendants no help.  *See also Schiro v. Cemex, S.A.B. de C.V.*, 438 F. Supp. 3d 194, 198 (S.D.N.Y. 2020) (SA Br. at 8) ("Because Cemex's statements were materially misleading **only** if bribes were actually paid,

- 13 -

Plaintiffs must plead sufficient facts describing the essential elements of the alleged bribery.")
(citing *Gamm*).[3]

Here, the falsity of Defendants' statements does not turn on whether the conduct at issue
violated the law. What matters is whether Sealed Air's auditor hiring process was "*competitive*" and
"*comprehensive*," as Defendants told investors it was. The well-pleaded allegations of the CAC
make clear that it was not. These misrepresentations are actionable.[4]

In addition, the legal violations Defendants contend are necessary may very well come to
pass. According to Sealed Air's most recent quarterly report on Form 10-Q, filed on October 28,
2020 (the "Q3 2020 10-Q"), the SEC's investigation into the conduct at issue in this case remains
ongoing. Rothman Decl. Ex. 2. In the Q3 2020 10-Q, Sealed Air notes that it "cannot predict the
outcome or duration of the investigation." *Id.*

Moreover, Defendants cannot take refuge behind the fact that the SEC has not yet filed
charges, because statutory authority expressly prohibits a party from claiming that the SEC's failure
to pursue an investigation means that the agency found the party's disclosures to investors to be true

---

[3]   *See also In re Axis Capital Holdings Ltd., Sec. Litig.*, 456 F. Supp. 2d 576, 585 (S.D.N.Y. 2006)
(SA Br. at 8) ("[E]ach of plaintiffs' nondisclosure claims are entirely dependent upon the predicate
allegation that AXIS participated in an anticompetitive scheme to drive other insurance companies
out of the market."); *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 354-55 (S.D.N.Y. 2008) (SA
Br. at 8-9) ("[T]he essential predicate for all of plaintiffs' claims is the allegation that FBR
knowingly provided substantial assistance to an illegal insider trading scheme that violated the
securities laws.") *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 578-579
(S.D.N.Y. 2016) (SA Br. at 9-10) (allegations "rest[ed] on the failure to disclose uncharged illegal
conduct").

[4]   Sealed Air selectively quotes an out-of-circuit decision, *City of Austin Police Retirement System
v. ITT Educational Services, Inc.*, 388 F. Supp. 2d 932, 942 (S.D. Ind. 2005), to make the erroneous
argument that Plaintiffs are required to allege a fraudulent "fire" at the pleading stage in order to
satisfy its pleading burden as to the alleged false statements. *See* SA Br. at 10-11. Not so. *See In re
BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 77 (S.D.N.Y. 2017) ("Ultimately, plaintiffs must
allege 'enough facts to state a claim to relief that is plausible on its face.'") (quoting *Twombly*, 550
U.S. at 570).

or accurate.  15 U.S.C. §78z provides:

> No action or failure to act by the [Securities and Exchange] Commission or the Board of Governors of the Federal Reserve System, in the administration of this chapter shall be construed to mean that the particular authority has in any way passed upon the merits of, or given approval to, any security or any transaction or transactions therein, **nor shall such action or failure to act with regard to any statement or report filed with or examined by such authority pursuant to this chapter or rules and regulations thereunder, be deemed a finding by such authority that such statement or report is true and accurate on its face or that it is not false or misleading.  It shall be unlawful to make, or cause to be made, to any prospective purchaser or seller of a security any representation that any such action or failure to act by any such authority is to be so construed or has such effect**.

Accordingly, courts have held that even affirmative statements that the SEC will not pursue further action against a company cannot support a finding that the company did not commit securities fraud.  *See In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1245 (N.D. Cal. 2008) (letter informing defendant that the SEC had concluded its investigation "did not 'clear' [defendant] of wrongdoing").

Furthermore, the DOJ's decision to close its criminal investigation into Stiehl's conduct in no way impacts Plaintiffs' civil recovery here.  *See Sedima, S.P.R.L. v. Imrex Co., Inc.*, 741 F.2d 482, 501 n.51 (2d Cir. 1984) ("[A] civil action may succeed . . . [even] if the government [does] not show that the violation constituted a *criminal* act.") *rev'd on other grounds, Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479 (1985).  The DOJ's decision not to bring criminal charges may be the result of numerous factors, but in no way can be used as a finding that the underlying conduct did or did not occur.  *See, e.g., Duttle v. Bandler & Kass*, 1990 WL 113187, at *3-*4 (S.D.N.Y. July 30, 1990) (in a private securities fraud case, precluding defendants from introducing evidence that they were not charged by the SEC or indicted to establish that they were not guilty of any wrongdoing); *Berman v. Sink*, 2016 WL 8730672, at *2 (E.D. Cal. May 27, 2016) (granting motion to preclude evidence regarding the lack of criminal charges, holding that "[t]here are a variety of reasons for a

prosecutor's determination not to file criminal charges"); *J.W. v. City of Oxnard*, 2008 WL 4810298, at \*22 (C.D. Cal. Oct. 27, 2008) (granting motion to exclude district attorney's decision not to prosecute, finding that "[t]he decision not to prosecute is highly discretionary and demonstrates nothing more than the opinion of the prosecutor"); *see also U.S. v. Mahaffy*, 693 F.3d 113, 126 n.9 (2d Cir. 2012) ("'[A] judgment of acquittal is not usually admissible to rebut inferences that may be drawn from the evidence that was admitted.'").

### 2.      The EY Retention Statements Are Attributable to Both Stiehl and Sealed Air

Stiehl incorrectly asserts that he is not liable for the EY Retention Statements because he did not sign either SEC filing in which those statements appeared. Stiehl Br. at 3-4. Citing *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011), Stiehl contends that he cannot be held liable if he did not "make" a challenged statement alleged to be false and misleading. Stiehl Br. at 3-4. But *Janus* concerns whether one legal entity can be held liable under Section 10(b) for the statements made by a separate legal entity – a subject with absolutely no bearing here. *See* 564 U.S. at 137.

The EY Retention Statements, issued in the 2014 Form 8-K and 2015 Proxy Statement, are attributed to Stiehl – the Chief Accounting Officer and Controller of the Company – under the well-established "group pleading doctrine," which "creates a presumption 'that "group published" documents such as "statements in prospectuses, registration statements, annual reports, [and] press releases" are attributable to "individuals with direct involvement in the everyday business of the company," "who either were or acted like corporate insiders."'" *In re Barrick Gold Sec. Litig.*, 2015 WL 3486045, at \*2 (S.D.N.Y. June 2, 2015).

Even after *Janus*, the group pleading doctrine remains "'alive and well'" in the Second Circuit. *FIH, LLC v. Found. Capital Partners LLC*, 176 F. Supp. 3d 52, 72 (D. Conn. 2016)

(collecting cases). *See also In re Cannavest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 241 (S.D.N.Y. 2018); (denying argument that *Janus* overruled the group pleading doctrine); *In re Satyam Comput. Servs. Ltd. Sec. Litig.*, 915 F. Supp. 2d 450, 477 n.16 (S.D.N.Y. 2013) (same).

Stiehl's direct involvement in the management and oversight of Sealed Air as its Chief Accounting Officer and Controller at the time of the EY Retention Statements makes him liable for them under the group pleading doctrine. In fact, when these false statements were made, Stiehl was contemporaneously signing **all** of Sealed Air's annual and quarterly SEC filings in his capacity as the Company's Chief Accounting Officer and Controller – often serving as the **sole signatory** of those documents. *See, e.g.*, ¶46, 2014 10-K (signatory), ¶55 (sole signatory of Q1 2015 Form 10-Q), ¶56 (sole signatory of Q2 2015 Form 10-Q), ¶57 (sole signatory of Q3 2015 Form 10-Q). Therefore, Stiehl's contention that he was not involved in the process of drafting and reviewing the November 2014 Form 8-K and 2015 Proxy Statement must be rejected. Stiehl Br. at 4; *see also* SA Br. at 17. This is particularly so in light of the actual substance of the statements in dispute, which concern the Company's hiring of its independent accounting firm. ¶¶44, 52. Stiehl is the person who was in charge of the Company's accounting operations and financial reporting at the time they were made. ¶24. His connection to these statements cannot seriously be contested.

