ORIGINAL

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 6/1/21

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**UA LOCAL 13 PENSION FUND, UA LOCAL 13 & EMPLOYERS GROUP INSURANCE FUND, and PLUMBERS & STEAMFITTERS LOCAL 267 PENSION FUND, individually and on behalf of all others similarly situated,**

Plaintiffs,

- against -

**SEALED AIR CORPORATION and WILLIAM G. STIEHL,**

Defendants.

19 Civ. 10161 (LLS)

**OPINION & ORDER**

In this putative securities class action, Defendants Sealed Air Corporation and William G. Stiehl move to dismiss lead plaintiffs UA Local 13 Pension Fund, UA Local 13 & Employers Group Insurance Fund, and Plumbers & Steamfitters Local 267 Pension Fund's Corrected Amended Complaint ("CAC") (Dkt. No. 32) under Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4.

For the following reasons, the motions (Dkt. Nos. 33 & 36) are granted in part and denied in part.

## BACKGROUND

The CAC asserts two claims: one against both Sealed Air and Stiehl for violations of Section 10(b) of the Exchange Act and Rule 10b-5, and one against Stiehl for violation of Section 20(a) of the Exchange Act (control person liability).

Plaintiffs contend that Stiehl and Sealed Air made numerous statements that were rendered false or misleading by Stiehl's alleged interference in the company's auditor selection process, by which Stiehl ensured that Ernst & Young ("EY") was selected as the company's auditor. Plaintiffs call that alleged interference the "bid-rigging scheme."

The CAC alleges that the following statements about Sealed Air's retention of EY, made in Sealed Air's November 2014 Form 8-K and 2015 Proxy Statement, were false and misleading because the selection process was actually neither competitive nor comprehensive and did not actually involve several accounting firms:

> On November 11, 2014, the Audit Committee of the Board of Directors (the "Audit Committee") of Sealed Air Corporation ("Sealed Air" or the "Company") approved the selection of Ernst & Young LLP ("EY") to serve as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2015 <u>following a competitive search process</u>. The <u>competitive search process involved several international registered public accounting firms</u>. . . . [Emphasis added].

CAC ¶ 44.

> Selection of Independent Auditor (Proposal 12)
>
> On November 11, 2014, <u>following a competitive search process, the Audit Committee selected Ernst & Young LLP ("EY") to be engaged as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2015. The competitive search process involved several international registered public accounting firms</u>. . . .

> On February 16, 2015, the Audit Committee approved the engagement of EY as our independent registered public accounting firm to examine and report on the Company's consolidated financial statements and the effectiveness of the Company's internal control over financial reporting for the fiscal year ending December 31, 2015, subject to ratification of the retention by the stockholders at the Annual Meeting. <u>Following a comprehensive request for proposal process, the Audit Committee considered EY to be well qualified.</u> . . .
>
> On March 2, 2015, EY was engaged to serve as Sealed Air's independent registered public accounting firm for the fiscal year ending December 31, 2015. . . . [Emphasis added].

CAC ¶ 52.

The CAC then alleges that the bid-rigging scheme renders false or misleading statements defendants made about three different sets of Sealed Air's corporate procedures in the company's SEC filings.

First, Sealed Air's Form 10-K filings for 2014 through 2017 and Form 10-Q filings for the first quarter of 2015 through the second quarter of 2018, each signed by Stiehl, stated that the company designed and maintained disclosure controls and procedures that satisfied SEC requirements and that the Chief Executive Officer and Chief Financial Officer ("CFO") concluded they were effective at the "reasonable assurance" level.[1]

---

[1] The Court concurrently assesses plaintiffs' allegation that Sealed Air omitted from its SEC filings information necessary to comply with SEC Regulation S-K Item 307 (17 C.F.R. § 229.307), which requires disclosure of management's conclusions "regarding the effectiveness of the registrant's disclosure controls and procedures."

-3-

Second, the company's 2014 through 2017 Form 10-K filings incorporated its Codes of Conduct and Ethics. The CAC alleges that Stiehl's involvement in the bid-rigging scheme showed excerpts from those Codes to be false or misleading.

Third, in the Sarbanes-Oxley certifications to Sealed Air's third quarter 2017 through second quarter 2018 Form 10-Q filings and 2017 Form 10-K filing, Stiehl attested to four statements that the CAC alleges were made false or misleading by his participation in the bid-rigging scheme.

Finally, the CAC alleges that Sealed Air's disclosures in its SEC filings necessary to comply with SEC Regulation S-K Items 303 (17 C.F.R. § 229.303) and 105 (id. § 229.105, formerly Item 503 at id. § 229.503) were false and misleading because they omitted information about the bid-rigging scheme.

