UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— x

UA LOCAL 13 & EMPLOYERS GROUP
INSURANCE FUND, Individually and on
Behalf of All Others Similarly Situated,

                    Plaintiff,

    vs.

SEALED AIR CORPORATION and
WILLIAM G. STIEHL,

                 Defendants.

———————————————————————— x

:  Civil Action No. 1:19-cv-10161-LLS

:

:  <u>CLASS ACTION</u>

:

:

:

:

:

:

:

:

:

:

:

:

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF
CLASS REPRESENTATIVES AND CLASS COUNSEL**

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION .................................................................................................1

II. STATEMENT OF FACTS COMMON TO THE CLASS ...................................4

    A. Defendants' Materially False and Misleading Statements During the Class Period ....................................................................................................4

    B. The SEC Finds that Sealed Air's EY Hiring Process Was Neither "Competitive" Nor "Comprehensive" ..............................................................8

    C. This Action and the Proposed Class Representatives ..........................................10

III. THE PROPOSED CLASS SATISFIES RULE 23 .............................................11

    A. Legal Standards for Class Certification ..............................................................11

    B. Certification Is Proper Under Rule 23(a) .............................................................12

        1. The Class Is so Numerous that Joinder of All Members Is Impracticable ..............................................................................................12

        2. Common Questions of Law or Fact Exist for All Class Members ............13

        3. The Proposed Class Representatives' Claims Are Typical of Those of the Class ............................................................................................................14

        4. The Proposed Class Representatives Will Fairly and Adequately Protect the Interests of the Class ..............................................................15

    C. Certification Is Proper Under Rule 23(b)(3) ........................................................17

        1. Common Questions of Law and Fact Predominate Over Individual Questions ..................................................................................................18

            a. The "Fraud-on-the-Market" Presumption Applies .........................19

                (1) Sealed Air Common Stock Traded in an Efficient Market During the Class Period ........................................20

                    (i) Sealed Air Shares Experienced a High Weekly Trading Volume ........................................21

                    (ii) A Sufficient Number of Financial Analysts Covered and Reported on Sealed Air During the Class Period ..................................................22

**Page**

(iii)   Sealed Air Common Stock Traded on the NYSE Under the Supervision of Designated Market Makers with Brokers Standing Ready to Buy and Sell the Shares ..........................23

(iv)   Sealed Air Was Eligible to File Form S-3 During the Class Period .........................................24

(v)   The Price of Sealed Air Common Stock Reacted to Company-Specific Announcements During the Class Period ..............24

(vi)   Sealed Air's Large Market Capitalization Supports Market Efficiency ...................................25

(vii)   Sealed Air Common Stock's Narrow Bid-Ask Spread Supports Market Efficiency................25

(viii)   The High Percentage of Market Float Supports Market Efficiency ...................................26

b.   Reliance Is Presumed for All Class Members Under *Affiliated Ute* ...............................................................................26

c.   Damages Are Measurable on a Class-Wide Basis .........................28

2.   A Class Action Is Superior to Other Available Methods for the Fair and Efficient Adjudication of This Action................................................29

D.   The Court Should Appoint Plaintiffs' Choice of Counsel ....................................30

IV.   CONCLUSION...............................................................................................................32

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Affiliated Ute Citizens v. United States*,
406 U.S. 128 (1972)...................................................................................................26, 27

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997)...................................................................................................2, 11, 18

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013)...................................................................................................19, 20

*Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
955 F.3d 254 (2d Cir. 2020), *vacated on other grounds*,
141 S. Ct. 1951 (2021)...............................................................................................19, 20

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988).............................................................................................. *passim*

*Billhofer v. Flamel Techs., S.A.*,
281 F.R.D. 150 (S.D.N.Y. 2012) ...............................................................................23

*Cammer v. Bloom*,
711 F. Supp. 1264 (D.N.J. 1989) ...................................................................... *passim*

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
310 F.R.D. 69 (S.D.N.Y. 2015) ....................................................................... *passim*

*Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*,
504 F.3d 229 (2d Cir. 2007)........................................................................................12

*City of Ann Arbor Emps.' Ret. Sys. v. Sonoco Prods. Co.*,
270 F.R.D. 247 (D.S.C. 2010) .....................................................................................22

*City of Livonia Emps.' Ret. Sys. v. Wyeth*,
284 F.R.D. 173 (S.D.N.Y. 2012) ...............................................................................31

*City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*,
2017 WL 3608298
(S.D.N.Y. Aug. 22, 2017) ...........................................................................13, 16, 18, 19

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)...........................................................................................................28

*Dodona I, LLC v. Goldman, Sachs & Co.*,
296 F.R.D. 261 (S.D.N.Y. 2014) ...................................................................................27, 28

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) .................................................................................................................2

*Ellenburg III v. JA Solar Holdings Co.*,
262 F.R.D. 262 (S.D.N.Y. 2009) ........................................................................................32

*Fogarazzo v. Lehman Brothers, Inc.*,
232 F.R.D. 176 (S.D.N.Y. 2005) ...................................................................................14, 27

*Fogarazzo v. Lehman Brothers, Inc.*,
263 F.R.D. 90 (S.D.N.Y. 2009) ............................................................................................12

*Glauser v. EVCI Career Colls. Holding Corp.*,
236 F.R.D. 184 (S.D.N.Y. 2006) ........................................................................................17

*Gruber v. Gilbertson*,
2019 WL 4439415
(S.D.N.Y. Sept. 17, 2019) .........................................................................................2, 11, 29

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014) ..........................................................................................................3, 20

*Haw. Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Ent. Holdings, Inc.*,
338 F.R.D. 205 (S.D.N.Y. 2021) .................................................................................4, 11, 13

*In re Allergan PLC Sec. Litig.*,
2021 WL 4077942
(S.D.N.Y. Sept. 8, 2021).......................................................................................................24

*In re Barrick Gold Sec. Litig.*,
314 F.R.D. 91 (S.D.N.Y. 2016) .....................................................................................16, 28

*In re Blech Sec. Litig.*,
187 F.R.D. 97 (S.D.N.Y. 1999) ...........................................................................................13

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
2020 WL 1329354
(S.D.N.Y. Mar. 23, 2020) ...............................................................................................2, 11

*In re Drexel Burnham Lambert Grp., Inc.*,
960 F.2d 285 (2d Cir. 1992).................................................................................................17

*In re DVI Inc. Sec. Litig.*,
249 F.R.D. 196 (E.D. Pa. 2008), *aff'd*,
639 F.3d 623 (3rd Cir. 2011) .........................................................................................22, 23

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
    312 F.R.D. 332 (S.D.N.Y. 2015) ................................................................................4, 12

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    574 F.3d 29 (2d Cir. 2009).......................................................................................15, 31

*In re IndyMac Mortg.-Backed Sec. Litig.*,
    286 F.R.D. 226 (S.D.N.Y. 2012) ...................................................................................19

*In re Initial Pub. Offerings Sec. Litig.*,
    471 F.3d 24 (2d Cir. 2006)..............................................................................................12

*In re JPMorgan Chase & Co. Sec. Litig.*,
    2015 WL 10433433
    (S.D.N.Y. Sept. 29, 2015) .........................................................................................12, 18

*In re Liberty Tax, Inc. Sec. Litig.*,
    435 F. Supp. 3d 457 (E.D.N.Y. 2020) ...........................................................................10

*In re MF Glob. Holdings Ltd. Inv. Litig.*,
    310 F.R.D. 230 (S.D.N.Y. 2015) ...................................................................................29

*In re Mindbody, Inc. Sec. Litig.*,
    489 F. Supp. 3d 188 (S.D.N.Y. 2020)............................................................................10

*In re NYSE Specialists Sec. Litig.*,
    260 F.R.D. 55 (S.D.N.Y. 2009) .....................................................................................13

*In re Perrigo Co. PLC Sec. Litig.*,
    493 F. Supp. 3d 291 (S.D.N.Y. 2020).......................................................................16, 17

*In re Petrobras Sec.*,
    862 F.3d 250 (2d Cir. 2017).........................................................................................21, 25

*In re SCOR Holding (Switz.) AG Litig.*,
    537 F. Supp. 2d 556 (S.D.N.Y. 2008).............................................................................30

*In re Signet Jewelers Ltd. Sec. Litig.*,
    2019 WL 3001084
    (S.D.N.Y. July 10, 2019) ................................................................................. *passim*

*In re Virtus Inv. Partners, Inc. Sec. Litig.*,
    2017 WL 2062985
    (S.D.N.Y. May 15, 2017).................................................................................................14

*In re Visa Check/MasterMoney Antitrust Litig.*,
    280 F.3d 124 (2d Cir. 2001)..............................................................................................12

*In re Vivendi Universal, S.A. Sec. Litig.*,
   242 F.R.D. 76 (S.D.N.Y. 2007) ..................................................................................14

*In re Winstar Commc'ns Sec. Litig.*,
   290 F.R.D. 437 (S.D.N.Y. 2013) ...........................................................................22, 23

*In re WorldCom, Inc. Sec. Litig.*,
   219 F.R.D. 267 (S.D.N.Y. 2003) ..............................................................................27

