# EXHIBIT B

**UNITED STATES OF AMERICA**
**Before the**
**SECURITIES AND EXCHANGE COMMISSION**

**SECURITIES EXCHANGE ACT OF 1934**
Release No. 92539 / August 2, 2021

**ACCOUNTING AND AUDITING ENFORCEMENT**
Release No. 4238 / August 2, 2021

**ADMINISTRATIVE PROCEEDING**
File No. 3-20446

| | |
|---|---|
| **In the Matter of**<br><br>**WILLIAM G. STIEHL, CPA,**<br><br>**Respondent.** | **ORDER INSTITUTING PUBLIC ADMINISTRATIVE AND CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTIONS 4C AND 21C OF THE SECURITIES EXCHANGE ACT OF 1934 AND RULE 102(e) OF THE COMMISSION'S RULES OF PRACTICE, MAKING FINDINGS, AND IMPOSING REMEDIAL SANCTIONS AND A CEASE-AND-DESIST ORDER** |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate that public administrative and cease-and-desist proceedings be, and hereby are, instituted against William G. Stiehl, CPA ("Respondent" or "Stiehl") pursuant to Sections 4C[1] and 21C of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 102(e)(1)(iii) of the Commission's Rules of Practice.[2]

---

[1]  Section 4C provides, in relevant part, that:

The Commission may censure any person, or deny, temporarily or permanently, to any person the privilege of appearing or practicing before the Commission in any way, if that person is found . . . (1) not to possess the requisite qualifications to represent others; (2) to be lacking in character or integrity, or to have engaged in unethical or improper professional conduct; or (3) to have willfully violated, or willfully aided and abetted the violation of, any provision of the securities laws or the rules and regulations issued thereunder.

[2]  Rule 102(e)(1)(iii) provides, in pertinent part, that:

The Commission may censure a person or deny, temporarily or permanently, the privilege of appearing or practicing before it . . . to any person who is found . . . [t]o have willfully violated, or willfully aided and abetted the violation of any provision of the Federal securities laws or the rules and regulations thereunder.

**II.**

In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement (the "Offer"), which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over Respondent and the subject matter of these proceedings, which are admitted, and except as provided herein in Section V, Respondent consents to the entry of this Order Instituting Public Administrative and Cease-and-Desist Proceedings Pursuant to Sections 4C and 21C of the Securities Exchange Act of 1934 and Rule 102(e) of the Commission's Rules of Practice, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order ("Order"), as set forth below.

**III.**

On the basis of this Order and Respondent's Offer, the Commission finds that:[3]

**SUMMARY**

1.      This matter arises from conduct by Stiehl, the then-CAO and controller of a United States publicly-traded company and SEC-Registrant ("Issuer") from 2014 through 2015 in connection with Issuer's selection process and appointment of an accounting firm to serve as the independent auditor of Issuer's financial statements ("Audit Firm").

2.      Throughout 2014, Stiehl and Audit Firm improperly interfered with the Request for Proposal ("RFP") process initiated and overseen by Issuer's Audit Committee to select an independent auditor for fiscal year 2015. On multiple occasions, Stiehl provided Audit Firm with competitive bid and other confidential documents and information in an effort to enable Audit Firm to secure the audit engagement.

3.      The manner in which Audit Firm obtained the engagement would cause a reasonable investor to conclude that Audit Firm was not capable of exercising objectivity and impartiality upon becoming Issuer's independent auditor and that such conduct therefore would result in a violation of the Commission's and the Public Company Accounting Oversight Board ("PCAOB")'s auditor independence rules. Stiehl reviewed Audit Firm's representation that it was independent in audit reports that were included in or incorporated by reference into Issuer's public filings for 2015. Stiehl also reviewed and approved Issuer's 2014 and 2015 public statements that Issuer's Audit Committee approved the selection of Audit Firm "to serve as the Company's

---

[3]   The findings herein are made pursuant to Respondent's Offer of Settlement and are not binding on any other person or entity in this or any other proceeding.

Independent Registered Public Accounting Firm for the fiscal year ending December 31, 2015 following a competitive search process."

