# EXHIBIT C

**UNITED STATES OF AMERICA**
**Before the**
**SECURITIES AND EXCHANGE COMMISSION**

**SECURITIES EXCHANGE ACT OF 1934**
Release No. 92540 / August 2, 2021

**ACCOUNTING AND AUDITING ENFORCEMENT**
Release No. 4239 / August 2, 2021

**ADMINISTRATIVE PROCEEDING**
File No. 3-20447

| | |
|---|---|
| **In the Matter of**<br><br>**ERNST & YOUNG LLP,**<br>**JAMES G. HERRING, JR., CPA,**<br>**JAMES A. YOUNG, CPA,**<br>**AND CURT W. FOCHTMANN,**<br>**CPA,**<br><br>**Respondents.** | **ORDER INSTITUTING PUBLIC ADMINISTRATIVE AND CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTIONS 4C AND 21C OF THE SECURITIES EXCHANGE ACT OF 1934 AND RULE 102(e) OF THE COMMISSION'S RULES OF PRACTICE, MAKING FINDINGS, AND IMPOSING REMEDIAL SANCTIONS AND A CEASE-AND-DESIST ORDER** |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate that public administrative and cease-and-desist proceedings be, and hereby are, instituted against Ernst & Young LLP ("EY"), James G. Herring, Jr., ("Herring"), James A. Young ("Young"), and Curt W. Fochtmann ("Fochtmann") (collectively, the "Respondents") pursuant to Sections 4C[1] and 21C of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 102(e)(1)(ii) of the Commission's Rules of Practice.[2]

---

[1]  Section 4C provides, in relevant part, that:

   The Commission may censure any person, or deny, temporarily or permanently, to any person the privilege of appearing or practicing before the Commission in any way, if that person is found . . . (1) not to possess the requisite qualifications to represent others; (2) to be lacking in character or integrity, or to have engaged in unethical or improper professional conduct; or (3) to have willfully violated, or willfully aided and abetted the violation of, any provision of the securities laws or the rules and regulations issued thereunder.

[2]  Rule 102(e)(1)(ii) provides, in pertinent part, that:

   The Commission may . . . deny, temporarily or permanently, the privilege of appearing or practicing before it . . . to any person who is found . . . to have engaged in unethical or improper professional conduct.

**II.**

In anticipation of the institution of these proceedings, Respondents have submitted Offers of Settlement (each, an "Offer" and collectively, the "Offers"), which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over Respondents and the subject matter of these proceedings, which are admitted, and except as provided herein in Section V as to Herring, Young, and Fochtmann, Respondents consent to the entry of this Order Instituting Public Administrative and Cease-and-Desist Proceedings Pursuant to Sections 4C and 21C of the Securities Exchange Act of 1934 and Rule 102(e) of the Commission's Rules of Practice, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order ("Order"), as set forth below.

**III.**

On the basis of this Order and Respondents' Offers, the Commission finds[3] that:

**A.    SUMMARY**

1.    This matter involves improper professional conduct by EY, a public accounting firm, from 2014 through 2015 and EY audit partners James "Jay" Herring ("Herring") and James "Jay" Young ("Young"), and EY tax partner Curt Fochtmann ("Fochtmann") (collectively, "EY Partners") in connection with their pursuit to serve as the independent auditor for a United States publicly-traded company and SEC-Registrant ("Issuer").

2.    Throughout 2014, EY Partners and Issuer's then-CAO and controller ("CAO") improperly interfered with the Request for Proposal ("RFP") process initiated and overseen by Issuer's Audit Committee to select an independent auditor for fiscal year 2015. By and through EY Partners, EY solicited and obtained from CAO competitive bid and other confidential documents and information on multiple occasions in an effort to secure the audit engagement. EY regional management and national leadership were, or should have been, aware of the conduct undertaken by EY Partners in connection with ultimately winning the engagement.

3.    EY and EY Partners should have known that the manner in which EY obtained the engagement would cause a reasonable investor to conclude that EY was not capable of exercising objectivity and impartiality upon becoming Issuer's independent auditor and that such conduct therefore would result in a violation of the Commission's and the Public Company Accounting Oversight Board ("PCAOB")'s auditor independence rules. EY, by and through Herring and

---

[3]  The findings herein are made pursuant to Respondents' Offers of Settlement and are not binding on any other person or entity in this or any other proceeding.

Young, made representations that it was independent in audit reports that were included in or incorporated by reference into Issuer's public filings for 2015. EY, through Herring and Young, also reviewed and provided edits to Issuer's 2014 and 2015 public statements that Issuer's Audit Committee approved the selection of EY "to serve as the Company's Independent Registered Public Accounting Firm for the fiscal year ending December 31, 2015 following a competitive search process."

4.      At the time of selection and appointment by the Audit Committee, Issuer became EY Charlotte, North Carolina's largest audit client. During fiscal year 2015, EY collected audit, tax, and other services fees of over $13 million from Issuer.

5.      After Issuer learned of the RFP-related conduct on May 2, 2019, Issuer's Audit Committee conducted an internal investigation and terminated CAO's employment on June 19, 2019. The next day, the Audit Committee publicly announced in Issuer's Form 8-K that CAO's employment had been terminated for cause. On August 7, 2019, Issuer's Audit Committee unanimously terminated EY's audit engagement and approved the engagement of another firm as Issuer's independent audit firm. On August 12, 2019 the Audit Committee publicly announced in Issuer's Form 8-K that EY was dismissed because of the "pendency of the SEC investigation, along with the [Audit] Committee's dissatisfaction with information it learned about the process by which EY was selected as auditor. . . ."

6.      For the reasons set forth below, EY violated Rule 2-02(b)(1) of Regulation S-X and caused Issuer's violations of Sections 13(a) and 14(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, 13a-13, and 14a-9 promulgated thereunder. Young, Herring, and Fochtmann caused EY's violation of Rule 2-02(b)(1) of Regulation S-X and Herring and Young caused Issuer's violations of Sections 13(a) and 14(a) of the Exchange Act and relevant rules thereunder. EY also failed to comply with the requirements of Rule 3526(a), which requires that before the initial engagement, a prospective auditor must describe to the audit committee, in writing, all relationships "that may be reasonably thought to bear on independence." Respondents' conduct constituted improper professional conduct pursuant to Section 4C(a)(2) of the Exchange Act and Rule 102(e)(1)(ii) of the Commission's Rules of Practice.

