M77ClocC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UA LOCAL 13 & EMPLOYERS GROUP
INSURANCE FUND, Individually
and on Behalf of All Others
Similarly Situated,

                Plaintiff,

          v.                          19 Civ. 10161 (LLS)

SEALED AIR CORPORATION, and
WILLIAM G. STIEHL,

                Defendants.

------------------------------x
                                      New York, N.Y.
                                      July 7, 2022
                                      2:46 p.m.

Before:

                    HON. LOUIS L. STANTON,

                                      District Judge

                          APPEARANCES

ROBBINS GELLER RUDMAN & DOWD LLP
     Attorneys for Plaintiff
BY:  ROBERT D. GERSON
     ROBERT M. ROTHMAN

HOLWELL SHUSTER & GOLDBERG LLP
     Attorneys for Defendant Sealed Air Corporation
BY:  VINCENT G. LEVY

M77ClocC

(Case called)

(Appearances noted)

THE COURT:  What you've just done convinces me that the rule, the current rule about masks and COVID is that people who are speaking don't have to wear masks.  That's a wise rule because I couldn't hear what you were saying.  So I think we better proceed by, whoever is speaking, doing it from the lecturn where we've got a solid mic and without a mask, unless you would prefer to wear a mask, and if you do, that is honored and you're free to do it, it's entirely up to you, but you are free to take it off.  Also, when you are speaking, as you have noticed, I do.

Please be seated, anybody who doesn't want to stand.

I've read your submissions and I think that the nature of the questions raised and the timing of the action, the stage of the action that we're at, the best way to proceed this afternoon is first getting straight some of the basic facts in the case, which have not really been enunciated for a long time, if ever, and so I would like to get the plaintiff's understanding.

Who is going to be speaking for the plaintiff?

MR. GERSON:  I will, sir, Robert Gerson from Robbins Geller.

THE COURT:  Mr. Gerson?

MR. GERSON:  Yes.

THE COURT:  Yes, take the lecturn and start by telling me why was Ernst & Young fired?

MR. GERSON:  Why was Ernst & Young fired, your Honor?  Sure.  So, Ernst & Young was fired as a result of an audit committee investigation that was conducted by Sealed Air in the year 2019, which looked into the process by which they had been retained in 2014.

As we've noted in other filings, your Honor --

THE COURT:  Mr. Gerson, let me rephrase my question.  I'm sorry it wasn't clear.  Why was Ernst & Young fired?  Why were they fired?

MR. GERSON:  Ernst & Young was fired because they were retained by Sealed Air via process that was entirely rigged.  At the time they were retained, the chief accounting officer of the company and certain partners from Ernst & Young --

THE COURT:  You're talking about Mr. Stiehl?

MR. GERSON:  Yes, Mr. Stiehl, correct.

THE COURT:  Okay.

MR. GERSON:  Were, for lack of a better term, in cahoots with respect to the RFP, the request for proposal process.  Mr. Stiehl shared confidential information that had been given to Sealed Air by the other firms, supposedly partaking in what they later termed falsely to investors of the company, a competitive process.

In the limited documents that we've seen and the

M77ClocC

explicit findings made by the Securities and Exchange Commission in 2021, Mr. Stiehl shared these confidential materials and did whatever he could to make sure that Ernst & Young was victorious, and when this caught the attention of the SEC, a subpoena was issued to Sealed Air for documents concerning the process by which Ernst & Young was retained and the audit committee, Sealed Air's own audit committee commenced an investigation and quickly thereafter terminated Ernst & Young based on what they had found.

I must note, your Honor, part of the reason why we have written to the Court for today's conference is that defendants are yet to produce any documents from that audit committee investigation.  All we know as to why they were fired is largely coming from the SEC's explicit findings, and your Honor ruled on April 15th that the admissibility of those orders is going to be reserved for a later date.  So that is why, in part, we are here today.

THE COURT:  Yes, I've read your submissions.

How did the defendant find out about these communications between Mr. Stiehl and Ernst & Young?  Was the first indication of it in the subpoena from the SEC?

MR. GERSON:  Well, your Honor, to be quite clear, we don't know because we don't have the documents.  As we stand here before you today, the defendants have produced 3,406 documents, and it's a sprawling class action --

M77ClocC

THE COURT:  Mr. Gerson, I'm asking for your information.

MR. GERSON:  My information.  I do not know that --

THE COURT:  Your information as of today.

MR. GERSON:  As of today, I do not know because that subpoena was issued in the year 2019.  As of today, neither Sealed Air nor Mr. Stiehl have produced a single piece of paper that was generated in the year 2019.

THE COURT:  Yes, I understand that's your position.

What was the nature of the information that was being transferred?  You describe it as a proposal.  What information was being transferred between Stiehl and Young that required both to be fired?

MR. GERSON:  Sure.  So the type of information that was being transferred was confidential information from the other participants, that's one bucket.  So, for example, in the summer of 2014, Sealed Air issued a formal request for proposal to retain a new auditor for their fiscal year ending in 2015, and that was given out to several accounting firms and there were about four or five participants.  So when it came time for the different accounting firms to submit their proposal of how they were going to do the work and whatnot and what fees they were going to charge, which partners were going to work on that case -- very confidential stuff, very technical --

THE COURT:  You mean participants in the process of

hiring a new accountant?

MR. GERSON:  Correct.  Correct, your Honor.

THE COURT:  I see.

MR. GERSON:  So the limit --

THE COURT:  That clears it up.  And he was conveying the information about the reactions --

MR. GERSON:  Not only the reactions, your Honor, the submissions.  From the limited documents that we would see, he would get an email, for example, from PricewaterhouseCoopers and forward it from his iPad to the gentleman at Ernst & Young, sometimes within hours, the confidential information of what the other accounting firms were going to do --

THE COURT:  What about the other candidates for the accountant --

MR. GERSON:  That's correct.  And according to the Securities and Exchange Commission and the orders, Mr. Stiehl even went so far as to delete expense numbers for the final two candidates.  It was down to Ernst & Young and KPMG.  He went so far as to delete numbers in their proposal so they would come in and have a lower bid.  And again, we recognize that your Honor has ruled that the admissibility of those findings are for a later date in this case, but that's what we know from the SEC filings, but that's not what we know yet from the documents which the defendants have not given us.

