UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————————— x

UA LOCAL 13 & EMPLOYERS GROUP
INSURANCE FUND, Individually and on
Behalf of All Others Similarly Situated,

                         Plaintiff,

     vs.

SEALED AIR CORPORATION and
WILLIAM G. STIEHL,

                      Defendants.

—————————————————————————— x

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No. 1:19-cv-10161-LLS-RWL

<u>CLASS ACTION</u>

DECLARATION OF ROBERT M.
ROTHMAN IN SUPPORT OF PLAINTIFFS'
MOTION FOR (1) FINAL APPROVAL OF
CLASS ACTION SETTLEMENT, (2)
APPROVAL OF PLAN OF ALLOCATION,
AND (3) LEAD COUNSEL'S
APPLICATION FOR AN AWARD OF
ATTORNEYS' FEES AND EXPENSES AND
AWARDS TO PLAINTIFFS PURSUANT TO
15 U.S.C. §78u-4(a)(4)

4891-5591-3283.v2

Robert M. Rothman declares, pursuant to 28 U.S.C. §1746, as follows:

1.       I am a partner of the law firm of Robbins Geller Rudman & Dowd LLP ("Robbins Geller" or "Lead Counsel").  Robbins Geller serves as Lead Counsel to Plaintiffs in the above-captioned action (the "Action").[1]  I submit this Declaration in support of Plaintiffs' Motion for Final Approval of Class Action Settlement, Approval of Plan of Allocation, and Lead Counsel's Application for an Award of Attorneys' Fees and Expenses and Awards to Plaintiffs Pursuant to 15 U.S.C. §78u-4(a)(4).[2]  I have personal knowledge of the matters set forth herein based on my active participation in all material aspects of the prosecution and settlement of this Action.  If called upon, I could and would competently testify that the following facts are true and correct.

## I.       INTRODUCTION AND OVERVIEW

2.       The parties have entered into a proposed settlement of the Class's claims alleged in this securities class action against defendants Sealed Air Corporation ("Sealed Air" or the "Company") and William G. Stiehl ("Stiehl" and, with Sealed Air, "Defendants").  Plaintiffs' claims arise out of Defendants' allegedly false and misleading statements concerning the process through which Sealed Air selected Ernst & Young LLP ("EY") to be its registered public accounting firm.  Defendants represented that the retention process was a "competitive" one involving several international accounting firms and that the Company had adequate internal controls in place.  Plaintiffs allege those statements were false because Defendant Stiehl, the Company's former Chief Accounting Officer, rigged the process to ensure EY's selection by providing EY with confidential

---

[1]   Plaintiffs are UA Local 13 Pension Fund, UA Local 13 & Employers Group Insurance Fund ("Local 13 Funds"), Plumbers & Steamfitters Local 267 Pension Fund ("Local 267 Fund"), and Plumbers and Steamfitters Local No. 7 Pension and Welfare Funds ("Local 7 Funds").

[2]   Unless otherwise indicated, all capitalized terms herein have the meanings ascribed to them in the Stipulation and Agreement of Settlement, dated September 9, 2022 (the "Stipulation").  *See* ECF 100.

information from the Audit Committee, forwarding competitors' bids to EY, and personally altering EY's bid.

3.　　The Settlement (defined below) provides substantial relief to the Class.　The Stipulation, previously filed with the Court (ECF 100), provides for the payment of $12,500,000 in cash (the "Settlement Amount") to the Class in exchange for a release of the Released Claims (as defined in the Stipulation) against the Released Persons (the "Settlement").　The Settlement is the product of Plaintiffs' and Lead Counsel's careful analysis and vigorous litigation of the claims, as well as extensive arm's-length settlement negotiations between the parties, which took place during an all-day mediation session, supervised by nationally recognized mediator David M. Murphy, Esq., subsequent negotiations, and ultimately, Mr. Murphy's recommendation that the case be settled for $12.5 million, which the parties accepted.

4.　　The benefit to the Class must be weighed against the significant chance that it might obtain a much smaller recovery or none at all after years of protracted litigation followed by years of appellate review.　If at any stage of the Action Defendants were ultimately to prevail on their various arguments concerning falsity, materiality, scienter, loss causation, and damages, the Class would have been left with little or no recovery.　In sum, the Settlement represents a very good recovery in light of the significant risks involved in continued litigation.

5.　　As detailed herein, the Settlement is the product of a comprehensive investigation, detailed analysis, and extensive arm's-length negotiations by experienced counsel, which involved the assistance of a highly experienced mediator.　Lead Counsel, working closely with Plaintiffs, negotiated the Settlement with a thorough understanding of the strengths and weaknesses of the claims asserted against both Defendants.　Notably, Plaintiffs did not agree to settle until fact discovery was almost complete in the case.　By that time, in addition to reviewing the information

obtained during discovery, Plaintiffs analyzed: (i) documents filed with the U.S. Securities and Exchange Commission ("SEC"); (ii) two Orders Instituting Public Administrative and Cease-and-Desist Proceedings Pursuant to Sections 4C and 21C of the Securities Exchange Act of 1934 and Rule 102(e) of the Commission's Rules of Practice, Making Findings, and Imposing Remedial Sanctions and a Cease and-Desist Order against Stiehl and EY (the "SEC Orders"); (iii) other information, including press releases, news articles, and other public statements issued by or concerning the Company and Stiehl; (iv) research reports issued by financial analysts concerning the Company; and (v) other publicly available information and data concerning the Company's auditor selection process.

6.      Moreover, Plaintiffs did not agree to the Settlement until after they had the ability to consult with experts, two of whom drafted expert reports which were served on Defendants.  For example, Plaintiffs served expert reports from their economist, Professor Steven P. Feinstein, Ph.D., CFA, on issues of market efficiency, loss causation, damages, and materiality.  Plaintiffs also retained Harvey L. Pitt – the former Chairman of the SEC – who drafted a report setting forth his opinions on issues concerning practices and understandings with respect to audits, expected procedures and processes of auditor selection, and auditor independence.

7.      In addition to its comprehensive investigation and discovery efforts, Lead Counsel drafted two complaints (ECF 1 and 32), successfully opposed Defendants' motions to dismiss (ECF 46), and filed a motion for class certification (ECF 82-84).

8.      Moreover, in advance of the mediation session, Plaintiffs marshalled the evidence and drafted a detailed mediation statement, supported by documents, which addressed issues of both liability and damages.  As a result of these efforts, Lead Counsel and Plaintiffs were fully informed

- 3 -

4891-5591-3283.v2

regarding the strengths and weaknesses of the case against Defendants before agreeing to the Settlement.

9.    Nonetheless, while Plaintiffs believed in the merits of their case, they understood that the risks in this case were palpable.  Throughout the Action, Defendants advanced strong arguments that Plaintiffs would be unable to establish materiality, loss causation, or damages.  Accordingly, while Lead Counsel believes that the Class's claims are strong, there was a significant chance that one or more of Defendants' defenses may have ultimately proved insurmountable – and the Class may have ended up with little or no recovery.  The significance of these risks was heightened by the prospect of years of protracted litigation through costly dispositive motion practice, a trial, and lengthy appeals.  The Settlement avoids these and other risks while providing a substantial and immediate monetary benefit to the Class.