In addition, Stiehl's attempt to separate himself from the 2015 Proxy Statement because his signature does not appear on the document outright disregards the fact that nobody signed the 2015 Proxy Statement. *See* Declaration of Michael J. Berkovits in Support of Stiehl's Motion to Dismiss (ECF No. 38) ("Berkovits Decl.") Ex. 2. Definitive proxy statements by their very nature are unsigned SEC filings, but that does not relieve the people responsible for the statements contained therein from §10(b) liability. *See, e.g.*, *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 545 (S.D.N.Y. 2011) ("Many press releases are unsigned. Statements in such press releases cannot

necessarily be pegged to a single 'speaker.'  But that certainly does not mean that nobody made the statement, and cannot preclude Section 10(b) liability."); *In re Nevsun Res. Ltd.*, 2013 WL 6017402, at *11 n.5 (S.D.N.Y. Sept. 27, 2013) (rejecting argument by senior executive that he did not make challenged statements appearing in company press releases and securities filings because he did not sign them and holding that he and other senior executives "made" the statements under the group pleading doctrine); *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 374 (S.D.N.Y. 2012) ("It is not inconsistent with *Janus Capital* to presume that multiple people in a single corporation have the joint authority to 'make' an SEC filing, such that a misstatement has more than one 'maker.'"); *see also Barrick Gold*, 2015 WL 3486045, at *2 n.11 (*Janus* "has no bearing on how corporate officers who work together in the same entity can be held jointly responsible on a theory of primary liability").[5]

Moreover, there can be no serious dispute that Sealed Air is liable for **all** of the alleged misstatements at issue.  *See, e.g.*, *In re Tenaris S.A. Sec. Litig.*, 2020 WL 6018919, at *10 (E.D.N.Y. Oct. 9, 2020) ("makers" of the actionable statements included "Tenaris, as the entity that filed and published the actionable statements[.]"); *Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 371 (S.D.N.Y. 2012) ("[T]here is no dispute that BoA, through its various public filings, 'made' the statements and omissions at issue in this action.").[6]

---

[5]  Further, Stiehl's contention that he was not mentioned in either the November 2014 Form 8-K or the 2015 Proxy Statement is untrue.  Stiehl Br. at 3.  The 2015 Proxy Statement discussed Sealed Air's Code of Ethics for its "Senior Financial Executives" (*see infra* §IV.3.a.) which included its "Controller" *i.e.*, Stiehl.  *See* Berkovits Decl. Ex. 2 at 22.  Moreover, the 2015 Proxy Statement repeatedly refers the 2014 Form 10-K, signed by Stiehl.  *See, e.g.*, 2015 Proxy Statement at 3 ("Please refer to pages 2, 49, 60 and 89 of our Annual Report on Form 10-K filed on February 27, 2015 for additional information about our key accomplishments in 2014").  Berkovits Decl. Ex. 2.

[6]  *Washington State Investment Board v. Odebrecht*, 2020 WL 2555431 (S.D.N.Y. May 20, 2020) (Stiehl Br. at 3) relied upon by Defendants is distinguishable.  The only misstatements at issue in that case appeared in offering memoranda whose contents were "expressly attribute[d]" to a *different* entity.  Also inapposite is *City of Roseville Employees' Retirement System v. EnergySolutions, Inc.*,

- 18 -

### 3.    Defendants' Representations About Sealed Air's Corporate Policies and Procedures Are Actionable

#### a.    Defendants Code of Conduct and Code of Ethics Statements Are Actionable

Defendants made actionable misstatements and omissions regarding the Company's Code of Conduct and Code of Ethics For Senior Financial Executives (collectively, the "Code Statements"). As this Court recognized in *In re Grupo Televisa Securities Litigation*, "statements contained in a code of conduct are actionable where they are directly at odds with the conduct alleged in a complaint." 368 F. Supp. 3d 711, 721 (S.D.N.Y. 2019) (Stanton, J.) (quoting *In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *17 (S.D.N.Y. Nov. 26, 2018)). Here, the Code Statements are "directly at odds" with the alleged misconduct. ¶¶49-50. For example, in the Code of Conduct, Defendants, *inter alia*, represented that:

> Each of our employees is expected to comply with the law, **but our standard of business ethics goes beyond compliance with law**. No list of rules can substitute for the exercise by anyone who represents our Company of basic morality, common decency, high ethical standards and respect for the law.

¶49. Likewise, in the Code of Ethics, Defendants, *inter alia*, stated that:

> All Senior Financial Executives should be scrupulous in avoiding a conflict of interest with respect to the Company's interests. A "conflict of interest" exists **whenever an individual's private or personal interests interfere or conflict in any way (or even appear to interfere or conflict) with the interests of the Company**. . . . Any such **potential or actual conflict of interest must be disclosed** to the Board, and the Senior Financial Executive **must comply** with any measure that may be required by the Audit Committee or the Board in order to avoid or eliminate such conflict.

---

814 F. Supp. 2d 395, 417 (S.D.N.Y. 2011) (Stiehl Br. at 3-4) (SA Br. at 17), where the two individuals held not to be makers of the alleged misstatements were not even directors of the company at the time the registration statement was issued. Here, Stiehl was Sealed Air's Chief Accounting Officer and Controller when the EY Retention Statements were made, and served as the Company's Chief Financial Officer for the remainder of the Class Period. ¶24.

¶50.  These statements are directly contravened by the CAC's allegations that Stiehl – one of Sealed Air's most senior executive officers – was circumventing these policies by personally interfering in the Company's auditor hiring process to ensure that EY was retained.  ¶¶8, 92-93, 105.  *See In re Electrobras Sec. Litig.*, 245 F. Supp. 3d 450, 463 (S.D.N.Y. 2017) (code of ethics statements actionable where they "stand in stark contrast with" alleged misconduct).

In assessing code of conduct statements, courts have recognized that "context matters." *In re Signet Jewelers Ltd. Sec. Litig.*, 389 F. Supp. 3d 221, 230 (S.D.N.Y. 2019); *see also Tenaris*, 2020 WL 6018919, at *7-*8 (code of conduct statements actionable "because of the context in which they were made").  In context, the Code Statements are not "inactionable puffery," as Defendants suggest (Stiehl Br. at 4-6; SA Br. at 11-12), but concrete assurances to investors that the Company operated under strict ethical and legal standards.  "While certain statements, viewed in isolation, may be mere puffery, when the statements are 'made repeatedly in an effort to reassure the investing public about matters particularly important to the company and investors, those statements may become material to investors.'"  *Signet*, 2018 WL 6167889, at *11; *see also Constr. Laborers Pension Tr. v. CBS Corp.*, 433 F. Supp. 3d 515, 532 (S.D.N.Y. 2020) (noting that code of conduct statements can be material if they "were so anathema to the alleged internal wrongdoing that, even if general or aspirational, they were materially false").[7]  Similar to *Grupo Televisa*, "when (as here alleged) the statements were made repeatedly in an effort to reassure the investing public about the Company's integrity, a reasonable investor could rely on them as reflective of the true state of affairs at the Company."  368 F. Supp. 3d at 721.  Here, the Code Statements were incorporated by reference and repeated in all material respects in each of Sealed Air's annual reports on Form 10-K for 2016, 2017,

---

[7]  *See also Holwill v. AbbVie Inc.*, 2020 WL 5235005, at *4 (N.D. Ill. Sept. 1, 2020) (code of conduct statements, "viewed in the light most favorable to Plaintiffs, are not inherently aspirational but are unqualified statements regarding [defendant's] conduct").

and 2018 (¶¶60, 69, 80) – **all** of which were signed by Stiehl.  ¶¶46, 59, 67.  In any event, as discussed below, "[m]ateriality is a fact-intensive inquiry more appropriate for summary judgment or trial."  *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 2019 WL 1247583, at *31 (S.D.N.Y. Mar. 19, 2019); *see infra* §IV. C.[8]