## DISCUSSION

Defendants argue that the CAC alleges neither the falsehoods or misleading statements in question, nor their authors' states of mind, with sufficient particularity to satisfy Fed. R. Civ. P. 9(b) and the PSLRA, 15 U.S.C. § 78u-4(b)(1)-(2).

### EY Retention Statements

Defendants first contend that the CAC does not describe with enough detail the bid-rigging scheme that plaintiffs allege rendered fraudulent Sealed Air's repeated statement that it

-4-

chose Ernst & Young to be "the Company's independent registered public accounting firm for the fiscal year ending December 31, 2015" by "a competitive search process" that "involved several international registered public accounting firms." CAC ¶¶ 44, 52.

To support this contention, Defendants quote the Second Circuit's holding in Gamm v. Sanderson Farms, Inc., 944 F.3d 455 (2d Cir. 2019) that "when a complaint claims that statements were rendered false or misleading through the nondisclosure of illegal activity, the facts of those underlying illegal acts must also be pleaded with particularity." Id. at 458.

But the Gamm opinion goes on to explain that because "smoking gun" direct evidence of an anticompetitive agreement is often hard to come by at the pleading stage, such an agreement can be pled by "circumstantial facts supporting the inference that a conspiracy existed." Id. at 465.

Plaintiffs point to Sealed Air's firing of its former Chief Accounting Officer ("CAO"), Controller, and CFO William Stiehl and its former auditor Ernst & Young as supporting the inference that the search process was corrupt:

> Just weeks after receiving a subpoena explicitly relating to the process by which the Company selected EY as its auditor and launching its own internal investigation on the issue, Sealed Air took the extraordinary step of firing Stiehl, its Chief Financial Officer, "for cause." ¶93. Five days after receiving a criminal subpoena which Sealed Air described as "relating to the termination of our

-5-

> former CFO and relating to the process by which the
> Company selected its independent audit firm" the
> Company fired EY. ¶95. It placed the reason for
> terminating EY squarely on the Audit Committee's
> "<u>dissatisfaction with information it learned about the
> process by which EY was selected as auditor.</u>" ¶96.

Pls.' Opp'n at 10-11 (emphasis in original).

Defendants' citation to <u>City of Austin Police Ret. Sys. v. ITT Educ. Servs., Inc.</u>, 388 F. Supp. 2d 932, 942 (S.D. Ind. 2005) for the proposition that plaintiffs' circumstantial evidence is insufficient to plead the bid-rigging scheme is inapposite. In <u>City of Austin</u>, the Court found that the termination of federal criminal and SEC investigations into defendants negated inferences that plaintiffs had sought to draw from those investigations. <u>Id.</u> at 941-42. Here the existence of the bid-rigging scheme is inferred not only from the criminal and SEC investigations, but also from their apparent direct connection with Sealed Air's firing of Stiehl and EY.

The CAC thus sufficiently alleges the bid-rigging scheme, and that Sealed Air's statements that it retained EY after a competitive search involving several accounting firms were false or misleading.

### Corporate Procedures

Defendants argue that "Plaintiffs also do not adequately explain <u>why</u> the company's statements about its policies and procedures were rendered false by omission." Sealed Air Mem. at 11 (emphasis in original).

-6-

### The Statements About Disclosure Controls and Procedures

Stiehl and Sealed Air stated in 15 SEC filings between the first quarter of 2015 and the second quarter of 2018 that the company maintained disclosure controls and procedures

> designed to ensure that information required to be disclosed in our reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that our employees accumulate this information and communicate it to our management, . . .

and that "our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective at the 'reasonable assurance' level." See CAC ¶ 47 (quoting 2014 Form 10-K).

Defendants argue that plaintiffs do not sufficiently allege that the controls and procedures were inadequately designed, insufficient or not followed, nor the actions which should have been taken to avoid violation of the controls.

Plaintiffs' allegation that the disclosure controls and procedures "were not designed to ensure that employees accurately communicated required information but rather permitted the Company to file reports pursuant to the Exchange Act with the SEC that misstated and/or omitted material facts required to be disclosed by SEC rules and regulations" is sufficient at the pleading stage. See CAC ¶ 51(b). It does not identify the deficient language. But that is a matter of

evidence, which does not have to be pleaded, and the CAC states the nature of the claim.[2]

## Codes of Conduct and Ethics

Defendants argue that the statements in the company's Codes of Conduct and Ethics are aspirational, inactionable puffery.