*Katz v. Image Innovations Holdings, Inc.*,
   2010 WL 2926196
   (S.D.N.Y. July 22, 2010) .....................................................................................13, 18

*Krogman v. Sterritt*,
   202 F.R.D. 467 (N.D. Tex. 2001) ......................................................................21, 24, 26

*Lapin v. Goldman Sachs & Co.*,
   254 F.R.D. 168 (S.D.N.Y. 2008) ...........................................................................19, 30

*Marisol A. v. Giuliani*,
   126 F.3d 372 (2d Cir. 1997)..........................................................................................2

*McIntire v. China MediaExpress Holdings, Inc.*,
   38 F. Supp. 3d 415 (S.D.N.Y. 2014).......................................................................13, 22

*Menkes v. Stolt-Nielsen S.A.*,
   270 F.R.D. 80 (D. Conn. 2010)..................................................................................19

*Operating Loc. 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*,
   595 F.3d 86 (2d Cir. 2010)..........................................................................................10

*Osberg v. Foot Locker, Inc.*,
   2014 WL 5800501
   (S.D.N.Y. Nov. 7, 2014) ............................................................................................27

*Pa. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co.*,
   772 F.3d 111 (2d Cir. 2014).......................................................................................13

*Phillips Petroleum Co. v. Shutts*,
   472 U.S. 797 (1985)...................................................................................................29

*Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.*,
   277 F.R.D. 97 (S.D.N.Y. 2011) .................................................................................15

*Roach v. T.L. Cannon Corp.*,
   778 F.3d 401 (2d Cir. 2015), *cert. denied*,
   138 S. Ct. 1702 (2018)...........................................................................................18, 28

*Rubenstein v. Adamany*,
  2021 WL 5782359
  (2d Cir. Dec. 7, 2021) ...........................................................................................9

*Scheufele v. Tableau Software, Inc.*,
  2020 WL 2553100
  (S.D.N.Y. Feb. 13, 2020) .....................................................................................28

*Sgalambo v. McKenzie*,
  268 F.R.D. 170 (S.D.N.Y. 2010) .........................................................................31

*Strougo v. Barclays PLC*,
  312 F.R.D. 307 (S.D.N.Y. 2016) ...............................................................21, 25, 26

*Strougo v. Mallinckrodt Pub. Ltd. Co.*,
  2020 WL 3469056
  (S.D.N.Y. June 25, 2020).....................................................................................31

*Sykes v. Mel S. Harris & Assocs. LLC*,
  780 F.3d 70 (2d Cir. 2015).....................................................................................28

*Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*,
  546 F.3d 196 (2d Cir. 2008).....................................................................................25

*Titan Grp., Inc. v. Faggen*,
  513 F.2d 234 (2d Cir. 1975).....................................................................................27

*Tyson Foods, Inc. v. Bouaphakeo*,
  577 U.S. 442 (2016).....................................................................................13

*UA Loc. 13 Pension Fund v. Sealed Air Corp.*,
  2021 WL 2209921
  (S.D.N.Y. June 1, 2021)...............................................................................10, 11, 27

*Villella v. Chem. & Mining Co. of Chile Inc.*,
  2015 WL 6029950
  (S.D.N.Y. Oct. 14, 2015) .....................................................................................31

*Waggoner v. Barclays PLC*,
  875 F.3d 79 (2d Cir. 2017)...............................................................................18, 20, 21, 24

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
　§78........................................................................................................................9, 14
　§78j(b)................................................................................................... *passim*
　§78n(a) ..............................................................................................................9, 10
　§78t(a) ..............................................................................................................11, 15

Federal Rule of Civil Procedure
　Rule 23 ................................................................................................... *passim*
　Rule 23(a).......................................................................................11, 16, 17, 32
　Rule 23(a)(1)-(4) .............................................................................................17
　Rule 23(a)(1) .............................................................................................12, 13
　Rule 23(a)(3) .............................................................................................15
　Rule 23(a)(4) .............................................................................................16, 30
　Rule 23(b) .............................................................................................11
　Rule 23(b)(3)................................................................................... *passim*
　Rule 23(c)...............................................................................................30
　Rule 23(d) ...............................................................................................30
　Rule 23(g) ...............................................................................................30
　Rule 23(g)(1)(A) .............................................................................................30

17 C.F.R.
　§240.10b-5 .............................................................................................15
　§229.105...............................................................................................11, 27
　§229.303(a) .......................................................................................10, 11, 27
　§229.307...............................................................................................11, 27

Sarbanes-Oxley Act of 2002
　Pub. L. No. 107-204 (2002) ...............................................................................6, 10

Plaintiffs UA Local 13 Pension Fund, UA Local 13 & Employers Group Insurance Fund, Plumbers & Steamfitters Local 267 Pension Fund, and Plumbers and Steamfitters Local No. 7 Pension and Welfare Funds (collectively, "Plaintiffs" or "Proposed Class Representatives"), by their counsel, respectfully submit this memorandum of law in support of their motion for an Order: (i) certifying this action as a class action pursuant to Federal Rule of Civil Procedure 23; (ii) appointing UA Local 13 Pension Fund, UA Local 13 & Employers Group Insurance Fund, Plumbers & Steamfitters Local 267 Pension Fund, and Plumbers and Steamfitters Local No. 7 Pension and Welfare Funds as Class Representatives; and (iii) appointing Lead Counsel Robbins Geller Rudman & Dowd LLP ("Robbins Geller") as Class Counsel.

In support of their motion, Plaintiffs submit this memorandum of law; the Declarations of Steven Ostrander, Fund Administrator for UA Local 13 Pension Fund and UA Local 13 & Employers Group Insurance Fund ("Ostrander Decls."); the Declaration of Michael Nanno, Fund Manager for Plumbers & Steamfitters Local 267 Pension Fund ("Nanno Decl."); the Declaration of Ryan Heimroth, Administrator for Plumbers and Steamfitters Local No. 7 Pension and Welfare Funds ("Heimroth Decl."); the Report on Market Efficiency by Professor Steven P. Feinstein, Ph.D., CFA, dated July 14, 2022 (the "Feinstein Rpt."); the Declaration of Robert M. Rothman of Robbins Geller ("Rothman Decl."); and a [Proposed] Order, filed concurrently herewith.

## I.    INTRODUCTION

Pursuant to Rule 23, Plaintiffs respectfully seek certification of a class consisting of:

> All persons and entities who purchased or otherwise acquired Sealed Air Corporation's ("Sealed Air" or the "Company") common stock during the period from November 17, 2014 through June 20, 2019 and were damaged thereby. Excluded from the Class are Defendants and their immediate families, the Company's officers and directors at all relevant times, as well as their immediate families, Defendants' legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

Courts in this District have "'consistently held that claims alleging violations of Sections 10(b) and 20(a) of the Exchange Act'" – such as those here – "'are especially amenable to class certification.'" *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2020 WL 1329354, at *2 (S.D.N.Y. Mar. 23, 2020) (collecting cases). In such cases, common issues typically predominate, and a class action is the superior method for redressing the common injury inflicted upon Class members by defendants. As the Supreme Court has held, "[p]redominance is a test readily met in certain cases alleging . . . securities fraud." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). "'Rule 23 is given liberal rather than restrictive construction, and courts are to adopt a standard of flexibility.'" *Marisol A. v. Giuliani*, 126 F.3d 372, 377 (2d Cir. 1997). Accordingly, "the Second Circuit instructs district courts 'to adopt a liberal interpretation of Rule 23 in order to maximize the benefits to both private parties and to the public provided by class actions.'" *Gruber v. Gilbertson*, 2019 WL 4439415, at *2 (S.D.N.Y. Sept. 17, 2019). Indeed, the application of Rule 23 furthers the goals of the securities laws, which "seek to maintain public confidence in the marketplace . . . by deterring fraud, in part, through the availability of private securities fraud actions." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005).

Here, the proposed Class readily satisfies *all* the elements of Rule 23. First, numerosity cannot be disputed, with more than 180 million shares of Sealed Air common stock outstanding and actively traded on the New York Stock Exchange ("NYSE") and at least 1,354 major institutions owning Sealed Air stock during the Class Period. In addition, there are likely thousands of smaller investors who also invested in Sealed Air during the Class Period.[1]

Second, this action involves many common issues of law and fact. As the Corrected Amended Complaint for Violations of the Federal Securities Laws (the "CAC," ECF No. 32) details,

---

[1]    Defendants are Sealed Air and William G. Stiehl ("Stiehl" and, together with Sealed Air, "Defendants").

questions of law and fact common to the Class include whether: (i) Defendants' conduct violated the Securities Exchange Act of 1934 (the "Exchange Act"); (ii) Defendants publicly misrepresented material facts or omitted material facts they were required to disclose; (iii) Defendants knowingly or recklessly disregarded that the alleged misstatements and omissions were false and/or misleading; (iv) the price of Sealed Air common stock was artificially inflated as a result of Defendants' alleged misconduct; and (v) the Class suffered damages when the artificial inflation of Sealed Air common stock dissipated upon revelation of the truth.