4.      After Issuer learned of Stiehl's RFP-related conduct on May 2, 2019, Issuer's Audit Committee conducted an internal investigation and terminated Stiehl's employment on June 19, 2019. The next day, the Audit Committee publicly announced in Issuer's Form 8-K that Stiehl's employment had been terminated for cause after "an internal review by the Audit Committee of the Board." On August 7, 2019, Issuer's Audit Committee unanimously terminated Audit Firm's audit engagement and approved the engagement of another firm as Issuer's independent audit firm. On August 12, 2019, the Audit Committee publicly announced in Issuer's Form 8-K that Audit Firm was dismissed because of the "pendency of the SEC investigation, along with the [Audit] Committee's dissatisfaction with information it learned about the process by which [Audit Firm] was selected as auditor. . . ."

5.      For the reasons set forth below, Stiehl caused and willfully[4] aided and abetted, within the meaning of Section 4C(a)(3) of the Exchange Act and Rule 102(e)(1)(iii) of the Commission's Rules of Practice, Issuer's violations of Sections 13(a) and 14(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, 13a-13, and 14a-9 thereunder.

## B.      RESPONDENT

6.      **William G. Stiehl, CPA** ("Stiehl"), age 59, of New Orleans, Louisiana, is a CPA licensed in North Carolina since 2006 and licensed in Ohio from 1986 through 2008. Stiehl served as Issuer's CAO and controller from January 2013 to October 2017, after which Stiehl served as Issuer's acting and then permanent CFO until his employment was terminated in June 2019. Before working for Issuer, Stiehl was employed as an auditor at a public accounting firm and in various internal audit and senior financial accounting roles at two public companies.

## C.      RELEVANT ISSUER AND INDIVIDUALS

7.      **Issuer** is a Fortune 500 multi-national company with substantial operations in the United States. Issuer's shares are registered with the Commission pursuant to Exchange Act Section 12(b) and listed on the New York Stock Exchange. Issuer files periodic reports, including on Forms 10-K and 10-Q, with the Commission pursuant to Exchange Act Section 13(a).

8.      **Audit Firm** is a professional service limited liability partnership, headquartered in New York, New York, with offices located throughout the United States. Audit Firm provides auditing, consulting, and tax services to various entities, including companies whose securities are

---

4   "Willfully," for purposes of imposing relief under Section 4C(a)(3) of the Exchange Act and Rule 102(e)(1)(iii) of the Commission's Rules of Practice, "means no more than that the person charged with the duty knows what he is doing." *Wonsover v. SEC,* 205 F.3d 408, 414 (D.C. Cir. 2000) (quoting *Hughes v. SEC,* 174 F.2d 969, 977 (D.C. Cir. 1949)).

registered with the Commission and trade in the U.S. markets. Audit Firm served as Issuer's auditor from 2015 to August 2019. On August 12, 2019, Issuer filed a Form 8-K dismissing Audit Firm and appointing another firm as Issuer's independent audit firm.

9.      **Audit Partner**, age 46, is an assurance partner at Audit Firm. Audit Partner led Audit Firm's RFP pursuit of Issuer in 2014 and then served as the engagement partner[5] on the Audit Firm engagement team that provided audit and other services to Issuer from 2015 to March 2018. As the engagement partner, Audit Partner supervised Audit Firm's engagement to audit and review Issuer's financial statements. Audit Partner is licensed as a CPA by the State of North Carolina.

10.      **Coordinating Partner**, age 60, was an assurance partner at Audit Firm throughout the relevant period. Coordinating Partner joined Audit Firm's RFP pursuit of Issuer beginning in August 2014 and became the coordinating partner on Issuer's engagement for the fiscal year ending December 31, 2015.[6] As coordinating partner on the Issuer engagement, Coordinating Partner had final responsibility for the audits and quarterly reviews of Issuer's financial statements from 2015 through August 2019. Coordinating Partner is licensed as a CPA by the States of North Carolina and Ohio. Coordinating Partner retired from Audit Firm in 2020.

11.      **Tax Partner**, age 60, was a tax partner at Audit Firm, as well as the Carolinas Tax Market Leader for Audit Firm throughout the relevant period. Tax Partner was on the Audit Firm RFP pursuit of Issuer and served as the tax partner on the subsequent Issuer audit engagement teams from 2015 until May 2019. As tax partner, Tax Partner reviewed the work of, and supervised, Audit Firm tax professionals on the audit engagement team who performed audit and review procedures related to Issuer's income tax accounting throughout that period. Tax Partner is licensed as a CPA by the State of North Carolina and has been previously licensed as a CPA by the States of Alabama, Georgia, Ohio, and Texas. Tax Partner retired from Audit Firm in 2020.