## B.    RESPONDENTS

7.      **Ernst & Young LLP** ("EY") is a professional service limited liability partnership, headquartered in New York, New York, with offices located throughout the United States. It is a member firm of Ernst & Young Global Limited and provides auditing, consulting, and tax services to various entities, including companies whose securities are registered with the Commission and trade in the U.S. markets. EY served as Issuer's auditor from 2015 to August 2019. On August

12, 2019, Issuer filed a Form 8-K dismissing EY and appointing another firm as Issuer's independent audit firm.

8.        **James G. Herring, Jr., CPA** ("Herring"), age 47, of Charlotte, North Carolina, is an assurance partner at EY. Herring led EY's RFP pursuit of Issuer in 2014 and then served as the engagement partner on the EY engagement team that provided audit and other services to Issuer from 2015 to March 2018. As the engagement partner, Herring supervised EY's engagement to audit and review Issuer's financial statements.[4] Herring is licensed as a CPA by the State of North Carolina.

9.        **James A. Young, CPA** ("Young"), age 60, of Charlotte, North Carolina, was an assurance partner at EY throughout the relevant period. Young joined EY's RFP pursuit of Issuer beginning in August 2014, and became the coordinating partner on Issuer's engagement for the fiscal year ending December 31, 2015.[5] As coordinating partner on the Issuer engagement, Young had final responsibility for the audits and quarterly reviews of Issuer's financial statements from 2015 through August 2019. Young is licensed as a CPA by the States of North Carolina and Ohio. He previously was licensed as a CPA by the State of Michigan from 2005 to 2017. Young retired from EY in 2020.

10.        **Curt W. Fochtmann, CPA** ("Fochtmann), age 61, of Charlotte, North Carolina, was a tax partner at EY as well as the EY Carolinas Tax Market Leader throughout the relevant period. Fochtmann was on the EY RFP pursuit of Issuer and served as the tax partner on the subsequent Issuer audit engagement teams from 2015 until May 2019. As the tax partner, Fochtmann reviewed the work of, and supervised, EY's tax professionals on the audit engagement team who performed audit and review procedures related to Issuer's income tax accounting throughout that period. Fochtmann is licensed as a CPA by the State of North Carolina and has been previously licensed as a CPA by the States of Alabama, Georgia, Ohio, and Texas. Fochtmann retired from EY in 2020.

## C.        RELEVANT ISSUER AND INDIVIDUAL

11.        **Issuer** is a Fortune 500 multi-national company with substantial operations in the United States. Issuer's shares are registered with the Commission pursuant to Exchange Act

---

[4]    The term "engagement partner" is used by EY to describe the second assurance partner on an audit engagement. The engagement partner was not responsible for signing Issuer's audit reports.

[5]    The term "coordinating partner" is used by EY to describe the lead partner who signed the audit reports on EY's behalf on this engagement.

Section 12(b) and listed on the New York Stock Exchange. Issuer files periodic reports, including Forms 10-K and 10-Q, with the Commission pursuant to Exchange Act Section 13(a).

12.     **CAO**, a CPA, served as Issuer's CAO and controller from January 2013 to October 2017, after which CAO served as Issuer's acting and then permanent CFO until his employment was terminated in June 2019. Before working for Issuer, CAO was employed as an auditor at a public accounting firm and in various internal audit and senior financial accounting roles at two public companies.

## D.     FACTS

### Background

13.     Among other engagements from 2004 through December 2012, Herring served as a manager and senior manager on EY audit teams for two public companies at which CAO served in internal audit and senior financial accounting roles. CAO was one of the primary contacts to Herring and the EY teams on those engagements. During those eight years, CAO and Herring worked closely together, and CAO came to view Herring as a trusted advisor.

14.     In January 2013, Issuer, which was then headquartered in New Jersey, hired CAO as its controller and CAO. At the time, another accounting firm had served as Issuer's independent auditor for decades. Beginning in February 2013, CAO participated in internal discussions at Issuer about initiating an RFP process to solicit competitive bids from audit firms for Issuer's independent audit work.

### CAO Provided Herring With Confidential Information
### Before the Issuance of the RFP

15.     As Issuer worked internally to initiate the RFP process, CAO began to provide certain confidential information to Herring. In August 2013, CAO provided Herring and EY with a draft RFP presentation to Issuer's Audit Committee. CAO did not provide this pre-RFP confidential information to any other audit firm. In May 2014, for example, CAO called Herring to provide EY with exclusive news regarding the timing of Issuer's upcoming RFP. During this call, CAO also shared confidential news of Issuer's pending relocation of its corporate headquarters to Charlotte, North Carolina.

16.     CAO allowed EY to assist in drafting portions of Issuer's RFP before it was publicly released and arranged for Herring to meet with CAO's financial personnel at least a month before other firms' personnel were invited to do so. An internal EY victory 'case study' prepared shortly after EY was awarded the Issuer audit described this access as a "head start none of the

other firms were given." This exclusive access also ultimately led to CAO adding, at another EY partner's suggestion, over $1 million in global compliance tax services to Issuer's RFP.

### Issuer's Audit Committee Sought a Competitive and Fair RFP Process

17.    On July 14, 2014, after Issuer's Audit Committee authorized the RFP's requirements and rules, Issuer invited EY and three other audit firms, including Issuer's then-incumbent audit firm, to submit bids in what the Audit Committee intended to be a competitive and fair RFP process. The RFP documents stated that Issuer intended that the process would allow all prospective "Independent Registered Public Accounting Firm[s]" an "equal opportunity to provide their best proposals" to Issuer's Audit Committee. At the time, Issuer's Audit Committee was not aware that EY already had obtained confidential information about and relevant to the RFP from CAO.

18.    Issuer's RFP stated that all non-public information submitted by the audit firms competing in the RFP would be treated as confidential. Each of the audit firms competing in the RFP signed a bi-lateral Non-Disclosure Agreement ("NDA") in connection with the process. Issuer's RFP set forth specific instructions regarding the timing of all submissions and fair and equal access to key audit and financial information in a web-based data room. The RFP also contained a "Conflicts of Interest" paragraph, which made clear that all competitors that submitted proposals represented that: (i) Issuer personnel have not participated in the preparation of the firm's proposal; and (ii) Issuer personnel have not conveyed to the competitors any information pertaining to this RFP.