THE COURT:  And Sealed Air learned of this because of

M77ClocC

the SEC subpoena which wanted to learn more about what the order committee was doing in this respect; is that correct?

MR. GERSON:  Well, your Honor, again, frankly, we do not know the answer to that.  But what I do know is that there are some documents that I have seen where, at the time a woman named Carol Lowe, who was the chief financial officer at the company, was involved in some of this process with Mr. Stiehl.  So it is not entirely clear when they learned it or what they learned, but to some of the limited documents that we have seen do indicate that Ms. Lowe was also involved in this process with Mr. Stiehl.  Again, she was the chief financial officer at the company at the time this was taking place.

THE COURT:  My question is really about how did they learn of it.  I take it that it was connected to the subpoena.

MR. GERSON:  It very well might be the case, but to use some colloquial terms, we have not gotten under the hood yet, your Honor.  There are so many documents that remain outstanding.

THE COURT:  Have you ever seen the subpoena?

MR. GERSON:  No.  In fact, we asked your Honor for the subpoenas at an earlier date.

Your Honor, we don't know if the SEC raised these issues with the company or if someone at the company raised it with the SEC.  We don't know that one way or the other yet.

THE COURT:  I see.  When was the decision to fire

Ernst & Young made, do you know?

MR. GERSON:  I do.  It was in August of 2019.

THE COURT:  That was because of the report of the audit committee?

MR. GERSON:  That's correct.  The audit committee determined -- in fact, according to the SEC findings, the audit committee, quote, unanimously determined to fire both Stiehl and Ernst & Young, but we have not seen any documents showing that unanimous termination.  There appears to be some board resolution.  We have not seen any documents relating to that investigation, which was clearly encompassed by your Honor's April 15th order.

THE COURT:  But you're satisfied that it was the decision of the audit committee that directly resulted in the firing of Ernst & Young, and ultimately Stiehl?

MR. GERSON:  I'm sorry, your Honor.  That appears to be the case, but again, I can't answer definitively until I see the documents.

THE COURT:  Yes, I understand that road to answer to the question.  Thank you.

What is your information about what happened between Sealed Air and the SEC in this respect after Sealed Air responded to the subpoena?  Was it dropped or pursued?

MR. GERSON:  Sure.  So the there were two subpoenas. The subpoena we are talking about right now was from the year

M77ClocC

2019, and the SEC's investigation continued on till August 2nd of 2021 where the SEC made explicit findings that Ernst & Young was hired pursuant to an effectively rigged process where they found that two of the very same statements that we have at issue in our case were false, were unquestionably false because that process was, in fact, not competitive.  But as far as the back and forth and the ins and outs, again, your Honor, we don't have a single piece of correspondence between the company and the SEC.

THE COURT:  I see.  But it is an explicit finding in the SEC findings?

MR. GERSON:  Yes, your Honor.

THE COURT:  I see.  But you've seen none of the documents between the SEC and Sealed Air in this matter?

MR. GERSON:  That's correct.  To be clear, what we have seen are --

THE COURT:  You've seen the findings?

MR. GERSON:  We've seen the findings and we've seen certain handpicked, if you will, emails from the year 2014.  So five years before the SEC subpoena we're talking about took place.  We've seen some emails taking, you know, that at the time of some of the conduct that we're discussing here, but in terms of the investigation or any back and forth between the company and the SEC, the number, your Honor, is zero, zero documents.

M77ClocC

THE COURT:  Mr. Levy, tell me about the questions that were put to you by Mr. Gerson and your responses to them in this respect, in this narrow respect, that is to say the SEC's interest in the hiring of Ernst & Young and what followed from that.

MR. LEVY:  Well, from our perspective, the plaintiffs have made document requests, which we complied with, and the Court entered an order that we've also complied with, and then they ask to extend the schedule.  So we did not receive --

THE COURT:  How did you comply with it?  Did you furnish them the documents?

MR. LEVY:  We did.

THE COURT:  What documents did you furnish them with?

MR. LEVY:  We furnished them with over three thousand documents.  Those documents consist of documents that are responsive to the document requests --

THE COURT:  Excuse me.  What documents did you furnish them with?

MR. LEVY:  Well, they include all the documents that were provided by the company to the SEC that relate to the retention process of Ernst & Young.  So the documents that my friend on the other side cited that are referenced in the SEC order were provided to them.

THE COURT:  In other words, the subpoena and the response?

M77ClocC

MR. LEVY:  The subpoena was not provided because they moved to compel that production and your Honor denied that request and said the subpoena was a fishing expedition and ordered us to produce a narrower set of documents.

THE COURT:  I think that's correct.

MR. LEVY:  Which we complied with.  In fact, we had complied with the Court's order --

THE COURT:  But your complete response was furnished to the SEC.

MR. LEVY:  I'm sorry, your Honor.  I didn't catch the first part of your question.

THE COURT:  It's correct that your complete response to the subpoena was furnished, a copy was furnished to the plaintiff.

MR. LEVY:  As your Honor will remember from the last conference, the SEC was investigating a number of matters, and what we provided to the plaintiffs was our complete response to the SEC as regards the issues that matter in this case and that are set forth in the SEC's order from August of 2021 that my friend was quoting to you.

THE COURT:  And those were presumably the basis for the SEC's conclusions?

MR. LEVY:  They were, your Honor.  They're cited in the order.

THE COURT:  How much other communication back and

forth between Sealed Air and the SEC took place in respect of this matter?

MR. LEVY:  Well, there were additional documents produced in response to subpoenas that do not relate to the issues in this case.  In terms of what was provided --

THE COURT:  My understanding, because you might have had other things going on with the SEC?