10.    The other terms of the Settlement are the product of careful negotiations between the parties and are set forth in the Stipulation.  For all of the reasons stated herein, Lead Counsel believes that the Settlement is fair, reasonable and adequate, is in the best interests of the Class, and should be approved.  The Settlement has the full support of Plaintiffs.  *See* Declaration of Steven Ostrander, Exhibit A hereto ("Ostrander Decl."), Declaration of Ryan Heimroth, Exhibit B hereto ("Heimroth Decl."), and Declaration of Michael Nanno, Exhibit C hereto ("Nanno Decl."), each of whom was deposed in the Action and actively involved in its prosecution.

11.    Lead Counsel seeks an award of attorneys' fees of 25% of the Settlement Amount, plus its litigation expenses of $455,832.33, with interest thereon earned at the same rate as the Settlement Fund.  The fee request is pursuant to fee agreements with Plaintiffs, and has their full support.

4891-5591-3283.v2

12.     Pursuant to the Court's Order Preliminarily Approving Settlement and Providing for Notice dated September 14, 2022 (ECF 102), as amended (ECF 103) (the "Preliminary Approval Order"), the Notice of Pendency and Proposed Settlement of Class Action (the "Notice") and the Proof of Claim and Release form ("Proof of Claim," and together with the Notice, the "Notice Packet") were mailed to all Class Members who could be identified with reasonable effort, and the Summary Notice was published in *The Wall Street Journal* and transmitted over *Business Wire*.

13.     The Notice advised all recipients of, among other things: (i) the terms of the Settlement; (ii) the definition of the Class; (iii) their right to exclude themselves from the Class; (iv) their right to object to any aspect of the Settlement, including the Plan of Allocation and Lead Counsel's request for attorneys' fees and expenses; and (v) the procedures and deadline for submitting a Proof of Claim in order to be eligible for a payment from the proceeds of the Settlement.

14.     The Court-ordered deadline for filing objections to the Settlement or requesting exclusion from the Class is December 30, 2022.  To date, no objections to any aspect of the Settlement have been filed and only one request for exclusion has been received.  If any objections or additional requests for exclusion are received, Plaintiffs will address them in a reply submission to be filed on or before January 13, 2023.

15.     Gilardi & Co. LLC ("Gilardi"), which has been retained by Lead Counsel and approved by the Court as Claims Administrator, has advised that as of December 14, 2022, a total of 226,336 copies of the Notice Packet have been mailed to potential Class Members and nominees. *See* Declaration of Ross D. Murray Regarding Notice Dissemination, Publication, and Requests for Exclusion Received to Date ("Mailing Decl."), ¶¶5-11, attached hereto as Exhibit D.  Additionally,

the Notice Packet, Stipulation, and Preliminary Approval Order have been posted on the website established for the Settlement: www.SealedAirSecuritiesLitigation.com.

## II.    THE NATURE AND HISTORY OF THE LITIGATION

### A.    The Commencement of the Action, Appointment of Lead Plaintiffs and Lead Counsel, and Filing of the Amended Complaints

16.    On November 1, 2019, UA Local 13 & Employers Group Insurance Fund initiated this Action in the United States District Court for the Southern District of New York, as a class action arising under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5.  ECF 1.

17.    Pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), on November 1, 2019, notice was published advising putative Class members of their right to file a Motion for Appointment as Lead Plaintiff.  15 U.S.C. §§78u(a)(1), (a)(3)(B)(i).  In response to that Notice, only the Local 13 Funds and Local 267 Fund moved to be appointed as lead plaintiffs.  On January 22, 2020, the Court granted their unopposed motion and approved their selection of Robbins Geller as Lead Counsel.  ECF 17.  Thereafter, the Court so ordered a proposed briefing schedule for the filing of an amended complaint and responses thereto.  *See* ECF 28.

18.    On July 13, 2020, Plaintiffs filed a Corrected Amended Complaint ("CAC") on behalf of themselves and all purchasers of Sealed Air common stock between November 17, 2014 and June 20, 2019, inclusive (the "Class Period").  ECF 32.

### B.    The CAC and a Summary of the Class's Allegations

19.    Before and after initiating this Action, Lead Counsel directed an extensive investigation of the alleged securities law violations at issue.  This investigation included, but was not limited to reviewing: (i) documents filed with the SEC; (ii) other publicly available information, including press releases, news articles, and other public statements issued by or concerning the

Company and Stiehl; (iii) research reports issued by financial analysts concerning the Company; and (iv) publicly available information and data concerning the Company and its 2014 auditor selection process.

20.     Based on this investigation, Lead Counsel prepared the CAC on behalf of Sealed Air investors, including Plaintiffs, who purchased or otherwise acquired Sealed Air's common stock during the period November 17, 2014 to June 20, 2019, inclusive, and who were damaged thereby.

21.     The CAC asserts claims against Sealed Air and Stiehl under §§10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Plaintiffs allege that Defendants made materially false and misleading statements concerning the process by which the Company selected EY to be its registered public accounting firm in 2014.  Specifically, Defendants had represented that EY was selected through a "competitive" process involving several international accounting firms. Plaintiffs allege, however, that those statements were materially false and misleading because Defendant Stiehl rigged the auditor selection process in favor of EY.

22.     Plaintiffs also allege, among other things, that Defendants' statements regarding the Company's disclosure controls and procedures in Class Period SEC filings, along with the Sarbanes Oxley Act certifications signed by Defendant Stiehl during the Class Period – in which he certified the accuracy of the Company's disclosure control-related representations – were materially false and misleading because they misrepresented and/or failed to disclose that Stiehl corrupted the process pursuant to which the Company selected its auditor.

23.     Plaintiffs contend that the truth regarding Defendants' false statements began to emerge on August 6, 2018, when the Company announced its receipt of a subpoena from the SEC seeking documents concerning the Company's accounting for income taxes, its financial reporting

and disclosures, and other matters.  On the announcement of this news, the price of Sealed Air stock fell more than 5% on very heavy trading volume.

24.     On May 2, 2019, Sealed Air received another subpoena from the SEC seeking information about the Company's process for selecting EY, as well as about EY's independence.  At that time, Sealed Air's Audit Committee initiated an internal review specifically to examine the Company's selection of EY.

25.     Then, on June 20, 2019, six weeks after the review commenced, Sealed Air filed a press release with the SEC on Form 8-K announcing that, as a direct result of the internal investigation, the Company had fired Stiehl "for cause."  The press release explicitly stated that Stiehl was fired because of his role in the selection of EY as the Company's auditor.

26.     In response to this news, the price of Sealed Air stock again fell approximately 5%, on very heavy trading volume.