### b.    Defendants' Statements About Sealed Air's Disclosure Controls and Procedures Are Actionable

In connection with each Form 10-K and 10-Q issued during the Class Period, Sealed Air and Stiehl falsely represented that management had evaluated Sealed Air's Disclosure Controls and Procedures and "concluded that our disclosure controls and procedures were effective at the 'reasonable assurance' level."  ¶¶47, 57, 61, 63-65, 68, 71-72, 75, 79, 83, 87.  As the CAC alleges, Item 307 of Regulation S-K [17 C.F.R. §229.307], *Disclosure Controls and Procedures* required Sealed Air's Forms 10-K and 10-Q during the Class Period to express the conclusion by its management, including Stiehl, about the effectiveness of the Company's disclosure controls and procedures, defined by relevant regulation as the controls and procedures designed to ensure that information required to be disclosed in reports filed with the SEC is appropriately recorded,

---

[8]    While Defendants' assurances were direct, Plaintiffs do not allege that Sealed Air's Code of Conduct and Code of Ethics operated as "guarantees that no employees will violate the securities laws," as Stiehl contends.  Stiehl Br. at 5.  Rather, Plaintiffs allege that the Code Statements portrayed Sealed Air as a Company whose employees, *inter alia*, acted at a "highly ethical level" when, in reality, of one of its most senior executives and the person who signed each of the Company's annual and quarterly filings with the SEC was the very person who was directly circumventing these policies through his own misconduct.  ¶¶49, 60, 69, 80.  As a result, *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019) (SA Br. at 11-12) is distinguishable.  There, the Court held that Cigna's Code of Ethics contained nothing more than "general declarations about the importance of acting lawfully and with integrity" and thus concluded that a reasonable stockholder would not "consider [these statements]  important in deciding whether to buy or sell shares of stock." *Id*. at 63.  Here, the CAC alleges the Defendants made specific, affirmative false representations claiming that Sealed Air "*has a reputation* for conducting its business on a highly ethical level" and admitting that "[i]t is important that we *continue* this record of integrity in the future."  ¶¶49, 60, 69, 80.

processed, summarized and reported.  ¶102.[9]

These statements falsely represented that such controls were operating effectively when, contrary to its management's representation, Sealed Air's selection of EY to serve as the Company's independent registered public accounting firm did not follow a competitive search process involving several international registered public accounting firms, but, rather, followed a process that was manipulated by Stiehl to ensure EY would be selected as the Company's auditor.  ¶¶51, 58, 62, 66, 70, 73, 103.  Further, this conduct subjected Sealed Air to contingent liabilities, including fines, reputational damage, criminal penalties and/or other sanctions, which were not disclosed to investors in violation of SEC rules and regulations.  *Id*.; *see In re Goldman Sachs Grp., Inc. Sec. Litig.*, 2014 WL 2815571, at *5 (S.D.N.Y. June 23, 2014) (statements that Goldman Sachs had in place "extensive procedures and controls that are designed to . . . address conflicts of interest" actionable where they were "directly at odds with its alleged conduct").

### c.    The Statements in Stiehl's SOX Certifications Are Actionable

After his appointment as CFO, Stiehl personally certified, pursuant to the Sarbanes-Oxley Act ("SOX certifications"), the accuracy of the false statements concerning Sealed Air's disclosure controls and procedures.  ¶¶76-77, 81-82, 84-85, 88, 91.  The statements in these SOX certifications are actionable because Stiehl attested to representations about Sealed Air's disclosure controls he knew to be false, based on his own personal involvement in the activities that violated those controls. *See, e.g., Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 617- 19 (S.D.N.Y. 2015) (SOX certifications actionable where statements therein were false or

---

[9]    Sealed Air attempts to avoid its obligations under Item 307 by contending that "Plaintiffs never allege that Stiehl made any conclusions about the effectiveness of the [C]ompany's disclosure controls."  SA Br. at 15.  But that is wholly inaccurate.  He did precisely that.  *See* ¶¶47, 57, 61, 63- 65, 68, 71-72, 75, 79, 83, 87.

misleading); *In re Glob. Brokerage, Inc.*, 2019 WL 1428395, at \*14 (S.D.N.Y. Mar. 28, 2019) (CEO liable for signing SOX certifications attesting to accuracy of company's public filings).

### C. The CAC Adequately Alleges Materiality

Defendants' false statements and omissions were material. "The Second Circuit has stated: Materiality is a mixed question of law and fact. . . . Such questions of mixed law and fact are not normally disposed of on a motion to dismiss, but are reserved for dismissal on summary judgment or at trial." *Burkle v. OTK Assocs., LLC*, 2 F. Supp. 3d 519, 522-523 (S.D.N.Y. 2014) (Stanton, J.). The Court should not dismiss "a securities fraud complaint on materiality grounds unless the omitted material is 'so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" *Lexmark Int'l*, 2019 WL 1247583, at \*31. Courts must analyze "all relevant considerations" when assessing materiality. *Litwin v. Blackstone Grp, L.P.*, 634 F.3d 706, 717 (2d Cir. 2011).

Defendants wonder "how could it plausibly matter to an investor how EY was selected?" (SA Br. at 24), but blatantly ignore the fact that **they** put final approval of the EY hiring directly in the hands of **investors**. *See* Berkovits Decl. Ex. 2 at 76 (2015 Proxy Statement, "Selection of Independent Auditor (Proposal 12). The Board of Directors recommends a vote FOR the proposal to ratify the selection of EY as our independent public accounting firm for 2015."). Defendants cannot credibly argue that the EY retention process was immaterial to investors when they solicited those very same investors' **permission** to hire EY in the first place. SA Br. at 24.[10]

The importance of a Company's auditor selection process is highlighted by the Final Report of the Advisory Committee on the Auditing Profession (the "ACAP Report"), formed by the U.S.

---

[10]   These facts refute Sealed Air's assertion that the materiality of the alleged false statements is based in hindsight. SA Br. at 24-25; *see also Miss. Pub. Emps.' Ret. Sys. v. Boston Sci. Corp.*, 523 F.3d 75, 90 (1st Cir. 2008) (observing that while "[t]he law proscribes the pleading of fraud by hindsight," plaintiffs cannot "be expected to plead fraud with complete insight").

Department of the Treasury.[11]  The ACAP Report recommends that all public companies put auditor ratification to an annual shareholder vote so as to allow "shareholders to voice a view on the audit committee's work, including the reasonableness of audit fees and apparent conflicts of interest" noting that "shareholder ratification of auditor selection through the annual meeting and proxy process can enhance the audit committee's oversight to ensure that the auditor is suitable for the company's size and financial reporting needs."  *Id.*  The fact that Sealed Air put this issue up for a shareholder vote is precisely the "theory explaining why investors would have cared about [the fixed EY hiring process]" that Defendants demand.  SA Br. at 26.

In addition, SEC's Staff Accounting Bulletin ("SAB") No. 99 provides that materiality associated with financial disclosures requires an assessment of the factual context in which the user would view the financial information.  *See* ¶106.  Here, on the heels of informing investors that the IRS intended to deny Sealed Air's $1.49 billion income tax deduction in full and the Company's announcement not to retain KPMG LLP as its independent auditor – after having served in such capacity since 1998 – Defendants created the false impression that EY was best suited to serve as the Company's independent auditor after engaging in a "comprehensive request for proposal" and "competitive search" process.  ¶¶41-44, 52.  Given the auditor's role as a trusted gatekeeper of the financial reporting process, it simply cannot be determined as a matter of law on a motion to dismiss that the alleged misstatements about the process by which EY was selected to serve as the Company's auditor were obviously unimportant to a reasonable investor.  *See In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 289 n.61 (S.D.N.Y. 2005) (quoting Revision of the Commission's Auditor Independence Requirements, Exchange Act Release No. 33-7870, 65 Fed. Reg. 43,148,

---

[11]  *See* Final Report of the Advisory Committee on the Auditing Profession (Oct. 6, 2008), Rothman Decl. Ex. 3.