> It is well-established that general statements about reputation, integrity, and compliance with ethical norms are inactionable "puffery," meaning that they are "too general to cause a reasonable investor to rely upon them." This is particularly true where, as here, the statements are explicitly aspirational, with qualifiers such as "aims to," "wants to," and "should."

City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG, 752 F.3d 173, 183 (2d Cir. 2014).

The CAC alleges the following statements from the Code of Conduct are false or misleading:

> <u>Sealed Air Corporation has a reputation for conducting its business on a highly ethical level.</u> It is important that we continue this record of integrity in the future. Each and every employee of the Company and its subsidiaries throughout the world is responsible for the maintenance of our fine reputation.
> \* \* \*
> <u>Each of our employees is expected to comply with the law, but our standard of business ethics goes beyond compliance with law. No list of rules can substitute for the exercise by anyone who represents our Company of basic morality, common decency, high ethical standards and respect for the law.</u> . . .
> \* \* \*
> In the course of performing their duties, employees may have access to confidential information concerning other employees such as information appearing on job applications, salary information or other confidential

---

[2] For the same reason, plaintiffs state a 10b-5 claim premised on an SEC Item 307 violation. <u>See</u> footnote 1, <u>supra</u> p.3.

> information concerning that employee. <u>All employees must treat this information as confidential, use it only for proper purposes and divulge it only to those having a "need to know" it.</u>
>
> \* \* \*
>
> <u>No Sealed Air employee may put his or her personal interests ahead of the interests of the Company. Even the appearance of a conflict can damage the reputation of an employee or the Company.</u> . . .
>
> \* \* \*
>
> <u>Sealed Air requires its employees to comply fully with anti-corruption laws in the United States and similar laws in other countries.</u> . . .

CAC ¶ 49 (emphasis in original).

Those statements are not actionable. They describe Sealed Air's and its employees' responsibility to conduct business ethically in too generic a fashion to be relied on. They set no enforceable standards: confidential information must be used "only for proper purposes." They impose no specific obligations on employees beyond those already required by law. What is covered by "interests"?

The statements that the CAC quotes from the company's Code of Ethics for Senior Financial Executives reflect the same characteristics:

> This Code of Ethics sets forth the standards and procedures to be followed by Sealed Air's <u>Chief Executive Officer, Chief Financial Officer, Controller, Treasurer, and all other employees performing similar functions</u> for the Corporation (the "Senior Financial Executives") to <u>promote honest and ethical conduct, appropriate disclosure in Sealed Air's periodic reports and other documents filed with the Securities and Exchange Commission</u>, and compliance with applicable governmental rules and regulations. This Code of Ethics supplements the Sealed Air Code of

Conduct, which also applies to all Senior Financial Executives.

Conflicts of Interest

<u>All Senior Financial Executives should be scrupulous in avoiding a conflict of interest with respect to the Company's interests. A "conflict of interest" exists whenever an individual's private or personal interests interfere or conflict in any way (or even appear to interfere or conflict) with the interests of the Company.</u> . . .

Conflicts of interest are prohibited as a matter of Company policy, unless approved under applicable guidelines established by the Board of Directors or a committee of the Board. . . . Any such potential or actual conflict of interest must be disclosed to the Board, and the Senior Financial Executive must comply with any measure that may be required by the Audit Committee or the Board in order to avoid or eliminate such conflict.

<u>Any employee, officer or director of the Company who becomes aware of a conflict or potential conflict involving a Senior Financial Executive should bring it to the attention of the General Counsel of the Corporation or a member of the Audit Committee</u> of the Board of Directors at the principal executive offices of the Corporation. . . .

Accounting Complaints

The Company's policy is to comply with all applicable financial reporting and accounting regulations applicable to the Company. <u>If a Senior Financial Executive or any other employee of the Company has concerns or complaints regarding questionable accounting or auditing matters involving the Company, then he or she is encouraged to submit those concerns or complaints (anonymously, confidentially or otherwise) to the Audit Committee of the Board.</u> . . .

Disclosure Controls and Procedures

The federal securities laws and the regulations of the New York Stock Exchange impose disclosure requirements on the Company, including requiring the Company to

> file certain reports with the Securities and Exchange
> Commission and the New York Stock Exchange and make
> certain public disclosures. Such reports and
> disclosures must comply with all applicable legal and
> NYSE requirement.
>
> The Company has adopted certain disclosure controls
> and procedures in connection with its reporting and
> other public disclosures. Each Senior Financial
> Executive must strictly adhere to such controls and
> procedures. <u>All Senior Financial Executives must
> ensure that such reports and disclosures are (i) full,
> fair, timely, factual, accurate and understandable and
> (ii) meet all legal and exchange requirements.</u> These
> requirements apply to all public disclosures of
> material information about the Company, including
> written disclosures, oral statements, visual
> presentations, analyst and press conferences, and
> media and investor calls. . . .