Third, the Proposed Class Representatives' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the Exchange Act.

Fourth, the Proposed Class Representatives will fairly and adequately protect the interests of the members of the Class. No antagonism exists between the Proposed Class Representatives and the Class, and proposed Class Counsel, Robbins Geller, is competent and experienced in class action and securities litigation.

Fifth, the case satisfies the predominance requirement of Rule 23(b)(3). Namely, common issues of fact and law – including falsity, materiality, causation, scienter, and damages – are subject to common proof and plainly predominate over individual issues. And because the market for Sealed Air common stock, which traded on the NYSE, was efficient during the Class Period, the Class is entitled to the "fraud-on-the-market" presumption of class-wide reliance under *Basic Inc. v. Levinson*, 485 U.S. 224, 246-47 (1988), and *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 277-78 (2014) ("*Halliburton II*"). *See* Feinstein Rpt., attached as Ex. A to the Rothman Decl.,[2] ¶¶17-19, 153-155.

---

[2]    All "Ex. __" references are attached to the Rothman Decl.

Finally, the "superiority" requirement under Rule 23(b)(3) is satisfied because: (a) joinder of all members of the Class is impracticable; (b) the damages suffered by individual Class members may be relatively small; and (c) the expense and burden of individual litigation make it impracticable for members of the Class to individually redress the wrongs done to them.  *Haw. Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Ent. Holdings, Inc.*, 338 F.R.D. 205, 217 (S.D.N.Y. 2021) ("Because in this case, like most complex securities cases, '[m]ultiple lawsuits would be costly and inefficient' and 'although a large number of individuals may have been injured, no one person may have been damaged to a degree which would induce him to institute litigation solely on his own behalf,' a class action is the superior method of ensuring efficient and fair adjudication of all claims.") (quoting *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 312 F.R.D. 332, 352 (S.D.N.Y. 2015)).

Accordingly, Plaintiffs respectfully request certification of the Class, appointment of the Proposed Class Representatives as Class Representatives, and appointment of Robbins Geller as Class Counsel.

## II.  STATEMENT OF FACTS COMMON TO THE CLASS

### A.  Defendants' Materially False and Misleading Statements During the Class Period

Sealed Air is a global manufacturer and seller of packaging and equipment systems used in food, industrial, medical, and consumer applications.  ¶30.[3]  In 1998, the Company acquired the Cryovac packaging business of W.R. Grace & Co. ("Grace").  ¶3.  In that transaction, Grace and its businesses agreed to retain and to indemnify Sealed Air for, from, and against all liabilities, including liabilities relating to asbestos-containing products previously manufactured or sold by

---

[3]  All "¶__" or "¶¶__" references are to the CAC, unless otherwise noted.  In quoted material, all emphasis is added and internal citations are omitted, unless otherwise noted.  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the CAC.

Grace. *Id*. Shortly thereafter, Sealed Air was sued in lawsuits alleging that the Cryovac transaction amounted to a fraudulent transfer and/or gave rise to successor liability, and that, as a result, the Company was financially responsible for the alleged asbestos liabilities of Grace (which would later file for bankruptcy protection) and its subsidiaries. ¶35. After protracted litigation, the parties to those underlying actions entered into a definitive settlement agreement to resolve all then-current and future asbestos-related claims, fraudulent-transfer claims, and successor-liability claims made against Sealed Air arising from the Cryovac transaction (the "Settlement Agreement"). *Id*.

Grace emerged from bankruptcy and, in accordance with the terms of the Settlement Agreement and reorganization plan, Sealed Air, *inter alia*, made a cash payment of $930 million to trusts established for the benefit of the Grace-related asbestos claimants. ¶37. Relatedly, the Company reported a $1.49 billion income tax deduction on its 2014 consolidated U.S. income tax return. ¶41. Shortly thereafter, however, Sealed Air disclosed that the IRS intended to disallow the $1.49 billion deduction "in full." ¶42.

On the heels of this disclosure, with its major tax implications, Sealed Air announced that the Audit Committee of the Board of Directors (the "Audit Committee") had dismissed KPMG LLP ("KPMG") as the Company's independent public accounting firm, having served in that role since 1998. ¶43. At the same time, Sealed Air announced the Audit Committee's approval of the selection of Ernst & Young LLP ("EY") to replace KPMG as the Company's auditor, beginning with the fiscal year ending December 31, 2015. ¶44.

In a press release filed with the SEC on Form 8-K (the "November 2014 Form 8-K"), Sealed Air highlighted the supposedly competitive process by which it chose EY to be its auditor:

> On November 11, 2014, the Audit Committee of the Board of Directors (the "Audit Committee") of Sealed Air Corporation ("Sealed Air" or the "Company") approved the selection of Ernst & Young LLP ("EY") to serve as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2015

> following a competitive search process.  The competitive search process involved several international registered public accounting firms. . . .

*Id.*  Recognizing the importance of the selection of its new auditor, particularly as the Company faced a $1.5 billion dispute with the IRS, Sealed Air sought shareholder approval to ratify its selection of EY.  ¶52.  In a definitive proxy statement on Schedule 14A dated April 2, 2015 (the "2015 Proxy Statement"), filed in support of that approval, the Company represented the "competitive search process" and "comprehensive request for proposal process" through which EY had been selected.  *Id.*[4]

These statements were demonstrably false and misleading because Stiehl, the Company's then Chief Accounting Officer and Controller, had rigged the entire auditor selection process in EY's favor.  ¶¶45, 54; *infra* §II.B.

Nonetheless, throughout the Class Period, Defendants made representations about the adequacy of Sealed Air's disclosure controls and procedures – without even hinting to investors that Stiehl, one of the Company's senior-most financial officers, had manipulated the process of selecting EY specifically to circumvent these processes and controls.  ¶¶47, 50.  Further, in certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), Stiehl – following his promotion to Chief Financial Officer of Sealed Air – personally certified both the accuracy of the Company's disclosure control-related representations and that he had "disclosed . . . [a]ny fraud, whether or not material, that involves management or other employees."  ¶¶76-77, 81-82, 84-85, 88, 91.  But he knew those representations to be false based on his personal involvement in violating those controls.  ¶116.

On August 6, 2018, the Company announced that it had received a subpoena from the SEC seeking documents concerning the Company's accounting for income taxes, its financial reporting and disclosures, and other matters.  ¶89.

---

[4]    These statements are sometimes referred to herein as the "EY Selection Statements."

On the announcement of this news, the price of Sealed Air stock fell more than 5%, on very heavy trading volume. ¶90.

As the SEC's investigation into the Company's financial reporting continued, additional details of the tainted process by which EY was selected to serve as Sealed Air's auditor began to emerge. On May 2, 2019, Sealed Air received another subpoena from the SEC seeking information about the Company's process for selecting EY, as well as about EY's independence. ¶92. Thereafter, Sealed Air's Audit Committee initiated an internal review specifically to examine the Company's selection of EY. ¶93. On June 20, 2019, only six weeks after the review commenced, Sealed Air filed a press release with the SEC on Form 8-K announcing that, as a direct result of the internal investigation, the Company had fired Stiehl "for cause." ¶¶92-93. The press release explicitly stated that Stiehl was fired because of his role in the selection of EY as the Company's auditor. *Id.*

In response to this news, the price of Sealed Air stock again fell approximately 5%, on very heavy trading volume. ¶¶94, 109.

But the federal government's inquiry into Sealed Air's selection of EY did not end there. On August 2, 2019, Sealed Air revealed it had received a Grand Jury subpoena from the U.S. Attorney's Office, "seeking documents relating to the termination of our former CFO and relating to the process by which the Company selected its independent audit firm beginning with fiscal year 2015." ¶95. Just five days later, on August 7, 2019, Sealed Air fired EY effective immediately. ¶96. In an August 12, 2019 press release, Sealed Air confirmed that EY's firing was directly related to the process by which by the Company had originally selected it. *Id.*

- 7 -

**B.      The SEC Finds that Sealed Air's EY Hiring Process Was Neither "Competitive" Nor "Comprehensive"**

Just two months after this Court denied the motions to dismiss, largely sustaining Plaintiffs' allegations (*see infra* §II.C.), the SEC issued two separate orders – one against Stiehl and one against EY – confirming the veracity of Plaintiffs' allegations.  *See In the Matter of William G. Stiehl, CPA*, Admin. Proceeding File No. 3-20446; *In the Matter of Ernst & Young LLP, James G. Herring Jr., CPA, James A. Young, CPA, and Curt W. Fochtmann*, CPA, Admin. Proceeding File No. 3-20447 (Exs. B and C, the "SEC Orders").[5]  The SEC Orders make factual findings providing chapter-and-verse support for Plaintiffs' allegations, giving a step-by-step description of how Stiehl rigged the EY hiring process, and determining that the EY Selection Statements were materially false and misleading when made.