## D.      FACTS

### Background

12.      From 2004 through December 2012, Stiehl served in internal audit and senior financial roles for two public companies at which Audit Firm was the independent auditor. Stiehl was one of the primary contacts to Audit Partner and the Audit Firm teams on those engagements.

---

[5]  The term "engagement partner" is used by Audit Firm to describe the second assurance partner on an audit engagement. The engagement partner was not responsible for signing Issuer's audit reports.

[6]  The term "coordinating partner" is used by Audit Firm to describe the lead partner who signed the audit reports on Audit Firm's behalf on this engagement.

During those eight years, Stiehl and Audit Partner worked closely together, and Stiehl came to view Audit Partner as a trusted advisor.

13.     In January 2013, Issuer, which was then headquartered in New Jersey, hired Stiehl as its controller and CAO. At the time, another accounting firm had served as Issuer's independent auditor for decades. Beginning in February 2013, Stiehl participated in internal discussions at Issuer about initiating an RFP process to solicit competitive bids from audit firms for Issuer's independent audit work.

### Stiehl Provided Audit Partner With Confidential Information Before the Issuance of the RFP

14.     As Issuer worked internally to initiate the RFP process, Stiehl began to provide certain confidential information to Audit Partner. In August 2013, without Issuer's knowledge, Stiehl provided Audit Partner and Audit Firm with a draft RFP presentation to Issuer's Audit Committee. Stiehl did not provide this pre-RFP confidential information to any other audit firm. In May 2014, for example, Stiehl called Audit Partner to provide Audit Firm with exclusive news regarding the timing of Issuer's upcoming RFP. During this call, CAO also shared confidential news of Issuer's pending corporate headquarters relocation to Charlotte, North Carolina.

15.     Stiehl allowed Audit Firm to assist in drafting portions of Issuer's RFP before it was publicly released and arranged for Audit Partner to meet with Stiehl's financial personnel at least a month before other firms' personnel were invited to do so. This exclusive access ultimately led to Stiehl adding, at the suggestion of another partner at the Audit Firm, over $1 million in global compliance tax services to Issuer's RFP.

### Issuer's Audit Committee Sought a Competitive and Fair RFP Process

16.     On July 14, 2014, after Issuer's Audit Committee authorized the RFP's requirements and rules, Issuer invited Audit Firm and three other audit firms, including Issuer's then-incumbent audit firm, to submit bids in what Audit Committee intended to be a competitive and fair RFP process. The RFP documents stated that Issuer intended that the process would allow all prospective "Independent Registered Public Accounting Firm[s]" an "equal opportunity to provide their best proposals" to Issuer's Audit Committee. At the time, Issuer's Audit Committee was not aware that Stiehl had already provided Audit Firm with confidential information about and relevant to the RFP.

17.     Issuer's RFP stated that all non-public information submitted by the audit firms competing in the RFP would be treated as confidential. Each of the audit firms competing in the RFP signed a bi-lateral Non-Disclosure Agreement in connection with the process. Issuer's RFP set forth specific instructions regarding the timing of all submissions and fair and equal access to key audit and financial information in a web-based data room. The RFP also contained a

"Conflicts of Interest" paragraph, which made clear that all competitors that submitted proposals represented that: (i) Issuer personnel have not participated in the preparation of the firm's proposal; and (ii) Issuer personnel have not conveyed to the competitors any information pertaining to this RFP.

### CAO Unilaterally Provided Audit Firm with Confidential Competitive Bids and Audit Committee Materials without Audit Committee Authorization

18.     As CAO, Stiehl was assigned overall responsibility for ensuring that Issuer's RFP process was executed in the manner that Issuer's Audit Committee intended. Stiehl understood the RFP process and its importance to the Audit Committee's selection of an independent auditor. Stiehl knew that a level playing field that treated all competitors equally was an integral part of the RFP appointment process.