### CAO Unilaterally Provided EY with Confidential Competitive Bids and Audit Committee Materials without Audit Committee Authorization

19.    By signing the NDA, EY agreed to comply with the RFP process as set forth in Issuer's RFP documents. Without Audit Committee authorization, CAO provided EY, through Herring, with competing firms' proposals and submissions, the details of each competitive bid, and all of the internal documents prepared for Issuer's Audit Committee, often before the Audit Committee itself received them. Despite the clear contravention of the RFP process and EY's obligation under the NDA, on receipt, Herring shared this information with Young, Fochtmann, and other members of the EY engagement and pursuit teams, who then shared the competing firms' proposals and certain other unauthorized confidential information with EY regional and national leadership.

20.    CAO also gave EY an "open invitation" to provide "suggestions or comments" to RFP materials summarizing each competitors' proposals that were going to the Audit Committee. (*E.g.*, Herring email to Young, Fochtmann, and others: "*See attached for materials that are going to A[udit] C[ommittee] for meeting next Tuesday. If you have any suggestions or comments we can provide to [CAO], we have an open invitation.*") (emphasis added). On multiple occasions

6

during the RFP process, Respondents solicited and received information from CAO outside of the RFP's web-based data room, including "integral" incumbent fee information, which enabled EY to "come up with an informed fee for the RFP."

21.    EY Partners knew or should have known that EY often was the sole recipient of valuable competitive intelligence (*e.g.*, Herring email to Young, Fochtmann and other EY engagement and pursuit team members: "[CAO] asked that I review and provide any comments/feedback before [CAO] sends [the RFP Audit Committee survey] to the Audit Committee. *Keep in mind that this is for our benefit and will not be shared with the other firms.* Please provide comments by end of day today so I can share with [CAO] tomorrow am." (emphasis added)). Similarly, EY Partners and EY ignored various indicators that should have made it apparent that CAO was not acting with the Audit Committee's authority or with the knowledge or approval of Issuer's senior management.

22.    On September 15, 2014, EY and three other competing audit firms submitted their initial confidential bid proposals to Issuer. The proposals contained detailed staffing and billing information, including Excel spreadsheets that included hundreds of engagement team names and email addresses, specific billing rates, budgeted hours, proposed bid amounts, and staffing levels covering dozens of international jurisdictions. CAO immediately forwarded the complete bid proposals provided by two competing audit firms, including all supporting Excel spreadsheets, to Herring. In a footnote below its table of contents, the incumbent firm's bid proposal expressly included an "irreparable harm" confidentiality provision. On the early morning of September 16, 2014, Herring asked for a copy of the third competing audit firm's bid proposal, which CAO emailed in its entirety to Herring later that same morning. CAO later asked EY, through Herring, for "some . . . stats that I would be able to use in the [Audit Committee] presentation" to portray another competing firm as having insufficient audit experience to support a potential client of Issuer's size and EY obliged. CAO then used that information to inform Issuer's Audit Committee that "[Issuer] account would be nearly twice the size as their biggest global client."

**EY Used the Competitive Intelligence and Confidential Bid Information It Received**

23.    EY used the competitive intelligence and confidential bid information provided to it by CAO for EY's own benefit by broadly circulating it throughout EY, including to EY partners contemporaneously pursuing other RFP opportunities. EY Business Development personnel working on Issuer's RFP shared, sometimes within hours of receipt, competitors' full bid proposals with over 20 EY individuals outside the Issuer pursuit, including personnel in regional and national leadership positions. As one example of how quickly and how far EY disseminated the competitive intelligence gained from these proposals, on September 19, 2014, EY's Business Development department circulated an email to at least 180 EY professionals entitled "Competitive Intelligence – Technology and Project Management." The email attached a 26-slide PowerPoint

attachment, and, in relevant part, stated that the intelligence contained in that PowerPoint was based largely on: "*...recently received competitive proposals [names of audit firms identified] on an active F500 audit pursuit thanks to a trusted relationship by one of our partners.*" (emphasis added).

24.    Without the Audit Committee's knowledge and in contravention of the RFP, Respondents also were able to use CAO and the confidential information provided by CAO to influence the Audit Committee at multiple stages throughout the RFP process. For example, on October 3, 2014, CAO sent EY, through Herring, "the slide deck that I plan to share in executive committee," and asked Herring to share "additional talking points that you think might be beneficial" before CAO met with the Audit Committee to present CAO's views of the competing firms. CAO's 16-page slide deck identified each competing audit firm by "Key Qualitative Highlights," "Pros and Cons," and bid amount. Three days later, on October 6, 2014, after soliciting comments from Young, Fochtmann, and others within EY's engagement and pursuit teams, Herring provided CAO with a detailed list of additional "Cons" against the incumbent audit firm, including one that Herring stated was a "big negative the [Audit Committee] would be interested in" and additional "Pros" in favor of EY, including one that Herring urged "maybe you [CAO] could play that up" prior to the Audit Committee's scheduled down-selection meeting on October 7, 2014. To that end, Herring informed Young, Fochtmann, and EY regional leadership: "*I traded messages with [CAO] and spoke to [CAO] this weekend. I think we are in good shape going into the A[udit] C[ommittee] meeting. They plan to verbally differentiate during the meeting. I sent [CAO] a list of things [CAO] can use during the meeting to help with that.*" (emphasis added).

25.    On October 8, 2014, unaware of the above-described conduct, the Audit Committee selected two RFP finalists, the incumbent audit firm and EY. The Audit Committee instructed the two firms to make their final bids at the end of October, which pursuant to the RFP would be submitted on the same day. The Audit Committee instructed CAO to give both firms "the same opportunity to sharpen their pencils for this last round."

### EY Solicited and Obtained Key Confidential Competitive Information in Contravention of the RFP Instructions

26.    On October 30, 2014, the incumbent audit firm asked CAO in an email—which CAO immediately forwarded to Herring—whether "we (and E&Y) [were] to re-submit fees" the next day in accordance with "protocol and the preferred process." CAO replied "Yes, if there is any change in fees, then you can resubmit tomorrow." Later that same day, CAO met Herring for dinner and they, along with Fochtmann and others from EY and Issuer attended a National Football League game in EY's suite in Charlotte, North Carolina.