MR. LEVY:  Right.

THE COURT:  I'm concerned only with the issues in this case, which is the ones that deal with Ernst & Young and Stiehl.

MR. LEVY:  Right.  To my understanding, that was all provided to the plaintiffs, all the documents that we have that are in written form that are --

THE COURT:  What's the source of your understanding?

MR. LEVY:  I did not, myself, conduct the review of the documents.  I had the lawyers who work with me, and it is based on due inquiry with those lawyers.  We reviewed the set of documents provided to the SEC.  For those documents that relate to the subject matter of this dispute, the plaintiffs have not identified a document that is referenced by the SEC in its order that we did not provide to them.  If they do so, we will take a look to see if we have inadvertently missed something.  But our intention and what my belief is sitting here today is that we have provided them with the nonprivileged

M77ClocC

documents that exist, that are in our possession, that were provided to the SEC that relate to the subject matter of this case.

I'm looking at my colleague in case he wants to correct anything I said

THE COURT:  -- such a gulf between you and Mr. Gerson about what was supplied.  It seems, to me, it's a simple matter of fact.

MR. LEVY:  I believe the basic dispute is more about the schedule and the fact that no deposition had been noticed by them, even though they've known about the facts for many, many months, because the SEC orders were issued or consent decrees between Mr. Stiehl --

THE COURT:  No.  The fact I'm talking about, I'm now dealing with what was furnished to him.  He says he got none of these documents.  Do you not --

MR. GERSON:  Your Honor, again, we received certain emails that seem to have been provided -- that were provided to the SEC from the year 2014.  We don't have, for example, any correspondence with the SEC, anything from the audit committee. It's audit committee report.  Again, the audit committee are the folks who determined to fire Mr. Stiehl and Ernst & Young in 2019.  Zero documents, no wells submission, no deposition transcripts or exhibits.  Again, wherein Sealed Air presented its own version of the facts, nothing regarding the Department

M77ClocC

of Justice investigation, it's another part of this case.  They received a criminal subpoena, nothing on that end, nothing relating in any way to Mr. Stiehl's firing or Ernst & Young's firing, not even a document advising that either they had been fired or a board resolution.

THE COURT:  This is in your letter and you've already told it to me at least once this afternoon, but what is your answer to it?

MR. LEVY:  We've provided the documents that are responsive to the document requests that they served upon us, and until this letter was filed seeking extension, they did not write to us or ask us about these documents.  There is no motion to compel that was filed.  It's fine to send a letter, but many of these documents don't exist.  For example, and it's in our letter, I know you've read it, we don't have deposition transcripts from the SEC.  There is, to my knowledge, no written audit committee material that is nonprivileged that relates to the firing of Mr. Stiehl or EY.

Moreover, the fact, I should add, that those materials are not --

THE COURT:  You say that it's known privilege.

MR. LEVY:  I'm unaware of privileged written material either.  My understanding is it was done orally.

THE COURT:  Well, initially, I directed my questions to Mr. Gerson because I wanted to find out how much he was able

M77ClocC

to learn from what you gave him, and it has obvious gaps in it.

Now, why is that?

MR. LEVY:  First of all, it doesn't seem that there are gaps as regard the subject matter of the disclosure, which is that what matters in this case.  Mr. Gerson was able to recite chapter and verse what occurred.  What he's saying, he's not sure is about the process of firing EY and Mr. Stiehl.

The reason there are gaps is because Mr. Gerson, for eleven months, hasn't tried to get that discovery, has not noticed a deposition.  We were before your Honor in September or October of this past year on a stipulation where they identified the witnesses they wanted to depose.  We agreed that the depositions would be done by May.  They've done nothing. The reason that he does not know is because he did not ask, and that is not a reason to extend the discovery schedule.

THE COURT:  I invite both of your attention to the language of our April 15 order, which has been more than most of my orders misconstrued and distorted to meet the temporary needs of counsel, but I revert to the actual text.  It doesn't mention depositions, it doesn't mention documents, it makes no directions with respect to either.  Although, as I say, that when inferred by counsel, it does something completely different and I feel, more important, it deals with information.  It says defendant shall disclose to plaintiffs, in full, the information which led to the investigation of the

M77ClocC

selection of Ernst & Young as the firm and the information learned by that investigation and the information on which the termination of the employment was based.

Now, the fact that the phrasing of Mr. Gerson's discovery requests weren't phrased to elicit that particular information does not impress me at all because it isn't what I care about. What I care is that he be informed about the nature of case and the facts.

What is your response to that?

MR. LEVY: Your Honor, we treated your Honor's order as imposing an additional obligation beyond the requests. So if I misspoke and suggested otherwise, I very much apologize. We provided those documents that do include all of this information that is responsive to your Honor's order. So the information is included in emails, contemporaneous emails and was provided to the plaintiffs. In other words, the plaintiffs have the underlying contemporaneous material --

THE COURT: That's the emails that Mr. Gerson's been referring to, between you and him or between who and who?

MR. LEVY: They have the emails, for example, between Mr. Stiehl and EY that he was explaining. Those emails are among the information which is responsive to each of the topics in your Honor's order. So we've provided the documents that show that information.

THE COURT: Did the audit committee render a written

M77ClocC

report to the board of directors?

MR. LEVY:  I am not aware of one.

THE COURT:  You're not aware of yes or no, or you're not aware that it did?

MR. LEVY:  It is my understanding, based upon due inquiry, that there is no written report and no written finding of facts that would illustrate these issues or that would bear on these issues.

THE COURT:  What communications were made between the audit committee and the members of the board of directors?  All oral?

MR. LEVY:  I have to check that, your Honor.

THE COURT:  On what basis did the board of directors vote?