27.     On August 2, 2019, Sealed Air announced that the DOJ had commenced an investigation into the process by which EY was selected to serve as Sealed Air's auditor and the Company's termination of Stiehl.  Five days later, on August 7, 2019, Sealed Air fired EY, effective immediately.  In an August 12, 2019 press release, Sealed Air confirmed that EY's firing was directly related to the process by which by the Company had originally selected it.

28.     Defendants continue to deny any and all allegations of wrongdoing, and deny that they have committed any act or omission giving rise to any liability or violation of law.

### C.     Defendants' Motions to Dismiss, the Court's Opinion and Order Largely Denying Defendants' Motions, and Subsequent Events

29.     On September 4, 2020, Sealed Air and Stiehl filed separate motions to dismiss the CAC.  ECF 33-38.  Sealed Air argued, among other things, that the CAC failed to plead: (i) falsity with particularity; (ii) scienter; and (iii) materiality.  Stiehl joined the Company's motion to dismiss

4891-5591-3283.v2

and made additional arguments that the CAC should be dismissed as against him, including because it failed to adequately allege control liability. In accordance with the PSLRA, discovery in the Action was stayed until the Court ruled on Defendants' motions to dismiss.

30. On November 24, 2020, Plaintiffs filed their Omnibus Memorandum of Law in Opposition to Defendants' Motions to Dismiss. ECF 42. Plaintiffs argued that the CAC pled actionable misstatements because Defendants knew, but failed to disclose, that Stiehl manipulated the bidding process to ensure that EY would be selected as the Company's auditor. Plaintiffs also argued that they adequately alleged the materiality of the misstatements and omissions based on, among other things, Defendants' own prior express representation that the auditor selection process was important. Plaintiffs' opposition also asserted that by alleging the personal involvement of Stiehl, the Company's then-Chief Accounting Officer and Controller, in the rigged EY hiring process, the CAC not only adequately alleged scienter against Stiehl himself, but also against the Company.

31. On January 15, 2021, Defendants filed and served reply briefs in further support of their motions to dismiss. ECF 44-45.

32. On June 1, 2021, the Court entered its Opinion and Order granting in part and denying in part Defendants' motions to dismiss (the "Order"). ECF 46. The Court held that Plaintiffs adequately alleged actionable misstatements and omissions concerning EY's retention, the Company's disclosure controls and procedures, and compliance with the Sarbanes Oxley Act. *Id*. at 4-8, 11-13. The Court also found that Plaintiffs adequately alleged a strong inference of scienter as against Stiehl and corporate scienter as against Sealed Air for all of the actionable misstatements and omissions. *Id*. at 17. Additionally, the Court found that Plaintiffs adequately alleged Defendants' violation of Items 303 and 105 of Regulation S-K, due to Sealed Air's Class Period SEC filings

- 9 -

4891-5591-3283.v2

failing to disclose the bid rigging that resulted in EY's retention as the Company's independent registered accounting firm. *Id*. at 13. Finally, the Court held that Plaintiffs adequately alleged a control-person claim under Section 20(a) of the Exchange Act as against Stiehl. *Id*. at 18-19.

33.    While sustaining the majority of Plaintiffs' allegations, the Court dismissed claims arising from Defendants' statements regarding the Company's code of conduct and ethics. *Id*. at 11.

34.    On July 15, 2021, Defendants filed their answers to the CAC, denying Plaintiffs' substantive allegations and asserting 21 separate affirmative defenses. ECF 50-51.

### D.    Fact Discovery

35.    Following the Court's Order denying, in part, Defendants' motions to dismiss, Plaintiffs began discovery.

#### 1.    Joint Rule 26(f) Report

36.    On July 19, 2021, the Court issued an Order for Conference pursuant to Rule 16(b). ECF 53. In accordance therewith, the parties negotiated a Joint Report and Discovery Plan Pursuant to Fed. R. Civ. P. 26(f) outlining, *inter alia*, statements of the issues as they then appeared, a detailed proposed case schedule, and an estimated time frame for fact discovery. ECF 58.

37.    On October 4, 2021, the parties appeared before the Court for a Rule 16(b) conference. The same day, the Court entered a Scheduling Order setting deadlines for fact discovery, expert discovery, and other pre-trial deadlines. ECF 60.

#### 2.    Initial Disclosure Statement

38.    On September 30, 2021, Plaintiffs served their Initial Disclosure Statement pursuant to Fed. R. Civ. P. Rule 26(a)(1). In it, Plaintiffs identified numerous individuals and entities likely to have discoverable information supporting the claims alleged in the CAC. To compile this information, Plaintiffs reviewed their own internal files, public information regarding Sealed Air's

- 10 -

corporate organization, and the information obtained during the course of their investigation into the matters alleged in the CAC.

### 3.    Protective Order

39.    To protect against the public disclosure of potentially sensitive personal or proprietary information, the parties negotiated and prepared a protective order to govern the treatment, handling, and continued protection of confidential information produced in this Action.  The parties also negotiated the extent to which, and the conditions under which, such confidential information could be shown to deponents, non-parties, and others not previously privy to such information.  The parties submitted a Joint Stipulation and [Proposed] Protective Order on January 3, 2022, which the Court entered on January 4, 2022.  ECF 63.

### 4.    Discovery Directed to Defendants

40.    Plaintiffs conducted extensive discovery into Sealed Air and Stiehl, and their statements concerning the Company's auditor selection process and its disclosure controls and procedures.

41.    To build their case, on October 15, 2021, Plaintiffs served document requests on Defendants.  These requests focused on a variety of issues, including the process by which Sealed Air hired EY, Mr. Stiehl's direct involvement in EY's retention, Sealed Air's firing of both Mr. Stiehl and EY, the Company's disclosure controls and procedures, along with documents concerning the ongoing government investigations into these matters.

42.    Defendants served responses and objections to Plaintiffs' Requests for the Production of Documents.

43.    The parties held several meet and confer sessions to discuss the scope of Plaintiffs' document requests and exchanged a series of letters memorializing such discussions.

4891-5591-3283.v2

44.     When the parties were unable to reach an agreement about the proper scope of Defendants' document production, Lead Counsel vigorously advocated for the Class by litigating and requesting Court intervention on those discovery issues. For example, when negotiations failed to result in either an agreed-upon relevant time period for discovery or an agreement by Sealed Air to produce certain subpoenas received from the SEC and DOJ, Plaintiffs filed a letter with the Court requesting an informal conference to address the matter under S.D.N.Y. Local Rule 37.2, in advance of the filing of a motion to compel. ECF 64. Defendants submitted a letter in opposition to Plaintiffs' letter on February 3, 2022, and Plaintiffs filed a reply letter on February 4, 2022. ECF 66-67.

45.     At around the same time, further factual developments occurred. Most notably, both Stiehl and EY entered into the SEC Orders regarding the process pursuant to which EY was selected as the Company's auditor. While neither Stiehl nor Sealed Air admitted to the findings in the SEC Orders, those findings corroborated, chapter and verse, the allegations Plaintiffs had lodged 14 months earlier.