43,150 (July 12, 2000) ("The federal securities laws . . . make independent auditors 'gatekeepers' to the public securities markets.")).[12]

SAB No. 99 further provides that the "volatility of the price of a registrant's securities in response to certain types of disclosures may provide guidance as to whether investors regard quantitatively small misstatements as material." ¶109.  While Sealed Air claims that there is "no logical connection between the alleged wrongdoing and the company's securities price," (SA Br. at 2) after the Company announced that Stiehl had been fired as Sealed Air's CFO "**for cause**," the market capitalization of Sealed Air plummeted by approximately $300 million.  ¶109.  There can be little basis to conclude at this stage of the litigation that the alleged misconduct, which resulted in an approximate $300 million diminution in the value of Company by the marketplace, is so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of its importance.  *See Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 550 (S.D.N.Y. 2017) (holding that a "significant stock drop further supports [] materiality"); *Lockheed*, 875 F. Supp. 2d at 368 (stock drop on release of previously concealed information supports materiality).[13]

---

[12]   In light of Defendants' demonstrably false affirmative statements about the EY hiring process, the fact that Sealed Air did not correct or restate its financial results for the years in which EY served as auditor (SA Br. at 2, 3-4, 24) is a red herring.  ¶¶44, 52.  The lack of a restatement does not weaken the CAC's allegations.  *See, e.g., Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002) ("[T]he fact that the financial statements for the year in question were not restated does not end [the plaintiff's] case when he has otherwise met the pleading requirements of the PSLRA.").

[13]   Defendants incorrectly argue that the 5% drop in Sealed Air's stock price following the announcement of an SEC subpoena seeking documents about "the Company's accounting for income taxes, its financial reporting and disclosures and other matters" (¶¶89, 90) is "irrelevant to Plaintiffs' theories of liability."  SA Br. at 25.  Not so.  The Company's financial reporting and disclosures – in particular its disclosure controls and procedures, which Stiehl falsely attested to the accuracy of – are directly at issue in this case.  ¶¶46-47, 55-57, 59, 63-65, 67, 71-72, 75, 78, 81, 83-84, 87-89, 92-93.  Regardless, the specifics of the information requested by the SEC, including the "other matters" being investigated and what "*may*" have caused Sealed Air's stock price to decline

It is certainly plausible that a reasonable investor would consider Stiehl's misconduct – which resulted in two separate federal investigations and called into question the integrity of the Company as a whole – to be material. *See Ganino*, 228 F.3d at 165 ("Materiality is determined in light of the circumstances existing at the time the alleged misstatement occurred."). Similarly, Stiehl's endorsement of false statements about Sealed Air's disclosure controls and his issuance of false SOX certifications about those same controls would be material to a reasonable investor. *See In re Insys Therapeutics, Inc. Sec. Litig.*, 2018 WL 2943746, at *5 (S.D.N.Y. June 12, 2018) ("When assurance that a company complies with its accounting policies, or that a company has effective internal controls, turns out to be false, that would be 'viewed by the reasonable investor as having significantly altered the total mix of information made available.'").

### D. The CAC Adequately Alleges Violations of Items 303 and 503

Each of Sealed Air's Class Period Forms 10-K and 10-Q violated Item 303 of Regulation S-K for failing to disclose the known risks and uncertainties to Sealed Air's business posed by Stiehl's misconduct in the hiring of EY. ¶100; 17 C.F.R. §229.303. Item 303 imposes an "affirmative duty to disclose . . . any known trends or uncertainties . . . that the registrant reasonably expects will have a material . . . unfavorable impact on . . . revenues or income from continuing operations." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015); 17 C.F.R. §229.303. The SEC's interpretive release for Item 303 explains that "the Regulation imposes a disclosure duty 'where a trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations.'" *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012) (quoting Management's Discussion and Analysis of Financial Condition and Results of Operations,

(SA Br. at 25) remain open factual issues inappropriate for resolution at the motion to dismiss stage. *See Yi Xiang, et al., v. Inovalon Holdings, Inc., et al.*, 268 F. Supp. 3d 515, 525 (S.D.N.Y. 2019).

- 26 -

Securities Act Release No. 6835, Exchange Act Release No. 26,831, Investment Company Act Release No. 16,961, 43 SEC Docket 1330 (May 18, 1989)).[14]

Stiehl's manipulation of Sealed Air's auditor retention process subjected the Company to contingent liabilities, including fines, reputational damage and other sanctions, that were reasonably likely to have a material adverse effect on the Company's operating results. ¶¶100, 103. This created risk and uncertainty within the meaning of Item 303. *Id.*; *see Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 95-96 (2d Cir. 2016) (requiring Item 303 disclosure because "SAIC was aware of the fraud by late March 2011 but was uncertain about its likely effect on SAIC's current and future revenues"). Sealed Air once again narrowly focuses on the illegality of the alleged misconduct, ignoring the basis of Plaintiffs' Item 303 claim: that Stiehl's conduct – whether or not technically "illegal" – subjected Sealed Air to contingent liabilities, including fines, reputational damage and other sanctions and therefore triggered a disclosure duty under Item 303. SA Br. at 14. ¶100.[15]

Stiehl, a signatory of all of Sealed Air's Forms 10-K and 10-Q filed during the Class Period, was clearly aware of this uncertainty because his own conduct caused it. ¶¶46, 55-57, 59, 63-65, 67, 71-72, 75-76, 78, 81, 83-84, 87-88. Accordingly, the "sole remaining issue is whether the effect of the 'known' information was 'reasonably likely' to be material." *Blackstone*, 634 F.3d at 716. Unless Sealed Air's management was able to determine that a material effect of these contingent liabilities on Sealed Air's financial condition or results of operations was not reasonably likely to

---

[14]   The Second Circuit has held that the failure to make the required disclosure under Item 303 on Forms 10-K or 10-Q can serve as the basis for a Section 10(b) securities fraud claim. *See Stratte-McClure*, 776 F.3d at 100 ("a failure to make a required Item 303 disclosure in a 10-Q filing is indeed an omission that can serve as the basis for a Section 10(b) securities fraud claim").

[15]   Sealed Air's reliance on *Lopez v. Ctpartners Executive Search Inc.*, 173 F. Supp. 3d 12 (S.D.N.Y. 2016) (SA Br. at 14) is entirely misplaced. There, the court held that the non-disclosure of the "coarse and unsavory work environment" at issue "*had no prospect*" of impacting the company's financial condition. *Id.* at 33-34. Here, the failure to disclose Stiehl's interference in the hiring of EY potentially implicated contingent liabilities, fines, and other sanctions. ¶100.

occur, disclosure was required under Item 303. *Stratte-McClure*, 776 F.3d at 103. The undisclosed conduct at issue, which later resulted in two separate federal investigations, cannot be deemed "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of [its] importance." *FIH*, 176 F. Supp. 3d at 70. In any event, materiality is "inherently fact-specific" and should not be resolved now. *Blackstone*, 634 F.3d at 716; *see supra* §IV.C.

Similarly, each of Sealed Air's Class Period Forms 10-K and 10-Q violated Item 503 of Regulation S-K for failing to disclose the most significant matters making an investment in the Company's stock risky. ¶101; 17 C.F.R. §229.503.[16] Item 503 "is intended to provide investors with a clear and concise summary of the material risks to an investment in the issuer's securities." *Silverstrand Invs. v. AMAG Pharms., Inc.*, 707 F.3d 95, 103 (1st Cir. 2013). The risks at issue here, including Stiehl's misconduct, which subjected Sealed Air to contingent liabilities, including fines, reputational damage, criminal penalties and/or other sanctions were not adequately disclosed in its SEC filings during the Class Period, supporting a claim under Item 503. *See EnergySolutions, Inc.*, 814 F. Supp. 2d at 427 (S.D.N.Y. 2011) (finding a violation of Item 503 where known risks were not sufficiently described).

### E.    The CAC Adequately Pleads Scienter

Defendants acted with the requisite scienter. To plead scienter, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2). Plaintiffs may plead scienter by "'alleging facts to show that defendants had both motive and opportunity to commit fraud, **or** . . . by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" *Ganino*, 228 F.3d at 168-69. To plead recklessness, the conduct alleged must be "highly unreasonable, representing an

---

[16]    On May 2, 2019, the SEC relocated Item 503(c) to Item 105, but did not change its scope or application.

extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 127 n.11 (2d Cir. 2013).