CAC ¶ 50 (emphasis in original).

Despite an appearance of gravity and solemnity, these statements are similarly undefined and abstract: "interests" are without limits, conduct must be "honest and ethical," and federal and company regulations requiring accurate reports must be complied with. They create no new obligations specific enough to support a lawsuit if not observed, beyond the requirements of present law. They are puffery.

### Sarbanes-Oxley Certifications

In the company's Sarbanes-Oxley certifications to its third quarter 2017 through second quarter 2018 Form 10-Q filings, Stiehl attested that

> (a) "this report does not contain any untrue statement
> of a material fact or omit to state a material fact
> necessary to make the statements made, in light of the
> circumstances under which such statements were made,

-11-

not misleading with respect to the period covered by this report;"

(b) "[t]he registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have . . . [d]esigned such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;"

(c) "[e]valuated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation;" and

(d) "[t]he registrant's other certifying officer and I have disclosed . . . [a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting."

See CAC ¶ 76 (alterations and omissions in complaint) (quoting the Q3 2017 Form 10-Q).

Defendants' only challenge to plaintiffs' allegation that defendants' Sarbanes-Oxley certifications were false or misleading is that plaintiffs do not sufficiently "describe what was fraudulent" about the alleged bid-rigging scheme. Sealed Air. Mem. at 7 n.8.

As the Court found that plaintiffs have alleged the big-rigging scheme with sufficient particularity, this challenge fails.

### Items 303 and 105

Plaintiffs argue that defendants failed to disclose in their SEC filings material uncertainties and events they were required to disclose by SEC Item 303, 17 C.F.R. § 229.303, and risk factors they were required to disclose under SEC Item 105, id. § 229.105, and that these omissions rendered false or misleading the disclosures that defendants otherwise made in accordance with Items 303 and 105 in their SEC filings.

Item 303 requires disclosure of "material events and uncertainties known to management that are reasonably likely to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition" and "matters that are reasonably likely based on management's assessment to have a material impact on future operations." Id. § 229.303(a). Item 105 requires "a discussion of the material factors that make an investment in the registrant or offering speculative or risky." Id. § 229.105(a).

Defendants argue that "Plaintiffs do not sufficiently plead what information was required to be disclosed." Sealed Air Mem. at 13.

The CAC alleges that defendants' omission of the following information about the bid-rigging scheme and its attendant consequences violated Items 303 and 105:

> (a) that Sealed Air's selection of EY to serve as the Company's independent registered public accounting firm did not follow a competitive search process involving several international registered public accounting firms but rather followed an illegally manipulated process through which bids were rigged by Stiehl and EY to ensure EY would be selected as the Company's registered public accounting firm; and
>
> (b) that the unlawful bid rigging by Stiehl subjected Sealed Air to contingent liabilities, including fines, reputational damage, criminal penalties and/or other sanctions which, in violation of SEC rules and regulations, were not disclosed to investors and were reasonably likely to have a material effect on the Company's future operating results.

CAC ¶ 103.

That describes, with sufficient particularity to state a 10b-5 claim premised on a violation of Items 303 and 105, the omitted material events and uncertainties and risk factors that plaintiffs allege defendants were required to disclose.

### Scienter and Primary Liability

Defendants next contend that plaintiffs do not "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Novak v. Kasaks, 216 F.3d 300, 311 (2d Cir. 2000).

#### EY Retention Statements

Defendants argue that they did not make the EY retention statements with the requisite state of mind because Stiehl is

the only Sealed Air employee who plaintiffs allege knew of the bid-rigging scheme and he neither signed the documents in which the statements were made nor had ultimate authority over the statements.

In Janus Capital Group v. First Derivative Traders, 564 U.S. 135 (2011), the Supreme Court held that

> For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it. Without control, a person or entity can merely suggest what to say, not "make" a statement in its own right. One who prepares or publishes a statement on behalf of another is not its maker. And in the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed.

Id. at 142-43.

Sealed Air's November 14, 2014 Form 8-K Statement, was signed by Sealed Air's then-Senior Vice President and Chief Financial Officer Carol P. Lowe. See Stiehl Mem. Ex. 1 at 4. The company's April 2, 2015 Proxy Statement, Stiehl Mem. Ex. 2, was not signed by Stiehl, but by various other company insiders, and the EY retention statement in that filing is part of a proposal to retain EY made by the Board of Directors to the company's stockholders. See Stiehl Mem. Ex. 2 at 75. Stiehl is not mentioned in either document.