The SEC Orders reveal Stiehl's stunning efforts to manipulate the RFP process to hand the victory to EY – including by brazenly sharing confidential information with EY.  As the SEC found, "[d]espite the clear contravention of the RFP process and without Audit Committee authorization, Stiehl provided [EY], through [an EY] Audit Partner, with competing firms' proposals and submissions, the details of each competitive bid, and all of the internal documents prepared for [Sealed Air's] Audit Committee, often before the Audit Committee itself received them." Ex. B ¶19.

Stiehl even went so far as to make his own revisions to line items in EY's final proposal so that it would be more favorable than KPMG's.  According to the SEC, "although [EY]'s final bid was slightly higher than [KPMG's] final bid (once budgeted expenses were taken into

---

[5]      Each order is entitled "Order Instituting Public Administrative and Cease-and-Desist Proceedings Pursuant to Sections 4C and 21C of the Securities Exchange Act of 1934 and Rule 102(e) of the Commission's Rules of Practice, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order."

consideration), Stiehl <u>deleted</u> those expense amounts from the final bid summary information that he gave to the Audit Committee, which created the appearance that [EY's] bid was lower." *Id*. ¶28.

It is hardly surprising, then, that the SEC found the EY Selection Statements to be materially false and misleading when made:

> On November 14, 2014, [Sealed Air] filed its Form 8-K announcing: "Audit Committee of the Board of Directors . . . of [Sealed Air] approved the selection of [EY] to serve as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2015 following a <u>competitive search process</u>." <u>This representation was materially false and misleading because the RFP process was not competitive</u>. Stiehl reviewed and approved [Sealed Air's] representation (in the 2014 Form 8-K and a subsequent 2015 Proxy Statement) that [Sealed Air's] Audit Committee approval process was subject to a "competitive search process."

*See id*. ¶33.  As a result, the SEC concluded that Sealed Air violated the Securities and Exchange Act of 1934, and that Stiehl willfully aided and abetted those violations:

> Because [Sealed Air] issued misleading filings that purported or made representations that it did regarding [Sealed Air's] Audit Committee approval process and the RFP "<u>competitive search process</u>" in disclosures to its November 11 [sic], 2014 Form 8-K and its April 2, 2015 Proxy Statement, <u>which were not true and accurate when made</u>, [Sealed Air] violated Sections 13(a) and 14(a) and Rules 12b-20, 13a-11, and 14a-9 thereunder.  Issuer's Form 10-K incorporated the April 2, 2015 Proxy Statement by reference.  Stiehl reviewed and authorized Issuer's disclosures.
>
> *         *         *
>
> As a result of the conduct described above, <u>Stiehl caused and willfully aided and abetted [Sealed Air's] violations</u> of Sections 13(a) and 14(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, 13a-13, and 14a-9 promulgated thereunder during the relevant period and for the purposes of Rule 102(e)(1)(iii).

*Id*. ¶¶44, 46.

Significantly, violations of Section 14(a), which the SEC recognized, and Section 10(b), which Plaintiffs allege, have elements in common – including falsity and materiality.  *Compare Rubenstein v. Adamany*, 2021 WL 5782359, at *2 (2d Cir. Dec. 7, 2021) (identifying Section 14(a) elements) *with Operating Loc. 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 93 (2d Cir. 2010) (identifying Section 10(b) elements); *see also In re Liberty Tax, Inc. Sec.*

*Litig.*, 435 F. Supp. 3d 457, 465 (E.D.N.Y. 2020) ("Plaintiffs' claims under Section 10(b) or Section 14(a) both require a material misrepresentation or omission and loss causation."). And because those common elements are essentially identical between the two statutes, the SEC's conclusions have special relevance here. *See, e.g.*, *In re Mindbody, Inc. Sec. Litig.*, 489 F. Supp. 3d 188, 217 (S.D.N.Y. 2020) (Caproni, J.) ("Materiality for purposes of Section 14(a) is *indistinguishable* from the Section 10(b) standard.").

### C.     This Action and the Proposed Class Representatives

The initial complaint in this matter was filed on November 1, 2019. ECF No. 1. On January 22, 2020, following an unopposed motion, the Court appointed Lead Plaintiffs. ECF No. 17. The Court also approved Robbins Geller as Lead Counsel. *Id.*

On July 13, 2020, Plaintiffs filed the CAC. ECF No. 32. Defendants filed separate motions to dismiss the CAC on September 4, 2020 (ECF Nos. 33, 36), which the Court largely denied on June 1, 2021, holding, *inter alia*, that "[t]he CAC thus sufficiently alleges the bid-rigging scheme, and that Sealed Air's statements that it retained EY after a competitive search involving several accounting firms were false or misleading." *UA Loc. 13 Pension Fund v. Sealed Air Corp.*, 2021 WL 2209921, at *3 (S.D.N.Y. June 1, 2021). The Court upheld two additional categories of alleged false statements: (i) those concerning the Company's disclosure controls and procedures set forth in 15 separate SEC filings made by Sealed Air during the Class Period; and (ii) Stiehl's SOX certifications filed with the SEC, in which he attested to the accuracy of the false statements about the Company's disclosure controls and procedures and that he had "disclosed . . . [a]ny fraud, whether or not material, that involves management or other employees." *Id.* at *3, *5-*6. Moreover, the Court found that Plaintiffs adequately alleged Defendants' violations of Items 303, 105 (formerly Item 503), and 307 of Regulation S-K, in light of the omission of anything about the RFP bid-rigging in Sealed Air's Class Period SEC filings. *Id.* at *8; *see also* 17 C.F.R. §229.303(a);

17 C.F.R. §229.105; 17 C.F.R. §229.307.  Finally, the Court held that Plaintiffs adequately alleged a control-person claim under Section 20(a) of the Exchange Act against Stiehl.  *Sealed Air*, 2021 WL 2209921, at *3 n.2, *8.

Because Plaintiffs purchased thousands of shares of Sealed Air common stock throughout the Class Period, they suffered damages as a result of Defendants' violations of the federal securities laws, as alleged in the CAC.  *See* ECF Nos. 32-1, 32-2, 32-3, 32-4.  As a result, the Proposed Class Representatives seek appointment to serve as Class Representatives, and appointment of their counsel as Class Counsel.

### III.    THE PROPOSED CLASS SATISFIES RULE 23

#### A.    Legal Standards for Class Certification

To justify certification under Rule 23, a proposed class must satisfy each prerequisite of Rule 23(a), as well as one of the requirements under Rule 23(b).  *See* Rule 23; *Amchem*, 521 U.S. at 615.  Rule 23(a) requires a plaintiff to demonstrate that: (1) the class is so numerous that joinder of all members is impractical; (2) at least one question of law or fact is common to the class; (3) the class representatives' claims are typical of the class's claims; and (4) the class representatives will be able to fairly and adequately protect the interests of the class.  Rule 23(a); *AMC Ent.*, 338 F.R.D. at 211.

"The Second Circuit has directed district courts to interpret Rule 23 liberally, to maximize the benefits to both private parties and to the public provided by class actions," and has noted that, "'[i]f there is to be an error made, let it be in favor and not against the maintenance of the class action, for it is always subject to modification should later developments during the course of the trial so require.'"  *Chi. Bridge*, 2020 WL 1329354, at *2; *Gruber*, 2019 WL 4439415, at *2 (same); *Facebook*, 312 F.R.D. at 340; *see also In re JPMorgan Chase & Co. Sec. Litig.*, 2015 WL 10433433, at *2 (S.D.N.Y. Sept. 29, 2015) ("The Second Circuit has construed Rule 23 liberally and

directed district courts to err on the side of granting class certification.").  The Second Circuit also instructs district judges to "assess all of the relevant evidence admitted at the class certification stage and determine whether each Rule 23 requirement has been met," but has cautioned that district courts must "avoid the risk that a Rule 23 hearing will extend into a protracted mini-trial of substantial portions of the underlying litigation."  *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 41-42 (2d Cir. 2006); *see also In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 135 (2d Cir. 2001) ("The question for the district court at the class certification stage is whether plaintiffs' . . . evidence is sufficient to demonstrate common questions of fact warranting certification of the proposed class, not whether the evidence will ultimately be persuasive.").

As demonstrated below, the Proposed Class Representatives satisfy the prerequisites of Rule 23 and the proposed Class should be certified.

### B.  Certification Is Proper Under Rule 23(a)

#### 1.  The Class Is so Numerous that Joinder of All Members Is Impracticable

Rule 23(a)(1)'s "numerosity" requirement is met if "the class is so numerous that joinder of all members is impracticable."  "Impracticable does not mean impossible; joinder may merely be difficult or inconvenient, rendering use of a class action the most efficient method to resolve plaintiffs' claims."  *Fogarazzo v. Lehman Brothers, Inc.*, 263 F.R.D. 90, 96 (S.D.N.Y. 2009) (citing *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 244-45 (2d Cir. 2007)).  "'In securities fraud class actions relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period.'"  *In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at *8 (S.D.N.Y. July 10, 2019).  "Numerosity is presumed for classes larger than forty members."  *Pa. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co.*, 772

- 12 -

F.3d 111, 120 (2d Cir. 2014); *see also AMC Ent.*, 338 F.R.D. at 211. In demonstrating that numerosity is satisfied, plaintiffs may rely on reasonable inferences drawn from available facts to estimate a proposed class size. *See In re Blech Sec. Litig.*, 187 F.R.D. 97, 103 (S.D.N.Y. 1999).