19.     Despite the clear contravention of the RFP process and without Audit Committee authorization, Stiehl provided Audit Firm, through Audit Partner, with competing firms' proposals and submissions, the details of each competitive bid, and all of the internal documents prepared for the Issuer's Audit Committee, often before the Audit Committee itself received them.

20.     Stiehl also gave Audit Firm an open invitation to provide suggestions or comments to RFP materials summarizing each competitors' proposals that were going to the Audit Committee. On multiple occasions during the RFP process, Audit Firm solicited and received information from Stiehl outside of the RFP's data room, including "integral" incumbent fee information, which enabled Audit Firm "to come up with an informed fee for the RFP."

21.     Stiehl unilaterally shared intelligence with Audit Firm because he wanted Audit Firm to "get a seat at the table in the ultimate RFP." Stiehl did not act with the Audit Committee's authority or with the knowledge or approval of Issuer's senior management.

22.     On September 15, 2014, Audit Firm and three other competing audit firms submitted their initial confidential bid proposals to Issuer. The proposals contained detailed staffing and billing information, including Excel spreadsheets that included hundreds of engagement team names and email addresses, specific billing rates, budgeted hours, proposed bid amounts, and staffing levels covering dozens of international jurisdictions. Stiehl immediately forwarded the complete bid proposals provided by two competing audit firms, including all supporting Excel spreadsheets, to Audit Partner. In a footnote below its tables of contents, the incumbent firm's bid proposal expressly included an "irreparable harm" confidentiality provision. On the early morning of September 16, 2014, Audit Partner asked for a copy of the third competing audit firm's bid proposal, which Stiehl emailed in its entirety to Audit Partner later that same morning. Stiehl later asked Audit Firm, through Audit Partner, for "some . . . stats that I would be able to use in the [Audit Committee] presentation" to portray another competing firm as having insufficient audit experience to support a potential client of Issuer's size and Audit Firm

obliged.  Stiehl then used that information to inform Issuer's Audit Committee that "[Issuer] account would be nearly twice the size as their biggest global client."

## Stiehl Enabled Audit Firm to Influence the Audit Committee's RFP Process Without Its Knowledge

23.      Without the Audit Committee's knowledge and in contravention of the RFP, Stiehl enabled Audit Firm to influence the Audit Committee at multiple stages throughout the RFP process.  For example, on October 3, 2014, Stiehl sent Audit Firm, through Audit Partner, "the slide deck that I plan to share in executive committee," and asked Audit Partner to share "additional talking points that you think might be beneficial" before Stiehl met with the Audit Committee to present his views of the competing firms.  Stiehl was not authorized or instructed to share this information with Audit Firm or to solicit additional talking points.  Stiehl did not tell anyone within Issuer that he had done so.  Stiehl's 16-page slide deck identified each competing audit firm by "Key Qualitative Highlights," "Pros and Cons," and bid amount.  Three days later, on October 6, 2014, Audit Partner provided Stiehl with a detailed list of additional "Cons" against the incumbent audit firm, including one that Audit Partner stated was a "big negative the [Audit Committee] would be interested in" and additional "Pros" in favor of Audit Firm, including one that Audit Partner urged "maybe you [Stiehl] could play that up" prior to the Audit Committee's scheduled down-selection meeting on October 7, 2014.

24.      On October 8, 2014, unaware of the above-described conduct, the Audit Committee selected two RFP finalists, the incumbent audit firm and Audit Firm.  The Audit Committee instructed the two firms to make their final bids at the end of October, which pursuant to the RFP would be submitted on the same day.  The Audit Committee instructed Stiehl to give both firms "the same opportunity to sharpen their pencils for this last round."  Stiehl repeatedly informed his direct reports that the finalists would submit revised bids on October 31, 2014.

## CAO Provided Audit Firm With Key Confidential Competitive Information in Contravention of the RFP Instructions

25.      On October 30, 2014, the incumbent audit firm asked CAO in an email—which Stiehl immediately forwarded to Audit Partner—whether "we (and [Audit Firm]) [were] to re-submit fees" the next day in accordance with "protocol and the preferred process."  CAO replied "Yes, if there is any change in fees, then you can resubmit tomorrow."  Later that same day, Stiehl met Audit Partner for dinner and they, along with Tax Partner and others from Audit Firm and Issuer, attended a National Football League game in Audit Firm's suite in Charlotte, North Carolina.