8

27.     In contrast to CAO's instructions to the incumbent firm, on October 30, 2014, CAO informed EY, through Herring: "FYI – sounds like [incumbent audit firm] may be changing their number but have no idea to what extent. We can talk Friday after I receive [incumbent's revised proposal]. Don't send me anything yet."

28.     On October 31, 2014, the incumbent audit firm submitted a 20-page revised bid proposal with audit fee reductions of five percent, which CAO forwarded to Herring and Fochtmann seven minutes later. EY, through Herring, then solicited additional information about the incumbent audit firm's revised bid, which CAO obtained from the incumbent audit firm and forwarded to Herring.

29.     EY did not file its own proposal until five days later, during which time, CAO and EY, by and through EY Partners, agreed upon a final bid number that was almost identical to the incumbent audit firm's revised bid. In fact, although EY's final bid was slightly higher than the incumbent firm's final bid (once budgeted expenses were taken into consideration), CAO deleted those expense amounts from the final bid summary information that CAO gave to the Audit Committee, which created the appearance that EY's bid was lower.

30.     Shortly after EY submitted its final bid number—and six days before the Audit Committee made its appointment—CAO emailed a draft Form 8-K to EY and asked Herring and Young for edits. The draft Form 8-K identified EY as the newly selected independent auditor. CAO did not email the incumbent audit firm this draft Form 8-K. Young provided the requested edits on behalf of EY.

31.     CAO's provision of the incumbent's final bid and proposal to Respondents before EY filed its own enabled EY to make its fee submission and shape its oral presentation and final bid and proposal to the Audit Committee based on what it saw in the incumbent audit firm's final bid and proposal. EY modified its written and oral presentation after receiving information from CAO. Not only did EY modify its fees, but it also added personnel to the presentation, changed its representations regarding its overall portfolio, and amended its response to recent audit wins highlighted by the incumbent audit firm in its final proposal. Despite the terms of the RFP, EY received both its competitor's confidential final bid and proposal and then additional time to submit its own. These were red flags that Respondents should have acted upon and scrutinized. EY should have but failed to recognize that CAO was likely not authorized by the Audit Committee to share incumbent's updated bid and proposal.

32.     On November 11, 2014, the morning of the final oral presentations to Issuer's Audit Committee, CAO provided Herring with the final "top level summary the board will see, and will refer to during the executive session[,]" adding that it was "[j]ust a comparison of the two firms to

9

facilitate the discussion.  But again some of the big arguing points, I have left off, so that I can just verbalize."

33.     That same day, the Audit Committee unanimously selected and appointed EY as Issuer's new auditor.  In an email to EY's national leadership, EY Partners characterized the appointment as a "$10 million a year annuity which will span across multiple service lines."  That night, CAO sent another EY partner (CAO's former college roommate), a congratulatory email with the message: "Back in the family!!!"

34.     On behalf of EY, on November 11, 2014 and February 6, 2015, Young signed two separate letters to Issuer's Audit Committee that purported to disclose in writing all matters that could reasonably bear on EY's independence of Issuer upon the initiation of the audit engagement, as required by PCAOB rules.  Neither of these letters mentioned nor otherwise disclosed EY and Respondents' RFP-related conduct.

35.     On November 14, 2014, Issuer filed its Form 8-K announcing: "Audit Committee of the Board of Directors . . . of [Issuer] approved the selection of Ernst & Young LLP to serve as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2015 following a competitive search process."  This representation was materially false and misleading, because the RFP process was not competitive.  EY, through Herring and Young, substantially reviewed and edited Issuer's representation (in the 2014 Form 8-K and a subsequent 2015 Proxy Statement) that Issuer's Audit Committee approval process was subject to a "competitive search process."

### Neither EY Nor EY Partners Disclosed Their RFP-Related Conduct to the Audit Committee or Other Members of Issuer's Senior Management

36.     Respondents did not disclose their RFP-related conduct to the Audit Committee or other member of Issuer's senior management.  In June 2019, after the Audit Committee discovered the RFP-related conduct, Issuer's Audit Committee unanimously terminated CAO's employment for cause and, in August 2019, terminated EY's engagement.

37.     Audit reports issued on Issuer's 2015 financial statements, which were included or incorporated by reference in public filings with the Commission, indicated that EY was independent.  EY, through Herring and Young, substantially reviewed and provided edits to Issuer's representations disclosed in a 2014 Form 8-K and a 2015 Proxy Statement that Issuer's Audit Committee approved the selection of EY "to serve as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2015" following a "competitive search process."

10

## EY's Quality Control System

38.    SEC Rules and PCAOB standards require auditors to be independent of SEC-registrant audit clients.  PCAOB quality standards require audit firms to establish policies and procedures "to provide the firm with reasonable assurance that personnel maintain independence (in fact and appearance) in all required circumstances." (QC 20.09)  Audit firms are required to monitor on an ongoing basis whether personnel are complying with the independence requirements.  (QC 20.08)  Such quality controls must be suitably designed in relation to, among other factors, the firm's size, number of officers, and nature and complexity of the firm's practice. (QC 20.04).

39.    During the relevant period, EY maintained a global code of conduct as well as policies and procedures regarding auditor independence, ethics, and integrity.  EY trained and tested its audit professionals on those policies.  EY required audit engagement teams for public company clients, including Issuer, to follow certain pre-engagement, annual, and quarterly review procedures to assess EY's independence from those audit clients.  During the relevant period, EY's policies and procedures addressed possible familial, employment, financial relationships, and other relationships between Issuer and EY that are expressly prohibited by Commission's auditor independence Rules 2-01(c)(1)-(6), (8).

40.    During the relevant period, EY required each audit engagement team member to certify he or she was independent of the audit client and that he or she had read, understood, and complied with EY's policies on independence.  Outside of procedures that were specific to individual audit clients, EY also required all audit professionals to certify on an annual basis, and audit professionals at the level of manager and above on a quarterly basis, that they read understood, and complied with EY's internal policies on independence. Herring, Young, and Fochtmann repeatedly certified (in quarterly and annual certifications) that they were independent from Issuer and in compliance with EY's policies on independence.