MR. LEVY:  Usually, boards meet in person and in this case, the audit committee had attorneys.  The attorneys gave oral reports, there were certain documents that were shared, those documents have all been provided to the plaintiffs because they are historical documents.  So the information that we had and that we located in written form was provided to them.  We have not provided an email of counsel, internally within counsel discussing these issues, for example.  I don't think that is responsive, but the information that is called for by your Honor's order was provided.

THE COURT:  Now, with respect to the firing of

Mr. Stiehl, there were some further procedures gone through before that was done.

MR. LEVY:  Well, my understanding is they were conversations, but none of them bear on the issues in the case. The information upon which the termination was based, which is what your Honor required, what your Honor's order called for was provided to the plaintiffs.  It's also reported in the disclosure that is set forth in the plaintiff's complaint and it is also described in the SEC order.  So, again, they've had this information for nearly a year.

THE COURT:  Mr. Gerson, what about that?

MR. GERSON:  So a few responses to that, your Honor.

First, in our opening letter, dated January 31st, we explained that we were coming to the Court knowing the fact discovery window was set to close in June of 2022.  We were concerned that --

THE COURT:  I'm not talking about the fact window, I'm talking about what you know about the case from your investigation of the case so far.

MR. GERSON:  So our investigation of the case so far is that we have a handful of emails from the year 2014.  Sealed Air is a major publicly traded company.  We find it hard to believe that not a single written record exists regarding the terminating, the firing of its chief financial officer or the firing of its auditor, both of which were the product of an

internal audit committee investigation.  And our request, very clearly, asked for these -- we, of course, view this with respect to the noncompliance with your Honor's April 15th order, which is clear, but also, we clearly requested all of this information from the defendants in our document requests. We just have not received it.  I mean, there has to be a board resolution firing the auditor.  This is not sort of a mom-and-pop shop.  There is simply no way that there is no written record about the termination of the auditor at the board of directors level of this company.  They're saying there is no correspondence about meetings, about things to discuss inside the company, about firing the chief financial officer. This isn't some person off in some satellite factory, this is one of the heads of the entire company.

So, it is quite clear, and even as I mentioned earlier, the SEC noted in their findings, Mr. Levy said that there is no documents that we cite that were missing.  Of course we don't know all of them because we'd have to guess, but it says in the SEC findings on paragraph 34, this is of the Mr. Stiehl order that, quote, in June 2019, after audit committee discovered RFP-related conduct, issuer, meaning Sealed Air's audit committee, quote, unanimously terminated Stiehl's employment for cause.  Unanimously terminated.  How did the SEC find that out?  That's got to be documented somewhere.  It's just simply shocking to us that not a single

M77ClocC

piece of paper exists regarding all these critical events that were ongoing at this company in the year 2019 and thereafter.

THE Securities and Exchange Commission's investigation into this company went on for another two years, and both sets of defendants, that is Mr. Stiehl and Sealed Air separately, are saying they don't have a single copy of any piece of paper, of anything that took place, no definitions, no exhibits, no correspondence, and importantly, Mr. Stiehl was fired from Sealed Air in 2019 and the investigation continued for another two years.  So we find it hard to believe that he has no unique documents.

THE COURT:  And with that state of affairs, you didn't immediately start taking depositions of the witnesses, saying what's going on here and what is happening and what happened then?

MR. GERSON:  Well, your Honor --

THE COURT:  You simply waited?

MR. GERSON:  Your Honor, at the February 18th hearing, your Honor posed a question to my colleague, Mr. Rothman, when he was expressing his concern of the deadline, and you said, quote, why not wait until the end of the process, meaning the document production process, and then evaluate where you stand and what you need.  We made clear our concern of the June 30 fact discovery deadline, nonetheless we abided by your Honor's guidance.

THE COURT:  I wasn't preventing you from taking depositions.  I just thought that you might gather some more information.  But when you did not and were unable to, you simply waited?

MR. GERSON:  Well, your Honor, to be clear, we didn't have their last set of documents until June 14th.  So that's when they said they first complied.  It's the first indication we had of compliance with the order.  We received 675 documents at 10:55 p.m. on June 14th.  By the afternoon of the 16th, we had reviewed all of those documents, determined that they had not complied with the order or our document request, and immediately sent defendants a stipulation proposing an extension.

THE COURT:  What's in those 675 pages?

MR. GERSON:  What's in those documents, they're essentially more of the same of other documents.  They're from the year 2014, largely, some back and forth between some other folks, but a bit more general on RFP process or internal emails on timing and some folks that worked on the RFP process with Mr. Stiehl.  Nothing that really moves the ball on our end and nothing that sheds light at all about what happened after, what happened at other moments during the class period, that is leading up to the year 2019 or leading up to what happened thereafter through the conclusion of the SEC's investigation.  There is no documents about any of those events that have been

M77ClocC

given to us.

Again, your Honor, the plaintiff in this case has produced more pages of materials than the defendants, and frankly, I've never seen that in the years that I've been doing class actions.  We produced more pages of materials than defendants in a five-year class period with multiple government investigations, with both sets of defendants taking the position that they don't have any documents to give to us from those investigations.

THE COURT:  I think we're drifting off the point.  My suggestion to you that you wait and see if you got some more production had nothing to do with the taking of a deposition.  The picture of the documents that you had and the simplicity of the case, and with that, you don't go to the participants in the case and put to them the questions I put to you, why did you fire Ernst & Young and get their answer.  What did the audit committee do, get their answer.  What records of it was made, get their answer.  But no, you all expect it to drop into your lap by asking for documents.  This isn't the action of a trial lawyer.

MR. GERSON:  Your Honor, we frankly didn't have the universe of folks of whose depositions we needed to take because we don't know who all the players are yet.  We have a small handful of documents.  Again, your Honor, there are --just to reiterate one other point here --

M77ClocC

THE COURT:  You get a 30(b)(6) witness.

MR. GERSON:  I'm sorry, your Honor?

THE COURT:  There is no problem finding out who was on the board, who was on the committee.

MR. GERSON:  Understood, your Honor.

THE COURT:  Simply, that is not beyond the reach of your firm.