46.     On February 18, 2022, the parties appeared before the Court to argue the discovery dispute. ECF 69. During the hearing, the Court directed Sealed Air to submit a brief on the issue of the admissibility of the SEC's findings. *Id*. On March 3, 2022, Sealed Air submitted a letter to the Court regarding the admissibility of the SEC's findings. ECF 71. Stiehl joined in the letter filed by Sealed Air. ECF 72.

47.     Plaintiffs responded to Sealed Air's letter on March 7, 2022 arguing, among other things, that the SEC Orders would be admissible because they fall into the hearsay exception of Federal Rule of Evidence 803(8)(A)(iii) for "factual findings from a legally authorized

4891-5591-3283.v2

investigation." ECF 73. Sealed Air and Plaintiffs submitted additional letters on March 21, 2022 and March 22, 2022. ECF 74-75.

48.    In an Order dated April 15, 2022, the Court deemed the question of the admissibility of the SEC Orders to be "premature . . . prior to motions for summary judgment at the earliest." ECF 76. However, the Court granted the critical part of Plaintiffs' underlying request by directing Defendants to disclose, "in full, a. the information which led to the investigation of the selection of Ernst & Young, LLP as Defendant's public accounting firm; b. the information learned by that investigation; and c. the information upon which the termination of Defendant Stiehl's employment was based." *Id.*

49.    Pursuant to the Court's orders, Defendants produced responsive documents. Lead Counsel analyzed those documents to uncover additional evidence supporting Plaintiffs' claims.

50.    Plaintiffs also served interrogatories on Defendants on July 29, 2022 seeking information relating to, among other things, the investigation into the process by which Sealed Air selected EY as its auditor.

51.    Plaintiffs also noticed seven fact depositions, directed to current and former Sealed Air employees, Stiehl, the EY partners involved in the process by which EY was retained by Sealed Air, and a Rule 30(b)(6) to Sealed Air deposition on 10 separate deposition topics.

### 5.    Non-Party Discovery

52.    Plaintiffs also served non-party document subpoenas on both the SEC and EY. In response to the subpoenas, following protracted negotiations, the SEC produced the sworn deposition testimony of the most critical witnesses in this case, including Stiehl, Carol Lowe (Sealed Air's former CFO), and the three EY partners directly involved in Sealed Air's auditor selection process.

- 13 -

4891-5591-3283.v2

53.    Lead Counsel was able to utilize the information to corroborate the allegations.

54.    Thus, by vigorously pursuing discovery, Lead Counsel adduced the evidence necessary to establish the elements of each of Plaintiffs' claims and fully evaluate a negotiated resolution.

### 6.    Defendants' Discovery Demands

55.    Defendants served comprehensive document requests upon Plaintiffs.  Although Defendants' requests were overly broad and unduly burdensome, Plaintiffs voluntarily produced more than 20,000 pages of documents rather than burden the Court with another discovery dispute.

56.    In addition, each of the Plaintiffs sat for a deposition.  Specifically, Defendants took Plaintiffs' depositions through the following representatives: (i) Steven Ostrander, the fund administrator for the Local 13 Funds, on July 22, 2022; (ii) Ryan Heimroth, the administrator for the Local 7 Funds, on July 26, 2022; and (iii) Michael Nanno, the fund manager for the Local 267 Fund, on August 3, 2022.  Lead Counsel worked extensively with each Plaintiff representative to prepare them for and defended them at their respective depositions.

57.    Each Plaintiff representative testified regarding, *inter alia*: (i) their respective involvement in and supervision of the Action; (ii) the allegations in the CAC, including the bases of the claims alleged; and (iii) their adequacy as Class Representatives.

### E.    Plaintiffs' Motion to Certify the Class

58.    On July 15, 2022, Plaintiffs filed their Motion for Class Certification and Appointment of Class Representatives and Class Counsel.  ECF 82-85.  Plaintiffs' accompanying memorandum of law explained how Plaintiffs established all of the requirements of Fed. R. Civ. P. 23, as well as the factors necessary to qualify as an efficient market for the purposes of the presumption of reliance established in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988).  ECF 83.

59.     In further support of their motion, Plaintiffs submitted an expert report by Professor Steven P. Feinstein, Ph.D., CFA on issues related to class certification.  ECF 84-1.  Professor Feinstein, founder and president of Crowninshield Financial Research, Inc. ("Crowninshield"), is an Associate Professor of Finance at Babson College, and has published extensively regarding corporate valuation, derivatives, and investments.  Prior to entering academia, Professor Feinstein was an economist at the Federal Reserve Bank of Atlanta.  Professor Feinstein has provided analysis and testimony in numerous class action securities lawsuits, ERISA cases, the qui tam yield burning cases, derivatives valuations, and complex business litigation.  Professor Feinstein's report concluded that the market for Sealed Air common stock was efficient during the Class Period.  Among other things, Professor Feinstein conducted an event study, which identified a cause-and-effect relationship between the release of new, Sealed Air-specific information and the movement in Sealed Air's stock price, evidencing that Sealed Air common stock traded in an efficient market during the Class Period.  In addition, Professor Feinstein concluded that damages would be subject to measurement on a class-wide basis.

60.     Defendants took the deposition of Professor Feinstein on July 28, 2022 regarding his opinions concerning issues of market efficiency and the availability of a class-wide damage model.  Lead Counsel worked closely with Professor Feinstein to prepare him for and defend him at his deposition.

F.     **Merits-Based Expert Witnesses**

61.     To assist Lead Counsel in investigating and proving Plaintiffs' claims and navigating the complex issues involved in this matter, the services of experts were required.  The work performed by these experts provided valuable insight in evaluating the merits of Plaintiffs' case as well as guidance for settlement during the course of the litigation.

- 15 -

62.    On August 6, 2022, in accordance with the schedule ordered by the Court, Plaintiffs served merits-based reports authored by their experts on merits issues, Professor Feinstein and Mr. Pitt.

### 1.    Steven P. Feinstein, Ph.D., CFA and Crowninshield Financial Research

63.    In addition to retaining Professor Feinstein on class certification issues, Plaintiffs retained him to provide expert opinions on the issues of materiality, loss causation, and damages.

64.    Professor Feinstein authored a second expert report on these issues.  In his merits report, Professor Feinstein opined that the alleged misrepresentations and omissions alleged by Plaintiffs, including regarding the process by which EY was selected to be the Company's auditor, caused the price of Sealed Air stock to be artificially inflated over the course of the Class Period. Professor Feinstein concluded that alleged misrepresentations and omissions were important to investors and caused them to lose money when the truth began to be revealed by way of the Company's announcement of its receipt of an SEC subpoena concerning the Company's accounting, financial reporting and disclosures and other matters on August 6, 2018.  According to Professor Feinstein, investors incurred additional damages following the Company's June 20, 2019 announcement that Stiehl was fired "for cause" in connection with the process by which Sealed Air retained EY as its auditor.

### 2.    Harvey L. Pitt

65.    Plaintiffs retained Mr. Pitt to provide expert opinions on practices and understandings with respect to audits, expected procedures and processes of auditor selection, and auditor independence.