Under the Supreme Court's instructions on how to evaluate scienter, "the reviewing Court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Tellabs,* 551 U.S. at 326.  And, while the inference of scienter must be strong and "at least as compelling as any opposing inference," it "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id*. at 324; *Lockheed*, 875 F. Supp. 2d at 372 ("a tie . . . goes to the plaintiff").  The analysis weighs "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23 (emphasis in original); *see also Blanford*, 794 F.3d at 305 ("A court . . . must assess the complaint in its entirety, and not scrutinize each allegation.").  Further, a court must take into account only those "plausible opposing inferences" – *i.e.*, plausible nonculpable explanations for the defendant's conduct – that may be "rationally drawn from the facts alleged." *Tellabs*, 551 U.S. at 310, 314.

Here, the CAC alleges that Defendants rigged the process by which Sealed Air selected EY as its independent auditor, then falsely represented to investors that its auditor retention process was "competitive" and "comprehensive." ¶¶8, 44, 52, 92-93, 105.  After Defendants got caught in this falsehood by the SEC, the Audit Committee began its own investigation into the process by which the Company selected EY.  ¶93.  As a result of that investigation, Sealed Air fired Stiehl, its Chief Financial Officer, "**for cause**."  ¶¶92-96.  Then, following the receipt of a grand jury subpoena from the DOJ in connection with a criminal investigation into Stiehl's firing and the EY hiring process,

- 29 -

Sealed Air terminated EY.  ¶96.  Sealed Air later admitted that it fired EY because of "the pendency of the SEC investigation, along with the [Audit] Committee's dissatisfaction with information it learned about the process by which EY was selected as auditor." *Id.*

Based on these allegations – which must be accepted as true – it is at least equally likely that Defendants engaged in consciousness misbehavior or recklessness when falsely representing to investors that the auditor selection process was "competitive" and "comprehensive" when Stiehl himself rigged the process to ensure EY was retained.  Tellingly, Defendants fail to offer **any** competing inference to these facts, much less one that is more likely than the inference suggested by Plaintiffs.  *Tellabs*, 551 U.S. at 326.  Indeed, under these facts, there is no credible inference other than that Stiehl, the person who engaged in the bid rigging and then made false statements about it to investors, knew, or recklessly disregarded, that these statements were false.

Unable to contest a finding of scienter under the analysis demanded by the Supreme Court, Defendants resort to asking the Court to look at each of the allegations of scienter in isolation.[17] Indeed, the Supreme Court has expressly admonished courts against treating allegations of scienter in isolation, as Defendants attempt to do.  *Tellabs*, 551 U.S. at 326.  Rather, scienter must be judged "holistically." *Id.*  As set forth below, a review of all the allegations holistically, including, Stiehl's "**for cause**" firing after an internal investigation concerning the EY hiring process, two separate federal investigations into Stiehl's misconduct, the Company's firing of EY after entering the crosshairs of both the SEC and DOJ, and Stiehl's Class Period stock sales, collectively, demonstrate that Plaintiffs have adequately alleged scienter against Defendants.

---

[17]  For example, Sealed Air confines its arguments on circumstantial evidence of scienter to only the four specific examples enumerated by the *Novak* Court.  SA Br. at 20-23.  This is improper.  The *Novak* factors, "are merely illustrative, not exhaustive, of facts needed to sustain a 10(b) claim on a motion to dismiss."  *George v. China Auto. Sys., Inc.*, 2012 WL 3205062, at *8 (S.D.N.Y. Aug. 8, 2012) (citing *ECA & Local 134 IBEW Joint Pension Tr. v. JP Morgan Chase Co.*, 553 F.3d 187, 199 (2d Cir. 2009)).

### 1. Stiehl's "For Cause" Firing Supports a Compelling Inference of Scienter

Sealed Air fired Stiehl "**for cause**" precisely because of his conduct in connection with "*the process by which the Company selected its independent audit firm for the period beginning with fiscal year 2015, and relating to the independence of that audit firm.*" ¶¶92-96. These facts which must be accepted as true, support a compelling inference of scienter. *See In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 632-33 (S.D.N.Y. 2014) ("[T]he decision to terminate the defendants . . . more likely suggests a higher level of wrongdoing approaching recklessness or even conscious malfeasance"); *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1273-74 (N.D. Cal. 2000) (finding strong inference of scienter where senior executives were fired "for cause"); *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1167 (D. Or. 2015) ("[T]he fact that [CEO] was terminated for cause . . . after the conduct came to light is evidence supporting an inference of scienter); *Pub. Pension Fund Grp. v. KV Pharm. Co.*, 2013 WL 1831427, at *3 (E.D. Mo. Apr. 30, 2013) (finding that termination of CEO "for cause" contributed to scienter); *Luna v. Marvell Tech. Grp.*, 2017 WL 2171273, at *5 (N.D. Cal. May 17, 2017) (strong inference of scienter where "Marvell terminated [both] CEO [and President] just one month after its audit committee began investigating these issues").

Courts in this District routinely find that even mere resignations are sufficient to support a strong inference of scienter. *See, e.g.*, *In re Fairway Grp. Holding Corp. Sec. Litig.*, 2015 WL 249508, at *16 (S.D.N.Y. Jan. 20, 2015) (CEO's resignation same day that fraud was revealed supported inference of scienter); *Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 474 (S.D.N.Y. 2013) ("[T]he resignation and retirement of company insiders alleged to have been involved in the scheme . . . all contribute to the inference of scienter."). Similarly, courts have found a strong inference of scienter where executives were suspended pending an internal investigation into alleged

improprieties. *See, e.g., In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 506 (S.D.N.Y. 2005) ("Plaintiffs thus link the suspensions to the alleged fraud, and defendants offer no contrary explanation for [executive] departures. Under these circumstances, the suspensions support a strong inference of scienter."). Here, Stiehl did not resign. Nor was he suspended. Sealed Air fired Stiehl "for cause." ¶93. *See Kaltman v. Key Energy Servs., Inc.*, 447 F. Supp. 2d 648, 664 (W.D. Tex. 2006) (distinguishing a "for cause" termination from a resignation and finding that termination of CEO "for cause" supported strong inference of scienter).[18]

Sealed Air's only response to the allegations surrounding Stiehl's "for cause" firing is feebly arguing that they do not show he "intended to commit securities fraud." SA Br. at 21.[19] Plaintiffs need not meet such a high pleading threshold to defeat a motion to dismiss; it is sufficient that the CAC alleges that Defendants – at a minimum – acted with an intent to deceive **or** with a reckless disregard for the truth. *See, e.g., Blanford*, 794 F.3d at 305 (mental state required for liability is either an "intent to deceive, manipulate, or defraud," *or* "recklessness"); *Setzer v. Omega Healthcare Inv'rs, Inc.*, 968 F. 3d 204, 215 (2d Cir. 2020) ("[T]he allegations in the Complaint raise a strong inference that Defendants acted, at the very least, recklessly in choosing to disclose incomplete and misleading information."). Far from alleging merely that Sealed Air was "mismanaged," as Defendants suggest (SA Br. at 21), the CAC alleges that Stiehl interfered in the Company's auditor

---

[18]   Sealed Air relies on two inapposite cases in which the relevant executives left their respective companies in far less suspicious circumstances than those present here. *In re Interpool, Inc. Sec. Litig.*, 2005 WL 2000237, at *17 (D.N.J. Aug. 17, 2005) (SA Br. at 21) did not remotely concern the issue of executives being fired "for cause." They resigned. *Id*. at *17. Similarly, in *C.D.T.S. No. 1 v. UBS AG*, 2013 WL 6576031, at *7 (S.D.N.Y. Dec. 13, 2013) (SA Br. at 21), the executives at issue resigned and/or were demoted.

[19]   Sealed Air only mentions Stiehl's "for cause" firing within its discussion of the "second" *Novak* factor (*i.e.*, "deliberately illegal behavior"). *See* SA Br. at 19-20. Yet, the adequacy of Plaintiffs' allegations are not confined to an analysis of just one of numerous factors courts consider in assessing an inference of scienter. *See China Automotive Sys.*, 2012 WL 3205062, at *8.

hiring process to ensure that EY was the winner and then consciously or recklessly proclaimed that the process was competitive. ¶¶8, 44, 52, 92-93, 105.