As the EY retention statements are attributed to people other than Stiehl, plaintiffs have not raised a strong inference

that Stiehl had ultimate authority or control over those statements. He thus did not make the EY Retention Statements, and cannot be held primarily liable for them under Section 10b-5.

That does not end the inquiry. Sealed Air made both of the EY retention statements, as those executives and directors who signed the statements made them on behalf of the company in the company's SEC filings.

Corporate scienter does not require that the individual who made the statement at issue on the corporation's behalf themselves knew of its falsity.

> Where the defendant at issue is a corporation, it is possible to plead corporate scienter by pleading facts sufficient to create a strong inference either (1) that "someone whose intent could be imputed to the corporation acted with the requisite scienter" or (2) that the statements "would have been approved by corporate officials sufficiently knowledgeable about the company to know" that those statements were misleading.

Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC, 797 F.3d 160, 177 (2d Cir. 2015) (quoting Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc., 531 F.3d 190, 195-96 (2d Cir. 2008). "The scienter of the other officers or directors who were involved in the dissemination of the fraud may also be imputed to the corporation, even if they themselves were not the actual speaker." Jackson v. Abernathy, 960 F.3d 94, 98 (2d Cir. 2020).

Stiehl was Sealed Air's Chief Accounting Officer ("CAO") and Controller when the company said in its SEC filings that it chose EY to be its "independent registered public accounting firm." See CAC ¶ 118. Stiehl's position as the company's top accountant strongly implies that he was involved in the crafting and approval of the company's statements about its search for and selection of an accounting firm. Accordingly, his knowledge of the EY retention statements' falsity can plausibly be imputed to Sealed Air at this stage of the litigation.

The CAC thus states facts creating a strong inference that Sealed Air made the EY retention statements with a sufficiently culpable state of mind, but does not state a 10b-5 claim against Stiehl with regard to the EY retention statements because he did not make them.

### Stiehl-Signed Statements

The CAC therefore also states fact which raise a strong inference that Stiehl and Sealed Air had the requisite state of mind when they made the remaining statements. Stiehl signed those statements on Sealed Air's behalf and they were published in Sealed Air's various SEC filings. Stiehl and Sealed Air thus made the remaining statements. As the alleged perpetrator of the bid-rigging scheme, there is a strong inference that Stiehl was aware that the scheme rendered those statements false or

-17-

misleading. He thus acted with the requisite scienter, and that scienter may be imputed to Sealed Air.

### Control Person Liability

"To state a claim of control person liability under § 20(a), 'a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud.'" Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC, 750 F.3d 227, 236 (2d Cir. 2014) (quoting ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 108 (2d Cir. 2007)).

Plaintiffs have adequately alleged (1) a primary violation by Sealed Air, (2) Stiehl's control of Sealed Air, first as CAO and Controller and then as CFO,[3] and (3) Stiehl's culpable participation in the bid-rigging scheme, his failure to rectify the EY retention statements when he knew they were false or misleading, and his false or misleading statements. Thus,

---

[3] Control of a company or controlled person for the purpose of determining Section 20(a) control person liability is different from control over a specific statement for purposes of determining Section 10b-5 primary liability. See Janus, 564 U.S. at 146 (footnote omitted)(alteration in original)("Congress also has established liability in § 20(a) for '[e]very person who, directly or indirectly, controls any person liable' for violations of the securities laws. § 78t(a) (2006 ed., Supp. IV). First Derivative's theory of liability based on a relationship of influence resembles the liability imposed by Congress for control. To adopt First Derivative's theory would read into Rule 10b-5 a theory of liability similar to—but broader in application than, see post, at 2310 — what Congress has already created expressly elsewhere. We decline to do so.")

plaintiffs have sufficiently pled control person liability against Stiehl for all surviving claims.

## CONCLUSION

Defendants' motions to dismiss the complaint (Dkt. Nos. 33 & 36) are granted dismissing plaintiffs' Rule 10b-5 claim against Stiehl for the EY retention statements and plaintiffs' Rule 10b-5 claims against both defendants based on Sealed Air's Code of Conduct and Code of Ethics.

The motions are denied as to plaintiffs' Rule 10b-5 claim against Sealed Air for the EY retention statements, plaintiffs' Rule 10b-5 claim against both defendants based on the disclosure protocol statements, the Sarbanes-Oxley certifications, and the Item 303 and 105 disclosures, and plaintiffs' Section 20(a) claim against Stiehl to the extent it is premised on any of those statements.

So ordered.

Dated: New York, New York
June 1, 2021

*Louis L. Stanton*
LOUIS L. STANTON
U.S.D.J.