Sealed Air is a publicly traded company listed on the NYSE that had an average of 186.59 million shares of common stock outstanding during the Class Period. Feinstein Rpt. ¶95. The average daily trading volume during the Class Period for the Company's common stock was 1,986,343 shares. *Id.* ¶58. At least 1,354 major institutions owned Sealed Air stock during the Class Period. *Id.* ¶70. In addition, Plaintiffs believe there are thousands of smaller investors who are also members of the proposed Class. Given the number of investors that purchased Sealed Air stock during the Class Period, joinder of all affected purchasers would be impracticable.

Plainly, Rule 23(a)(1)'s numerosity requirement is satisfied.

### 2. Common Questions of Law or Fact Exist for All Class Members

Commonality is "'met if plaintiffs' grievances share a common question of law or of fact.'" *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 2017 WL 3608298, at \*5 (S.D.N.Y. Aug. 22, 2017). A "common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'" *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016). "'Commonality does not mandate that all class members make identical claims and arguments.'" *Katz v. Image Innovations Holdings, Inc.*, 2010 WL 2926196, at \*3 (S.D.N.Y. July 22, 2010). Rather, "'[e]ven a single common legal or factual question will suffice.'" *In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 70 (S.D.N.Y. 2009). The commonality requirement, therefore, "has been characterized as a 'low hurdle.'" *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 424 (S.D.N.Y. 2014). Generally, "where putative class members have been injured by similar material misrepresentations and omissions, the commonality requirement is satisfied." *Fogarazzo v. Lehman Brothers, Inc.*, 232

- 13 -

F.R.D. 176, 180 (S.D.N.Y. 2005). "The commonality requirement 'has been applied permissively' in securities fraud litigation." *In re Vivendi Universal, S.A. Sec. Litig.*, 242 F.R.D. 76, 84 (S.D.N.Y. 2007); *see also Signet*, 2019 WL 3001084, at *8 (commonality satisfied "as is typical of most securities fraud . . . class actions").

Virtually all of the questions of law and fact raised in this case are common to the Class. These questions include, *inter alia*, whether: (i) Defendants' conduct violated the Exchange Act; (ii) Defendants publicly misrepresented material facts or omitted material facts they were required to disclose; (iii) Defendants knowingly or recklessly disregarded that the alleged misstatements and omissions were false and/or misleading; (iv) the price of Sealed Air common stock was artificially inflated as a result of Defendants' alleged misconduct; and (v) the Class suffered damages when the artificial inflation of Sealed Air common stock's price dissipated upon revelation of the truth.

The answers to these common questions are likewise common and susceptible to generalized class-wide proof. Accordingly, this case satisfies the commonality requirement. *See, e.g.*, *Signet*, 2019 WL 3001084, at *8 (finding commonality in securities fraud case where common questions included "whether (i) statements disseminated to the Class by Defendants during the Class Period misrepresented or omitted material facts; (ii) the alleged fraud was material to the putative Class; and (iii) Defendants acted knowingly or recklessly"); *see also In re Virtus Inv. Partners, Inc. Sec. Litig.*, 2017 WL 2062985, at *2 (S.D.N.Y. May 15, 2017) ("Courts in this Circuit find commonality satisfied where there are common issues relating to violations of federal securities laws, misrepresentations of material fact, scienter, and damages.").

### 3. The Proposed Class Representatives' Claims Are Typical of Those of the Class

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Rule 23(a)(3). To satisfy the typicality requirement, a plaintiff

must show that "'each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability.'"  *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009).  "In a securities class action, when 'plaintiffs will necessarily seek to develop facts relating to . . . the dissemination of allegedly false or misleading statements underlying their claims,' the claims and nature of evidence 'are generally considered sufficient to satisfy the typicality requirement.'"  *Signet*, 2019 WL 3001084, at \*8.

The Proposed Class Representatives' claims, like the Class's claims, are based on the same legal theory: Defendants' violations of Section 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Here, neither the facts nor the legal theories on which this action is based are unique to the Proposed Class Representatives; all Class members' claims arise from Defendants' wrongful course of conduct as alleged in the CAC, and are based on the same legal theories.  The Proposed Class Representatives and all other Class members allege that they purchased Sealed Air common stock at artificially inflated prices during the Class Period as a result of Defendants' material misrepresentations and omissions, and were damaged upon the revelation of the alleged corrective disclosures and/or materialization of the risks as alleged in the CAC.  As such, the Proposed Class Representatives' claims are typical of other class members.  *See Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 277 F.R.D. 97, 109 (S.D.N.Y. 2011) ("'As long as plaintiffs assert, as they do here, that defendants committed the same wrongful acts in the same manner, against all members of the class, they establish [the] necessary typicality.'") (alteration in original).

### 4.     The Proposed Class Representatives Will Fairly and Adequately Protect the Interests of the Class

Rule 23(a) requires that "the representative parties will fairly and adequately protect the interests of the class."  Rule 23(a)(4).  This requirement is satisfied where, as here: (1) the class representatives' interest are to vigorously pursue the claims of the class and are not "'antagonistic to

the interests of other class members'"; and (2) the proposed class counsel "are qualified, experienced and able to conduct the litigation." *In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 99 (S.D.N.Y. 2016); *MetLife*, 2017 WL 3608298, at *7.

The Proposed Class Representatives' interests are entirely aligned with those of the Class. As discussed above, all members of the Class allege claims arising from the same wrongful conduct and based on the same legal theories as those of the Proposed Class Representatives. Plaintiffs have each taken their respective roles and obligations to the putative Class seriously, and have acted to protect the interests of the Class. Should they be appointed Class Representatives, they each intend to act in a similar fashion to protect the best interests of the Class. Through counsel, the Proposed Class Representatives have investigated and filed the CAC, successfully opposed the motions to dismiss the CAC, vigorously pursued discovery, made voluminous productions of their own documents, and, if appointed as Class Representatives, will continue to actively monitor and direct this litigation to maximize the recovery for the proposed Class. Ostrander Decls. ¶¶5,7; Nanno Decl. ¶¶5,7; Heimroth Decl. ¶¶5,7. The Proposed Class Representatives' actions thus far, and the common interest they share with the Class in seeing this litigation successfully prosecuted, fully satisfy Rule 23(a)(4)'s adequacy standard.

Additionally, the Proposed Class Representatives, each institutional investors, are ideally suited to act as Class Representatives, especially because the "[t]he PSLRA was designed to increase the likelihood that institutional investors," such as Plaintiffs, "will serve as lead plaintiffs." *In re Perrigo Co. PLC Sec. Litig.*, 493 F. Supp. 3d 291, 294 (S.D.N.Y. 2020); *see* Ostrander Decls. ¶5; Nanno Decl. ¶5; Heimroth Decl. ¶5. *See also Glauser v. EVCI Career Colls. Holding Corp.*, 236 F.R.D. 184, 188 (S.D.N.Y. 2006) (courts in this District "have recognized [institutional investors] as being ideally suited to control this type of securities class action litigation").

- 16 -

Moreover, because the Proposed Class Representatives, as large institutional investors, collectively owned thousands of shares of Sealed Air common stock during the Class Period, their interest in seeing this action prosecuted to its fullest is directly aligned with that of the Class. *See* Ostrander Decls. ¶5; Nanno Decl. ¶5; Heimroth Decl. ¶5. And because the Proposed Class Representatives and the absent Class members sustained losses as a result of the same alleged material misrepresentations and omissions, the Proposed Class Representatives, by proving their own claims, will also necessarily prove the claims of thousands of absent Class members. Indeed, Plaintiffs and other Class members "share a common interest in showing that [Defendants] violated . . . [the] securities laws" and "wish to obtain the highest possible recovery" for the claims alleged. *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 291 (2d Cir. 1992).

Further, Plaintiffs have proposed the law firm of Robbins Geller as Class Counsel in this matter. *See* Ex. D (Firm Résumé of Robbins Geller). Robbins Geller has successfully conducted an extensive investigation into Defendants' conduct, prepared the CAC, and largely defeated the motions to dismiss. *See* ECF Nos. 42-43, 46. And since defeating those motions, Robbins Geller has been actively pursuing discovery. Thus, Robbins Geller is qualified and, along with the Proposed Class Representatives, has demonstrated that it will actively protect the interests of the Class. As a result, the requirements of Rule 23(a)(1)-(4) are satisfied.

### C. Certification Is Proper Under Rule 23(b)(3)

In addition to meeting the prerequisites of Rule 23(a), the proposed Class also satisfies Rule 23(b)(3)'s requirements that: (1) common questions of law or fact predominate over individual questions; and (2) class action treatment be superior to other methods of adjudication. *See Amchem*, 521 U.S. at 615. The Class's claims easily meet this requirement.