7

26.     In contrast to CAO's instructions to the incumbent firm, on October 30, 2014, Stiehl informed Audit Firm, through Audit Partner: "FYI – sounds like [incumbent audit firm] may be changing their number but have no idea to what extent. We can talk Friday after I receive [incumbent's revised proposal]. Don't send me anything yet."

27.     On October 31, 2014, the incumbent audit firm submitted a 20-page revised bid proposal with audit fee reductions of five percent, which Stiehl forwarded to Audit Partner and Tax Partner seven minutes later. Audit Firm, through Audit Partner, then solicited additional information about the incumbent audit firm's revised bid, which Stiehl obtained from the incumbent audit firm and forwarded to Audit Partner.

28.     Audit Firm did not file its own proposal until five days later, during which time, Stiehl and Audit Firm, by and through Audit Partner, Coordinating Partner, and Tax Partner, agreed upon a final bid number that was almost identical to the incumbent audit firm's revised bid. In fact, although Audit Firm's final bid was slightly higher than incumbent firm's final bid (once budgeted expenses were taken into consideration), Stiehl deleted those expense amounts from the final bid summary information that he gave to the Audit Committee, which created the appearance that Audit Firm's bid was lower.

29.     Shortly after Audit Firm submitted its final bid number —and six days before the Audit Committee made its appointment— Stiehl emailed a draft Form 8-K to Audit Firm and asked Audit Partner and Coordinating Partner for edits. The draft Form 8-K identified Audit Firm as the newly selected independent auditor. Stiehl did not email the incumbent audit firm this draft Form 8-K. Coordinating Partner provided the requested edits on behalf of Audit Firm.

30.     Stiehl's provision of the incumbent's final bid and proposal to Audit Firm before Audit Firm filed its own enabled Audit Firm to make its fee submission and shape its oral presentation and final bid and proposal to the Audit Committee based on what it saw in the incumbent audit firm's final bid and proposal. Audit Firm modified its written and oral presentation after receiving information from Stiehl. Not only did Audit Firm modify its fees, but it also added personnel to the presentation, changed its representations regarding its overall portfolio, and amended its response to recent audit wins highlighted by the incumbent audit firm in its final proposal. Despite the terms of the RFP and the Audit Committee's direction to CAO to give both firms an equal opportunity to "sharpen their pencils" and revised their bids, Stiehl gave Audit Firm its competitor's confidential final bid and proposal and then additional time to submit its own.

31.     On November 11, 2014, the morning of the final oral presentations to Issuer's Audit Committee, Stiehl provided Audit Partner with the final "top level summary the board will see, and will refer to during the executive session[,]" adding that it was "[j]ust a comparison of the two

8

firms to facilitate the discussion.  But again some of the big arguing points, I have left off, so that I can just verbalize."

32.     That same day, the Audit Committee unanimously selected and appointed Audit Firm as Issuer's new auditor.  That night, Stiehl sent another Audit Firm partner (his former college roommate), a congratulatory email with the message: "Back in the family!!!"

33.     On November 14, 2014, Issuer filed its Form 8-K announcing: "Audit Committee of the Board of Directors . . . of [Issuer] approved the selection of [Audit Firm] to serve as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2015 following a competitive search process."  This representation was materially false and misleading because the RFP process was not competitive.  Stiehl reviewed and approved Issuer's representation (in the 2014 Form 8-K and a subsequent 2015 Proxy Statement) that Issuer's Audit Committee approval process was subject to a "competitive search process."

### Stiehl Did Not Disclose His RFP-Related Conduct to the Audit Committee Or Issuer's Senior Management

34.     Stiehl did not disclose his RFP-related conduct to the Audit Committee or Issuer's senior management.  In June 2019, after the Audit Committee discovered the RFP-related conduct, Issuer's Audit Committee unanimously terminated Stiehl's employment for cause and, in August 2019, terminated Audit Firm's engagement.

35.     Stiehl obtained a monetary benefit for his work on the RFP.  For fiscal year 2014, Issuer's Compensation Committee awarded Stiehl a bonus based on a series of factors, of which $26,000 was attributable to his work on Issuer's RFP.