41.    Despite these policies and procedures, EY's quality control system did not effectively provide reasonable assurance that the firm and its employees maintained independence (in fact and appearance) in all required circumstances; namely, as applied to current and potential SEC-Registered audit clients during RFP and other pursuits.  Specifically, EY did not: (a) have any internal policies and procedures providing its personnel with guidance on how to identify and avoid conduct and behavior during the audit pursuit phase that could potentially violate SEC rules and PCAOB standards; (b) provide its personnel with any training, supervision, or consultation mechanism to provide reasonable assurances that they maintained heightened scrutiny toward independence during RFP and other pursuits; and (c) review or monitor its audit teams or business development personnel engaged in RFP and other pursuits for compliance with SEC rules and PCAOB rules and standards regarding audit independence, ethics, and integrity.

11

## E.    LEGAL ANALYSIS

42.    As the Commission has long recognized, "[i]ndependent auditors have an important public trust... It is the auditor's opinion that furnishes investors with critical assurance that the financial statements have been subjected to a rigorous examination by an objective, impartial, and skilled professional, and that investors, therefore, can rely on them." *Revision of the Commission's Auditor Independence Requirements*, Exchange Act Rel. No 43602, 2000 WL 1726933, at *2 (Nov. 21, 2000) ("*Adopting Release*"). Accordingly, Rule 2-02(b)(1) of Regulation S-X requires each auditor's report on a public issuer's financial statements to state "whether the audit was made in accordance with generally accepted auditing standards" ("GAAS"), including auditing standards set forth in PCAOB rules and Commission regulations.[6]

43.    In the *Adopting Release*, the Commission made clear that: "the general standard in paragraph (b) [of Rule 2-01] recognizes that an auditor must be independent in fact and appearance." Similarly, the preliminary note to Rule 2-01 of Regulation S-X provides that: "Section 210.2-01 is designed to ensure that auditors are qualified and independent of their audit clients both in fact and in appearance." GAAS, in turn, requires auditors to be independent from their clients in both fact and appearance. PCAOB Rule 3520; PCAOB Auditing Standards, Independence, AU § 220.03. Independence in fact and appearance are "equally important under the securities laws." *In the Matter of Ernst & Young LLP*, Exchange Act Rel. No. 46821, 2004 WL 824099, at *30 (Apr. 16, 2004); *see also United States v. Arthur Young & Co.*, 465 U.S. 805, 819 n.15 (1984) ("It is therefore not enough that financial statements be accurate; the public must also perceive them as being accurate.")

44.    The facts and circumstances in which an auditor will—and will not—be deemed independent are set forth in Rule 2-01 of Regulation S-X. Rule 2-01(c) provides a non-exclusive list of specific relationships that render an accountant non-independent. Rule 2-01(b) provides the "general standard" for auditor independence, which all auditors must meet even if their conduct does not fall within one of the non-exclusive specific prohibitions that render an accountant non-independent in Rule 2-01(c). In drafting Rule 2-01 in this manner, the Commission never intended to identify and describe in detail all relationships between an auditor and a client that could impair independence; Rule 2-01(c) states that it is a "*non-exclusive*" description of relationships that impair independence, and the preliminary note to the Rule states that, *"(t)he rule does not purport*

---

[6]   The Commission has stated that for audit reports issued on or after May 24, 2004, the reference in Rule 2-02(b)(1) to GAAS means the standards of the PCAOB plus any applicable Commission regulations, both of which require an auditor to be independent of its client. *See Commission Guidance Regarding the Public Company Accounting Oversight Board's Auditing and Related Professional Practice Standard No. 1*, Exchange Act Rel. No. 49708, 2004 WL 1439831, at *2 (May 14, 2004); *see also* PCAOB Rule 3520 ("A registered public accounting firm and its associated persons must be independent of the firm's audit client throughout the audit and professional engagement period."); PCAOB Auditing Standards, AU Section 220.03.

*to, and the Commission could not, consider all circumstances that raise independence concerns, and these are subject to the general standard [in Rule 2-01(b)].*" (emphasis added)

45.    The language of the general standard, Rule 2-01(b) of Regulation S-X, provides:

> [t]he Commission will not recognize an accountant as independent, with respect to an audit client, if the accountant is not, *or a reasonable investor with knowledge of all relevant facts and circumstances would conclude that the accountant is not, capable of exercising objective and impartial judgment on all issues encompassed within the accountant's engagement. In determining whether an accountant is independent, the Commission will consider all relevant circumstances,* including all relationships between the accountant and the audit client, and not just those relating to reports filed with the Commission.

17 C.F.R. § 210.2-01(b) (emphasis added). As the Commission recognized "[t]he appearance standard incorporated in the general standard is an objective one. Appearance is measured by reference to a reasonable investor. The 'reasonable person' standard is embedded in the law generally. In particular, the 'reasonable investor' standard is reflected in the concept of materiality under the federal securities laws." *See Adopting Release*. This standard applies with equal force to both individual accountants and the audit firms in which they practice. See 17 C.F.R. § 210.2-01(f) (1).

## Violations

46.    As a result of the conduct described above, Herring, Young, and Fochtmann lacked independence from Issuer and violated Rule 2-01(b)'s general standard for the 2015 financial statement audit and review periods. A reasonable investor with knowledge of all relevant facts and circumstances concerning RFP conduct by Herring, Young, and Fochtmann would conclude that each of them were not capable of exercising objective and impartial judgment for the 2015 audit and engagement period.

47.    As a result of the conduct described above, EY violated Rule 2-01(b) for the 2015 financial statement audit and review periods. As the Commission noted in the Adopting Release for the revisions to Rules 2-01 and 2-02, the "[d]efinition of 'accountant' includes the accounting firm in which the auditor practices. The definition makes clear that an individual accountant's lack of independence may be attributed to the firm." *Adopting Release*, Exchange Act Rel. No. 43602, 2000 WL 1726933, at \*86. A reasonable investor with knowledge of all relevant facts and circumstances concerning EY's RFP conduct would conclude that EY was not capable of exercising objective and impartial judgment upon initiation of the 2015 audit and engagement period.

13

48.    As a result, EY violated Rule 2-02(b)(1) of Regulation S-X by falsely certifying that its report for the 2015 audit period was conducted in accordance with PCAOB standards, when in fact the firm lacked independence during that audit and professional engagement period and violated the requirements of the rule. EY also signed 2014 and 2015 PCAOB Rule 3526 letters to Issuer's Audit Committee that did not disclose the RFP conduct and incorrectly certified that EY was not aware of any matters that could bear on independence.