MR. GERSON:  Your Honor, we did not feel it was appropriate to schedule depositions until we had an adequate record without these gaping holes that we've been describing to your Honor, including for the fact --

THE COURT:  The purpose of the deposition is to find out what's in the gaps between the documents, not to wait and hope that they'll be filled in by some external benefactor.

MR. GERSON:  Your Honor, it is our position that it is the most basic of documents that are still outstanding and still not produced to us, and certainly prejudiced the plaintiffs in trying to have to take these depositions without those basic materials that we've asked for in our document requests.

THE COURT:  I think your concept of how an officer in a corporation is fired is that it is surrounded by great many more documents than, in fact, usually takes place.  It's usually all oral or all but the most trivial or most important documents.  But the trial lawyer asks what happened.  When you

saw this, what did you say to somebody else.  No, not done, not even conceived, deferred until the documentary picture might be more complete.  This is a novel way to practice law.  I know it's been the direction of the bar, but it's an extreme -- what is the fear of taking the deposition and getting the facts, even though you don't have the letters that may pin the witness to something concrete?

MR. ROTHMAN:  Your Honor, may I help for a second?

THE COURT:  Surely.

MR. ROTHMAN:  Thank you, your Honor.  The fear is that we would not have the information to effectively cross examine the witness at a deposition if he gave us something that was contradicted by the documents.  And when your Honor ordered them to produce the documents, we were waiting for them to comply with that order so we would have those documents to effectively cross examine those witnesses.

THE COURT:  But if you have the witness testimony under oath and you find a document that contradicts it, you'll have very little problem either cross examining him at trial between the discrepancy in the letter and his testimony, or getting a continuation of the deposition to give him a chance to explain, whichever you want, but it won't extinguish either his first answer or the contradicting letter.

MR. ROTHMAN:  Respectfully, your Honor, sometimes it's not as easy to call a witness back for a second deposition if

they've already been deposed once and another document is produced and, in light of the Court's order, ordered them to produce those documents.  We believe it was prudent to wait for their production, which didn't come until the middle of June. And we wrote to the Court two days thereafter or we wrote to the defendants two days thereafter.

THE COURT:  Your belief that it was prudent, it was, in fact, very hazardous because you never got around to it.

MR. ROTHMAN:  We never got the documents.  I wouldn't say we never got around to it.  But I understand, in hindsight, what your Honor is saying.  But we thought, in light of the Court's order, we thought it would be prudent to wait to get the documents that the Court ordered the defendants to provide and then figure out which witnesses we would want to depose based on the names that were set forth in those documents. We'd also want the opportunity to have those witness authenticate the documents so that we could use them at trial.

THE COURT:  You've heard my views on that.

MR. ROTHMAN:  We have, your Honor.

THE COURT:  And now you want to come in and take depositions and extend the process of preparing a case for about six months, you found the nerve to put that forward?

MR. ROTHMAN:  Your Honor, obviously, we will be guided by whatever schedule the Court sets.

THE COURT:  Excuse me?

M77ClocC

MR. ROTHMAN:  I said obviously we'll be guided by whatever schedule the Court sets and we will finish everything we need to do within that time period.

THE COURT:  You will not be guided, you will be controlled.  My orders are not prefatory.  If they use the word information, they mean information.  If they use the word deposition, they mean deposition.  That's the way they should be read and applied.

MR. ROTHMAN:  Your Honor, that's the exact reason why we came to the Court, wrote to the Court in January of this year, had the hearing with the Court in February of this year, and that's when your Honor told us that the schedule could be changed with the stroke of a pen.  So we're really trying to be guided by your Honor's words.  I understand now in hindsight how we may have misinterpreted them, but in light of the fact that we came to the Court at the first sign of struggle in this case and the Court issued an order for the defendants to produce documents, defendants then waited 60 days before they produced any of the documents in response to the order and we came to the Court immediately thereafter.

THE COURT:  But your vision is confined to documents. You could be given information by your adversary in a letter or an email or a telephone conference, there are all kinds of ways that information about the facts in a case can be obtained and transmitted by grownup lawyers.

M77ClocC

MR. ROTHMAN:  I understand that, your Honor.

THE COURT:  None done, please give us more time.  You fear trying this case.  It's a simple case, it's just dry.

MR. ROTHMAN:  Your Honor, we don't fear trying this case.  In fact, part of the reason why we did wait is because, in February, we had a discussion with the Court about the admissibility of the SEC orders, which would have made our job much easier.  In April, the Court ruled that there was going to be no decision made about that and, therefore, we needed to pursue the discovery in a different manner.

THE COURT:  When the lawyer who has taken the deposition of the witness and gotten his or her testimony on the record about whatever facts were required to be established, when that lawyer in a later discovery of documents discovers one that contradicts what the witness said, it is not an occasion for melancholy.  It's a thrilling moment of high pleasure.

MR. ROTHMAN:  I've experienced that, your Honor. Thank you.

THE COURT:  I think we should probably at least consider the class dates question, because otherwise it will continue to tantalize.

It seems to me that the opening date for the class should be the day in August 2019 when it became clear to the defendant that Ernst & Young had to be fired.  At that point,

SOUTHERN DISTRICT REPORTERS, P.C.••
(212) 805-0300

M77ClocC

it became, as it were, a fact and action had to be taken, and they are chargeable with the full knowledge of that fact.  It's hard to say that, from then on, they weren't violating whatever disclosure of that fact the law required.  That is not the situation that existed until that decision became obvious, it seems to me.

MR. ROTHMAN:  Respectfully, your Honor, the fact of the false statement regarding the competitiveness of the request for proposal process was known to the defendants when they first made that statement back in 2014.  At that point, Mr. Stiehl himself, the chief accounting officer of the company knew that those statements were false because he was the one that was rigging the process.  And as the Court recognized in its decision on the motion to dismiss, that's when our class period starts because his state of mind is imputable to the corporation.  So the corporation can't come out and say, this was a competitive process, when the person who was running the process knew it was not competitive.