66.    Mr. Pitt is the Chief Executive Officer of the global business consulting firm, Kalorama Partners, LLC ("Kalorama Partners").  Prior to founding Kalorama Partners, Mr. Pitt

4891-5591-3283.v2

served as the 26th Chairman of the SEC. During his tenure as SEC chairman, Pitt led the SEC's unanimous adoption of dozens of rules implementing the Sarbanes-Oxley Act of 2002.

67.    Based on his vast experience, including by serving as Chairman of the SEC, Mr. Pitt opined that, among other things, the process by which Sealed Air selected EY as the Company's independent auditor was in stark contrast to the standard and accepted selection process for independent auditors. He further opined regarding the importance to investors of having an auditor selected pursuant to an unadulterated process.

68.    Plaintiffs also continued to consult with their experts in connection with the mediation process.

### G.    The Mediation

69.    The Settlement is the product of intense and hard-fought negotiations, which were conducted at arm's length between experienced counsel and supervised by David M. Murphy, Esq., of Phillips ADR, who has extensive experience in mediating securities class actions.

70.    Prior to the mediation, Plaintiffs and Defendants each submitted detailed opening mediation statements to Mr. Murphy explaining their positions on Defendants' allegedly false and misleading statements and issues concerning scienter, loss causation, and damages. The parties exchanged those mediation statements and thereafter, submitted and exchanged reply mediation statements, in which they responded to the various arguments raised in the opposing side's opening submission.

71.    The parties engaged in a full-day mediation session on May 17, 2022. During the course of that mediation, Lead Counsel vigorously advocated Plaintiffs' positions, bolstered by the facts learned through discovery. Lead Counsel also explained how Plaintiffs were prepared to move

4891-5591-3283.v2

for summary judgment on the issues of falsity and scienter as to Defendants' Class Period statements regarding EY's retention.  Defendants, too, vigorously argued their defenses.

72.     Following numerous conversations with Mr. Murphy throughout the mediation and thereafter, as a result of offers and counter-offers, and ultimately Mr. Murphy's recommendation, the parties agreed to settle the litigation for $12.5 million, subject to the negotiation of a formal settlement agreement and approval by the Court.

### H.     Preliminary Approval of the Settlement

73.     On September 9, 2022, Plaintiffs filed their motion for preliminary approval of the Settlement.  ECF 98.  In that motion, Plaintiffs requested that the Court approve the proposed forms of notice, which, among other things, described the terms of the Settlement, advised Class Members of their rights, set forth the proposed Plan of Allocation of Settlement proceeds, the maximum amount of attorneys' fees and the expenses that Lead Counsel would request, and the procedure for submitting Proofs of Claim.  ECF 99-101.

74.     On September 14, 2022, the Court preliminarily approved the terms of the Settlement, and scheduled a settlement hearing for final approval on January 20, 2023, at 2:00 p.m.  ECF 102.

### I.     The Factors Affecting Settlement Weigh in Favor of Approval of the Settlement

75.     The Settlement avoids the hurdles Plaintiffs would have to clear, not only with respect to proving the full amount of the Class's damages but liability as well, and avoids the significant costs associated with further litigation of this complex securities action, particularly summary judgment and trial.  After weighing the sizeable Settlement Fund against the significant risks and additional time and expense involved in continuing to litigate this Action, I respectfully submit that the Settlement is fair, reasonable, and adequate.

4891-5591-3283.v2

76.     In light of their detailed investigation into the facts, extensive discovery efforts, the advice of their experts, and the discussions that occurred during the mediation, Lead Counsel was able to identify the issues that are critical to the outcome of this case.  Lead Counsel has considered the risks of continued litigation, the likelihood of getting past summary judgment and, if successful, the risk, expense, and length of time to prosecute the litigation through trial and appeals.  Lead Counsel has also considered the substantial monetary benefit provided by the Settlement in light of such risks.  Plaintiffs were participants in this assessment and were consulted, and kept apprised, concerning the negotiations, before they agreed to enter into the Settlement.

77.     Lead Counsel has been, and currently is actively engaged in complex federal civil litigation, particularly the litigation of securities class actions.  Our reputation as attorneys who are willing to zealously carry a meritorious case through trial and appeals gives us a strong negotiating position, even under the difficult and challenging circumstances presented here, including the ongoing class certification and expert discovery challenges and the uncertainty and expense of a trial.

78.     Indeed, numerous hurdles remained before trial.  Although Lead Counsel believes that Plaintiffs would have ultimately prevailed on class certification and the merits at trial, Lead Counsel understands that a number of risks made the outcome of this litigation uncertain.

79.     For example, Defendants' principal liability defense was that they did not make any materially false statements to investors.  Defendants argued that the alleged misstatements concerning the competitive nature of the auditor retention process were not false, considering that the process actually involved several top accounting firms and resulted in the hiring of EY, one of the world's top auditing firms.  Nor, according to Defendants, were any misstatements material

4891-5591-3283.v2

because investors only cared that the Company retain a reputable firm that submitted the best bid. Defendants argued that EY was that firm.

80.     While the parties disagreed about the merits of these arguments, Plaintiffs recognized that were a jury to find them reasonable, it would be difficult for Plaintiffs to prove the falsity and materiality of the alleged misstatements at trial.

81.     In addition to the risks Plaintiffs faced establishing falsity and materiality, Defendants were also prepared to mount a defense asserting that Plaintiffs could not establish that Defendants made any false or misleading statements with the requisite scienter.  Specifically, Sealed Air would likely argue that Plaintiffs could not establish corporate scienter because Mr. Stiehl's conduct was not disclosed to senior management at the time.  Mr. Stiehl was poised to argue that because he was not involved in the process of writing or making the alleged false statements regarding the retention of EY, those statements could not lead to liability.

82.     Even if a jury found Plaintiffs succeeded in proving falsity and scienter, there remained a risk related to Plaintiffs' ability to prove loss causation and damages.  Defendants have argued that loss causation could not be established in connection with the August 6, 2018 disclosure because that disclosure specifically concerned the Company's receipt of a subpoena from the SEC seeking documents regarding the Company's accounting for income taxes, its financial reporting and disclosures, and other matters.  Defendants argued that the disclosure of the SEC subpoena did not alert investors about any issues with the auditor selection process.  Accordingly, it was Defendants' position that no losses were caused by that disclosure.

83.     Defendants further argued there could be no damages suffered as a result of the auditor retention process because there was no evidence that the Company's financial statements

- 20 -

4891-5591-3283.v2

were incorrect.  Thus, because EY completely rendered its services and did so for a lower cost, Defendants would likely claim the Class actually benefitted from the alleged bid-rigging.

84.     Defendants likely would have further argued that the methodology Plaintiffs' expert used to prove damages at trial was unreliable.

85.     Defendants' arguments, like Plaintiffs', were sure to be buttressed by expert witnesses.  Accordingly, issues relating to materiality, causation, and damages would have likely come down to an inherently unpredictable "battle of the experts."  Thus, while Plaintiffs' expert concluded damages could be up to $147.2 million, the actual amount awarded by the jury could be much lower than that.