Continuing to invite the Court to view Plaintiffs' allegations in isolation, Sealed Air contends that the CAC's scienter allegations fail the "third" *Novak* factor, but the Company fails to mention half of that factor – that is, whether Defendants "**had access to information** suggesting that their public statements were not accurate." *Novak*, 216 F.3d at 311; *see* SA Br. at 21-22 (focusing exclusively on whether Stiehl "knew facts" suggesting whether the public statements at issue were inaccurate). Defendants cannot seriously argue that Stiehl did not know facts – let alone have access to information – suggesting that EY was not hired pursuant to a "competitive search process." Why would Sealed Air fire Stiehl "for cause" for his role in "the process by which the Company selected [EY] . . . and relating to [EY's] independence" if he was not aware of contrary facts, or have access to information suggesting otherwise? *See CBS*, 433 F. Supp. 3d at 548 (finding scienter where defendants "knew facts or had access to information suggesting that [defendants'] public statement[s were] not accurate"); *In re Gen. Elec. Co. Sec. Litig*., 857 F. Supp. 2d 367, 395 (S.D.N.Y. 2012) ("In employing a holistic analysis, surely an inference of knowledge may be appropriate . . . where it would be 'absurd to suggest that management was without knowledge of the matter.'"); *Christine Asia Co. Ltd. v. Yun Ma*, 718 F. App'x 20, 23 (2d Cir. 2017) (finding scienter when it was "virtually inconceivable" that executives did not receive information).[20]

---

[20] The same is true with respect to the alleged misstatements concerning Sealed Air's corporate procedures incorporated by reference into SEC filings signed by Stiehl. *Compare. e.g.*, ¶50 ("A 'conflict of interest' exists whenever an individual's private or personal interests **interfere** or conflict in any way (or even appear to **interfere** or conflict) with the interests of the Company. . . .") with Rothman Decl. Ex. 1 at 4 ("SEC officials widened their inquiry to look at Ernst & Young's independence after coming across **emails that allegedly showed Mr. Stiehl interfered in the competition** held in 2014 to select an audit firm.").

In addition to the dubious facts surrounding Stiehl's dismissal from Sealed Air, it cannot be overlooked that he served as the Chief Accounting Officer, Controller, and Chief Financial Officer of Sealed Air during the Class Period.  ¶¶8, 24, 86.  *See In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, at \*11-\*12 (S.D.N.Y. Mar. 28, 2018) ("It requires no stretch of the imagination to infer that, due to their positions at the company . . .  Defendants 'knew facts or had access to information suggesting that their public statements . . . were not accurate.'").  Stiehl was clearly armed with information about the tainted EY hiring process – he was fired "for cause" for his personal role in it.  *See Novak*, 216 F.3d at 308 (Recklessness sufficient for Section 10(b) liability if "defendants knew or, more importantly, *should have known* that they were misrepresenting material facts related to the corporation").[21]

Defendants' scienter is further evidenced by the fact that the Audit Committee fired Stiehl "for cause" and terminated EY just weeks after starting its investigation.  The fact that the Audit Committee was so quickly able to reach this determination demonstrates Defendants' similarly had access to information suggesting their statements were false.  *See In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 517 (S.D.N.Y. 2011) (scienter is strongly inferred when undisclosed facts are so quickly or easily discovered); *Marvell*, 2017 WL 2171273, at \*5.

Defendants' failure to offer **any** non-fraudulent competing inference to Stiehl's "for cause" firing is notable.  All the Company could muster in response is the mere assertion that these allegations "do[] not show he committed securities fraud."  SA Br. at 23.  While Plaintiffs' inference of culpability need only be "at least as compelling" as any nonculpable inference Defendants could

_____

[21]    *C.D.T.S.*, 2013 WL 6576031, at \*6 (SA Br. at 22) is further distinguishable because the plaintiffs "failed to specify [] information" as to why the defendants had access to information or should have known facts demonstrating the falsity of their statements.  Likewise, the plaintiffs in *PetEdge, Inc. v. Garg*, 234 F. Supp. 3d 477, 495 (S.D.N.Y. 2017) (SA Br. at 21), a common law fraud case, failed to establish the CEO even participated in the alleged fraud.  Stiehl's participation in the fraud here is self-evident.

proffer, *Tellabs*, 551 U.S. at 324, in reality, the inference of Stiehl's scienter is decidedly more compelling and, in fact, the only plausible inference that can be reached. Sealed Air itself even concedes that "Stiehl's firing may be **'smoke'**" to the fraudulent fire. SA Br. at 10-11; *see Salix*, 2016 WL 1629341, at *16 ("Defendants fail to provide the Court with any cogent non-fraudulent inference that is *more* compelling than the inferences of fraud alleged by Plaintiffs") (emphasis in original); *see also Orthofix Int'l*, 89 F. Supp. 3d at 617 ("[T]he plaintiff does not need a smoking gun to allege sufficient facts to support a strong inference of scienter.").

### 2. The SEC and DOJ Investigations Further Support an Inference of Scienter

The fact that both the SEC and DOJ launched separate and distinct investigations into the process by which Sealed Air selected EY as its auditor, and in the case of the DOJ, Stiehl's firing, supports the plausibility and seriousness of these allegations and contributes to an inference of scienter. *See, e.g., In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 353, 380 (E.D.N.Y. 2013) ("[C]ourts have considered a governmental investigation as one piece of the puzzle when taking a 'holistic' view of the purported facts as they relate to scienter."); *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 168 (S.D.N.Y. 2008) (fact that the government "launched an investigation" contributed to a strong inference of scienter).[22] The argument that these multiple federal investigations "do not lead to a 'strong inference' that Stiehl ever intended to commit securities fraud" is wrong and once again completely misstates Plaintiffs' pleading burden. SA Br. at 21;

---

[22] *See also In re Packaged Seafood Prods. Antitrust Litig.*, 2017 WL 35571, at *8 (S.D. Cal. Jan. 3, 2017) ("[I]t is perfectly permissible to take as true the fact that a government investigation has been instituted, and that therefore at least several individuals within the governmental chain of command thought certain facts warranted further inquiry into . . . potential criminal [activity])."

*supra* 32.[23] Sealed Air concedes that, in addition to Stiehl's "for cause" firing, "[t]he existence of an SEC investigation . . . may be **'smoke'**" to the fraudulent fire. SA Br. at 10-11.

These separate federal investigations had considerable consequences for Sealed Air. Less than two weeks after receiving the DOJ subpoena seeking documents about both the EY hiring process and Stiehl's firing, Sealed Air ended its relationship with EY, effective immediately. ¶¶95-96. The Company left no doubt as to the reason for EY's firing – confessing that it was due to "the pendency of the SEC investigation, along with the [Audit] Committee's dissatisfaction with information it learned about the process by which EY was selected as auditor." ¶96. These facts, viewed holistically, further support the already strong inference of scienter here. *See Batwin v. Occam Networks, Inc.*, 2008 WL 2676364, at *13 (C.D. Cal. July 1, 2008) (strong inference of scienter where company "terminated PWC"); *see also Hall v. Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 233 (S.D.N.Y. 2008) ("[CEO's] forced resignation and Deloitte's resignation add to the overall pleading of circumstantial evidence of fraud.").[24]

### 3.     The Stock Sales at Issue Contribute to Scienter

With the strength of the conscious misbehavior and/or recklessness allegations here, pleading "motive and opportunity" is unnecessary to defeat Defendants' motions. *See Tellabs*, 551 U.S. at 325 ("the absence of a motive allegation is not fatal"); *Ganino*, 228 F.3d at 170 (when presented with allegations demonstrating "conscious or reckless misbehavior, [a court] need not also consider"

---

[23]    There is no dispute that these investigations concern the very misconduct at the heart of this case. *Cf. De Vito v. Liquid Holdings Grp., Inc.*, 2018 WL 6891832, at *36 (D.N.J. Dec. 31, 2018) ("The plaintiffs only speculate that the SEC is investigating the particular misconduct alleged in their complaint. Therefore, I do not factor the SEC investigation into the scienter analysis.").