### 1. Common Questions of Law and Fact Predominate Over Individual Questions

Under Rule 23(b)(3), predominance exists when the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. "'Predominance is a test readily met in certain cases alleging . . . securities fraud.'" *JPMorgan*, 2015 WL 10433433, at *4 (quoting *Amchem*, 521 U.S. at 625); *see also Katz*, 2010 WL 2926196, at *5 (same). "'Predominance is satisfied if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof.'" *Waggoner v. Barclays PLC*, 875 F.3d 79, 93 (2d Cir. 2017) (quoting *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015)), *cert. denied*, 138 S. Ct. 1702 (2018). The predominance inquiry ultimately "'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *MetLife*, 2017 WL 3608298, at *14 (quoting *Amchem*, 521 U.S. at 623).

The Class's claims depend on the same factual circumstances – *i.e.*, the same wrongful course of conduct will need to be proven for each claim to succeed. The facts and circumstances that underpin each of the false statements or omissions alleged are common to each Class member's claims. Plaintiffs allege that this course of conduct inflated the price of Sealed Air common stock. ¶¶10, 45, 54, 58, 62, 66, 70, 73, 77, 82, 85, 91, 104, 121-123, 128-129, 132, 148, 149.

When the truth about Defendants' conduct began to emerge, following the August 6, 2018 disclosure that Sealed Air had received a subpoena from the SEC seeking documents concerning the Company's accounting for income taxes, its financial reporting and disclosures, and other matters, Sealed Air's stock price declined by more than 5%. ¶¶89-90. Then, on June 20, 2019, following Sealed Air's announcement that Stiehl had been fired "for cause" because of his role in the selection

- 18 -

of EY as the Company's auditor, the price of Sealed Air common stock fell approximately 5%, on very heavy trading volume.  ¶¶92-94.

The Class's claims also depend on proof of common legal issues.  The Supreme Court has held that questions of whether a defendant knowingly and/or recklessly made public material misstatements and/or omissions (*i.e.*, the scienter, falsity, and materiality elements of a Section 10(b) claim), and whether the revelations of the alleged fraud proximately caused that company's stock price to decline (*i.e.*, the loss causation element), are each common questions of law and fact that predominate over individualized ones.  *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 467-70, 475 (2013); *see also Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 181 (S.D.N.Y. 2008) (existence of "alleged misrepresentations and/or omissions [is] susceptible to generalized proof"); *In re IndyMac Mortg.-Backed Sec. Litig.*, 286 F.R.D. 226, 235 (S.D.N.Y. 2012) ("[M]ateriality for Securities Act claims is an issue subject to generalized proof.").  In addition, "liability for the individual defendants is similarly subject to generalized proof." *Metlife*, 2017 WL 3608298, at *14; *Menkes v. Stolt-Nielsen S.A.*, 270 F.R.D. 80, 91 (D. Conn. 2010).

Moreover, in securities fraud cases, the predominance requirement is easily met because plaintiffs may avail themselves of a class-wide presumption of reliance established by the Supreme Court: the "fraud-on-the-market" theory espoused in *Basic*, which applies here.  485 U.S. at 246-47; *Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 955 F.3d 254, 271-72 (2d Cir. 2020), *vacated on other grounds*, 141 S. Ct. 1951 (2021).

### a.    The "Fraud-on-the-Market" Presumption Applies

The "fraud-on-the-market" theory "holds that 'the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations,'" and that whenever an "investor buys or sells stock at the market price, his 'reliance on any public material misrepresentations . . . may be presumed for purposes of a Rule

10b-5 action.'"  *Halliburton II*, 573 U.S. at 268 (quoting *Basic*, 485 U.S. at 246-47).  Once the fraud-on-the-market presumption is established, reliance is presumptively satisfied and may be rebutted only upon a "showing, by a preponderance of the evidence, that the entire price decline on the corrective-disclosure dates was due to something other than its alleged misstatements." *Goldman*, 955 F.3d at 270.

To invoke the presumption of reliance under this theory, a plaintiff need only demonstrate: "(1) that the alleged misrepresentations were publicly known; (2) that they were material; (3) that the stock traded in an efficient market; and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed."  *Halliburton II*, 573 U.S. at 268. Each of the *Basic* requirements is readily satisfied here.

**(1)  Sealed Air Common Stock Traded in an Efficient Market During the Class Period**

To invoke the fraud-on-the market presumption, a security must trade in an efficient market. *Amgen*, 568 U.S. at 462 ("In *Basic*, we held that if a market is shown to be efficient, courts may presume that investors who traded securities in that market relied on public, material misrepresentations regarding those securities.").  Although the Second Circuit has "declined to adopt a particular test for market efficiency," it has recognized that "district courts in this and other Circuits regularly consider" the "*Cammer*" factors: "(1) the average weekly trading volume of the stock, (2) the number of securities analysts following and reporting on it, (3) the extent to which market makers traded in the stock, (4) the issuer's eligibility to file an SEC registration Form S-3, and (5) the demonstration of a cause and effect relationship between unexpected, material disclosures and changes in the stock's price."  *Waggoner*, 875 F.3d at 94-95 (alterations omitted) (reciting factors from *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989)).

The Second Circuit has further recognized that courts in this District "often consider" the following additional factors, commonly referred to as the *Krogman* factors: "(1) the capitalization of the company; (2) the bid-ask spread of the stock; and (3) the percentage of stock not held by insiders ('the float')." *Waggoner*, 875 F.3d at 94-95 (quoting *Krogman v. Sterritt*, 202 F.R.D. 467, 474 (N.D. Tex. 2001)). The *Cammer* and *Krogman* factors are tools, not a checklist, and should be analyzed "holistic[ally]," "based on the totality of the evidence presented." *In re Petrobras Sec.*, 862 F.3d 250, 277 (2d Cir. 2017). "[T]he burden required to establish market efficiency 'is not an onerous one.'" *Waggoner*, 875 F.3d at 97.

Here, a holistic evaluation of the *Cammer* and *Krogman* factors overwhelmingly supports a finding that the market for Sealed Air common stock was efficient during the Class Period, entitling Plaintiffs and the Proposed Class to rely on the fraud-on-the-market presumption of reliance. In support of this motion, Plaintiffs submit the Feinstein Rpt. *See* Ex. A. Professor Feinstein analyzed Sealed Air common stock using both the *Cammer* and *Krogman* factors and concluded that the market for Sealed Air common stock was efficient during the Class Period. *See id*. ¶¶46-155.

|  | **(i)** | **Sealed Air Shares Experienced a High Weekly Trading Volume** |

The existence of an actively traded market, as evidenced by large weekly trading volume, "suggests efficiency 'because it implies significant investor interest in the company . . . [which], in turn, implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information.'" *Strougo v. Barclays PLC*, 312 F.R.D. 307, 316 (S.D.N.Y. 2016). During the Class Period, Sealed Air common stock's average daily trading volume was approximately 1,986,343 shares, with an average weekly trading volume of 5.36% and 9.93 million shares outstanding during this timeframe. Feinstein Rpt. ¶¶58-60. The large volume of trading in Sealed Air common stock supports the strong presumption that it traded in an efficient market during

- 21 -

the Class Period.  *Id.*; *China MediaExpress*, 38 F. Supp. 3d at 431 ("'[t]urnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one'") (quoting *Cammer*, 711 F. Supp. at 1293).

**(ii)   A Sufficient Number of Financial Analysts Covered and Reported on Sealed Air During the Class Period**

Analyst coverage "supports a finding of market efficiency" because it shows that "investment professionals" are "inject[ing] their views on the . . . security into the market."  *In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 446 (S.D.N.Y. 2013).  "This factor is commonly met where multiple large brokerage firms produce . . . reports on the financial condition of a company . . . ."  *China MediaExpress*, 38 F. Supp. 3d at 431.  At least 19 analyst firms issued reports about Sealed Air during the Class Period, including Barclays, BMO, Credit Suisse, Gabelli & Company, Jefferies, JPMorgan, KeyBanc, Macquarie, Morgan Stanley, Morningstar, RBC, SunTrust, UBS, and Wells Fargo.  Feinstein Rpt. ¶¶63-64.  This level of analyst coverage is more than enough to demonstrate market efficiency.  *See, e.g.*, *Winstar*, 290 F.R.D. at 446 (finding market efficient where three analysts followed security at issue); *City of Ann Arbor Emps.' Ret. Sys. v. Sonoco Prods. Co.*, 270 F.R.D. 247, 256 (D.S.C. 2010) (six analysts sufficient).

Courts also recognize that widespread media coverage is indicative of market efficiency.  *See Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 92 (S.D.N.Y. 2015) ("regular press coverage throughout the Class Period" weighed in favor of finding market efficiency).  Information about Sealed Air was widely disseminated in the form of news coverage.  Feinstein Rpt. ¶¶71-74.  Thus, the number of analyst reports and the substantial dissemination of news and other information regarding Sealed Air evidences the robust and active market for public information about the Company and supports market efficiency.  *Id.* ¶74; *see, e.g.*, *In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 209-10 (E.D. Pa. 2008) (three analysts with 80 analyst reports, together

with news items and press releases, "favor[ed] a finding of market efficiency"), *aff'd*, 639 F.3d 623 (3rd Cir. 2011).