36.     Audit reports issued on Issuer's 2015 financial statements, which were included or incorporated by reference in public filings with the Commission, indicated that Audit Firm was independent.  Stiehl reviewed Issuer's representations disclosed in a 2014 Form 8-K and a 2015 Proxy Statement that Issuer's Audit Committee approved the selection of Audit Firm "to serve as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2015" following a "competitive search process."

37.     During the relevant period, Stiehl knew and understood the audit independence rules.  As CAO, and later CFO, Stiehl had responsibilities directly connected to ensuring that Issuer's audits and reviews were performed by an independent auditor.  He also reviewed and supervised the preparation of Forms 8-K and proxy information that was incorporated into Issuer Forms 10-K that referenced the purported "competitive search process" through which the Audit Committee appointed Audit Firm as Issuer's independent auditor.

E.    LEGAL ANALYSIS

38.    As the Commission has long recognized, "[i]ndependent auditors have an important public trust. . . . It is the auditor's opinion that furnishes investors with critical assurance that the financial statements have been subjected to a rigorous examination by an objective, impartial, and skilled professional, and that investors, therefore, can rely on them." *Revision of the Commission's Auditor Independence Requirements*, Exchange Act Rel. No 43602, 2000 WL 1726933, at *2 (Nov. 21, 2000) ("*Adopting Release*"). Accordingly, Rule 2-02(b)(1) of Regulation S-X requires each auditor's report on a public issuer's financial statements to state "whether the audit was made in accordance with generally accepted auditing standards" ("GAAS"), including auditing standards set forth in PCAOB rules and Commission regulations.[7]

39.    In the *Adopting Release*, the Commission made clear that: "the general standard in paragraph (b) [of Rule 2-01] recognizes that an auditor must be independent in fact and appearance." Similarly, the preliminary note to Rule 2-01 of Regulation S-X provides that: "Section 210.2-01 is designed to ensure that auditors are qualified and independent of their audit clients both in fact and in appearance." GAAS, in turn, requires auditors to be independent from their clients in both fact and appearance. PCAOB Rule 3520; PCAOB Auditing Standards, Independence, AU § 220.03. Independence in fact and appearance are "equally important under the securities laws." *In the Matter of Ernst & Young LLP*, Exchange Act Rel. No. 46821, 2004 WL 824099, at *30 (Apr. 16, 2004); *see also United States v. Arthur Young & Co.*, 465 U.S. 805, 819 n.15 (1984) ("It is therefore not enough that financial statements be accurate; the public must also perceive them as being accurate.")

40.    The facts and circumstances in which an auditor will—and will not—be deemed independent are set forth in Rule 2-01 of Regulation S-X. Rule 2-01(c) provides a non-exclusive list of specific relationships that render an accountant non-independent. Rule 2-01(b) provides the "general standard" for auditor independence, which all auditors must meet even if their conduct does not fall within one of the non-exclusive specific prohibitions that render an accountant non-independent in Rule 2-01(c). In drafting Rule 2-01 in this manner, the Commission never intended to identify and describe in detail all relationships between an auditor and a client that could impair independence; Rule 2-01(c) states that it is a "*non-exclusive*" description of relationships that impair independence, and the preliminary note to the Rule states that, *"(t)he rule does not purport*

---

[7]    The Commission has stated that for audit reports issued on or after May 24, 2004, the reference in Rule 2-02(b)(1) to GAAS means the standards of the PCAOB plus any applicable Commission regulations, both of which require an auditor to be independent of its client. *See Commission Guidance Regarding the Public Company Accounting Oversight Board's Auditing and Related Professional Practice Standard No. 1*, Exchange Act Rel. No. 49708, 2004 WL 1439831, at *2 (May 14, 2004); *see also* PCAOB Rule 3520 ("A registered public accounting firm and its associated persons must be independent of the firm's audit client throughout the audit and professional engagement period."); PCAOB Auditing Standards, AU Section 220.03.

*to, and the Commission could not, consider all circumstances that raise independence concerns, and these are subject to the general standard [in Rule 2-01(b).]*" (Emphasis added).

41.     The language of the general standard, Rule 2-01(b) of Regulation S-X, provides:

> [t]he Commission will not recognize an accountant as independent, with respect to an audit client, if the accountant is not, *or a reasonable investor with knowledge of all relevant facts and circumstances would conclude that the accountant is not, capable of exercising objective and impartial judgment on all issues encompassed within the accountant's engagement. In determining whether an accountant is independent, the Commission will consider all relevant circumstances,* including all relationships between the accountant and the audit client, and not just those relating to reports filed with the Commission.