49.    Herring, Young, and Fochtmann caused EY's violations of Rule 2-02(b)(1).

50.    EY, Herring, and Young caused Issuer to violate Section 13(a) of the Exchange Act and relevant rules thereunder. Section 13(a) of the Exchange Act and Rule 13a-1 thereunder require public issuers to file annual reports with the Commission that have been audited by an independent accountant. An issuer violates Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-1 thereunder when it files annual reports with the Commission that fail to include financial statements audited by an independent public accountant. Similarly, an issuer violates Section 13(a) of the Exchange Act and Rule13a-13 thereunder when it files with the Commission quarterly reports that fail to include interim financial statements reviewed by an independent public accountant. EY, Herring, and Young caused Issuer's violation of Section 13(a) and Rules 12b-20, 13a-1 and 13a-13 because: (1) they knew or should have known that the conduct during the RFP deprived Issuer of an independent auditor during the 2015 audit and review engagement period; and (ii) EY issued an audit report that contained an unqualified opinion stating that it had conducted an audit of Issuer's annual financial statements in accordance with PCAOB standards.

51.    EY, Herring, and Young caused Issuer to violate Section 14(a) of the Exchange Act and relevant rules thereunder. An issuer violates Section 14(a) of the Exchange Act and Rule 14a-9 thereunder when such issuer files with the Commission a proxy statement that contains materially false or misleading information. Similarly, an issuer violates Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-11 thereunder when such issuer files a current report on Form 8-K reports that contains materially false or misleading information. EY, Herring, and Young caused Issuer's violation of Sections 13(a) and 14(a) and Rules 12b-20, 13a-11, and 14a-9 for conduct resulting in Issuer issuing misleading filings that purported or made representations that it did regarding Issuer's Audit Committee approval process and the RFP "competitive search process" articulated in the November 11, 2014 Form 8-K and the April 2, 2015 Proxy, which were not true and accurate when made. Issuer's Form 10-K incorporated the April 2, 2015 Proxy Statement by reference. EY, through Herring and Young, reviewed and provided substantive changes to Issuer's disclosures.

52.    EY, Herring, Young, and Fochtmann engaged in improper professional conduct pursuant to Rule 102(e)(ii) of the Commission's Rules of Practice by virtue of the SEC and PCAOB violations referenced herein. Rule 102(e)(1)(iv) and Section 4C(b)(2) of the Exchange

14

Act define negligent "improper professional conduct" to include: "(i) [a] single instance of highly unreasonable conduct that results in a violation of applicable professional standards" in circumstances in which the "accountant," in the case of Rule 102(e) or "registered public accounting firm or associated person," in the case of Section 4C(b)(2), "knows, or should know, that heightened scrutiny is warranted;" and (ii) "[r]epeated instances of unreasonable conduct, each resulting in a violation of applicable professional standards, that indicate a lack of competence to practice before the Commission." 17 C.F.R. § 201.102(e) (1) (iv)(B); 15 U.S.C. § 78d-3(b)(2).

53.    An auditor has an affirmative obligation to obtain the information that it needs to assess independence. It is not free to rely solely on information provided by management when warning signals or other factors should alert an accountant to potential independence violations. The Commission has made clear that auditor independence is always an area requiring heightened scrutiny. *See* Amendment to Rule 102(e) of the Commission's Rules of Practice, Rel. Nos. 33-7593, 34-40567, 1998 WL 729201, at *8 (October 19, 1998) ("Because of the importance of an accountant's independence to the integrity of the financial reporting system, the Commission has concluded that circumstances that raise questions about an accountant's independence always merit heightened scrutiny. Therefore, if an accountant acts highly unreasonably with respect to an independence issue, that accountant has engaged in 'improper professional conduct.'") The Commission also has found negligent conduct where an auditor, when it knew or should have known that independence was implicated, failed to gather all the salient, relevant facts pertinent to the independence determination. *See In re KPMG Peat Marwick LLP*, Rel. No. 43862, 54 S.E.C. 1135, 1182-83 (January 19, 2001), *reconsideration denied*, Rel. Nos. 34-44050 and AAER-1374 (March 8, 2001), *petition for review denied*, 289 F.3d 109 (D.C. Cir. 2002).

54.    Under PCAOB Rule 3526(a), EY was required to disclose to the Audit Committee in writing all matters that could reasonably bear on EY's independence of Issuer upon the initiation of the audit engagement. EY should have but failed to recognize that a reasonable investor with knowledge of all relevant facts and circumstances would conclude that EY was not capable of exercising objective and impartial judgment by virtue of the information it received during the RFP. EY, by and through Young, failed to communicate its misconduct to the Audit Committee, as required under PCAOB Rule 3526(a), before EY initiated the engagement.

55.    As a result of the conduct described above, EY, Herring, Young, and Fochtmann engaged in improper professional conduct under both prongs of the definition set forth in Rule 102(e)(1)(iv)(B) and Section 4C(b)(2) of the Exchange Act.

## F.    FINDINGS

56.    As a result of the conduct described above, the Commission finds that: (a) EY violated Rule 2-02(b)(1) of Regulation S-X: (b) Herring, Young, and Fochtmann caused EY's violation of Rule 2-02(b)(1) of Regulation S-X; (c) EY, Herring and Young caused Issuer's

15

violations of Sections 13(a) and 14(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, 13a-13, and 14a-9 promulgated thereunder; and (d) EY, Herring, Young, and Fochtmann engaged in improper professional conduct within the meaning of Section 4C(a)(2) of the Exchange Act and Rules 102(e)(1)(ii) and 102(e)(1)(iv)(B) of the Commission's Rules of Practice. Respondents' conduct involved repeated instances of unreasonable conduct, each resulting in violation of SEC Rules or PCAOB standards and indicated a lack of competence. Respondents' conduct also satisfies the standard of highly unreasonable conduct resulting in violations of SEC Rules or PCAOB standards in circumstances in which heightened scrutiny was warranted.