THE COURT:  You're saying that he knew that the competitiveness of the process was false and therefore should have been disclosed at the time of the first assertion of competition?

MR. ROTHMAN:  That's correct, your Honor, or no assertion of competition should have been made.

THE COURT:  When was that?

MR. ROTHMAN:  That was in 2014.  The facts weren't learned by investors until 2019, but the company, through its chief accounting officer, knew that the facts were --

THE COURT:  What about that, Mr. Levy?

MR. LEVY:  We obviously have a dispute with the plaintiffs about the merits, but I agree on the class definition that it should run from the alleged misstatement, which, in this case, was in 2014 through the last corrected disclosure that they allege, which is in 2019, I think in August, without obviously agreeing to everything else.

THE COURT:  It's a sound point, I think.

MR. LEVY:  Thank you, your Honor.

THE COURT:  And the closing date, the date of the public announcement of the firing of Stiehl or --

MR. ROTHMAN:  It's the firing of Stiehl, your Honor.

THE COURT:  I would think so, because that's the last end of the story.

MR. ROTHMAN:  That's correct.

THE COURT:  Okay.  Then let's adopt those.

We probably put enough time on the considerations underlying the extension of discovery.  It's clear to me, as a matter of overall justice, you should have some time to take the heretofore omitted depositions.  I'll give you time and I won't give you instructions about what depositions to take or how to take them, but I will say that if that time is not used,

M77ClocC

it will be waived, and I've given you a full list of reasons why I believe that.

That being said, Mr. Levy, I'm not satisfied on today's record that -- I'm not looking at a process of bobbing and weaving between the different definitions of requests for discovery in a way that, at the end of the day, leaves gaps in the picture of the facts of the case that has been given to the plaintiff.  I say that without rank or criticism, but merely as a neutral observation, and if that is the case, I want it cured.

This is a very straightforward, very simple claim, very simple, straightforward facts, but there must have been a good deal of discussion about it among the directors of the companies involved because, while they knew it may well not create documents about it, and my guess is there were many fewer documents about it than the plaintiffs have spent this time hoping, so I take their facial count of the number of documents as, really, on the order of poppycock.

But there were probably communications, there may be emails, there usually are, and some of that may have not been disclosed.  And even beyond documents, this is a case where both sides should have the whole facts, not have to dig for them, not have to suspect them and run them down.  The whole situation has been through such a sieve of SEC and related discoveries in the related matters that did not have a full

M77ClocC

disclosure is simply stupid, and full disclosure was what I required by my order largely for that reason.  It's not a case susceptible of either attack from ambush or expecting to get away with some harmful detail, which is still not going to make much difference in the outcome.  And I want you to use the time I'm extending to satisfy that purpose, regardless of the articulation that the request for it can be confined to.

MR. LEVY:  I understand.  And we'll take another look in light of your Honor's instructions today.

It is my understanding that we did provide the information that was called for, and if we find something else, we will provide it, but we did not look at the requests in abiding by your Honor's order, we looked at the order and that's how we treated it.

THE COURT:  Good.  I'm not criticizing, be it the litigation norm, but it just doesn't fit very well in this case.  So thank you for promising the full disclosure required.

MR. LEVY:  I will say that, again, they have had the SEC's consent decrees for almost a year.

THE COURT:  What the SEC does is only a cousin of what the company did and thought and knew and decided, they are two separate things.  The SEC isn't being sued here, it's the company.  That's why a disclosure beyond what the SEC asked for or got is fair.

MR. LEVY:  We'll take another look --

THE COURT:  Now, on the schedule, we're at the end of Thursday July 7.  I'm looking at the box on page 5 of the present scheduling order.  Proposed pretrial schedule, it has these different boxes.

The deadline for the completion of fact discovery, including third-party fact discovery, fact depositions and fact discovery motions is September 30, which restores you to a free time of about almost three months.  There are not very many witnesses with any useful knowledge.  Get them and ask them questions and get what you need or satisfy yourself it isn't there.  So that's going to run consecutively with these other dates.

The expert reports, as far as I know, July 6th is fine.  Opposition experts, August 3, fine.  August 24 for rebuttal experts, fine.  Completion of experts, September 24, fine.  Deadline to supply pretrial order materials, that's changed to October 20, 2022.  The deadlines in the next box for the submission of the pretrial order, voir dire, and so forth, November 10.  Those matters properly don't require quite a lot of decision-making and careful work and 10, 20 days can be too tight for that, so I'm extending it a little bit.  But plaintiff's submission, October 20, he has plenty of time to get that together.  And the completed joint pretrial order, November 10.  That's about three weeks later.  And the final 16B conference will be November 18 at 12:00 noon.  So those

M77ClocC

will be the changed dates.

MR. GERSON:  Your Honor, if I may, I didn't want to cut you off there, but, obviously, July 6th has already taken place.

THE COURT:  I understand that.

MR. GERSON:  So if we could get a brief extension for the expert reports, just the first date, we won't change any other dates, given that was -- today is July 7th.

THE COURT:  Have you even started any experts?

MR. ROTHMAN:  Your Honor, our experts have completed reports on class certification issues --

THE COURT:  What issues are the experts going to talk about?

MR. ROTHMAN:  They're going to talk about damages, class certification issues, market efficiency.  Those reports we have ready and we're prepared to file a class certification motion with those reports --

THE COURT:  You have them ready?

MR. ROTHMAN:  Yes, we have them ready.  We can file that motion next week.

THE COURT:  What date do you want to put in here then?

MR. ROTHMAN:  For those issues, we could file our reports in a week, and our motion.

THE COURT:  That's fine.

MR. ROTHMAN:  But the other issues concerning damages

M77ClocC

and factual based expert issues about disclosure controls and auditors and things like that, we were hoping to have the benefit of the fact discovery.

THE COURT:  Yes.

MR. ROTHMAN:  So for those issues, if we can get an extension of the July 6th date.