86.     Defendants further contended that the case would likely fail at the class certification stage.  In particular, Defendants asserted that they would be able to prove the absence of any price impact, defeating the presumption of reliance under *Basic*, 485 U.S. 224, and thus demonstrating that Plaintiffs had not satisfied their burden under Rule 23 of showing a predominance of common questions.

87.     Defendants' principal argument in this regard would likely have been that because of a purported mismatch between the alleged misstatements and the alleged corrective disclosures, there was no price impact.  Defendants likely would have asserted that the first alleged corrective disclosure, which revealed the receipt of a subpoena from the SEC, made no mention of Sealed Air's hiring of EY, and therefore demonstrated a lack of allegation-relation price impact.  As to the second alleged corrective disclosure, Defendants would have likely claimed they would be able to show that the market was reacting to a broader range of information than Stiehl's firing.

88.     While Plaintiffs strongly believed that the proposed Class was appropriate for class certification, there was no guarantee that the Court would certify it.  If Plaintiffs were unable to

4891-5591-3283.v2

obtain class certification, the Action could not be sustained on a class-wide basis and members of the putative Class would have been forced to commence individual actions (if timely).  There was also the risk that if a Class was certified, the Court might not maintain the Action, or particular claims, on a class-wide basis through trial.

89.    While Plaintiffs remain confident in their ability to prove their claims and successfully counter all of Defendants' arguments, when weighed against the certain and substantial benefits of Settlement, the risks of losing at trial or having the Action dismissed or materially narrowed prior to trial indicate that the Settlement is in the best interests of the Class.  There was certainly risk that Plaintiffs would not prevail and the Class could recover nothing.  Lead Counsel submits that these factors militate strongly in favor of the Settlement.

90.    Further, although Plaintiffs firmly believe that the documentary and testimonial evidence they would offer at summary judgment and trial fully substantiates their claims, there is no way of predicting with certainty which testimony, inferences, or interpretations the Court or jury would accept.

91.    In addition, the decision to settle at this time is supported by the anticipated duration and expense of additional litigation, substantial resources would be expended to proceed through trial, as well as a likely post-trial appellate process, all without any guarantee of a better resolution for the Class.  These expenditures would result in a considerable expense to be borne by the Class out of any potential recovery at trial.  Securities class actions are inherently complex, time consuming, and expensive, which is magnified when such cases proceed through trial.  The Settlement avoids these expenditures and provides an immediate recovery for the Class.  Therefore, this factor favors the Settlement.

4891-5591-3283.v2

92.     Finally, the lack of opposition to the Settlement also militates in favor of the Settlement.  As outlined below, notice has already been widely disseminated to potential Class Members.  The lack of any objections to the Settlement to date and receipt of just one request to opt out of the Class weigh in favor of the Settlement.  Any objections and additional requests to opt out will be presented with Plaintiffs' reply papers.

93.     In light of the significant risks of establishing liability and damages, Lead Counsel and Plaintiffs respectfully submit that the Settlement represents a very favorable result for the Class. It provides Class Members with a very substantial benefit now, where there is a significant likelihood of less recovery or no recovery at all following trial.

**J.     Mailing and Publication of Notice of Settlement**

94.     The Preliminary Approval Order, among other things, appointed Gilardi as the Claims Administrator and directed it to cause the mailing of the Notice Packet to all potential Class Members identifiable with reasonable effort, no later than September 28, 2022.  ECF 102, ¶11.

95.     The Preliminary Approval Order also directed Lead Counsel to cause the Summary Notice to be published once in the national edition of *The Wall Street Journal* and transmitted over a national newswire, no later than October 5, 2022.  *Id.*, ¶12.

96.     The Mailing Declaration, submitted herewith, states that over 226,000 Notice Packets have been mailed to potential Class Members, banks, brokers and nominees to date, and that the Summary Notice was published on October 5, 2022, in compliance with the provisions of the Preliminary Approval Order.  Mailing Decl., ¶¶11-12.

97.     To date, no objections to any aspect of the Settlement have been filed and only one request for exclusion has been received.  Mailing Decl., ¶16.

- 23 -

4891-5591-3283.v2

## III.    THE PLAN OF ALLOCATION

98.    The Plan of Allocation is set forth in the Notice (*see* Mailing Decl., Ex. A at 12-15) and provides that the Net Settlement Fund will be distributed to Authorized Claimants who timely submit valid Proofs of Claim that show a "Recognized Claim" according to the Court-approved Plan of Allocation.  Given the costs of distributing payments, the Net Settlement Fund will be allocated among all Authorized Claimants whose distribution amount is $10.00 or greater.

99.    The Plan of Allocation proposed by Plaintiffs, which was prepared with the assistance of Plaintiffs' damages expert, is designed to achieve an equitable and rational distribution of the Net Settlement Fund to eligible claimants, and is consistent with Plaintiffs' damages theories.  Lead Counsel believes that the Plan of Allocation provides a fair and reasonable method to equitably distribute the Net Settlement Fund among Authorized Claimants.

100.    Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Class Members who wish to participate in the distribution of the Net Settlement Fund must submit a valid Proof of Claim and all required information no later than December 27, 2022.  Claims may be submitted to the Claims Administrator through the mail or submitted online using the case website.  As provided in the Notice, after deduction of Court-awarded attorneys' fees and expenses, Notice and Administration Expenses, applicable taxes, and any other fees or expenses approved by the Court, the Net Settlement Fund will be distributed according to the Court-approved Plan of Allocation.

101.    The Net Settlement Fund will be distributed to Authorized Claimants on a *pro rata* basis, based on the relative size of their Recognized Claims.  A distribution amount will be calculated for each Authorized Claimant.  The Plan of Allocation considers the amount of alleged artificial inflation in the per share prices of Sealed Air common stock, as estimated by Professor

Feinstein. The calculations take into account several factors, including price changes in Sealed Air common stock in reaction to public disclosures that allegedly corrected the respective alleged misrepresentations and omissions, adjusting the price change for factors that were attributable to market or industry forces, and for non-fraud related Company-specific information.

102. After the Effective Date of the Settlement, in accordance with the terms of the Stipulation, the Plan of Allocation, or such further approval and further order(s) of the Court as may be necessary or as circumstances may require, the Net Settlement Fund will be distributed to Authorized Claimants whose distribution amount is $10.00 or more. After the distribution, if there is any balance remaining in the Net Settlement Fund after a reasonable amount of time from the date of the initial distribution, and after payment of any outstanding Notice and Administration Expenses, Taxes, and attorneys' fees and expenses, if any, Lead Counsel will, if feasible, reallocate the balance among Authorized Claimants in an equitable and economic fashion. Thereafter, any *de minimis* balance that still remains after re-distribution(s) and after payment of any outstanding Notice and Administration Expenses, Taxes, and attorneys' fees and expenses, if any, will be donated to the New York Bar Foundation, or a non-profit and non-sectarian organization chosen by the Court.

103. To date, there have been no objections to the Plan of Allocation. The Plan of Allocation is fair and reasonable, and should be approved.