[24]    The DOJ's decision to close its criminal investigation (SA Br. at 23) has no impact on Plaintiffs' civil recovery here, nor does it negate an inference of scienter. *See JP Morgan Chase Co.*, 553 F.3d at 200 n.5 ("SEC charges simply are not a prerequisite to pleading recklessness with regard to accounting and financial reporting violations.").

motive); *see also Lockheed*, 875 F. Supp. 2d at 371 ("That plaintiff has not pled motive does not make the fraud illogical; indeed, if that were the case, motive and opportunity would be the sole test for pleading scienter, not just an alternative test [to recklessness]."). Nonetheless, the CAC also alleges large, unusually timed stock sales by Stiehl (¶120) – while in possession of information contradicting his public statements – that bolster the already strong inference of his scienter discussed above. *See Scholastic*, 252 F.3d at 74-75 ("'[u]nusual' insider sales at the time of the alleged withholding of negative corporate news may permit an inference of bad faith and scienter"). Courts consider "the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling" to determine whether the stock sales are "unusual" to raise a strong inference of scienter. *Id.* at 74-75. The timing of the sales is also a factor. *See Blanford*, 794 F.3d at 309. There is no level of sales at which insider trading becomes unusual *per se*; each case is independently decided. *See Scholastic*, 252 F.3d at 75.

Here Stiehl sold his personally held Sealed Air stock at inflated prices for more than $400,000 in gross proceeds. ¶120.[25] Significantly, Stiehl traded without a 10b5-1 trading plan, meaning that he controlled when his trades were made and how many shares were sold – while possessing material inside information about the tainted EY hiring process. *See* ¶120 n.1 (incorporating by reference relevant Forms 4). *See comScore, Inc.*, 268 F. Supp. 3d at 555 (finding fact that "the vast bulk of the sales were not made pursuant to any Rule 10b5-1 trading plan" contributed to a strong inference of scienter). The nearly $4 million in Class Period stock sales by several non-defendant insiders further supports an inference of scienter. ¶120. *See, e.g., Stevelman v. Alias Research Inc.*, 174 F.3d 79, 85 (2d Cir. 1999) (motive adequately alleged where CEO sold

---

[25] Defendants' argument distinguishing gross proceeds and profits fails. SA Br. at 19-20. Courts routinely use gross proceeds to determine whether unusual insider trading took place. *See, e.g., Van Dongen*, 951 F. Supp. 2d at 475 (considering proceeds in scienter analysis); *Hutchins v. NBTY, Inc.*, 2012 WL 1078823, at *2, *6 (E.D.N.Y. Mar. 30, 2012) (same).

stock along with "several other insiders"); *In re Daou Sys., Inc.*, 411 F.3d 1006, 1024 (9th Cir. 2005) (sales by non-defendant executives contributed to strong inference of scienter).

Defendants' argument that Stiehl's Sealed Air shareholdings increased during the Class Period (SA Br. at 19) fares no better, as it outright disregards that any share increases came solely via automatic grants of stock, not through open market purchases. *See* ¶120 n.1 (incorporating Forms 4 filed with the SEC during the Class Period by reference). In other words, Stiehl did not spend a penny purchasing Sealed Air stock during the Class Period. *See Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 201 (S.D.N.Y. 2010) (shares acquired at no cost to defendant did not "demonstrate lack of scienter"). Taken holistically, as required under *Tellabs*, 551 U.S. at 326, the CAC's allegations demonstrate a compelling inference of Stiehl's scienter.

### 4.    The CAC Adequately Alleges Sealed Air's Corporate Scienter

Because the CAC pleads a strong inference of scienter as to Stiehl, it establishes Sealed Air's corporate scienter as well. ¶118; *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 Fed. Appx. 10, 15 (2d Cir. 2011) ("In most cases, the most straightforward way to raise such an inference for a corporate defendant will be to plead it for an individual defendant."); *Orthofix Int'l N.V.*, 89 F. Supp. 3d at 619 (same); *see also CBS*, 433 F. Supp. 3d at 549 ("Moonves was CEO and Chairman of the Board of CBS, which is more than sufficient to impute his scienter to the Company."); *Glob. Brokerage*, 2019 WL 1428395, at \*16 (corporate scienter alleged based on scienter of company's CEO and chief dealer); *Tenaris*, 2020 WL 6018919, at \*11 ("Courts routinely impute to the corporation the intent of officers and directors acting within the scope of their authority.").

Sealed Air disputes its corporate scienter for the EY Retention Statements on the sole basis that Stiehl did not "make[]" them. SA Br. at 16-17 (citing *Janus*). But, "*Janus* does not concern corporate scienter. Rather, *Janus* addresses what it means to 'make' a statement for purposes section 10(b)." *Pa. Pub. Sch.*, 874 F. Supp. 2d at 371; *supra* §IV.B.2. Moreover, in the very case on which

- 38 -

Sealed Air rests its corporate scienter argument, *Jackson v. Abernathy* (SA Br. at 16, 17, 23), the Second Circuit expressly stated that "[t]he scienter of the other officers or directors who were involved in the dissemination of the fraud **may also be imputed to the corporation, even if they themselves were not the actual speaker**." 960 F.3d 94, 98-99 (2d Cir. 2020) (citing *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177 (2d Cir. 2015)); *see also In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 516 (S.D.N.Y. 2009) ("the individual making an alleged misstatement and the one with scienter do not have to be one and the same").[26]

Accordingly, while Plaintiffs have established the EY Retention Statements are attributable to Stiehl (*see supra* §IV.B.2.), his state of mind is imputed to Sealed Air. *Jackson*, 960 F.3d at 98; *Loreley Fin.*, 797 F.3d at 178 (finding corporate scienter adequately alleged where "high-level employees" not alleged to have prepared their companies' offering documents knew the facts that made those documents misleading); *Patel v. L-3 Commc'ns Holdings Inc.*, 2016 WL 1629325, at \*14-\*15 n.38 (S.D.N.Y. Apr. 21, 2016) ("[T]he person whose state of mind is imputed to the corporate defendant need not also be the person who made the material misstatements at issue."); *see also Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008) ("It is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud."). Sealed Air does not otherwise challenge its own scienter for the EY Retention Statements beyond its ill-fated *Janus* argument. *See* SA Br. at 16-17.

---

[26] In *Jackson* (SA Br. at 17), the plaintiffs attempted to impute the scienter of three company employees well below the ranks of Stiehl – Sealed Air's Chief Accounting Officer, Controller, and eventually Chief Financial Officer. 960 F.3d at 97-99. ¶¶8, 24, 86. The Court held that those three employees "did not themselves possess scienter" in light of "the steps they took to raise concern" about the issue at hand, which the Second Circuit found "belie[d] any inference of fraudulent intent." *Jackson*, 960 F.3d at 99. No such comparison can be made to the allegations here, where Stiehl himself interfered in the process to hire EY as Sealed Air's auditor. ¶¶8, 92-93, 105.

In addition, Stiehl's conduct is imputed to Sealed Air irrespective of whether the Company benefitted from his conduct. *See Rex & Roberta Ling Living Tr. u/a Dec. 6, 1990 v. B. Commc'ns., Ltd.*, 346 F. Supp. 3d 389, 409 (S.D.N.Y. 2018) ("[W]here a company's highest-level directors allow the company's outward-facing communications to omit their own known, material misconduct, they can fairly be said to act on behalf of the company regardless of whether the underlying misconduct itself benefits the company."); *see also Acticon AG v. China N.E. Petroleum Holdings Ltd.*, 615 F. App'x 44, 45 (2d Cir. 2015) (imputing the scienter of a CEO to a company where CEO "attest[ed] to the company's internal controls, while allegedly simultaneously looting [the company's] treasury and engaging in unauthorized transfers of company funds").