> **(iii)      Sealed Air Common Stock Traded on the NYSE Under the Supervision of Designated Market Makers with Brokers Standing Ready to Buy and Sell the Shares**

The third *Cammer* factor, the number of market makers, provides additional evidence of market efficiency for Sealed Air common stock. "Market makers promote efficiency by reacting quickly to new information by buying or selling securities in order to drive their price to the market-clearing level." *Winstar*, 290 F.R.D. at 446.

At the outset, Sealed Air common stock traded on the NYSE during the Class Period. For many courts, this fact alone supports a presumption of efficiency. *See Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 159 (S.D.N.Y. 2012) (Sweet, J.) (stating that a security listed on NASDAQ, American Stock Exchange, or NYSE is presumed efficient at class certification stage); *Carpenters*, 310 F.R.D. at 81 (collecting cases noting that some courts presume securities traded on national markets to be efficient and that most courts agree that NYSE listing "is a good indicator of efficiency").

But regardless of the sufficiency of a NYSE listing by itself, the trading of Sealed Air common stock on the NYSE was conducted by a highly developed network of brokers and overseen by the "Designated Market Maker" for Sealed Air common stock. Feinstein Rpt. ¶76. There were at least 171 market makers for Sealed Air stock, including Barclays, Goldman Sachs, JPMorgan, Morgan Stanley, and UBS – more than enough to support a finding of efficiency. *Id*. ¶80; *see Winstar*, 290 F.R.D. at 446 (six market makers evidenced market efficiency); *Carpenters*, 310 F.R.D. at 92 (finding 51 market makers sufficient and noting that courts in the Second Circuit had found as few as six market makers adequate to support a finding of efficiency).

- 23 -

**(iv)**      **Sealed Air Was Eligible to File Form S-3 During the Class Period**

A company is eligible for S-3 registration when, among other things, it has filed Exchange Act reports for a specified length of time and has outstanding float above a certain sizable value. Feinstein Rpt. ¶84. S-3 registration eligibility is indicative of market efficiency because the filing requirement ensures that financial data is available to market participants, and the "public float" requirement indicates that many market participants would have examined the information. *Id.* ¶87; *see also Cammer*, 711 F. Supp. at 1284-85. Because Sealed Air satisfied both the original and revised float conditions for S-3 registration throughout the Class Period, *see* Feinstein Rpt. ¶¶89-90, this factor weighs in favor of finding that Sealed Air traded in an efficient market. *See Cammer*, 711 F. Supp. at 1287.

**(v)**      **The Price of Sealed Air Common Stock Reacted to Company-Specific Announcements During the Class Period**

The fifth *Cammer* factor permits, but does not require, a plaintiff to submit "direct evidence" demonstrating a "cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." *Waggoner*, 875 F.3d at 94. The Second Circuit has held that "a plaintiff seeking to demonstrate market efficiency need not always present direct evidence of price impact through event studies" – particularly where the other, "indirect" *Cammer* and *Krogman* factors provide compelling evidence of market efficiency. *Id.* at 96-98. Here, the first four *Cammer* factors and all of the *Krogman* factors, discussed below, support market efficiency, rendering unnecessary the need to analyze the fifth *Cammer* factor. *See In re Allergan PLC Sec. Litig.*, 2021 WL 4077942, at *10 (S.D.N.Y. Sept. 8, 2021) ("All together, these factors so strongly support a presumption of market efficiency, that it obviates the need to examine the empirical evidence necessary to evaluate the fifth *Cammer* factor."); *see also Carpenters*, 310 F.R.D.

- 24 -

at 86 ("In the usual case of common or other highly traded and analyzed stock, there is no reason to burden the court with review of an event study and the opposing expert's attack of it.").

Nonetheless, Plaintiffs' expert, Professor Feinstein, performed a collective event study for Sealed Air common stock, focusing on Sealed Air's earnings announcements and comparing those events to all other days during the Class Period. *See* Feinstein Rpt. ¶¶113-152. "'[A]n event study that correlates the disclosures of unanticipated, material information about a security with corresponding fluctuations in price has been considered prima facie evidence of the existence of such a causal relationship.'" *Petrobras*, 862 F.3d at 278 (quoting *Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 207-08 (2d Cir. 2008)). As detailed in his report, Professor Feinstein's event study identified a cause-and-effect relationship between the release of new, Sealed Air-specific information and the movement in Sealed Air's stock price, evidencing that Sealed Air common stock traded in an efficient market during the Class Period. Feinstein Rpt. ¶¶18, 108, 154.

|  | (vi) | **Sealed Air's Large Market Capitalization Supports Market Efficiency** |
|---|---|---|

Market capitalization is an indicator of market efficiency because "investors tend to be more interested in companies with higher market capitalizations, thus leading to more efficiency." *Strougo*, 312 F.R.D. at 315. During the Class Period, Sealed Air's market capitalization ranged between $4.88 billion and $11.40 billion. Feinstein Rpt. ¶92. Because the Company's average capitalization during the Class Period was larger than that of 90% of all other publicly traded companies in the U.S., this factor supports a strong finding of market efficiency. *Id*. ¶¶92-93.

|  | (vii) | **Sealed Air Common Stock's Narrow Bid-Ask Spread Supports Market Efficiency** |
|---|---|---|

"A bid-ask spread is the amount by which the asking price for an asset exceeds its bid price." *Signet*, 2019 WL 3001084, at *12 n.6. "This percentage reflects the difference between the highest

price a buyer is willing to pay for an asset and the lowest price that a seller is willing to accept." *Id*. "A large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade." *Krogman*, 202 F.R.D. at 478. The bid-ask spread of Sealed Air common stock during the Class Period averaged approximately 0.02%, which is much narrower than the mean level among all stocks traded on U.S. exchanges, supporting a finding of efficiency. Feinstein Rpt. ¶98-101; *see also Signet*, 2019 WL 3001084, at *12 (finding that an average bid-ask spread of 0.3% "strongly indicates that the stock traded in an efficient market").

> **(viii)**        **The High Percentage of Market Float Supports Market Efficiency**

A stock's "float" is the number of shares outstanding, excluding shares held by insiders and affiliated corporate entities. A higher float indicates greater market efficiency, *see Krogman*, 202 F.R.D. at 478, because when insiders with private information hold large portions of the security, "the price is less likely to reflect only the total of all public information." *Strougo*, 312 F.R.D. at 316-17. On average during the Class Period, there were 184.99 million shares in Sealed Air's float and 186.59 million shares outstanding, resulting in an average float of 99.15% of shares outstanding. Feinstein Rpt. ¶95. Thus, Sealed Air's high public float supports a finding of market efficiency. *See id*. at ¶96.

* * *

In sum, while not required, all of the *Cammer* and *Krogman* factors support a finding that the market for Sealed Air common stock was efficient during the Class Period. Thus, class-wide reliance may be presumed under the *Basic* fraud-on-the-market doctrine.

> **b.**    **Reliance Is Presumed for All Class Members Under *Affiliated Ute***

Class members are also presumed to rely on Defendants' omissions, as set forth in the Supreme Court's decision in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972). Under

- 26 -

*Affiliated Ute*, "reliance is presumed when the claim rests on the omission of a material fact." *Fogarazzo*, 232 F.R.D. at 185-86; *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 298 (S.D.N.Y. 2003) ("There is no burden to prove reliance on an omission."); *see also Osberg v. Foot Locker, Inc.*, 2014 WL 5800501, at *6 (S.D.N.Y. Nov. 7, 2014) ("[I]n instances of total non-disclosure, as in Affiliated Ute, it is of course impossible to demonstrate reliance[.]") (citing *Titan Grp., Inc. v. Faggen*, 513 F.2d 234, 239 (2d Cir. 1975)).

Here, Plaintiffs allege that in each of its Forms 10-K and 10-Q during the Class Period, Sealed Air violated Item 303(a), 105 and 307 of Regulation S-K by failing to disclose that Sealed Air's selection of EY to serve as the Company's independent registered public accounting firm did not follow a competitive search process involving several international registered public accounting firms and that the bid rigging subjected Sealed Air to contingent liabilities, including fines, reputational damage, criminal penalties, and/or other sanctions. ¶103. Plaintiffs allege, *inter alia*, that, in violation of SEC rules and regulations, these undisclosed risks and uncertainties were reasonably likely to have a material effect on the Company's future operating results. *Id.*; *see also Sealed Air*, 2021 WL 2209921, at *3, *6 (upholding Plaintiffs' Item 303(a), 105 and 307 claims at the motion to dismiss stage).