17 C.F.R. § 210.2-01(b) (Emphasis added).  As the Commission recognized "[t]he appearance standard incorporated in the general standard is an objective one.  Appearance is measured by reference to a reasonable investor.  The 'reasonable person' standard is embedded in the law generally.  In particular, the 'reasonable investor' standard is reflected in the concept of materiality under the federal securities laws." *See Adopting Release*.  This standard applies with equal force to both individual accountants and the audit firms in which they practice.  See 17 C.F.R. § 210.2-01(f) (1).

42.     A reasonable investor with knowledge of all relevant facts and circumstances concerning Audit Firm's RFP conduct would conclude that Audit Firm was not capable of exercising objective and impartial judgment for the 2015 audit and engagement period.

43.     Section 13(a) of the Exchange Act and Rule 13a-1 thereunder require public issuers to file annual reports with the Commission that have been audited by an independent accountant. An issuer violates Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-1 thereunder when it files annual reports with the Commission that fail to include financial statements audited by an independent public accountant. Similarly, an issuer violates Section 13(a) of the Exchange Act and Rule 13a-13 thereunder when it files with the Commission quarterly reports that fail to include interim financial statements reviewed by an independent public accountant. Because Issuer's 2015 annual and quarterly reports were neither audited nor reviewed by a public accountant who was independent within the meaning set forth in Rule 2-01 of Regulation S-X, Issuer violated Section 13(a) and Rules 12b-20, 13a-1 and 13a-13.

44.     An issuer violates Section 14(a) of the Exchange Act and Rule 14a-9 thereunder when such issuer files with the Commission a proxy statement that contains materially false or misleading information.  Similarly, an issuer violates Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-11 thereunder when such issuer files a current report on Form 8-K reports that

contains materially false or misleading information. Because Issuer issued misleading filings that purported or made representations that it did regarding Issuer's Audit Committee approval process and the RFP "competitive search process" in disclosures to its November 11, 2014 Form 8-K and its April 2, 2015 Proxy Statement, which were not true and accurate when made, Issuer violated Sections 13(a) and 14(a) and Rules 12b-20, 13a-11, and 14a-9 thereunder. Issuer's Form 10-K incorporated the April 2, 2015 Proxy Statement by reference. Stiehl reviewed and authorized Issuer's disclosures.

45.    Rule 102(e)(1)(iii) of the Commission's Rules of Practice, and Section 4C(a)(3) of the Exchange Act, permit the Commission to censure a person or deny a person the privilege of appearing or practicing before it after finding that person "willfully violated, or willfully aided and abetted the violation of any provision of the Federal securities laws of the rules and regulations thereunder." 17 C.F.R. 201.102(e)(1)(iii); 15 U.S.C. Section 78d-3(a)(3).

## Violations

46.    As a result of the conduct described above, Stiehl caused and willfully aided and abetted Issuer's violations of Sections 13(a) and 14(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, 13a-13, and 14a-9 promulgated thereunder during the relevant period and for the purposes of Rule 102(e)(1)(iii).

## F.    FINDINGS

47.    Based on the foregoing, the Commission finds that Stiehl caused and willfully aided and abetted Issuer's violations of Sections 13(a) and 14(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, 13a-13, and 14a-9 promulgated thereunder. Stiehl's willful aiding and abetting of Issuer's violations of Section 13(a) and 14(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, 13a-13, and 14a-9 thereunder constituted violations of the Federal securities laws and regulations within the meaning of Sections 4C(a)(3) of the Exchange Act and Rule 102(e)(1)(iii) of the Commission's Rules of Practice.

## IV.

In view of the foregoing, the Commission deems it appropriate to impose the sanctions agreed to in Respondent Stiehl's Offer.

Accordingly, it is hereby ORDERED, effective immediately, that:

A.    Respondent Stiehl shall cease and desist from committing or causing any violations and any future violations of Sections 13(a) and 14(a) of the Exchange Act, and Rules 12b-20, 13a-1, 13a-11, 13a-13, and 14a-9 promulgated thereunder.