### EY's Remedial Efforts

57.     In August 2020, EY introduced new policy and guidance concerning RFP and other competitive proposal processes applicable to all SEC-Registered Audit Clients ("Channel 1 Clients").[7]  The new guidance, which is applicable to all EY personnel, includes a set of "specific considerations" designed to assist professionals to identify and avoid relationships and behaviors, such as the transmission of unauthorized confidential information, which might cause a reasonable third party to question EY's independence, ethics, and integrity during the pursuit process. It also asks EY professionals to seek consultation where it is unclear whether information was authorized or not. In November and December 2020, EY incorporated this new guidance into mandatory independence training for all EY partners, principals, all client-serving personnel, and certain non-client serving personnel.

58.     In 2021, EY developed and initiated implementation of procedures intended to measure compliance with, and the effectiveness of, its August 2020 Policy (the "Policy"). This includes a process where participants in an audit pursuit for an SEC Registered Audit Client will confirm periodically the information received in the pursuit and various certifications regarding compliance with the Policy. The procedures also include ongoing monitoring and testing of compliance by EY personnel.

59.     In determining to accept EY's Offer, the Commission considered the remedial acts undertaken by EY.

### Undertakings

60.     Respondent EY undertakes to complete the following actions:

a.   Notification.   Within ten (10) business days after entry of this Order EY shall provide all audit, business development, and client-facing tax personnel with a copy of this

---

[7]  For purpose of EY's remedial efforts and undertakings, "Channel 1 Clients" includes both existing EY audit clients and those that may become EY audit clients as a result of the proposal process. "Channel 1 Clients" also encompasses all independence-restricted entities for which EY provides assurance services, including attestation engagements.

Order.

b.  <u>EY Policies and Procedures</u>.  On an annual basis, review and update, as necessary, internal policies and procedures, as described in Paragraphs 57 and 58, that have been adopted to enhance EY's ability to comply with the independence, conflict of interest, ethics and integrity requirements under applicable Commission rules and PCAOB standards concerning EY's RFPs and other pursuits for all Channel 1 Clients (hereinafter referred to as "Channel 1 Pursuit Policies and Procedures").  Channel 1 Pursuit Policies and Procedures for EY include, guidance, training, professional education, checklists, certifications, consultations, disclosure, reporting, testing, monitoring, oversight, and special considerations, as appropriate.

c.  <u>Reports to the Commission</u>.   Review, evaluate, and report to Commission staff annually during a two-year term, as set forth herein, the effectiveness of, and ongoing efforts to improve, EY's Channel 1 Pursuit Policies and Procedures. During this period, should EY discover credible evidence, not already reported to the Commission staff, that non-compliant or improper professional RFP-related conduct has taken place, EY shall promptly report such conduct to the Commission staff in writing.  During this two-year period, EY shall:  (1) conduct an initial review and submit an initial report ("Initial Report"), and (2) conduct and prepare one follow-up review and report ("Final Report"), as described below:

   i.  <u>Initial Report</u>.  EY shall submit to the Commission staff a written report within 270 calendar days of the entry of this Order setting forth (i) a complete description of the Channel 1 Pursuit Policies and Procedures and related remediation efforts to date, including, but not limited to the areas of, EY implementation, monitoring, testing, and oversight; (ii) an assessment as to whether EY's Channel 1 Pursuit Policies and Procedures are reasonably designed to detect and provide reasonable assurance of compliance with the independence, conflict of interest, ethics, and integrity requirements under applicable Commission and PCAOB regulations; and (iii) a narrative description of any instances of non-compliance from the date of the Order through the date of the Initial Report. EY may extend the time period for issuance of the Initial Report with prior written approval of the Commission staff.

   ii.  <u>Final Report</u>. EY shall undertake and submit to the Commission staff one follow-up review, incorporating any comments provided by the Commission staff on the previous report, to further test, monitor, and assess whether its Channel 1 Pursuit Policies and Procedures are reasonably designed to detect and provide reasonable assurance of compliance with the independence, conflict of interest, ethics, and

17

integrity requirements under applicable Commission and PCAOB regulations. The Final Report shall also include a narrative description of any instances of non-compliance from the date of the Initial Report through the date of the Final Report. EY shall complete the Final Report no later than 640 days after the entry of this Order. EY may extend the time period for issuance of the Final Report with prior written approval of the Commission staff.

iii.   Review and Supervision: The Initial Report and Final Report shall be reviewed by the U.S. Director of Professional Practice Quality & Regulatory Matters and supervised by the U.S. Director of Quality Implementation , senior professionals knowledgeable and experienced in the areas of independence, conflict of interest, ethics, and integrity requirements under applicable Commission rules and PCAOB standards, The Commission staff may make reasonable requests for further evidence of compliance, and EY agrees to provide such evidence.

d.   Certification.  Within thirty (30) days of issuance of the Final Report, the EY U.S. Vice Chair – Assurance shall certify, in writing, compliance with the undertakings set forth above. The certification shall identify the undertakings, provide written evidence of compliance in the form of a narrative, and be supported by exhibits sufficient to demonstrate compliance. The Commission staff may make reasonable requests for further evidence of compliance, and EY agrees to provide such evidence.

e.   Submissions to the Commission Staff: Unless otherwise directed by the Commission staff, all Reports, Certifications, supporting materials and other documents required to be provided to the Commission shall be sent to: James Valentino, Senior Counsel, Division of Enforcement, Securities and Exchange Commission, 100 F Street, NE, Washington, DC 20549-5631, or such other address as the Commission may provide, with a copy to the Office of Chief Counsel of the Enforcement Division (the "Designees").

All such Reports, Certifications, and other documents submitted by EY likely will include confidential financial, proprietary, competitive business or commercial information. Public disclosure of the Reports could discourage cooperation, impede pending or potential government investigations or undermine the objectives of the reporting requirement. For these reasons, among others, the Reports, Certifications, and other documents, and the contents thereof, are intended to remain and shall remain non-public, except (1) pursuant to court order, (2) as agreed to by the parties in writing, (3) to the extent that the Commission determines in its sole discretion that disclosure would be in furtherance of the Commission's discharge of its duties and responsibilities, or (4) is otherwise required by law.