THE COURT:  No, expert discovery is September 30.

MR. ROTHMAN:  The opening report date of July 6th was the one that concerned us.

THE COURT:  Excuse me?

MR. ROTHMAN:  The opening report date, deadline for production of expert witness reports for issues on which the parties have the burden of proof, that's currently set for yesterday.

THE COURT:  On the experts, the rebuttal reports, August 24, you can make that.

MR. ROTHMAN:  Yes, but we need a date for our opening report.

THE COURT:  For those, August 3.  If you give your basic reports within the next week or so, you can get the opposition reports in by August 3.

MR. ROTHMAN:  Your Honor, when I said next week, that was on certain issues, the class certification-based issues. The damages issues may take a little bit longer than that in terms of computing damages that the expert needs to do.

M77ClocC

THE COURT:  What do you need?

MR. ROTHMAN:  If we can have the August 24th date for that.

THE COURT:  For the expert reports?

MR. ROTHMAN:  For the expert for the damage reports and the disclosure.

THE COURT:  August 24?  Or do you mean July 24?

MR. ROTHMAN:  Well, it's July 7th, your Honor.  I frankly don't know if my expert, if he's on vacation this week.

THE COURT:  You're looking, it's currently July 8th.

MR. ROTHMAN:  Thank you, your Honor.  Can we have till August 1st?

MR. LEVY:  Your Honor, there was a deadline yesterday. None of these issues bear on the --

THE COURT:  Have you not started your experts, your damages expert?

MR. ROTHMAN:  The expert report that we have that we're prepared to file next week concerns issues of market efficiency and other class certification related issues.  It doesn't concern damages yet.

THE COURT:  If you file his basic report by the end of next week, seems to me that they can get the opposition in by August 3.

MR. ROTHMAN:  For that report --

THE COURT:  Or you can do the same with theirs.

M77ClocC

MR. ROTHMAN:  But for the damage report, we would need additional time.

THE COURT:  Which one?

MR. ROTHMAN:  For his opinion on damages, we would need additional time on class-wide damages on the price inflation on every specific day, may take him additional time. That's why we would want until August to be able to do.

THE COURT:  It's a relatively short time between the making of the decision.  I see, we're now back to the 2014.  So he's got quite a sweep of history to cover.

MR. LEVY:  Your Honor, what I don't understand is this deadline has been in the schedule since September.

THE COURT:  What considerations is the expert taking into account?

MR. ROTHMAN:  The expert on damages takes into account information that comes into the market, and what I've seen in other cases is sometimes discovery will play a large part in that because the defendants may have communicated with certain investors and linked some information into the market, and that may cause a price spike or a price decline that's not otherwise explainable by simple objective market factors that the expert would be able to determine absent discovery.

THE COURT:  Causation.

MR. ROTHMAN:  Yes, there is some causation issues.

THE COURT:  Have you got this before you, this box

SOUTHERN DISTRICT REPORTERS, P.C.••
(212) 805-0300

M77ClocC

we're talking about?

MR. ROTHMAN:  I have the box in front of me, yes, sir.

THE COURT:  Tell me your dream dates for the boxes following the top one, starting with deadline production.

MR. ROTHMAN:  So deadline production, your Honor.

THE COURT:  That's passed.  You'll do that in the next week or so.

MR. ROTHMAN:  Yes.  My dream date that I don't think the Court will have me thrown out of here for is August 6th, just a 30-day extension of the opening expert report on issues other than class certification, which we'll file next week.

THE COURT:  You'd like that to be August 24 or what?

MR. ROTHMAN:  August 6, 2022.

THE COURT:  August?

MR. ROTHMAN:  The 6th.  Six.

THE COURT:  6th?

MR. ROTHMAN:  6th, correct.

THE COURT:  Instead of 3?

MR. ROTHMAN:  I'm talking about the second box.  I'm talking about the July 6th box, to make that August 6th.

THE COURT:  You want July 6th to be August 6th?

MR. ROTHMAN:  Correct.  I apologize, your Honor.

THE COURT:  I guess the heavens won't fall.  And the opposition reports September 6.

MR. LEVY:  Your Honor, if I may, we're the ones who

M77ClocC

were getting prejudiced in this schedule because they didn't put the expert reports together in time.  August is really not a convenient time for me in light of other commitments in my other cases.  If I could have until the 15th of September if we're going to adopt, you know, for another ten days.  The schedule had been filed, their report, yesterday --

THE COURT:  -- your report.

MR. ROTHMAN:  I'm not preparing the August 6th report, the opening report, I'm preparing --

THE COURT:  Well, you're not really preparing any of them, the expert is doing that.

MR. ROTHMAN:  That's correct, your Honor.

THE COURT:  So your obligations won't be interfered with.

MR. ROTHMAN:  I'm sorry.  That's Mr. Levy.

THE COURT:  The same is true for you, isn't it?

MR. LEVY:  It is, but it's usually back and forth with the expert.  What I was suggesting was rather than the 6th or the 3rd of September, somewhere around another 10 days beyond that.

THE COURT:  Just a little later in September?

MR. LEVY:  Correct, your Honor, just to have an extra week or so at the end so if there are issues -- I'm sorry, your Honor.  I have an arbitration that is set for the beginning of September and --

THE COURT:  September 20.

MR. LEVY:  Thank you, your Honor.

THE COURT:  That's for opposition reports?

MR. LEVY:  Correct, your Honor.

MR. ROTHMAN:  Correct, your Honor.

MR. LEVY:  And then I believe the schedule had three weeks for the rebuttals?

THE COURT:  Rebuttal reports.

MR. ROTHMAN:  The schedule currently has three weeks?

THE COURT:  Three weeks.  What's that, about October 15th?

MR. ROTHMAN:  That's about right, your Honor.

THE COURT:  Let's say October 15.

MR. ROTHMAN:  The court reporter just advised us that the 15th may be a Saturday.