## IV.   LEAD COUNSEL'S ATTORNEYS' FEES AND EXPENSES

### A.   Attorneys' Fees

104. Lead Counsel respectfully requests that the Court award attorneys' fees of 25% of the Settlement Amount. Lead Counsel believes such a fee is reasonable and appropriate in light of the efficiency with which Robbins Geller litigated this matter, the resources Robbins Geller expended in prosecuting the case, the inherent risk of nonpayment from representing the Class on a contingent

- 25 -

4891-5591-3283.v2

basis, and the aggregate monetary benefit conferred on the Class in a challenging case.  Lead Counsel further requests an award of $455,832.33 in litigation expenses.  The legal authorities supporting the requested fees and expenses are set forth in the accompanying memorandum of law.

### 1.    Time, Labor, and Fee Percentage Requested

105.    Lead Counsel has devoted a significant amount of time and resources in the research, investigation, and prosecution of this Action.

106.    Robbins Geller has substantial experience representing investors in securities fraud cases, including in this District.

107.    Robbins Geller's representation of the Class in this Action required considerable pre-filing investigation, as well as substantial work during the Action, including: (i) analyzing a massive amount of information, including Sealed Air SEC filings, conference call transcripts, analyst reports, and materials generated in connection with governmental investigations, and thoroughly researching the law pertinent to the claims and defenses asserted; (ii) drafting the CAC; (iii) opposing Defendants' motions to dismiss; (iv) moving for class certification; (v) litigating several discovery disputes; (vi) substantially completing document discovery from Defendants and third parties; (vii) reviewing deposition transcripts from key witnesses; (viii) consulting with internal and external experts; (ix) drafting opening and reply mediation statements; and (x) preparing for and participating in a full-day mediation session, as well as subsequent negotiations.

108.    Robbins Geller's experience and advocacy were required in presenting the strengths of the case from its inception to the mediation and thereafter, in an effort to achieve the best possible settlement and convince Defendants, Sealed Air's insurers, defense counsel, and the mediator of the risks Defendants faced from not settling.  The fee requested is based upon a percentage of the recovery after discussion with and approval by each Plaintiff.  *See* Ostrander Decl., ¶6; Heimroth

Decl., ¶6; Nanno Decl., ¶6.  The fee request is similar to other requests approved by judges in this District, as set forth in the accompanying memorandum.

### 2. Risk, Magnitude, and Complexity of the Litigation

109.    As detailed above, the Action involved challenging issues of law and fact that presented considerable risk to Plaintiffs' case.  This case involved litigating violations of §§10(b) and 20(a) of the Exchange Act.  Thus, when Lead Counsel undertook this representation, there was no assurance that the Action would survive a motion to dismiss or other proceedings, and therefore no assurance Lead Counsel would recover any payment for its services.

110.    Lead Counsel accepted the representation of the Class on a contingent fee basis in this securities class action wherein, even if a recovery was obtained, any payment for Lead Counsel's services was likely to be delayed for several years.  These cases present formidable challenges as there are numerous decisions ruling in favor of defendants at each stage of the litigation.  The motions to dismiss raised complex and challenging arguments, requiring experience and considerable effort to prepare a thorough and persuasive opposition.  And although a recovery is never guaranteed, Lead Counsel in this case had developed sufficient evidence before Settlement to convince Defendants and their insurers to pay $12,500,000 to settle these claims.  Had this case not settled, Lead Counsel was prepared to litigate this case through the remaining stages of fact discovery, expert discovery, class certification, summary judgment, trial, and appeal.  Each of those litigation stages would have posed considerable challenges and expenses.

### 3. Quality of Representation

111.    Lead Counsel worked efficiently and diligently to obtain a very good result for the Class.  From the outset, Lead Counsel employed considerable resources and spent considerable time researching and investigating facts to support a pleading that could survive a motion to dismiss and

4891-5591-3283.v2

position the Action for class certification. Theories of damages were complex and Lead Counsel devoted much time analyzing potential defenses to liability and damages.

112.    The recovery obtained for the Class is the direct result of the significant efforts of highly-skilled attorneys who possess substantial experience in prosecuting complex securities class actions. Lead Counsel is among the most experienced securities practitioners in the country. The Settlement represents a substantial recovery for the Class – one that is attributable to the diligence, determination, hard work, and reputation of Lead Counsel.

113.    The quality of opposing counsel is also important in evaluating the quality of Lead Counsel's work. Defendants were represented by experienced lawyers from Holwell Shuster & Goldberg LLP (Sealed Air) and Cooley LLP (Stiehl), which are well-respected defense firms. Defense counsel each has a reputation for defending complex securities cases such as this. The ability of Lead Counsel to obtain a favorable settlement for the Class in the face of such opposition confirms the excellence of Lead Counsel's representation.

114.    When Lead Counsel undertook to represent Plaintiffs and the Class, it was with the expectation that it would have to devote a significant amount of time and effort in its prosecution and advance large sums of expenses on experts, mediation, and discovery. The time spent by Lead Counsel on this case was at the expense of time that it could have devoted to other matters. Lead Counsel undertook this case solely on a contingent fee basis, assuming a substantial risk that the case would yield no recovery and leave Lead Counsel uncompensated. Unlike counsel for Defendants, who are paid an hourly rate and paid for their expenses on a regular basis, Lead Counsel has not been compensated for any time or expenses since this case began in 2019. When Lead Counsel undertook to represent Plaintiffs and the Class in this matter, it was with the knowledge that Lead Counsel would spend many hours of hard work against capable defense lawyers with no assurance of

- 28 -

ever obtaining any compensation for its efforts. The only way Lead Counsel would be compensated was to achieve a successful result.

115. As discussed above, the Settlement is a very good result for the Class in light of the risks and obstacles to recovery presented in this Action, including the difficulty in establishing liability and damages at trial, if Plaintiffs would have ultimately been successful in certifying a class and had prevailed at the summary judgment stage. Instead of facing additional years of uncertain, costly and time-consuming litigation, the Settlement will provide Class Members a benefit now without the risk of no recovery if the Action were to continue.

**B.    The Requested Expenses Are Fair and Reasonable**

116. Robbins Geller seeks an award of $455,832.33 in expenses and charges in connection with the prosecution of the Action.

117. Robbins Geller submits that the expenses are reasonable and were necessary for the successful prosecution of this Action. Lead Counsel was aware that it may not recover any of these expenses unless and until this Action was successfully resolved. Accordingly, Robbins Geller took steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of Plaintiffs' claims.

118. Robbins Geller's expenses reflect routine and typical expenditures incurred in the course of litigation, such as the costs of travel, investigation, document duplication, transcript fees, expert and consultant fees, mediation fees, and expedited mail delivery. Lead Counsel believes these expenses are reasonable and were necessary for the successful prosecution of the Action.