## F.       The CAC Sufficiently Pleads a Control-Person Claim Against Stiehl

Stiehl was a control person of Sealed Air.  To establish control person liability, a plaintiff must show: "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Okla. Police Pension Fund & Ret. Sys. v. Teligent, Inc.*, 2020 WL 3268531, at *20 (S.D.N.Y. June 17, 2020) "Allegations of control are not averments of fraud and therefore need not be pleaded with particularity." *DoubleLine Capital LP v. Construtora Norberto Odebrecht, S.A.*, 413 F. Supp. 3d 187, 220, (S.D.N.Y. Sept. 22, 2019).  "Whether a person is a 'controlling person' is a fact-intensive inquiry, and generally should not be resolved on a motion to dismiss." *In re Virtus Inv. Partners, Inc. Sec. Litig.,* 195 F. Supp. 3d 528, 542 (S.D.N.Y. 2016) (citing cases).  Indeed, only a "'narrow category of cases [exist] in which it is "implausible" or mere "unlikely speculation" that plaintiffs can develop a record that would support a finding of control, especially given the decidedly fact-based nature of the control inquiry.'" *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 637 (S.D.N.Y. 2007).

- 40 -

### 1.      Plaintiffs Plead a Primary Violation

As an initial matter, for all the reasons stated herein, Plaintiffs have stated a primary violation against Stiehl for his interference in the EY hiring process.  *See Alpha Capital Anstalt*, 2014 WL 6466994, at \*14 (S.D.N.Y. Nov. 18, 2014) ("Because Plaintiff has adequately pled a Section 10(b) claim as to NGBF, the primary violation element is sufficiently pled").

### 2.      Stiehl Was a Control Person

The CAC more than adequately pleads facts establishing Stiehl's control over Sealed Air, and, in particular, over the process of EY's selection as the Company's auditor.  ¶¶8, 92-93, 105, 155.  Control over a primary violator may be established by showing that the defendant possessed the power to direct or cause the direction of the primary violator's management and policies.  *See SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472-73 (2d Cir. 1996)).

At the outset, Stiehl only challenges control in connection with the EY Retention Statements, conceding he *was* a control person with respect to all other misstatements.  *See* Stiehl Br. at 7-9.  In any event, Stiehl's control is self-evident given that he was Sealed Air's Chief Accounting Officer and Controller at the time of EY's hiring.  ¶¶8, 24, 86.  *See Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 239, 257 (S.D.N.Y. 2012) (finding company's chief accounting officer and principal accounting officer to be control persons with respect to allegations concerning a $500 million understatement of tax obligations because they had "the power to direct or cause the direction of the management and policies[.]"); *see also In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d. 370, 401 (S.D.N.Y. 2007) (finding "control" where individual "held a 'senior executive position[],'" and was involved in the allegedly fraudulent decisions).[27]

---

[27]    *In re Flag Telecom Holdings, Ltd. Securities Litigation*, 308 F. Supp. 2d 249 (S.D.N.Y. 2004) (Stiehl Br. at 8, 9) supports Plaintiffs.  There, the court found allegations of control sufficient against certain defendants where, like here, the plaintiff "established that they had significant power within [the company] and controlled the content and dissemination of the allegedly false and misleading

Stiehl recycles his hapless argument that he had no control over the EY Retention Statements because he did not sign either document. Stiehl Br. at 8. But, as discussed at length above, this argument goes nowhere. *Supra* §IV.B.2. This is particularly so because a control person need not make the actionable statement. Stiehl's direct involvement in the management and oversight of Sealed Air's operations at the highest level at the time of the EY Retention Statements renders him a control person. Likewise, Stiehl disregards the incontrovertible fact that when these false statements were made, he was concurrently signing **all** of Sealed Air's annual and quarterly SEC filings – often serving as the sole signatory of those documents. *See supra* 17. Allegations of an officer signing multiple public filings are adequate to show control. *See Gruber v. Gilbertson*, 2018 WL 1418188, at *15 (S.D.N.Y. Mar. 20, 2018) ("Because the Complaint alleges that the Officer and Director Defendants signed various annual and quarterly reports . . . , these 'alone [are] sufficient to allege control person status' on them."). At this stage, the CAC adequately alleges that Stiehl was a control person. *See In re Refco*, 503 F. Supp. 2d at 640 (finding at the motion to dismiss stage that it was "not implausible that plaintiffs could develop a record that could support a finding of control").

### 3. Stiehl Was a Culpable Participant in the Alleged Fraud

Stiehl's culpable participation in the alleged fraud is unmistakable. There is disagreement within the Second Circuit about what exactly a plaintiff must plead with respect to culpable participation. *See CBS*, 433 F. Supp. at 551 ("a split among district courts in this Circuit persists over whether culpable participation must, like scienter, be pled with particularity . . ."). Regardless,

---

statements." *Id*. at 274. In *Floyd v. Liechtung*, 2013 WL 1195114, at *6 (S.D.N.Y. Mar. 25, 2013) (Stiehl Br. at 8), unlike here, there were no facts pleaded that the corporate defendant had "the power to direct or cause the direction of the management and policies."). *Id*. In *In re Smith Barney Transfer Agent Litigation*, 884 F. Supp. 2d 152, 167-168 (S.D.N.Y. 2012) (Stiehl Br. at 7, 8), the plaintiff only alleged control via an executive officer's access to information. In *In re Deutsche Telekom AG Securities Litigation*, 2002 WL 244597, at *6 (S.D.N.Y. Feb. 20, 2002) (Stiehl Br. at 8-9), the plaintiffs relied *solely* on allegations of stock ownership to allege control. *Id*. at *6.

the CAC sufficiently alleges culpable participation under any standard.

Even Sealed Air itself viewed Stiehl as a culpable participant in connection with the alleged fraud.  The Company fired him "for cause" precisely because of his conduct in connection with "the process by which the Company selected its independent audit firm for the period beginning with fiscal year 2015, and relating to the independence of that audit firm."  ¶¶92-96.  These allegations are more than enough to allege culpable participation.  *See, e.g.*, *Bristol Myers*, 586 F. Supp. 2d at 172 (Defendants "both were aware of information which contradicted the Company's public statements . . . more than satisf[ies] the requirement that the control person was a culpable participant in the fraud in some meaningful sense"); *Suez Equity Invs., L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 101 (2d Cir. 2001) ("The complaint alleges that [Defendant] was an officer of the Bank and that he had primary responsibility for the dealings of that Bank. . . .  While somewhat broad, this allegation is sufficient to plead controlling-person liability.").

## V.    CONCLUSION

For the reasons above, Plaintiffs respectfully request that the Court deny Defendants' motions.[28]

DATED:  November 24, 2020

Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
ROBERT M. ROTHMAN
ROBERT D. GERSON
PHILIP T. MERENDA

*/s/ Robert M. Rothman*
ROBERT M. ROTHMAN

---

[28]    If the Court dismisses all or part of the CAC, Plaintiffs respectfully request leave to amend, which should be freely given. *See* Fed. R. Civ. P. 15(a)(2); *Loreley Fin*, 797 F.3d at 190 ("Without the benefit of a ruling, many a plaintiff will not see the necessity of amendment or be in a position to weigh the practicality and possible means of curing specific deficiencies.").

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
rrothman@rgrdlaw.com
rgerson@rgrdlaw.com
pmerenda@rgrdlaw.com

*Lead Counsel for Plaintiffs*

ASHER KELLY LAW
MICHAEL ASHER
JACQUELINE A. KELLY
25800 Northwestern Highway, Suite 1100
Southfield, MI  48075
Telephone:  248/746-2710
248/747-2809 (fax)
masher@asherkellylaw.com
jkelly@asherkellylaw.com

TREVETT CRISTO P.C.
MICHAEL T. HARREN
2 State Street, Suite 1000
Rochester, NY  14614
Telephone:  585/454-2181
585/454-4026 (fax)
mharren@trevettcristo.com
BLITMAN & KING LLP
Ginger B. LaChapelle
800 Troy-Schenectady Road, Second Floor
Latham, NY  12110-2424
Telephone: 518/785-4387
gblachapelle@bklawyers.com

*Additional Counsel for Plaintiffs*

CERTIFICATE OF SERVICE

I, Robert M. Rothman, hereby certify that on November 24, 2020, I authorized a true and correct copy of the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.

/s/ Robert M. Rothman

ROBERT M. ROTHMAN