Under these circumstances, a showing of reliance on the omissions is unnecessary, even if Plaintiffs also allege that Defendants disseminated affirmative misstatements. *See Fogarazzo*, 232 F.R.D. at 186 (certifying class and finding that both the *Basic* and *Affiliated Ute* presumptions apply); *Dodona I, LLC v. Goldman, Sachs & Co.*, 296 F.R.D. 261, 270 (S.D.N.Y. 2014) ("the existence in Dodona's complaint of certain affirmative misrepresentations does not at this stage in the litigation preclude Dodona from relying on the *Affiliated Ute* presumption").

c.        **Damages Are Measurable on a Class-Wide Basis**

It is well-settled that damages in Section 10(b) securities fraud actions are subject to a common methodology that can be applied class-wide. *See, e.g.*, *Dodona I*, 296 F.R.D. at 271 ("[I]n light of the class-wide methodology for calculation of damages, any necessary individual inquiries are a far cry from the scope of individualized issues of proof that would defeat a finding of predominance . . . ."). In *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), the Supreme Court held that "a model for determining classwide damages relied upon to certify a class under Rule 23(b)(3) must actually measure damages that result from the class'[] asserted theory of injury[.]" *Roach*, 778 F.3d at 407. The Second Circuit has made clear that *Comcast* does not require "a finding that damages are capable of measurement on a classwide basis." *Id*. at 402. "All that is required at class certification is that 'the plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability.'" *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 88 (2d Cir. 2015); *see also Scheufele v. Tableau Software, Inc.*, 2020 WL 2553100, at *4 (S.D.N.Y. Feb. 13, 2020) ("Comcast did not rewrite the standards governing individualized damages consideration.").

Here, damages will be calculated on a class-wide basis, consistent with Plaintiff's theory of the case. *See* Feinstein Rpt. ¶¶2, 20, 160. As Professor Feinstein explains, valuation tools, including an event study, would be used to assess whether the alleged misrepresentations and omissions caused Sealed Air's stock price to be artificially inflated during the Class Period, and whether corrective disclosures caused the inflation to dissipate. Indeed, courts in this Circuit routinely find that damages in securities fraud cases can be calculated on a class-wide basis. *See, e.g.*, *Signet*, 2019 WL 3001084, at *20 (event studies are a "generally accepted method for measuring damages in a securities fraud class action"); *Barrick*, 314 F.R.D. at 106 (Section 10(b) damages are "measurable on a class-wide basis" and "do[] not create individualized damages issues that defeat

- 28 -

predominance"). Professor Feinstein has concluded that damages will be subject to measurement on a class-wide basis at the appropriate juncture. *See* Feinstein Rpt. ¶¶20, 160-171. Therefore, Plaintiffs' proffer of a class-wide approach to calculating damages further supports predominance.

### 2.    A Class Action Is Superior to Other Available Methods for the Fair and Efficient Adjudication of This Action

Rule 23(b)(3) requires the Court to determine that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Allowing this case to proceed as a class action is plainly a superior method for resolving the Proposed Class Representatives' and the Class's claims and will provide the most efficient and fair adjudication. As noted above, courts in this Circuit recognize that class actions are favorably viewed for adjudicating securities fraud cases. *See Gruber*, 2019 WL 4439415, at *9 ("'Generally, securities actions easily satisfy the superiority requirement because the alternatives are either no recourse for thousands of stockholders or a multiplicity and scattering of suits with the inefficient administration of litigation which follows in its wake.'"); *see also In re MF Glob. Holdings Ltd. Inv. Litig.*, 310 F.R.D. 230, 239 (S.D.N.Y. 2015) (same). As the Supreme Court has recognized, "[c]lass actions . . . permit the plaintiffs to pool claims which would be uneconomical to litigate individually. . . . [M]ost of the plaintiffs would have no realistic day in court if a class action were not available." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985).

> To determine the issue of "superiority," Rule 23(b)(3) sets forth the following factors:
>
> (A) the class members' interests in individually controlling the prosecution . . . of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by . . . class members; (C) the desirability . . . of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

*First*, the Class consists of a large number of geographically dispersed purchasers of Sealed Air common stock whose individual damages likely are too small to make individual litigation

economically worthwhile.  The Class members, therefore, have little interest in asserting separate claims.  *See, e.g.*, *Lapin*, 254 F.R.D. at 187 ("the amount of potential recovery per plaintiff is not so high as to ensure that each plaintiff could or would bring an action individually").  *Second*, Plaintiffs are not aware of any other active securities fraud litigation commenced by any Class member regarding the alleged fraud.  *Third*, resolving the litigation in this Court has many benefits, including eliminating the risk of inconsistent adjudications and promoting the fair and efficient use of the judicial system.  *Finally*, Plaintiffs do not foresee any management difficulties that will preclude this case from being maintained as a class action.  Rather, litigating each claim separately "would be wasteful, and result in delay and an inefficient expenditure of judicial resources."  *In re SCOR Holding (Switz.) AG Litig.*, 537 F. Supp. 2d 556, 579 (S.D.N.Y. 2008).

Moreover, the flexibility afforded the Court under Rule 23 will enable it to address and resolve any management difficulties that might arise.  *See* Rule 23(c), (d).  Thus, consistent with the requirements of Rule 23(b)(3), the certification of this action as a class action would be superior to other available methods for fairly and efficiently adjudicating the controversy.

### D.    The Court Should Appoint Plaintiffs' Choice of Counsel

As discussed above, Plaintiffs have satisfied the adequacy prong of Rule 23(a)(4).  In addition, Robbins Geller satisfies the considerations of Rule 23(g) and should be appointed as Class Counsel.[6]

Plaintiffs have ensured that the interests of the Class will continue to be protected by retaining counsel who are "'qualified, experienced and able to conduct the litigation.'"  *Flag*, 574

---

[6]    In appointing class counsel pursuant to Rule 23(g), a court must consider: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class[.]" Rule 23(g)(1)(A).  All four factors support the appointment of Robbins Geller as Class Counsel.

F.3d at 35.   Among other things, Robbins Geller has conducted a thorough investigation of Defendants' conduct, successfully opposed the majority of Defendants' motions to dismiss, worked with experts on issues common to the Class, and continues to pursue Plaintiffs' claims with zeal and vigor.   In short, Robbins Geller has diligently prosecuted Class members' claims to date, and is committed to doing so for as long as it takes to secure a successful outcome.

Robbins Geller lawyers have been appointed class counsel in hundreds of securities class actions.   Courts in this Circuit and around the country have recognized the experience and ability of Robbins Geller lawyers to effectively litigate complex securities class actions.   "Courts within this Circuit have repeatedly found Robbins Geller to be adequate and well-qualified for the purpose of litigating class action lawsuits."   *Carpenters*, 310 F.R.D. at 100.   *See, e.g.*, *Strougo v. Mallinckrodt Pub. Ltd. Co.*, 2020 WL 3469056, at *4 (S.D.N.Y. June 25, 2020) ("The Court finds, as it previously concluded and like many others in this Circuit before it, that Robbins Geller 'is experienced in securities class action litigation and qualified to conduct this lawsuit.'"); *In re Am. Realty Cap. Props., Inc. Litig.*, No. 1:15-mc-00040 (S.D.N.Y. Jan. 21, 2019) (Hellerstein, J.) Transcript at 55:14-15 (ECF No. 1316) (concerning Robbins Geller's role as sole lead counsel in recovering $1.025 billion for the class in a securities case, stating "the role of lead counsel was fulfilled in an extremely fine fashion by [Robbins Geller]"); *Villella v. Chem. & Mining Co. of Chile Inc.*, 2015 WL 6029950, at *8 (S.D.N.Y. Oct. 14, 2015); *City of Livonia Emps.' Ret. Sys. v. Wyeth*, 284 F.R.D. 173, 180-81 (S.D.N.Y. 2012); *Sgalambo v. McKenzie*, 268 F.R.D. 170, 174 (S.D.N.Y. 2010) (characterizing Robbins Geller as a "highly competent plaintiffs' firm[] with substantial securities class action experience"); *Ellenburg III v. JA Solar Holdings Co.*, 262 F.R.D. 262, 267-68 (S.D.N.Y. 2009).   In light of the firm's vast experience and the absence of any conflict between the firm and the Class, the Court should honor Plaintiffs' choice of counsel and appoint Robbins Geller as Class Counsel.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court: (i) certify this action as a class action pursuant to Rule 23(a) and 23(b)(3); (ii) appoint the Proposed Class Representatives as Class Representatives; and (iii) appoint Lead Counsel Robbins Geller as Class Counsel.

DATED:  July 15, 2022                             Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
ROBERT M. ROTHMAN
MARK T. MILLKEY
ROBERT D. GERSON
MAGDALENE ECONOMOU


*/s/ Robert M. Rothman*
ROBERT M. ROTHMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
rrothman@rgrdlaw.com
mmillkey@rgrdlaw.com
rgerson@rgrdlaw.com
meconomou@rgrdlaw.com

*Lead Counsel for Plaintiffs*

ASHERKELLY
MICHAEL J. ASHER
JACQUELINE A. KELLY
25800 Northwestern Highway, Suite 1100
Southfield, MI  48075
Telephone:  248/746-2710
248/747-2809 (fax)
masher@asherkellylaw.com
jkelly@asherkellylaw.com

BLITMAN & KING LLP
DANIEL R. BRICE
4443 North Franklin Street
Syracuse, NY  13204-5412
Telephone:  315/422-7111
315/471-2623 (fax)
dbrice@bklawyers.com

*Additional Counsel for Plaintiffs*