B.      Respondent Stiehl is denied the privilege of appearing or practicing before the Commission as an accountant.

C.      After two years from the date of this Order, Stiehl may request that the Commission consider his reinstatement by submitting an application (attention: Office of the Chief Accountant) to resume appearing or practicing before the Commission as:

   1.      a preparer or reviewer, or a person responsible for the preparation or review, of any public company's financial statements that are filed with the Commission (other than as a member of an audit committee, as that term is defined in Section 3(a)(58) of the Securities Exchange Act of 1934). Such an application must satisfy the Commission that Stiehl's work in his practice before the Commission as an accountant will be reviewed either by the independent audit committee of the public company for which he works or in some other acceptable manner, as long as he practices before the Commission in this capacity; and/or

   2.      a preparer or reviewer, or a person responsible for the preparation or review, of any public company's financial statements that are filed with the Commission as a member of an audit committee, as that term is defined in Section 3(a)(58) of the Securities Exchange Act of 1934. Such an application will be considered on a facts and circumstances basis with respect to such membership, and the applicant's burden of demonstrating good cause for reinstatement will be particularly high given the role of the audit committee in financial and accounting matters; and/or

   3.      an independent accountant.

Such an application must satisfy the Commission that:

   (a) Stiehl, or the public accounting firm with which he is associated, is registered with the Public Company Accounting Oversight Board ("Board") in accordance with the Sarbanes-Oxley Act of 2002, and such registration continues to be effective;

   (b) Stiehl, or the registered public accounting firm with which he is associated, has been inspected by the Board and that inspection did not identify any criticisms of or potential defects in the respondent's or the firm's quality control system that would indicate that Stiehl will not receive appropriate supervision;

13

(c) Stiehl has resolved all disciplinary issues with the Board, and has complied with all terms and conditions of any sanctions imposed by the Board (other than reinstatement by the Commission); and

(d) Stiehl acknowledges his responsibility, as long as he appears or practices before the Commission as an independent accountant, to comply with all requirements of the Commission and the Board, including, but not limited to, all requirements relating to registration, inspections, concurring partner reviews and quality control standards.

D.    The Commission will consider an application by Stiehl to resume appearing or practicing before the Commission provided that his state CPA license is current and he has resolved all other disciplinary issues with the applicable state boards of accountancy. However, if state licensure is dependent on reinstatement by the Commission, the Commission will consider an application on its other merits. The Commission's review may include consideration of, in addition to the matters referenced above, any other matters relating to Stiehl's character, integrity, professional conduct, or qualifications to appear or practice before the Commission as an accountant. Whether an application demonstrates good cause will be considered on a facts and circumstances basis with due regard for protecting the integrity of the Commission's processes.

E.    Stiehl shall, within ten (10) days of the entry of this Order, pay a civil money penalty in the amount of $51,000 to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury, subject to Exchange Act Section 21F(g)(3). If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. §3717.

Payment must be made in one of the following ways:

(1)    Stiehl may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

(2)    Stiehl may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

(3)    Stiehl may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

Enterprise Services Center
Accounts Receivable Branch

14

HQ Bldg., Room 181, AMZ-341
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying William G. Stiehl, CPA as a Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Tracy L. Price. Esq., Deputy Chief, FCPA Unit, Division of Enforcement, Securities and Exchange Commission, 100 F St., NE, Washington, DC 20549-5631.

F.      Amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Stiehl agrees that in any Related Investor Action, he shall not argue that he is entitled to, nor shall he benefit by, offset or reduction of any award of compensatory damages by the amount of any part of Stiehl's payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Stiehl agrees that he shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the Securities and Exchange Commission. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Stiehl by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

15

## V.

It is further Ordered that, solely for purposes of exceptions to discharge set forth in Section 523 of the Bankruptcy Code, 11 U.S.C. §523, the findings in this Order are true and admitted by Stiehl, and further, any debt for disgorgement, prejudgment interest, civil penalty or other amounts due by Stiehl under this Order or any other judgment, order, consent order, decree or settlement agreement entered in connection with this proceeding, is a debt for the violation by Stiehl of the federal securities laws or any regulation or order issued under such laws, as set forth in Section 523(a)(19) of the Bankruptcy Code, 11 U.S.C. §523(a)(19).

By the Commission.

Vanessa A. Countryman
Secretary