18

f.   Satisfaction of Undertakings. Unless otherwise notified by the Division of Enforcement, these undertakings are deemed satisfied ninety (90) days after EY's submission of certification of compliance pursuit to Paragraph 60.d, as appropriate.

g.   Recordkeeping. EY shall preserve and retain all documentation regarding all certifications and reports for seven (7) years and will make them available to the staffs of the Commission or the PCAOB upon request.

h.   Deadlines. For good cause shown, the Commission staff may in its sole discretion extend any of the procedural dates relating to the Undertakings. Deadlines for procedural dates shall be counted in calendar days, unless otherwise specified. If the last calendar day falls on a weekend or a federal holiday, the next business day shall be considered to be the last day.

i.   Petition to Reopen Matter. In determining whether to accept EY's Offer, the Commission has considered these undertakings. EY agrees that if the Division of Enforcement believes that EY has not satisfied these undertakings, Commission staff may petition the Commission to reopen the matter to determine whether additional sanctions are appropriate.

## IV.

In view of the foregoing, the Commission deems it appropriate to impose the sanctions agreed to in Respondents' Offers.

Accordingly, it is hereby ORDERED, effective immediately, that:

A.   Respondents EY, Herring, and Young shall cease and desist from committing or causing any violations and any future violations of Rule 2-02(b) of Regulation S-X, Sections 13(a) and 14(a) of the Exchange Act, and Rules 12b-20, 13a-1, 13a-11, 13a-13, and 14a-9 promulgated thereunder.

B.   Respondent Fochtmann shall cease and desist from committing or causing any violations and any future violations of Rule 2-02(b) of Regulation S-X.

C.   Respondent EY is hereby censured.

D.   Respondent EY shall comply with the undertakings enumerated in Section III, Paragraph 60 above.

E.   Respondents Herring, Young, and Fochtmann are denied the privilege of appearing or practicing before the Commission as accountants.

19

F.       After 3 years from the date of this Order for Herring, after 2 years from the date of this Order for Young, and after 1 year from the date of this Order for Fochtmann, Respondents Herring, Young, and Fochtmann may separately request that the Commission consider each of their reinstatements by submitting an application (attention: Office of the Chief Accountant) to resume appearing or practicing before the Commission as:

1.       a preparer or reviewer, or a person responsible for the preparation or review, of any public company's financial statements that are filed with the Commission (other than as a member of an audit committee, as that term is defined in Section 3(a)(58) of the Securities Exchange Act of 1934). Such an application must satisfy the Commission that Respondent's work in his practice before the Commission as an accountant will be reviewed either by the independent audit committee of the public company for which he works or in some other acceptable manner, as long as he practices before the Commission in this capacity; and/or

2.       a preparer or reviewer, or a person responsible for the preparation or review, of any public company's financial statements that are filed with the Commission as a member of an audit committee, as that term is defined in Section 3(a)(58) of the Securities Exchange Act of 1934. Such an application will be considered on a facts and circumstances basis with respect to such membership, and the applicant's burden of demonstrating good cause for reinstatement will be particularly high given the role of the audit committee in financial and accounting matters; and/or

3.       an independent accountant.

Such an application must satisfy the Commission that:

(a) Respondent, or the public accounting firm with which he is associated, is registered with the Public Company Accounting Oversight Board ("Board") in accordance with the Sarbanes-Oxley Act of 2002, and such registration continues to be effective;

(b) Respondent, or the registered public accounting firm with which he is associated, has been inspected by the Board and that inspection did not identify any criticisms of or potential defects in the respondent's or the

firm's quality control system that would indicate that the respondent will not receive appropriate supervision;

(c) Respondent has resolved all disciplinary issues with the Board, and has complied with all terms and conditions of any sanctions imposed by the Board (other than reinstatement by the Commission); and

(d) Respondent acknowledges his responsibility, as long as he appears or practices before the Commission as an independent accountant, to comply with all requirements of the Commission and the Board, including, but not limited to, all requirements relating to registration, inspections, concurring partner reviews and quality control standards.

G.    The Commission will consider an application by Herring, Young or Fochtmann to resume appearing or practicing before the Commission provided that his state CPA license is current and he has resolved all other disciplinary issues with the applicable state boards of accountancy. However, if state licensure is dependent on reinstatement by the Commission, the Commission will consider an application on its other merits. The Commission's review may include consideration of, in addition to the matters referenced above, any other matters relating to Herring, Young, or Fochtmann's character, integrity, professional conduct, or qualifications to appear or practice before the Commission as an accountant. Whether an application demonstrates good cause will be considered on a facts and circumstances basis with due regard for protecting the integrity of the Commission's processes.

H.    Respondent EY shall, within ten (10) days of the entry of this Order, pay a civil money penalty in the amount of $10,000,000 to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury, subject to Exchange Act Section 21F(g)(3). If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. §3717.

I.     Respondents Herring, Young, and Fochtmann shall, within ten (10) days of the entry of this Order, each pay a civil money penalty in the amount of $50,000, $25,000, and $15,000, respectively, to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury, subject to Exchange Act Section 21F(g)(3). If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. §3717.

J.     Payment must be made in one of the following ways:

21

(1)    Respondents may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

(2)    Respondents may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

(3)    Respondents may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

> Enterprise Services Center
> Accounts Receivable Branch
> HQ Bldg., Room 181, AMZ-341
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying as appropriate either Ernst & Young LLP, Herring, Young, or Fochtmann as a Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Tracy L. Price, Esq., Deputy Chief, FCPA Unit, Division of Enforcement, Securities and Exchange Commission, 100 F St., NE, Washington, DC 20549-5631.

K.    Amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Respondents agree that in any Related Investor Action, EY, Herring, Young, and Fochtmann shall not argue that they are entitled to, nor shall they benefit by, offset or reduction of any award of compensatory damages by the amount of any part of Respondents' payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Respondents agree that they shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the Securities and Exchange Commission. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against any of the Respondents by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

**V.**

It is further Ordered that, solely for purposes of exceptions to discharge set forth in Section 523 of the Bankruptcy Code, 11 U.S.C. §523, the findings in this Order are true and admitted by Herring, Young, and Fochtmann, and further, any debt for disgorgement, prejudgment interest, civil penalty or other amounts due by Herring, Young, or Fochtmann under this Order or any other judgment, order, consent order, decree or settlement agreement entered in connection with this proceeding, is a debt for the violation by Herring, Young, or Fochtmann of the federal securities laws or any regulation or order issued under such laws, as set forth in Section 523(a)(19) of the Bankruptcy Code, 11 U.S.C. §523(a)(19).

By the Commission.

Vanessa A. Countryman
Secretary