THE COURT:  It's a rule of law that anytime you pick a date out of the air, it's on a weekend.  October 15 is a Saturday.  Make it the 17th.  That gives you the weekend.

And expert depositions.  That really may fairly require a month, I wouldn't be surprised or shocked by that.  Let's say November 17, that's a Thursday.

MR. LEVY:  Your Honor, if I may?

THE COURT:  It seems to me with all of that work done, the pretrial order materials submitted by the plaintiffs is going to be rather easy.  Let's say October 30, gives you time

M77ClocC

to do it and I don't think it's very difficult.  If you do it and you could do it in that time.

MR. LEVY:  If I may, two issues.

THE COURT:  Excuse me?

MR. LEVY:  Two more issues, your Honor, on the schedule.  One is, I believe that the plaintiffs said they would file their class cert motion next week.  We would like some time with that, given that they will include expert report --

THE COURT:  Let's deal with that separately.  It's easy and convenient to do it separately.

MR. LEVY:  The other issue, which does bear on the pretrial materials, is we will be moving for summary judgment.  So just wanted to say that.

THE COURT:  Scheduling it is like saying to your children, don't put beans up your nose.  It excites away you're trying to prevent.

MR. LEVY:  I will refrain from doing that.

THE COURT:  Scheduling a motion is regarded as a departure from the trial schedule and should, for that reason, among many others, be discouraged.  In this case, it's really almost the equivalent of asking for a nonjury trial, not very different.

MR. LEVY:  We obviously will put in a premotion letter explaining the legal grounds.

M77ClocC

THE COURT:  And it's a good jury case.

MR. LEVY:  Right.

THE COURT:  Let's finish this scheduling and then fall back.  You see, the normal process is when the prospective movant decides he wants to move for summary judgment, he writes laying out the skeleton and there is kind of a preliminary look at it in correspondence, but mostly, it's loud.  I don't have jurisdiction to prevent people from making motions.  Then the schedule has to be reset anyway.

MR. LEVY:  So we'll abide by your Honor's practice, which I was aware of.  I just wanted to alert your Honor to the fact that we did intend to do that as the Court was setting its schedule, but we will, in due course, file a premotion letter.

THE COURT:  A good time to consider it is after the joint pretrial order has been filed because the knowledge that you want to do that affects the decision of what we're prepared to dispute and not dispute in that statement in the joint pretrial order and very much informs the decision about making a summary judgment motion.  So I would say bring it up right after that when we have that as a basis of reference.

We were up to November 17.  Pretrial order, I guess we stuck with October 20; right?

MR. GERSON:  I believe it was October 30, your Honor.

THE COURT:  Excuse me?

MR. GERSON:  I believe you said October 30, your

M77ClocC

Honor.

THE COURT:  October 30.  I think it was, yes.  Then the joint pretrial order, let's say November 21.  That's supposed to be a joint effort, collaborative, not just a summary of each side's pleadings, but input from both.  And November 21 is a Monday, that gives you the weekend.

Then the final pretrial conference is traditionally the following Friday, November 25.  That's probably Thanksgiving.  Sure enough, that's Thanksgiving.  Friday, December 2, 2:30.  Probably be the simplest thing if I have this redone as a scheduling order with these dates in it.  That will be done early next week.

MR. LEVY:  Thank you, your Honor.

THE COURT:  And on summary judgment, bring it up at the proper time if you wish.

MR. LEVY:  Will do so, your Honor.  Will your Honor's schedule address the schedule for class certification, as well?  I know you said you wanted to address that separately.

THE COURT:  What is the issue going to be about?

MR. LEVY:  Well, they will be filing a motion next week, I suppose, that addresses the class cert factors we'll be opposing, there will be expert reports on both sides.  So I suppose that --

THE COURT:  Expert on both sides about a class?

MR. LEVY:  Yes, your Honor, on predominance.

M77ClocC

THE COURT:  What are the issues?

MR. LEVY:  Whether the market is efficient and whether the presumption of efficiency applies in this case.  It's their burden to come in with evidence at the class cert stage and then we have the opportunity to rebut it.  Usually that's done with expert disclosure.

THE COURT:  There is a dispute about that?

MR. LEVY:  Yes, your Honor.

THE COURT:  That won't affect the time the motion is made, it may affect the time it's decided.

MR. LEVY:  Correct, your Honor.  I think it bears on the complexity of the motions.  I understand that there would be multiple expert reports in connection with the class cert motion based on what my friends have said.  We obviously had not seen them and we will want to put in responsive expert reports and have the opportunity to depose their experts and write responsive motion papers.

THE COURT:  I know the experts used very heavily on that issue.  In my own narrow experience, the decisive factors have really been on the facts, not on the expert analysis, but each one is a little different.

MR. LEVY:  Your Honor, in this case, it is our belief that or position is that there are serious issues on predominance and they will require expert testimony.

THE COURT:  I'll look at those with interest.

M77ClocC

There is an institutional pressure that it be made early and we're not going to meet that by any definition, but there is pressure on doing it promptly, then I think we can follow the normal times for responses and replies and keep the other matters going.

MR. LEVY:  Two weeks, which is the standard over the local rules, seems a little bit tight in the context of a motion that has multiple expert reports.  I'm sorry.  I misheard.  You said one.  So there will be an expert report. We will need time to fully put in our responsive brief to depose their expert, which is pretty standard on that expert report, and then we would put in an expert report.  I do not have in front of me the date that my friend said they would file their brief, but if it is next week and done by July 13th, it's a Wednesday, for example, or the 15th, which is the Friday, we'd want — I'm probably going to pick a Saturday — the 15th of August.  So four weeks rather than the standard two.

THE COURT:  I think I can set a date for answering more accurately when I have the moving papers before me and your letter explaining why you need more time and how much.

MR. LEVY:  Thank you, your Honor.

THE COURT:  Anything else?

MR. ROTHMAN:  Nothing else, your Honor.  Thank you.

THE COURT:  We're adjourned.

                              *  *  *