119. The information in this declaration regarding the Firm's expenses is taken from expense reports and supporting documentation prepared and/or maintained by the Firm in the ordinary course of business. I am the partner who oversaw and/or conducted the day-to-day

- 29 -

4891-5591-3283.v2

activities in the Action and I reviewed these reports (and backup documentation where necessary or appropriate) in connection with the preparation of this declaration.  The purpose of this review was to confirm both the accuracy of the entries on the printouts as well as the necessity for, and reasonableness of, the expenses committed to the Action.  As a result of this review, reductions were made to expenses in the exercise of billing judgment.  Based on this review and the adjustments made, I believe that the expenses for which payment is sought herein are reasonable and were necessary for the effective and efficient prosecution and resolution of the Action.  Those expenses and charges are summarized by category in the attached Exhibit E.

120.    The following is additional information regarding certain of these expenses:

(a)    Filing, Witness and Other Fees: $3,524.45.  These expenses have been paid to the Court for filing fees and to an attorney service firm who served process of the complaint and subpoenas.  The vendors who were paid for these services are set forth in the attached Exhibit F.

(b)    Business Wire: $545.45.  This expense was necessary under the PSLRA's "early notice" requirements, which provides, among other things, that "[n]ot later than 20 days after the date on which the complaint is filed, the plaintiff or plaintiffs shall cause to be published, in a widely circulated national business-oriented publication or wire service, a notice advising members of the purported plaintiff class – (I) of the pendency of the action, the claims asserted therein, and the purported class period; and (II) that, not later than 60 days after the date on which the notice is published, any member of the purported class may move the court to serve as lead plaintiff of the purported class." *See* 15 U.S.C. §78u-4(a)(3)(A)(i).

(c)    Court Hearing Transcripts and Deposition Reporting, Transcripts and Videography: $10,286.28.  The vendors who were paid for these services are listed in the attached Exhibit G.

4891-5591-3283.v2

(d)    Experts/Consultants: $397,048.50.

(i)    Crowninshield: $313,736.00. Crowninshield is a financial economics consulting firm. Robbins Geller retained Professor Steven P. Feinstein, Ph.D., CFA, the founder and president of Crowninshield and Associate Professor of Finance at Babson College, to provide two separate expert reports. First, Lead Counsel retained Professor Feinstein to provide professional opinions and testify about the following issues concerning class certification: (1) the efficiency of the market for Sealed Air common stock during the Class Period, and (2) whether or not damages could be subject to measurement on a class-wide basis. Professor Feinstein provided an expert report and was deposed by defendants on these issues. Robbins Geller then retained Professor Feinstein to provide opinions and testify about merits-based issues of materiality, loss causation, and damages. In addition, based on his damages models, Professor Feinstein provided assistance in formulating the Plan of Allocation for the Settlement.

(ii)    Kalorama Partners: $83,312.50. Through Kalorama Partners, Lead Counsel retained the services of Harvey L. Pitt, former chairman of the SEC, to provide opinions regarding practices and understandings with respect to audits, expected procedures and processes of auditor selection, and auditor independence. Mr. Pitt provided an expert report in this matter.

(e)    Online Legal and Financial Research: $15,898.78. This category includes vendors such as LexisNexis Products, Refinitiv, Thomson Financial, and Westlaw. These resources were used to obtain access to SEC filings, factual databases, legal research, and for proofreading and "blue-booking" court filings (including checking all legal authorities cited and quoted in briefs). This category represents the expenses incurred by Robbins Geller for use of these services in connection with this Action. The charges for these vendors vary depending upon the type of services requested. For example, Robbins Geller has flat-rate contracts with some of these providers for use

- 31 -

4891-5591-3283.v2

of their services.  When Robbins Geller utilizes online services provided by a vendor with a flat-rate contract, access to the service is by a billing code entered for the specific case being litigated.  At the end of each billing period in which such service is used, Robbins Geller's costs for such services are allocated to specific cases based on the percentage of use in connection with that specific case in the billing period.  As a result of the contracts negotiated by Robbins Geller with certain providers, the Class enjoys substantial savings in comparison with the "market-rate" for *a la carte* use of such services which some law firms pass on to their clients.  For example, the "market-rate" charged to others by LexisNexis for the types of services used by Robbins Geller is more expensive than the rates negotiated by Robbins Geller.

       (f)    Mediation Fees (Phillips ADR Enterprises, P.C.): $27,875.25.  David Murphy is a nationally recognized mediator of complex securities class actions.  The parties retained Mr. Murphy to oversee the mediation of this case.  The parties accepted a mediator's recommendation to settle the Action after hard-fought litigation and protracted negotiations with the help of Mr. Murphy.

## V.   PLAINTIFFS SEEK AWARDS PURSUANT TO 15 U.S.C. §78u-4(a)(4) BASED ON THEIR REPRESENTATION OF THE CLASS

121.   The PSLRA limits a class representative's recovery to an amount "equal, on a per share basis, to the portion of the final judgment or settlement awarded to all other members of the class," but also provides that "[n]othing in this paragraph shall be construed to limit the award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of a class."  15 U.S.C. §78u-4(a)(4).

122.   Here, as explained in the Ostrander, Heimroth, and Nanno declarations, attached hereto as Exhibits A, B, and C, Plaintiffs are seeking awards of $3,150 (Local 13 Funds), $4,800

(Local 7 Funds), and $4,800 (Local 267 Fund) for their time related to their active participation in the Action. *See* Ostrander Decl., ¶¶7-8; Heimroth Decl., ¶¶7-8, and Nanno Decl., ¶¶7-8.

123.    Many courts, including those in this Circuit, have approved reasonable payments to compensate plaintiffs for the time and effort they devoted to pursuing claims on behalf of a class. Plaintiffs here dedicated time and effort to interfacing with counsel, monitoring the investigation, reviewing documents before and after filing (as necessary), supervising the mediation process and negotiations, reviewing updates and factual developments, preparing for and sitting for depositions, and otherwise assisting counsel, as asked. Simply put, without their involvement in this Action and their contributions to date, there would be no recovery for the Class. As such, Lead Counsel respectfully submits that the Court should grant Plaintiffs' requested awards in their entirety.

## VI.    CONCLUSION

124.    For the reasons set forth above and in the accompanying memorandum of law, I respectfully submit that: (i) the Settlement is fair, reasonable and adequate, and should be finally approved; (ii) the Plan of Allocation represents a fair method for the distribution of the Net Settlement Fund among Authorized Claimants and should also be approved; and (iii) the application for an award of attorneys' fees of 25% of the Settlement Amount and expenses of $455,832.33, with interest thereon earned at the same rate as the Settlement Fund, plus awards of $12,750 in the aggregate to the Plaintiffs, should be granted in its entirety.

I declare under penalty of perjury that the foregoing is true and correct. Executed in Melville, New York, this 16th day of December, 2022.

/s/ Robert M. Rothman
ROBERT M. ROTHMAN

- 33 -

4891-5591-3283.v2

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on December 16, 2022, I authorized a true and correct copy of the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.

*/s/ Robert M. Rothman*
ROBERT M. ROTHMAN

ROBBINS GELLER RUDMAN
& DOWD LLP
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
Email: rrothman@rgrdlaw.com
